Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~

5   XEROX STATE &

6   LOCAL SOLUTIONS, INC.,

7

8              Plaintiff,

9

10       vs.              Case No.  1:15CV1707

11

12  CITY OF CLEVELAND, OHIO,

13

14          Defendant.

15            ~~~~~~~~~~~~~~~~~~~~~

16              Deposition of

17           MARTIN L. FLASK

18             CONFIDENTIAL

19

              April 8, 2016

20             9:30 a.m.

21            Taken at:

           Baker Hostetler LLP

22      127 Public Square, Suite 2000

           Cleveland, Ohio

23

24     Christine M. Emery, Notary Public

25

Page 2

1    APPEARANCES:

2          On behalf of the Plaintiff:

3                Baker Hostetler LLP, by

4                TERRY M. BRENNAN, ESQ.

5                SAM CAMARDO, ESQ.

6                127 Public Square, Suite 2000

7                Cleveland, OH  44114

8                216-861-7485

9                tbrennan@bakerlaw.com

10                scamardo@bakerlaw.com

11

12          On behalf of the Defendant:

13                City of Cleveland Department of

14                Law, by

15                JILLIAN L. DINEHART, ESQ.

16                CONNOR NATHANSON, ESQ.

17                601 Lakeside Avenue, Room 106

18                Cleveland, OH  44114

19                216-664-3559

20                jdinehart@city.cleveland.oh.us

21                cnathanson@city.cleveland.oh.us

22                      ~ ~ ~ ~ ~

23    ALSO PRESENT:

24                Wes Wadle (telephonically)

25                      ~ ~ ~ ~ ~

1                          TRANSCRIPT INDEX

2

3        APPEARANCES................................    2

4

5        INDEX OF EXHIBITS ......................  4

6

7        EXAMINATION OF MARTIN L. FLASK

8        BY MR. BRENNAN............................    5

9

10       REPORTER'S CERTIFICATE....................  115

11

12       EXHIBIT CUSTODY

13       EXHIBITS RETAINED BY THE COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS

2    NUMBER            DESCRIPTION            MARKED

3    Exhibit 1    License and Service .......... 12
                  Agreement

4

     Exhibit 2    Notice of Deposition.......... 19

5

     Exhibit 3    Calendar Entry, Document ..... 62

6                 CL019

7    Exhibit 4    NPR Article................... 91

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          MARTIN L. FLASK, of lawful age, called

2     for examination, as provided by the Federal

3     Rules, being by me first duly sworn, as

4     hereinafter certified, deposed and said as

5     follows:

6               EXAMINATION OF MARTIN L. FLASK

7     BY MR. BRENNAN:

8          Q.     Good morning, Mr. Flask.

9          A.     Good morning.

10         Q.     As I introduced myself off the

11    record, my name is Terry Brennan.  I, along

12    with Sam Camardo, who is here with me, are

13    attorneys representing Xerox in the lawsuit

14    that has been filed by Xerox against the City

15    of Cleveland in Federal District Court in the

16    Northern District of Ohio, in which Xerox is

17    seeking monies pursuant to a contract between

18    Xerox and the City of Cleveland.

19               You understand that you are here

20    today to have your deposition be taken?

21         A.     Yes, I understand.

22         Q.     For purposes of the record, if you

23    could just, please, state your full name and

24    spell your last name for the record?

25         A.     Martin, middle initial L, last name

Page 6

1   is Flask, F-L-A-S-K.

2        Q.    And, sir, what is your current

3   residential address?

4        A.    Is it relevant to this?

5        Q.    It is.  There may be a point in

6   time where we need to subpoena you to testify

7   at trial.

8        A.    So the purpose of my residence is

9   for potential subpoena purposes only?

10        Q.    Correct.  And we have a protective

11   order in the case so nobody is planning on

12   sharing what is public information outside of

13   attorneys.

14            MS. DINEHART:  We'll object to the

15   extent that he used to be a former police

16   officer and he was subpoenaed, subject to the

17   subpoena, through the City of Cleveland and he

18   is here.

19            MR. BRENNAN:  Understood.

20        Q.    But, sir, there could be a point

21   where your relationship between now and the

22   time of the trial terminate.  Either because

23   you resigned from the City of Cleveland or you

24   are terminated from the City of Cleveland and

25   we would have to serve you with the subpoena

Page 7

1    directly.

2         A.    Or retire from the City of

3    Cleveland.

4         Q.    Or retire, which would be

5    fantastic.

6              So we are just asking for your

7    residential address.  Again, we have a

8    protective order, we are not planning on

9    sharing it with anyone.

10   **THE FOLLOWING IS DEEMED CONFIDENTIAL AND FOR

11   ATTORNEYS' EYES ONLY**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1    A.    It's ███ ██████ ████████████

2    █████  in Macedonia, ████████

3    **END OF CONFIDENTIAL PORTION OF TRANSCRIPT**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1      Q.      And do you have any plans to -- are

2   you in the process of moving or do you have any

3   plans to change that address?

4      A.      No, I do not.

5      Q.      Okay.  And I trust that you have

6   testified hundreds of times?

7      A.      Yes.

8      Q.      How many times have you testified

9   in a civil deposition?

10     A.      Several dozen, I would say.

11     Q.      And of those several dozen, have

12  those all been in the capacity as the director

13  of public safety or were they chief of police

14  and other capacities?

15     A.      Other capacities other than

16  director of public safety, as chief of police,

17  or in my roles within the Cleveland Division of

18  Police.

19     Q.      And asking for an estimate, don't

20  need the exact number, but how many times have

21  you testified in a civil deposition wearing the

22  hat as the director of public safety?

23     A.      Less than five.

24     Q.      And I take it from those

25  experiences you are generally familiar with the

Page 10

1   rules of a deposition and how a deposition

2   takes place?

3        A.    Yes, sir, I am.

4        Q.    But just so there's no confusion

5   and so that attorneys who have deposed you in

6   the past may have had different rules, I just

7   want to make sure we have a common

8   understanding, so I am going to briefly review

9   those, if that makes sense to you.

10       A.    I understand.

11       Q.    I'm going to be asking you a series

12  of questions.  We have a stenographer here, who

13  is going to be taking down the answers.  She

14  can only take down oral answers and she can

15  only take verbal answers.  So, in other words,

16  uh-huh will not get transcribed.  A nod of the

17  head, a shrug of the shoulders won't get

18  transcribed.  Do you understand that?

19       A.    Yes, I do.

20       Q.    It's also important -- I may ask

21  questions that take longer than I would prefer

22  to have them take.  So if you could wait until

23  I have completed a question before you provide

24  a response it will make for a clearer record.

25       A.    Understood.

Page 11

1          Q.     Okay.  Not to be a modest, but I
2    think I'm generally more or less okay about
3    asking questions that are clear, but if there
4    is ever a point in time where you don't
5    understand a question, would you, you know,
6    provide me the courtesy of letting me know, I
7    don't know what you are asking, and I will try
8    to rephrase or clarify the question?
9          A.     I will.
10          Q.     Today is not an endurance test.
11    You have been designated on only a few topics
12    that I think are relatively non-controversial.
13    So I don't expect us to go all day.  Okay?
14    That being said, I think we will probably take
15    a break every hour.  If you need a break less
16    than every hour or otherwise, just let us know
17    and we will take a break.  The one caveat to
18    that is, if there is a pending question, I'm
19    going to need you to respond to that question
20    before we go ahead and take a break.  Do you
21    understand that?
22          A.     Understood.
23          Q.     Okay.  Do you have any questions
24    about the deposition at all?
25          A.     No, sir.

Page 12

1      Q.    Okay.  And you are aware that Xerox

2  did file a lawsuit in federal district court in

3  front of Judge Polster seeking monies under a

4  contract?

5      A.    I am aware.

6      Q.    And are you aware that the contract

7  was effective in June of 2013?

8      A.    I do not know the specific dates,

9  but I do recall that it was 2013.

10      Q.    Okay.  And I will show you --

11          MR. BRENNAN:  If I can please get

12  an exhibit sticker.

13      Q.    I am not here to hide the ball, so

14  marking for purposes of identification as

15  Plaintiff's Exhibit 1.

16              -   -   -   -   -

17          (Thereupon, Plaintiff's Exhibit 1,

18          License and Service Agreement, was

19          marked for purposes of

20          identification.)

21              -   -   -   -   -

22      Q.    And while you're reviewing it, just

23  for purposes of the record, it's a document,

24  the front page of which bears the label Exhibit

25  A, and it's now been marked with a sticker,

Page 13

1   Plaintiff's Exhibit 1.  But if you look in the

2   upper right-hand corner of the document it is

3   page ID number 67, and it continues through

4   page ID number 103.

5              Do you have the same document in

6   front of you, sir?

7        A.    Yes, sir, I do.

8        Q.    Okay.  And do you recognize this

9   document to be the contract executed between

10  Xerox and the City of Cleveland, which, if you

11  turn to the beginning of the agreement --

12       A.    I believe that it is, although I

13  have not seen it since 2013.

14       Q.    Okay.

15       A.    I believe this is a contract

16  between the City and Xerox.

17       Q.    Okay.  And if you -- page number

18  70, again, if you go on the upper right-hand

19  corner of the document, it's a document

20  effective June 1st, 2013, do you see that on

21  the first and second lines of the contract?

22       A.    Yes, I do.

23       Q.    Okay.  And if you turn to, again,

24  following those numbers, page ID number 89, you

25  have that in front of you, sir?

Page 14

1          A.     Yes, sir, I do.

2          Q.     And does that page bear your

3    signature?

4          A.     My signature, both printed and

5    script, dated June 27th, 2013.

6          Q.     Okay.  And you signed this contract

7    on behalf of the City of Cleveland?

8          A.     Yes, sir, I did.

9          Q.     In your capacity as the director of

10   public safety?

11         A.     Yes, sir.

12         Q.     And moving forward through the

13   document.  You see various schedules?

14              MS. DINEHART:  Can you reference a

15   page ID number, Terry?

16         Q.     Well, if you turn the page there,

17   there's an exhibit for compensation, then if

18   you turn, starting at page number -- ID number

19   93, do you see that there's a schedule for list

20   of sites?

21         A.     Schedule A, list of sites,

22   equipment to be deployed.

23         Q.     Okay.  If you turn to 96, schedule

24   B, project implementation schedule?

25         A.     Yes, sir, I see it.

1      Q.    Page 97, schedule C, processing

2   timeline?

3      A.    Yes, sir.

4      Q.    Okay.  And then if you turn to the

5   following page, page ID number 98, it's

6   amendment number one to the license and service

7   agreement by and between Xerox and the City of

8   Cleveland.  Do you see that?

9      A.    Yes, sir, I do.

10     Q.    Okay.  You were aware that there

11  was an amendment to the contract we just

12  reviewed?

13     A.    I recall there was an amendment.

14     Q.    Okay.  And if you move forward a

15  few pages to page ID number 103.  Again, same

16  question, you signed the amendment on behalf of

17  the City of Cleveland?

18     A.    Yes, sir, I did.  August 23rd,

19  2013.

20     Q.    Again, in the same capacity as the

21  safety director?

22     A.    Director of public safety for the

23  City of Cleveland.

24     Q.    That is not a title you currently

25  have?

Page 16

1          A.      No, I do not.

2          Q.      And what was the tenure of that

3     title in that position?

4          A.      I served as director of public

5     safety from January 1st, 2006 to February 10th,

6     2014.

7          Q.      So at the time -- is it fair to --

8     for purposes of the deposition, so we are

9     talking about the same frame, when I refer to

10    the contract, I'm going to be referring to the

11    document you originally signed, dated June

12    2013.  And when I talk specifically about the

13    amendment, if I do, I'm going to be talking

14    about the last few pages that we just reviewed,

15    signed in August of 2013.  Does that make

16    sense?

17         A.      Understood.

18         Q.      But you understand that both items

19    together became the contract between the City

20    of Cleveland and Xerox?

21         A.      Yes, sir, I understand.

22         Q.      And the reason you signed, both the

23    contract and the amendment on behalf of the

24    City of Cleveland, is because this was a

25    contract that was designed to further public

Page 17

1    safety; correct?

2        A.    That's correct.

3        Q.    In other words, if this were a

4    contract that was designed for financial

5    purposes or for the parks department, somebody

6    else would have signed it, but you signed it

7    because this contract was primarily designed

8    for public safety?

9        A.    That's correct.

10       Q.    Okay.  I hate to ask obvious

11   questions, but as the director of public

12   safety, is it fair to say that your primary

13   goal was to ensure the safety of the residents

14   of the City of Cleveland, as well as visitors,

15   whether those visitors are visitors who commute

16   here for work or otherwise?

17       A.    That certainly was part of my

18   duties and responsibilities.

19       Q.    Was that your primary duty and

20   responsibility, to ensure safety?

21       A.    I provided executive oversight to

22   both the divisions of police and fire and

23   administrative oversight of emergency medical

24   services, kennels, the division of corrections,

25   the office of professional standards and the

Page 18

1    office of emergency management.

2              So combined together it was a

3    multitude of duties and responsibilities, but

4    safety was the key word in my duties.

5         Q.    Correct.  That's your primary goal,

6    to ensure safety?

7         A.    Yes.

8         Q.    It was?

9         A.    Yes, sir, that's correct.

10         Q.    Okay.  And are you aware today that

11    you are testifying in two different capacities?

12    One capacity in what's called a 30(b)(6)or in

13    lay terms you will be testifying as the

14    representative of the City of Cleveland.

15    There's a federal rule of civil procedure that

16    allows an organization to designate the person

17    who has the most knowledge or all the knowledge

18    available on behalf of the organization and

19    that person will, in essence, give answers as

20    the voice of the City of Cleveland.  Do you

21    understand that you are testifying in that

22    capacity today?

23         A.    I understand that I'm testifying as

24    a representative of the City of Cleveland, but

25    I do not believe that I alone have insight and

Page 19

1    knowledge of all aspects of the contract or the

2    agreement.

3         Q.    No.  And we will break that down a

4    little bit.

5              You have been designated as a

6    (30)(b)(6) witness on a very few number of

7    limited topics.  You are not being asked to

8    testify about everything that might be at issue

9    in the litigation.

10             Do you understand that you have

11   been designated on a few particular topics to

12   be the voice of the City of Cleveland?

13        A.    That's my understanding.

14        Q.    Okay.  And it might help if I show

15   you the notice of deposition.

16                   -   -   -   -   -

17             (Thereupon, Plaintiff's Exhibit 2,

18             Notice of Deposition, was marked for

19             purposes of identification.)

20                   -   -   -   -   -

21        Q.    While I'm marking this, you also

22   understand that you will be giving deposition

23   testimony as a fact witness?  In other words,

24   you are going to bear the responsibility of

25   testifying as the voice and the knowledge of

Page 20

1   the City of Cleveland. You will be only

2   testifying as to things you personally know and

3   are aware of.

4          A.    I understand.

5          Q.    Okay. Showing you what's been

6   marked for purposes of identification

7   Plaintiff's Exhibit 2, which is a document

8   titled, rule 30(b)(6), notice of deposition for

9   City of Cleveland.

10              Do you have that document before

11  you, sir?

12         A.    Yes, sir, I do.

13         Q.    And if you turn to page two of the

14  document, which bears the heading, matters for

15  examination.

16         A.    I'm sorry, can you -- which page?

17         Q.    Page two?

18         A.    Page two. Yes, sir, I'm there.

19         Q.    Do you understand that for item

20  numbers two, three and five of this matter for

21  examination, you have been designated the

22  representative for the City of Cleveland?

23         A.    Yes, sir, I do.

24         Q.    Okay. Are you prepared today to

25  testify on those topics?

Page 21

1          A.      I can testify to the best of my
2    knowledge and memory.
3          Q.      As well as the City of Cleveland's
4    knowledge and memory?
5          A.      That's correct.
6          Q.      And, sir, what did you do to
7    prepare yourself to be able to testify on
8    behalf of the City of Cleveland on these three
9    topics?
10         A.      I reviewed my calendar of meetings
11   that I had, as well as having conversations
12   with attorneys of the Department of Law of the
13   City of Cleveland.
14         Q.      Okay.  Other than attorneys on
15   behalf of the City of Cleveland, did you speak
16   with anyone else to prepare yourself to testify
17   on these three topics?
18         A.      I had a brief conversation with
19   project manager Larry Jones II.
20         Q.      When did you have that conversation
21   with Mr. Jones?
22         A.      I believe Wednesday of this week.
23   Wednesday of this week.
24         Q.      Two days?  Okay.
25         A.      Yes, that's correct.

Page 22

1      Q.    Okay.  And I want to talk a little
2  bit more about that conversation.  You reached
3  out to him?
4      A.    I did.
5      Q.    And what did you say to Mr. Jones?
6      A.    I asked him for the number of
7  respondents that we had to the request for
8  proposals.  I remember the names of the
9  businesses that did respond to our request for
10  proposals, but I didn't have a memory of how
11  many actually responded to our RFP.
12      Q.    And did you tell him you were
13  asking this question because you were going to
14  be giving deposition testimony?
15      A.    Yes.  Yes, sir, I did.
16      Q.    Okay.  And was this a telephonic
17  communication or in person?
18      A.    No, it was telephone.
19      Q.    And what was Mr. Jones's response?
20      A.    He reminded me that there were five
21  respondents to the RFP.
22      Q.    And, again, the respondents to the
23  RFP -- RFP are a request for proposal?
24      A.    That's correct.
25      Q.    For the -- what we are calling the

1  2013 contract or the contract that's at issue

2  in the litigation?

3  　　　　A.　　Yes, sir, that's correct.

4  　　　　Q.　　Who were the respondents?

5  　　　　A.　　Redflex, KTS, Xerox, CATS CO, and

6  one -- one additional vendor.

7  　　　　Q.　　Okay.　The name of whom just eludes

8  you right now?

9  　　　　A.　　I don't recall at this moment.

10  　　　　Q.　　Okay.　But Mr. Jones did provide

11  you with the name of --

12  　　　　A.　　That's correct.

13  　　　　Q.　　-- the names of all five?

14  　　　　A.　　That's correct.

15  　　　　Q.　　Was there anything else to the

16  conversation or just simply quick and --

17  　　　　A.　　I don't think the conversation

18  lasted more than three to five minutes, if I

19  remember correctly.　It was a brief

20  conversation.

21  　　　　Q.　　What else was discussed during that

22  conversation?

23  　　　　A.　　Oh, I asked him who specifically --

24  I did ask him the second question, who

25  specifically sat on the review team to review

Page 24

1    the request for proposals.

2         Q.    On behalf of the City of Cleveland?

3         A.    City of Cleveland and the Clerk of

4    Courts' office.

5         Q.    Okay.  Did he provide you a

6    response to that question?

7         A.    He reminded me that there were

8    three representatives from the City of

9    Cleveland, three from the office of Clerk

10   Turner and himself.

11        Q.    Who were the three from -- on

12   behalf of the City of Cleveland?

13        A.    I do not know.  We didn't -- I

14   didn't discuss that with him.

15        Q.    He just identified the quantity of

16   folks rather than their identity?

17        A.    Yes, that's correct.

18        Q.    Okay.  Separate and apart from what

19   he told you, do you remember who was there on

20   behalf of the City of Cleveland at the time?

21        A.    (Pause.)

22        Q.    In other words, as I understand

23   your testimony, there were seven folks who were

24   deciding who is going to get this contract;

25   right?

Page 25

1      A.    There were seven individuals that
2   were evaluating the responses for the requests
3   for proposals.
4      Q.    Okay.  And who do you recall
5   wearing the City of Cleveland hat being one or
6   more of those folks?
7      A.    Larry Jones II.
8      Q.    Do you recall the two other
9   representatives?
10      A.    There were three additional
11   representatives from the City, I do not recall
12   their names.
13      Q.    Were you one of the
14   representatives?
15      A.    No, I wasn't.
16      Q.    So, in other words, you were not
17   one of the folks reviewing the responses, five
18   RFP responses, in deciding, hey, I should rank
19   this one first or I want --
20      A.    No, I did not.
21      Q.    Okay.  Do you recall who, if
22   anyone, on behalf of the clerks of courts had
23   that responsibility at the time?
24      A.    I do not know the specific names.
25   Other than the fact that there were three

1    representatives.

2         Q.    Okay.  And do you know who made the

3    determination, first, how many people would be

4    involved in reviewing the responses and,

5    secondly, who would compromise -- who would

6    compose that committee?

7         A.    I do not recall.

8         Q.    Okay.  And just to be clear, it was

9    not your decision, we need X number of people

10   to review the responses or the composition of

11   the committee should be these folks, that was

12   not your -- your bailiwick?

13        A.    There may have been a

14   recommendation made, but I do not recall who

15   made the recommendation or the composition

16   itself, how that structure was designed.

17        Q.    Okay.  Do you know why the Clerk of

18   Courts would participate in this type of review

19   process?

20        A.    Well, the clerks of courts in their

21   role handles all the buying structures,

22   payments, in a relationship between public

23   safety and, specifically, the Division of

24   Police and the Clerk of Courts was integrated

25   so that -- so the traffic camera enforcement

Page 27

1  program really was broader than just the
2  cameras and the police force.  It involved the
3  Clerk of Courts.
4        Q.    Because they are the folks that
5  have to process the actual tickets that are
6  issued and the payments that come in as a
7  result of the tickets?
8        A.    That's at least a portion of their
9  duties and responsibilities, certainly.
10       Q.    Okay.  As well as monitoring the
11  docket and dealing with filings and other
12  responsibilities?
13       A.    That's right.
14       Q.    You understand that the contract we
15  have been talking about is not the first
16  contract the City of Cleveland had for traffic
17  enforcement; correct?
18       A.    The first contract goes back to
19  2005, if I remember correctly.
20       Q.    And with whom did the City of
21  Cleveland enter into that contract with?
22       A.    I believe it was ACS.
23       Q.    And do you know where they are
24  located out of?
25       A.    No, I do not.

1    Q.    And did there come a point in time
2  where ACS stopped being the provider for
3  traffic enforcement for the City of Cleveland?
4    A.    I believe there was a name change,
5  but the timeline for that change is unclear.  I
6  don't recall.
7    Q.    Okay.  ACS became Xerox?
8    A.    That's my understanding.
9    Q.    Okay.  Do you know how many
10  different contracts from the first time the
11  City of Cleveland entered into a contract for
12  traffic camera enforcement until the present
13  the City entered into?
14    A.    I remember appearing before
15  Cleveland City Council in 2011 asking Council
16  for an extension of the current contract with
17  ACS.  And the City Council did approve that
18  contract extension sometime in 2011.
19    Q.    So it is your understanding that
20  there was a contract approximately 2005, an
21  extension in 2011, and this contract in 2015?
22    A.    That's correct.
23    Q.    And do you know whether the
24  composition of the people who are making the
25  decision or at least the recommendation to

Page 29

1    enter into a contract was the same in 2005 as
2    it was in 2013?
3         A.    The 2005 contract was entered into
4    by the administration of then Mayor Jane
5    Campbell.  Whether or not there were any
6    individuals that were involved in that original
7    agreement in 2005 to the 2011 extension, I'm
8    not aware of any.
9         Q.    Were the titles largely the same,
10   regardless of the individual folks who were
11   holding that title?  In other words, there were
12   people from the City of Cleveland, there were
13   people from the Clerk of Courts, and Mr. Jones
14   or his predecessor was involved?
15              MS. DINEHART:  Objection to the
16   extent he said he was not sure.
17        A.    I don't recall.  Not that I don't
18   recall.  I don't know.
19        Q.    Okay.  Were you involved in the
20   issuance of the original contract at ACS?
21        A.    In 2005?
22        Q.    Correct.
23        A.    No, sir.
24        Q.    But you were involved in the
25   renewal in 2011?

Page 30

1      A.      Yes, sir, I was.

2      Q.      And did you make the recommendation

3  that the renewal should take place?

4      A.      I did make a recommendation for a

5  renewal extension to take place to allow the

6  department of public safety to prepare a

7  request for proposals to explore the

8  feasibility of whether or not, number one, to

9  continue the program, number two, whether or

10 not to identify new technology that might be

11 available.

12          So when we asked for the extension

13 in 2011, I made a commitment, as did the City,

14 to develop the request for proposals and seek

15 additional services or other services.

16     Q.      And did that go out through an RFP

17 in 2011?

18     A.      I believe it was distributed in

19 November of 2012.  A request for proposals was

20 developed and distributed to vendors, potential

21 vendors, I think, in November of 2000 -- well,

22 it was late 2012.

23     Q.      And just like the 2013 contract,

24 did more than one vendor respond to that RFP?

25     A.      That was the RFP that we are

Page 31

1   talking about, the five vendors we are talking

2   about included Redflex, I think it was ATC, the

3   names of the five companies escape me right

4   now.

5        Q.    Okay.  And just to be clear, so at

6   the time the extension took place in 2011,

7   there was no RFP at that point in time?

8        A.    There was not.  None had yet been

9   developed.

10       Q.    Okay.  And having been through the

11  relationship with ACS, you made the

12  recommendation to whom that the contract should

13  be extended between ACS and City of Cleveland?

14       A.    I had conversations with the

15  current finance director, Sharon Dumas, our

16  staff, including the Chief of Police, project

17  coordinator, Larry Jones, and made a

18  recommendation to Cleveland City Council.

19       Q.    To continue the relationship with

20  ACS?

21       A.    For a period of two years, if I

22  remember correctly.

23       Q.    And what factors did you consider

24  at that point in time to determine whether or

25  not to continue that relationship?

1     A.     I thought the program had value.

2   And I believe that ACS was providing good

3   service to the City of Cleveland.  But we also

4   recognized at that time that technology had

5   moved along to the point where there were other

6   options and opportunities available to the City

7   of Cleveland in terms of the traffic

8   enhancement camera program that needed to at

9   least be considered.

10          The system that originally had been

11  installed was in 2005, in my opinion, was ahead

12  of others, was dated and could and should be

13  enhanced.

14     Q.     And when you refer to value, you

15  are not talking about economic value, you are

16  talking public safety value?

17     A.     I'm specifically talking about

18  public safety value.  I was familiar with the

19  trend, enforcement efforts, accident rates,

20  within the City of Cleveland.  And I believe,

21  in my opinion, and I made the argument it had

22  value to the residents.

23     Q.     For the extension, were you

24  involved at all in dealing with Xerox directly

25  about -- or ACS about negotiating the extension

Page 33

1   or talking about what technology could be

2   improved as part of the extension?

3        A.    I don't recall having a specific

4   role in those discussions, although I may have

5   been involved at some level of conversation.  I

6   don't believe that I personally was involved in

7   that, discussions with the vendor at that time.

8        Q.    Okay.  But fair to say as of 2011

9   you were satisfied with the work that ACS and

10  Xerox had done on behalf of the City of

11  Cleveland, recognizing you are always looking

12  for improvement?

13       A.    I believe that the service that

14  they provided, in my opinion, was very good,

15  very responsive, other than a few minor issues

16  that were identified.  The service that they

17  provided, in my opinion, was very good.

18       Q.    You've indicated that as part of

19  your preparation to testify on behalf of the

20  City of Cleveland you reviewed your calendar?

21       A.    Yes, sir.

22       Q.    Is that a paper calendar or an

23  electronic calendar?

24       A.    I looked at my most re -- when I

25  moved from public safety to the Office of the

Page 34

1   Mayor in February of 2010, I was able -- in

2   2014, I was able to look at the data that I

3   currently have available regarding

4   conversations and dates and so forth.  I did

5   not have access to the information prior to

6   2014, other than just a few, because different

7   systems, different servers.  I just didn't have

8   access.

9       Q.   Okay.  So in preparing for your

10  testimony today, you were only able to review

11  calendar information --

12      A.   Calendar information, there was a

13  short period of time in 2013 and 2014, up to

14  the current time.

15           MS. DINEHART:  Please, let him

16  finish the question.

17           THE WITNESS:  I'm sorry.  Okay.

18      Q.   Yeah, we are getting into -- I can

19  speak fast on occasion, I have been warned by

20  stenographers before.  I will try to measure it

21  here.

22           Again, you have reviewed an

23  electronic calendar, not a paper calendar?

24      A.   Electronic.

25      Q.   Do you know at what point in time

Page 35

1   that calendar started for purposes of your

2   review?

3        A.    Around September of 2013.

4        Q.    Okay.  And the program the City

5   uses is Microsoft Outlook?

6        A.    Yes, that's correct.

7        Q.    Okay.  And is it your practice,

8   when you make a calendar entry, to sometimes

9   put a narrative on that calendar entry?

10       A.    Yes, it is.

11       Q.    So, in other words, some people put

12  a calendar entry that says, for example,

13  deposition from 9:30 a.m. to X p.m. and just

14  leave it at that.  Was it more your practice to

15  put a calendar entry that would say, I had a

16  conversation with so and so and this is what we

17  discussed?

18       A.    It depends.  If it was an

19  appointment for a deposition like today, my

20  calendar would just articulate the fact that

21  I'm scheduled to be here from 9:30 to some

22  period of time without any details.

23            If I had a conversation with

24  someone and I thought it was worthy or

25  important to maintain a record, I would make a

Page 36

1  narrative section.  I would provide a

2  narrative.

3      Q.    And you would do that after the

4  fact; correct?

5      A.    Generally after the fact, that's

6  correct, or I would update my calendar.

7      Q.    So, in other words, as opposed to a

8  lot of folks using a calendar as a prospective

9  measure, you would, in essence, use the

10 calendar as kind of a diary of what happened

11 and what occurred during a conversation?

12     A.    Both.

13     Q.    Both?

14     A.    (Witness nodding affirmatively.)

15     Q.    Okay.  Fair enough.

16         Did you review any e-mails in

17 preparation for the testimony today on behalf

18 of the City of Cleveland?

19     A.    One or two e-mails.  If I -- one or

20 two.  And they involved, 2013, developing a

21 messaging for the traffic enforcement camera

22 system, the benefit that it had for the City of

23 Cleveland.

24         I remember working with Xerox to

25 create a message, its value, in terms of

Page 37

1    accident reduction and enforcement of speed

2    reduction and quality of life in the City of

3    Cleveland.  I remember at least one

4    conversation with a representative of Xerox in

5    that regard.

6         Q.    Is this because there was a

7    potential ballot initiative that might

8    negatively impact the traffic program?

9         A.    In 2013 I wasn't aware of any

10   ballot initiative.  The legislation had been

11   enacted by Cleveland City Council and we were

12   looking at, you know, this is good for the

13   citizens of Cleveland, thus created a more

14   timely message to the citizens on its value.

15   And that was around -- between September and

16   December of 2013.

17        Q.    Why were you doing that at that

18   point in time if the program had been in place

19   for approximately eight years?

20        A.    Well, there was significant

21   enhancement to the program.  We had an

22   increased number of traffic cameras located

23   throughout the City of Cleveland.  We had

24   increased flexibility with the mobility, with

25   the mobile traffic enforcement cameras, and we

Page 38

1   had the opportunity to use the cameras as
2   surveillance for the Division of Police.
3              These were options and
4   opportunities that weren't available to us
5   before the new contract.
6        Q.    But, in other words, would you need
7   to message to the electorate unless you viewed
8   there to be some potential exposure to the
9   Traffic Camera Program or was this simply just
10  PR?
11       A.    Well, it was PR, but it was safety
12  messaging.  First alert people, of course, we
13  had to make a notice to the public about where
14  the cameras were located.  That was a
15  requirement that we do so.
16             So that was part of the message,
17  that we had increased the number of the traffic
18  cameras, this is where they are located, put it
19  on the City's website, what's the value of the
20  program.  All of those things were done, not
21  only to messaging, but to be in compliance with
22  the legislation that was enacted by the
23  Cleveland City Council.
24       Q.    And with whom did you speak at
25  Xerox about those topics?

1      A.    You know, I spoke with Larry Jones,

2   again, who interacted or help facilitate with

3   someone from Xerox, but I don't recall whom.

4      Q.    Okay.  And what specifically do you

5   recall doing to message to the electorate the

6   benefits of the Traffic Camera Program at that

7   time?

8      A.    It was -- I worked with then

9   director of communications, Maureen Harper,

10  H-A-R-P-E-R, put some media advisories.  I know

11  it was put on the City's website.

12           At that time we had a safety blog,

13  a blog.  It was called CLE Safety, that we

14  posted.  And we shared it with members of

15  Council and others.

16     Q.    Okay.  Do you recall giving any

17  speeches on the topic of the benefits of the

18  Traffic Camera Program at that time?

19     A.    I do not recall it, during my

20  tenure as safety director, ever -- other than

21  testimony in front of City Council or maybe a

22  media inquiry, which I might be responsive to.

23  I do not recall ever giving any public

24  presentation on the program itself.

25     Q.    Okay.  Just stepping back to your

Page 40

1    role as a representative on behalf of the City

2    of Cleveland, have you testified to everything

3    you recall discussing between yourself and

4    Larry Jones earlier this week?

5         A.    Yes, sir.

6         Q.    And you spoke with your counsel as

7    well?

8         A.    That's right.

9         Q.    I don't want to know things you

10   discussed with your counsel about strategy or

11   otherwise, but as a result of preparing for

12   your 30(b)(6) testimony today, did you learn

13   new facts over the course of the past few weeks

14   that you didn't know prior to 2016?

15        A.    I learned that there were five

16   respondents to the RFP, where my memory

17   originally had suggested three.

18        Q.    Okay.

19        A.    I learned -- that was one thing

20   that I did, in fact, learn.  And I did learn

21   the number of individuals that was actually

22   participating in the review of the request for

23   proposals.  That it was seven individuals,

24   three from the clerk, three from the City of

25   Cleveland and Larry Jones II.

Page 41

1      Q.     Okay.  What you just testified to,

2 those are the only facts you're aware of today

3 that you wouldn't have been aware of in 2015 or

4 the end of 2014?

5      A.     No, sir, that's -- those that I

6 just identified are that which I actually

7 recall in my memory rather than learn, but

8 that's correct.

9      Q.     Okay.

10      A.     Yeah.

11      Q.     We had a double negative in there,

12 but you agree with my statement?

13      A.     Yes, I did.

14      Q.     Okay.  Is it fair to say, and I

15 think you have already testified to this, that

16 the City of Cleveland implemented the Traffic

17 Camera Program to enhance public safety?

18      A.     I believe that's the motive.

19      Q.     That was certainly your motive as

20 the director of public safety?

21      A.     I knew that the revenue stream,

22 although it was significant, it only

23 represented about one percent of the City's

24 annual operating budget.  So, you know, one

25 percent is -- although the dollar amount seems

Page 42

1   high, the real impact, in my opinion, was on

2   public safety.

3        Q.    And when you are talking about one

4   percent, at the time frame we are talking about

5   during the existence of the contract that's at

6   dispute in the litigation, your annual budget

7   was approximately 500 million dollars?

8        A.    525 to 550, depending on the year.

9        Q.    So the Traffic Camera Program was

10  generating approximately 5 million dollars or

11  less on an annual basis?

12       A.    The number fluctuated, actually

13  decreased through the years, but if I remember,

14  from 2013 it was 5 point 2 million dollars.

15       Q.    Is it fair to say, as the director

16  of public safety, you viewed the decrease in

17  revenue as actually, which may be

18  counterintuitive, a positive development?

19       A.    I certainly did.  I saw that the

20  number of -- I believe there was a direct

21  correlation between the number of citations,

22  that decrease, and the decrease in revenue

23  stream, along with the decrease in accidents

24  being beneficial to the City of Cleveland.

25       Q.    Right.

Page 43

1              So are you generally aware that in

2    the time frame of 2007, 2008, the revenue

3    generated from the Traffic Camera Program was

4    approximately 9 million dollars, and by the

5    time of this contract in 2013, that had

6    decreased to about 5 million dollars?

7         A.    Well, I knew -- I remember that it

8    was higher and that it was 5 point 2 in 2013,

9    but that's where my memory sits, but I do not

10   remember it being 9 million dollars, I don't

11   remember the exact numbers.

12        Q.    Okay.  And in ballpark terms --

13        A.    It --

14        Q.    -- revenue was cut about in half

15   during the life of the program, which you

16   viewed as a positive development?

17        A.    What I viewed as a positive, of

18   course, was the reduction in accidents and

19   traffic citations and notices being issued.

20        Q.    Right.

21              And all things being equal, you

22   would prefer to have the City of Cleveland have

23   more revenue rather than less revenue, but the

24   fact that the revenue was decreasing you viewed

25   as a positive?

Page 44

1      A.    Well, I viewed it as a benefit to

2  the program, yes.

3      Q.    Okay.  And to the program, a

4  benefit to the City of Cleveland?

5      A.    It was Operation Safe Streets was

6  the name the City of Cleveland named the

7  program.  We are referring to the traffic

8  camera enforcement program.

9      Q.    And Operation Safe Streets, was

10  that solely limited to the Traffic Camera

11  Program or were there other --

12      A.    There were --

13      Q.    -- components to that program?

14      A.    I'm sorry, I cut you off there.

15          There were other components

16  regarding -- including neighborhood traffic

17  enforcement by the officers on patrol, but

18  Operation Safe Streets was a combination of

19  enforcement issues that were linked to the

20  traffic camera enforcement program, but not

21  standing alone.

22      Q.    So, in other words, you're aware,

23  generally, that following the ballot initiative

24  in November, the City of Cleveland terminated

25  the Traffic Camera Program?

Page 45

1          A.     Understood.

2                 MS. DINEHART:   Objection.

3          Q.     And following that termination, did

4    end in its entirety or were there components

5    that still remained?

6          A.     I cannot -- because of the change

7    in my role in the Cleveland City Government,

8    I'm not familiar.   I do not know.

9          Q.     Okay.   You don't know whether there

10   were some vestiges that remained or whether it

11   was all scrapped after the ballot issue?

12         A.     I cannot answer that question.   I

13   do not know.

14         Q.     Are you aware of any components of

15   that operation that would potentially remain

16   viable following the end of the traffic

17   cameras?

18         A.     I would believe that

19   neighborhood -- again, from my own experience

20   rather than knowledge, I would believe that

21   neighborhood traffic enforcement by the

22   Cleveland Division of Police would continue.

23         Q.     You are just not aware sitting here

24   today one way or the other?

25         A.     No.   The only measurable item that

Page 46

1    I can identify is that I did some analysis late

2    last year and I saw that pedestrian fatalities

3    in the City of Cleveland 2015 almost doubled

4    over 2014.

5          Q.    Okay.  So following that, you know,

6    it's fair to say that it's your testimony that

7    Xerox and the City of Cleveland Traffic Camera

8    Program had a positive impact on public safety?

9          A.    I believe it had a very positive

10   impact.

11         Q.    And as you have just indicated, the

12   corollary is true, which is terminating the

13   program had a negative impact on public safety?

14         A.    I believe that it did.

15         Q.    Okay.  In other words, fatalities

16   increased, rates of accidents increased, number

17   of speeders increased?

18         A.    The only thing that I can clearly

19   articulate in response is from my own

20   experience and insight, is that the pedestrian

21   fatalities have increased, I'm not familiar

22   with the accident rates currently.

23         Q.    Okay.  So following the termination

24   of the program, pedestrian fatalities

25   increased.  Do you know whether driver

1    fatalities increased?

2         A.    I do not.

3         Q.    Okay.  But you are certainly aware

4    that pedestrian fatalities increased?

5         A.    That's correct.

6         Q.    The goal of the Traffic Camera

7    Program was to reduce incidents of driver

8    speeding?

9         A.    (Witness nodding affirmatively.)

10        Q.    If you could speak out loud, you

11   are nodding your head.

12        A.    I was waiting for you to stop

13   asking.

14        Q.    I will continue my --

15        A.    Okay.

16        Q.    But one of the goals -- fair

17   response on your behalf.  One of the goals of

18   the Traffic Camera Program was to reduce the

19   incidents of folks speeding?

20        A.    That's correct.

21        Q.    Another goal was to reduce the

22   incidents of folks running red lights?

23        A.    Yes, sir.

24        Q.    Okay.  Those two things together

25   had the ultimate goal of reducing accidents and

Page 48

1    injuries, including fatalities?

2         A.    Yes, sir.

3         Q.    Okay.  And, in other words, the

4    Traffic Camera Program was put in place, for

5    lack of a better phrase, to stop law breakers?

6         A.    Yes, sir.

7         Q.    Okay.  And the goal is to ensure

8    the safety of both drivers and pedestrians?

9         A.    Yes, sir.

10        Q.    In addition to the traffic cameras

11   themselves reducing the number of the folks

12   speeding and running red lights, is it fair to

13   say there are additional benefits from

14   implementing the traffic cameras?  And if you

15   need me to identify some, I'm fine doing so,

16   but are you aware of other benefits other than

17   people not speeding as much and not running red

18   lights as much?

19        A.    I believe that it enhanced the

20   perception of safety within the City of

21   Cleveland.  People driving into the community

22   would know in advance that, you know, you have

23   to be alert and aware of the laws and drive

24   safely.

25        Q.    So one of the benefits is actually,

Page 49

1   people -- whether or not I'm driving through

2   the City of Cleveland to get a ticket, I can

3   see there's a sign up there and there's a

4   camera up there that say, hey, you know, we are

5   the City of Cleveland, we are kind of

6   monitoring you, we are making sure you are

7   complying with our laws.  That's one of the

8   benefits, whether or not you issue a ticket?

9           A.    That's right.

10          Q.    And, in addition, there's some

11  benefit to the City of Cleveland, if it didn't

12  have traffic cameras, it may choose to deploy

13  officers to monitor speed and red light

14  violations; correct?

15          A.    It would require increased

16  employment of police officers to accomplish the

17  same goal.

18          Q.    And if you are having a police

19  officer monitor an intersection as opposed to a

20  traffic camera, that would cost the City of

21  Cleveland hundreds of thousand of dollars, if

22  you take into consideration salary and benefits

23  of the officer or officers?

24          A.    That's right.

25          Q.    And by freeing up officers who

Page 50

1    otherwise might be monitoring intersections
2    that the traffic cameras monitored, those
3    officers could then be re-deployed elsewhere
4    within the City of Cleveland to benefit public
5    safety otherwise; correct?
6           A.    Yes, sir.
7           Q.    Alternatively, the City of
8    Cleveland could hire a few officers and employ
9    fewer officers, but if the officers aren't
10   monitoring intersections, they can be used
11   elsewhere to stop drug dealers or to get guns
12   off the feet or otherwise?
13          A.    Or respond to other calls for
14   service, multitude of other services, yes, and
15   responsibilities, yes, sir.
16          Q.    You would agree with my statement
17   and the additional items that you added on?
18          A.    Yes, sir.
19          Q.    And is it fair to say that the
20   traffic cameras had a deterrent effect, not
21   only where they were located, but throughout
22   the City of Cleveland?
23                So, in other words, I'm driving in
24   from Shaker Heights to go work downtown at the
25   PNC Building and I see a traffic camera and the

Page 51

1    signage.  I might not only run red lights, but

2    slow down in that area, that might continue

3    throughout my tenure of driving through the

4    City of Cleveland?

5         A.    Yes, sir.

6         Q.    We talked a little bit about the

7    revenue decreasing over time after the traffic

8    cameras were implemented.  The same would be

9    true of the number of citations issued and

10   paid; correct?

11        A.    That's correct.

12        Q.    So, in other words, the program's

13   implemented in 2005, by 2013 the number of

14   citations are on the decline, both for red

15   light and speed?

16        A.    Yes, sir.

17        Q.    And, again, you view that as a

18   positive because people are now following laws?

19        A.    Yes, sir.

20        Q.    Okay.  In other words, it's not as

21   though 50 percent fewer folks are driving on

22   the street, just, you know, 50 percent fewer

23   folks -- or more folks are following the laws?

24        A.    That's my belief.

25        Q.    Okay.  Is it fair to say that the

1    Traffic Camera Program ended following a ballot

2    initiative, not because of a decision you made

3    to end the Traffic Camera Program?

4         A.    Yes, sir.

5         Q.    In an ideal world, is it fair to

6    say, the Traffic Camera Program, in your mind,

7    would have continued 2015, 2016 and to the

8    present?

9         A.    It would have continued at least

10   through the life of the contract.

11        Q.    And can you think of any reason why

12   you wouldn't have wanted it to continue after

13   the life of the contract?

14        A.    I cannot think of any reason why I

15   would recommend that it -- the program end.

16        Q.    Can you think of any initiative the

17   City of Cleveland has undertaken in its history

18   that has been more effective in reducing the

19   incidents of speeding and running red lights,

20   other than the Xerox/City of Cleveland Traffic

21   Camera Program?

22        A.    I do not have the statistical --

23   historical statistical information to compare

24   it against.  I'm certainly aware of programs

25   that have been in existence in the Cleveland

Page 53

```
 1   Division of Police historically that were
 2   viewed to be appropriate, even necessary, but I
 3   just don't have any statistical information
 4   upon which to compare.
 5        Q.    Okay.  And I won't extend it to the
 6   entire history of the City of Cleveland --
 7        A.    Yes.
 8        Q.    -- but during your tenure, can you
 9   think of any program the City of Cleveland
10   enacted that was effective at reducing the
11   incidents of speeding and running red lights as
12   the Xerox/City of Cleveland Traffic Camera
13   Program?
14        A.    No, sir.
15             MS. DINEHART:  Objection.
16             This is in his tenure as the
17   director of public safety?
18             MR. BRENNAN:  Correct.
19        Q.    With that addition, as director of
20   public safety, can you think of any other that
21   was as effective?
22        A.    No, sir.
23        Q.    Pardon me.
24             What services did Xerox provide
25   under the contract that we've discussed?
```

Page 54

1        A.      Installation, coordination,

2   providing information to the Division of

3   Police.  Networking, interaction, for both the

4   City and the Clerk of Courts.

5        Q.      Okay.

6        A.      Specific within the program itself,

7   the three areas that I articulated with the new

8   contract, of course --

9        Q.      Correct.

10       A.      -- with the offer to increase the

11  number of fixed locations throughout the City

12  of Cleveland, in those areas that were

13  approved.  The ability to utilize the fixed

14  camera location for the Division of Police as

15  surveillance cameras, and increased mobility of

16  the mobile and traffic enforcement program, the

17  mobile cameras.

18            MS. DINEHART:  Terry, I would like

19  to note for the record, is that one of the

20  30(b)(6) section or are you asking under his

21  personal knowledge?

22            MR. BRENNAN:  No, I'm sorry.

23       Q.      And I might have referred earlier,

24  if you look at your notice, I understand you

25  are the designated representative on topics

Page 55

1    two, four and five, I might have accidentally

2    said topic three.

3                    MR. NATHANSON:  Two, three and

4    five.

5                    MS. DINEHART:  Two, three and five.

6                    MR. BRENNAN:  Okay.

7         Q.    So two, three and five you have in

8    front of you?

9         A.    Yes, sir.

10                   MR. BRENNAN:  Yeah.  It's a fair

11   objection.

12        Q.    And I'll get back to your 30(b)(6),

13   but I would like to sort of -- we are in your

14   30(b)(6) deposition, I will take a break at

15   some point in time and I will just have you

16   testify in your personal deposition capacity,

17   so at a fair point to take a break --

18                   MS. DINEHART:  I just want to

19   clarify, then you are only talking about

20   30(b)(6) knowledge as of right now, you will

21   let us know when you switch to personal

22   knowledge, is that what you are saying?

23                   MR. BRENNAN:  We will take a break

24   and we will go to personal knowledge.

25                   MS. DINEHART:  Okay.

Page 56

1           Q.     So right now we are within the

2    umbrella although I crossed the line, and I

3    apologize, into your factual knowledge.

4                  Your testimony today, is it fair to

5    say, that's as the representative of the City

6    of Cleveland?

7           A.     Yes, sir.

8           Q.     Okay.  When you initially

9    considered whether or not that Xerox or ACS,

10   depending on what you consider the name to be

11   at the time, to continue to be the vendor for

12   the City of Cleveland for the Traffic Camera

13   Program, what factors were most important to

14   you?

15          A.     The development of the request for

16   proposals was, in my opinion, extremely

17   important.  Although I was not directly

18   involved in the development of the request for

19   proposals, those items that I wish to see

20   included within the request for proposals was

21   made very clear for the project coordinator and

22   anyone else involved at that time.

23                 Specifically, I wanted those three

24   things.  I wanted to increase the number of

25   fixed locations located throughout the City of

Page 57

1   Cleveland, increase the mobility of the mobile

2   cameras, and to have the ability for the

3   Division of Police to be able to utilize the

4   fixed camera locations as surveillance cameras

5   for operational and forensic purposes.  Those

6   were the three key items that I wanted to see

7   included within the request for proposals.

8            That, to my understanding, was, in

9   fact, incorporated in the respondents to the

10   RPF, responded to a multitude of issues, but

11   that being -- those three were included.

12        Q.    Did you review the RFP before it

13   was issued?

14        A.    I don't recall.  I don't recall.

15        Q.    Did you review all five responses

16   to the RFP?

17        A.    No, sir.

18        Q.    Okay.  Did you review any of the

19   five responses?

20        A.    No, sir.

21        Q.    Did somebody prepare for you or

22   otherwise give you information summarizing what

23   the responses were to the RFP?

24        A.    I believed I was briefed.  I

25   remember being briefed by the project manager,

Page 58

1   Larry Jones.  So certainly I was briefed on the

2   responses and the progress, but I don't recall

3   any specific briefing.  If the question is

4   briefing documents, I do not recall it.

5        Q.    Okay.  In other words, what

6   information did you have available when

7   considering the responses to the RFP and making

8   a recommendation?

9        A.    The recommendations from the

10  project manager and members of the project or

11  the review team.

12       Q.    And who were those folks?

13       A.    Again, I don't recall all six of

14  their names.  I do not recall.

15       Q.    Fair to say that the reason the

16  City of Cleveland chose to continue its

17  relationship with Xerox is because it viewed it

18  as the best possible provider of traffic camera

19  services?

20            MS. DINEHART:  Objection.

21            You can answer.

22       A.    The opinion of the project

23  coordinator and the team, they were most

24  responsive to our request for proposal.

25       Q.    Best technology?

Page 59

1       A.      Best --

2               MS. DINEHART:  Same objection.

3       A.      Yeah.  I do not know that they were

4   the best, but certainly provided the services

5   that we were seeking.

6       Q.      Okay.  Do you recall anyone

7   offering better technology?

8               MS. DINEHART:  Objection.

9       A.      I can't identify that there was.

10      Q.      Okay.  One of the reasons that the

11  City of Cleveland chose Xerox is because it

12  provided the best ticket processing?

13              MS. DINEHART:  Objection.

14      A.      They provided good ticket

15  processing.  Again, I do not know that they

16  were the best among all the five respondents in

17  that specific component.

18      Q.      Was the cost of working with Xerox

19  a factor in the determination by the City of

20  Cleveland to choose Xerox other another vendor?

21              MS. DINEHART:  Objection.

22      A.      It was a considerable amount of

23  discussion on funding or revenue stream in that

24  there were at least two options, one, a fixed

25  cost or a percentage of violations.  We made a

Page 60

```
 1   conscious decision to go forward on the side of
 2   a fixed cost.
 3           Q.    But this wasn't a lowest bid RFP?
 4           A.    No, sir, it was not.
 5           Q.    Do you know where Xerox stood in
 6   terms of the estimated cost of working with
 7   Xerox versus other vendors?
 8           A.    I do not recall that.
 9           Q.    And that wasn't a primary driver in
10   recommending Xerox over other vendors; correct?
11               MS. DINEHART:  Objection.
12           A.    Could you ask that question again
13   for me, please?
14           Q.    And that wasn't a driving factor in
15   the City of Cleveland choosing Xerox as opposed
16   to other vendors?
17           A.    I do not believe it was.
18           Q.    Okay.  Fair to say that as of 2013
19   that the City of Cleveland was very satisfied
20   with the services Xerox had been providing?
21           A.    I believe the City was satisfied
22   with the services provided.
23           Q.    Okay.  And I'm happy to show you
24   documents, but I think you said, you know,
25   extremely satisfied overall?
```

Page 61

1      A.    Yeah.   Other than a few -- again,
2  other than a few issues where we had cameras
3  that were inoperative for an extended period of
4  time and not being notified of that, I think
5  our relationship with ACS and Xerox was very
6  good.
7             MR. BRENNAN:   Okay.   Why don't --
8  we have been going just about an hour, why
9  don't we take a five-minute break right now --
10             MS. DINEHART:   Okay.
11             MR. BRENNAN:   -- if that makes
12  sense?
13             (Short recess had.)
14      Q.    Sir, I think you already testified
15  to this, but I'm just reviewing my notes, is it
16  fair to say that the Xerox/City of Cleveland
17  Traffic Camera Program had a tremendous
18  positive impact on public safety in the City of
19  Cleveland?
20      A.    Yes, sir, it did.
21      Q.    And we talked a little bit about
22  your calendar or what I inartfully referred to
23  as your diary entries here.   I want to hand you
24  an exhibit and understand how you keep records
25  here.

Page 62

```
 1                    -   -   -   -   -

 2              (Thereupon, Plaintiff's Exhibit 3,

 3              Calendar Entry, Document CL019, was

 4              marked for purposes of

 5              identification.)

 6                    -   -   -   -   -

 7        Q.    Showing you what's been marked for

 8   purposes of identification as Exhibit 3.  Do

 9   you recognize this document?

10        A.    Yes, sir, I do.

11        Q.    Okay.  And is this an example of

12   something that you would have put into your

13   Outlook Calendar to memorialize a conversation

14   that you had?

15        A.    Yes, sir.

16        Q.    And is this something that you

17   printed off in connection with the litigation?

18        A.    I don't know that I printed it or

19   provided it to the City's representative.  I

20   may have provided it to them electronically.

21        Q.    One way or the other --

22        A.    It was provided to the Law

23   Department of the City of Cleveland.

24        Q.    And in this particular

25   communication you're discussing your
```

Page 63

1    experiences with Xerox you write, most of which

2    have been extremely positive; correct?

3         A.    Yes, sir.

4         Q.    And was that true and accurate at

5    the time you wrote it?

6         A.    Yes, sir.

7         Q.    And is it true and accurate today?

8         A.    Again, my experiences with ACS,

9    slash, Xerox was very positive.

10        Q.    And that's true of the City of

11   Cleveland not just you, Mr. Flask, personally?

12        A.    That's correct.

13        Q.    Okay.  I think we are probably at

14   the point where we are ready to break from your

15   30(b)(6) deposition testimony and just cover

16   some topics in your personal capacity.

17             MR. BRENNAN:  So -- if that makes

18   sense, unless you have any issues you want to

19   cover or any questions you have?

20             MS. DINEHART:  No.

21             MR. NATHANSON:  No.

22        Q.    I will just redirect on the

23   30(b)(6) and we will move to your personal

24   capacity.

25             Okay.  So, again, now for purposes

Page 64

1   of this testimony, you are taking off your City

2   of Cleveland hat, you are not testifying as to

3   things you only became aware of from other

4   sources, you are testifying from your own

5   personal knowledge, things you saw, things you

6   heard, things you know personally. Does that

7   make sense?

8          A.   Yes, sir.

9          Q.   Okay. You have not been designated

10  as the representative for the City of Cleveland

11  on a number of topics as set forth in the

12  exhibit I showed you, including the negotiation

13  and execution of the contract. Is it fair to

14  say that you are not the best person to speak

15  to those topics?

16         A.   I would agree.

17         Q.   Same with the drafting of the

18  contract, did you draft the contract? Were you

19  involved in the drafting of the contract?

20         A.   No, sir, I was not.

21         Q.   Okay. Did you propose any

22  particular language for the contract, review

23  different versions or was it, in essence,

24  you're shown the final version and you trust

25  other folks within the City of Cleveland

Page 65

1    umbrella to give you a contract and you sign as

2    the director of public safety?

3         A.    Yes, sir.

4         Q.    That's how it happened up the

5    ladder, as I am describing it?

6         A.    Yes, sir.

7         Q.    You weren't involved with lay or

8    attorney representatives from the City of

9    Cleveland negotiating aspects of force majeure

10   provisions or termination for convenience

11   provision; is that true?

12        A.    That's true.

13        Q.    Do you know who did take the lead

14   on behalf of the City of Cleveland in terms of

15   negotiating the contract at issue in the

16   litigation?

17        A.    Although there may have been a

18   number of attorneys from the Law Department of

19   the City of Cleveland involved, I believe it

20   was Assistant Director of Law, Jeffrey Marks.

21        Q.    Is that answer also true of the

22   amendment for the contract?

23        A.    Yes, sir.

24        Q.    Was there a layperson who was

25   primarily responsible for the negotiation as to

Page 66

1    the contract and the amendment that you are

2    aware of?

3         A.    I'm not aware.

4         Q.    Do you know if anyone, not from the

5    law department, was involved in negotiating the

6    contract with the City -- with Xerox?

7         A.    I'm not aware.

8         Q.    Okay.  Sitting here today, are you

9    aware of the termination for convenience

10   provision in the contract?

11        A.    No, sir.

12        Q.    Are you aware of the force majeure

13   provision in the contract?

14        A.    I've heard the terminology used,

15   but I'm not sure I understand it.

16        Q.    You have heard of force majeure

17   generally or in connection with this contract?

18        A.    In connection with this contract as

19   a result of one meeting that I was in

20   attendance with representatives of Xerox, Jeff

21   Marks, and the representative of the City of

22   Cleveland.

23        Q.    And when did that meeting take

24   place?

25        A.    Sometime in late 2014.

Page 67

1      Q.      Following the ballot initiative or
2   before the ballot initiative?
3      A.      Following the ballot initiative.
4      Q.      I'm sorry, I didn't get all the
5   notes.  Who do you recall attending that
6   meeting and where did that take place?
7      A.      The meeting was held in the office
8   of the director of public safety.  I do recall
9   that Assistant Director of Law, Jeff Marks, was
10  in attendance, as I was, of course,
11  Larry Jones II was in attendance as the
12  representative of the City of Cleveland, along
13  with a number of other individuals, who I don't
14  recall.
15     Q.      On behalf of the City of Cleveland
16  or Xerox?
17     A.      On behalf of Xerox.  It was myself,
18  Larry Jones, Assistant Director of Law, Jeff
19  Marks, representatives of Xerox, but I don't
20  recall specifically who they were or whether or
21  not there was any other representatives for the
22  City of Cleveland.
23     Q.      Sitting here today can you name any
24  Xerox employees?
25     A.      No, sir, I cannot.

Page 68

1      Q.    What do you recall being said about
2   force majeure during that meeting?
3      A.    I know the term was used, but I do
4   not recall the context of how it was used.  It
5   was -- my sense was it was a very preliminary
6   conversation --
7      Q.    Okay.  Do you know --
8      A.    -- that didn't result in any
9   decisions.
10     Q.    And I cut you off.  It did not
11  result in any decisions?
12     A.    That's right.
13     Q.    So, in other words, tell me if I'm
14  inaccurately restating your testimony, but
15  following the ballot initiative there's a
16  meeting between representatives and the City of
17  Cleveland and Xerox that sort of determined
18  where we go from here or what the next steps
19  are, as a result of ballot initiative?
20     A.    That's my understanding.  And
21  that's my memory.
22     Q.    Okay.  And during that meeting
23  someone uses the term force majeure?
24     A.    That's correct.
25     Q.    And you don't recall whether there

Page 69

1    -- who used it or in what context they used it?

2         A.    No, sir, I do not.

3         Q.    And you don't recall what if any

4    response there was to someone using the term

5    force majeure?

6         A.    No, sir, I do not.

7         Q.    And as a result of that meeting no

8    decision was made, there was no action plan,

9    sort of where do we go from here was left an

10   open item?

11        A.    That's correct.

12        Q.    And when did you first become aware

13   of the ballot initiative?  If the ballot

14   initiative is passed in November, when did you

15   first become aware of it?

16        A.    I believe sometime in the spring of

17   2014.  Specific dates, I just -- elude me.

18        Q.    Understood.

19        A.    Yeah.

20        Q.    And how did it come to your

21   attention, the ballot initiative, in the spring

22   of 2014?

23        A.    Through some media reports.

24        Q.    Okay.  In other words, you saw

25   reports that voters were gathering signatures

Page 70

1    and potentially putting this on the ballot?

2         A.    That's right.

3         Q.    That didn't come to your attention

4    as a result of anything internal in the City of

5    Cleveland?  In other words, conversation with

6    another City employee or a memo or a document?

7         A.    None that I recall.

8         Q.    When you first heard about that

9    media report, do you recall whether that was a

10   media report on Cleveland dot com, The Plain

11   Dealer, whether it was televised, radio?

12        A.    I don't recall the exact source.

13        Q.    Okay.  Regardless of the medium

14   from which you first heard about it, is it fair

15   to say your initial reaction was not positive?

16   In other words, I hope this doesn't get passed

17   because this is a great program and it's

18   helping the City of Cleveland?

19        A.    I was disappointed that it was even

20   being considered.

21        Q.    For the reasons I've articulated?

22        A.    That's correct.

23        Q.    And what did you do, if anything,

24   in response to hearing that the voters might

25   put it on the ballot in November?

Page 71

1      A.    I remember interacting with the

2 press department, the media department of the

3 mayor's office, providing some information in

4 response to some media inquiries about the

5 program itself.

6      My role was limited in providing

7 statistical information and other things to the

8 press offices in Cleveland.

9      Q.    Okay.  And was that a proactive

10 measure on your part or responsive to inquiries

11 from your media coverage?

12      A.    I believe it was reactive on my

13 part.

14      Q.    So, in other words, someone from

15 your internal media folks calls you up, shoots

16 you an e-mail and says, hey, there might be a

17 ballot initiative?

18      A.    It wasn't about the ballot

19 initiative.  It was about, what are the facts

20 about the program itself, you know, revenue

21 streams, number of tickets being issued and

22 rates and so forth, that kind of information

23 that the police division and public safety

24 maintained at that time was shared with the

25 press office.

Page 72

1      Q.    Okay.  But you understood that

2  those inquiries were being made by the media in

3  the spring of 2014?

4      A.    Well, they may have been made even

5  earlier than that, throughout the previous ten

6  years or so that they had been in existence,

7  but certainly spring of 2014, as I remember.

8      Q.    Okay.  Which came about as a result

9  of the fact that the voters were, perhaps,

10  putting something on the ballot?

11      A.    It was a petition effort underway.

12      Q.    And other than responding to

13  internal requests from your media folks, did

14  you do anything else to address the possibility

15  that voters might put a ballot initiative?

16      A.    My role significantly changed on

17  February 10th of 2014, so my direct involvement

18  with public safety, other than in a supportive

19  role, was -- my role of public safety was

20  minimalized, February 10th, 2014.

21      Q.    Did you ever talk with Mayor

22  Jackson about the ballot initiative either

23  before or after it was passed?

24      A.    I can say I'm sure that I did, but

25  I don't recall when or the content of the

Page 73

1    conversations.

2          Q.    All right.  I want to try to break

3    that down, even if you don't have a memory.

4                Do you recall speaking to Mayor

5    Jackson about the ballot initiative before it

6    was passed?

7          A.    I don't recall.

8          Q.    Do you recall speaking with Mayor

9    Jackson after the ballot initiative was passed?

10         A.    I have spoken with the mayor late

11   last year regarding the absence of the traffic

12   enforcement cameras, certainly in 2015.

13         Q.    And what triggered that

14   conversation?

15         A.    Statistical information that I

16   became aware of that showed a significant

17   increase in pedestrian fatalities within the

18   City of Cleveland.

19         Q.    Did you initiate the conversation

20   with the mayor or did he initiate the

21   conversation with you?

22         A.    I initiated it.

23         Q.    You went to the mayor and you said,

24   Mayor Jackson, now that we don't have cameras

25   there is a greater number of pedestrian

Page 74

1  fatalities and we have to do something about
2  this?
3        A.    I had a conversation with the mayor
4  and the chief of police and the traffic
5  commissioner.
6             Traffic -- pedestrian traffic
7  fatalities were not tracked on a weekly summary
8  report as prepared by the Division of Police,
9  and I recommended to the chief that it be
10  included in the weekly summary report.  And I
11  think that's how the conversation involving, at
12  least my briefing, the mayor of what action I
13  had done.
14        Q.    Okay.  But in the course of that
15  conversation there was some nexus between the
16  traffic cameras and the fatalities?  In other
17  words, you are communicating to the folks at
18  the meeting, we don't have the cameras,
19  fatalities are increased?
20        A.    Well, the conversation was broader
21  than just the cameras.  I also saw a
22  significant decrease in traffic enforcement
23  activities by officers of the Cleveland
24  Division of Police.  Statistically I saw, in
25  2015, that the number of traffic citations

Page 75

1    issued by officers had decreased about 25

2    percent.

3            So the information, as I remember

4    sharing with the mayor is, we have a two-fold

5    issue here, decreased enforcement by uniformed

6    officers, the absence of traffic cameras and

7    traffic cameras may have led, I had to qualify

8    by saying may have led, to a significant

9    increase of traffic pedestrian fatalities here

10   in the City of Cleveland.  Although, I couldn't

11   have any evidence to support, you know,

12   scientific data to support my belief.  The two

13   factors took place simultaneously.

14       Q.    And you can't think of other

15   factors that may have resulted in the --

16       A.    I did see that, beside the City of

17   Cleveland, there was an increase in pedestrian

18   fatalities.  I saw that the numbers were edging

19   up in the cities and in areas all across the

20   country, so it wasn't unique just to the City

21   of Cleveland.

22            There may have been other factors,

23   including but not limited to, texting and

24   conversations on the phone.  There may have

25   been a multitude of factors for which I am not

Page 76

1    aware.  But I did see the two statistics that
2    coincided with the rise.
3          Q.    Do you recall when it was that
4    officers started to issue fewer tickets?
5          A.    I do not know the time frame, but I
6    did, during my review, it was last August or
7    September of last year, 2015.  I just did a
8    cursory check on some data that was provided by
9    the Division of Police that stood out as being
10    various and historical numbers.
11          Q.    But do you recall when that -- if
12    that decrease started to take place in November
13    of 2014 or subsequent to that?
14          A.    I do not know.
15          Q.    But if I asked you to go back to
16    your computer and pull that data, you believe
17    you would have a report that would show, on a
18    monthly or a weekly basis, the number of
19    citations issued?
20          A.    Cleveland Division of Police has a
21    weekly report that's prepared that identifies
22    the number of enforcement actions taken, along
23    with reported crimes within the City of
24    Cleveland that's prepared on a weekly basis.
25          Q.    And that report exists going back

Page 77

1  years?

2       A.    I do not know how long they have

3  been retained, but the basic format of the

4  report dates back until 1996, 1997.

5       Q.    Okay.  And specific as to the --

6  and do you recall when this conversation was

7  that you had with the mayor?

8       A.    I believe late last summer, early

9  fall, 2015.

10       Q.    Do you know whether you have a

11  calendar entry that would reflect that meeting?

12       A.    I would -- I do not recall.

13       Q.    Okay.  Would you expect that you

14  would, that's your practice to keep those types

15  of entries?

16       A.    I keep a record of those items,

17  those meetings or discussions or points in time

18  that I may need to refer back to for a

19  statistical reporting for documentation

20  purposes.  A normal conversation with the mayor

21  probably would not have been retained for that

22  purpose.  But a conversation with the chief

23  probably would.

24       Q.    Okay.  So I believe your testimony

25  was, and correct me if I am wrong, it's, you

Page 78

1   know, February of 2014, your role in public

2   safety is getting minimized; correct?

3            A.     That's correct.

4            Q.     So why is it that now we are moving

5   into 2015, you're having conversations with the

6   mayor and other folks about the traffic program

7   and other issues?

8            A.     I was a recipient of the weekly

9   statistical report provided by the Division of

10  Police.  And I would give it a cursory review

11  on a weekly basis.  And then my review was

12  normally cursory.  But when I looked at -- in

13  more detail some statistical matters I saw that

14  the numbers stood out as a significant

15  decrease.  So I called the traffic commissioner

16  and had a conversation with a few folks to

17  figure out what was going on and why that

18  decrease had occurred.

19           Q.     And you reviewed those statistics

20  at the time on a weekly basis?

21           A.     I was a recipient, but because of

22  my role and not being directly involved in the

23  oversight of public safety, although I was a

24  recipient, I would review it, I would see it,

25  do a cursory review, it was normally just a

1    normal report.  For some reason -- I focused on

2    this one for some reason, I can't tell you why.

3          Q.     Switching topics a little bit.  Is

4    it fair to say that the -- and I'm talking

5    about the time period prior to November of

6    2014, that the Traffic Camera Program, not

7    everyone within Cleveland City Council agreed

8    with the Traffic Camera Program?

9          A.     There were supporters and

10   detractors, but to answer your question

11   directly, there were some who did not support

12   it.

13         Q.     It was a hot button topic

14   politically?

15               MS. DINEHART:  I'm sorry, can you

16   repeat that question?

17         Q.     It was a hot button topic

18   politically?

19         A.     No more or no less than some

20   others.

21         Q.     There certainly were some folks

22   within City Council who voted against traffic

23   cameras?

24         A.     Correct.

25         Q.     There were folks, members of City

Page 80

1  Council, who came forward and said I don't want

2  these traffic cameras in my ward?

3       A.    That's right.

4       Q.    Do you recall who the Council

5  members were who voted against the Traffic

6  Camera Program?

7       A.    I do not recall the vote, who voted

8  for or against it.

9       Q.    All right.

10      A.    I do not recall.

11      Q.    Do you recall which Council members

12  came forward and said, please, do not put these

13  in my ward, I don't want them?

14      A.    I remember two that I can recall.

15      Q.    Okay.

16      A.    Councilman Zack Reed, Zachary Reed,

17  and I believe Councilman Terrell Pruitt, in

18  ward one, did not want any cameras installed

19  within his ward.

20      Q.    And when did Councilman Pruitt

21  bring that to your attention?

22      A.    2013.

23      Q.    Do you know when in 2013, before or

24  after the contract renewal?

25      A.    During the discussions with City

1    Council on our recommendation to award the

2    contract to Xerox.

3         Q.    And what do you recall Councilman

4    Pruitt saying to you?

5         A.    Department of Public Safety had

6    made a recommendation based on statistical

7    information and accident reporting that a

8    camera may be valuable to a certain area of his

9    ward.  I remember him telling me personally

10   that he would get back with me and later he

11   said he wished not to have it in his ward.

12        Q.    Do you recall what words he used or

13   language he used?

14        A.    Other than saying he didn't want

15   them in his ward, I don't remember him

16   specifically saying why.  I didn't ask him why.

17        Q.    There was no statement, I find

18   these things to being a nuisance or taxing our

19   residents or I don't believe they promote

20   public safety, any of those things?

21        A.    No, sir.

22        Q.    Okay.

23        A.    No, sir.

24        Q.    And did you ultimately agree with

25   that recommendation or that --

Page 82

1     A.    Yes, sir.

2     Q.    And why?  Did you conclude that it

3 wouldn't have promoted public safety or you

4 just acceded to the wishes of the Councilman?

5     A.    It was my understanding that the

6 locations were imbedded within the legislation

7 itself.  They are required, specific locations,

8 to be approved by Council.  So they were

9 imbedded within the legislation to identify

10 specific locations.  If they weren't there, the

11 cameras wouldn't be there.  So the Council, in

12 order to get Council approval, if the

13 Councilman didn't want it in his ward, we

14 didn't include it.

15    Q.    Your goal was to get Council, the

16 majority of Council, to approve?

17    A.    To support the program, that's

18 correct.

19    Q.    And if that means some Council

20 members don't want them in their ward and the

21 vote was in favor of it, you were in favor of

22 doing that?

23    A.    Yes, I was.

24    Q.    Moving on to Councilman Reed, you

25 recall him indicating that he didn't want

Page 83

1  cameras in his ward?

2       A.    Yes, I do.

3       Q.    And when did he convey that to you?

4       A.    As a result of a Council boundary

5  realignment the previously posted traffic

6  camera location was within his new boundary of

7  his new Council ward, I believe it was on

8  Broadway Avenue.  He asked that it be

9  immediately removed from his ward.  Councilman

10  Brancatelli says, move it to mine.  And I think

11  that action was taken.  So it was moved from

12  his ward about five blocks up the street to

13  Brancatelli's ward up Broadway Avenue.

14            I do not remember if that was pre

15  2013 -- although, I believe it was pre 2013, I

16  just don't recall the time frame.  But I do

17  remember the action being taken.

18       Q.    And do you recall in specifics what

19  he said to you?  Hey, I don't think these

20  things are effective or just a money trap or

21  anything?

22       A.    He was -- I don't believe that he

23  ever had any one on one conversation with me

24  regarding the program.  His comments and his

25  position was stated that Council committee

1  hearings are on the floor of Council.

2      Q.    And do you recall him, during those

3  communications, taking the position that the

4  Traffic Camera Program is more about revenue

5  than it is about public safety?

6      A.    I recall -- I remember very clear

7  that he was adamantly and vocally opposed to

8  the program, but I do not recall his specific

9  argument.

10      Q.    But you would have recalled it if

11  it dealt with public safety?  In other words,

12  if he was making public statements in front of

13  City Council saying, these don't work, they

14  don't stop accidents?

15      A.    I don't recall him ever stating

16  anything even close to that.

17      Q.    Okay.  And, in fact, you know, we

18  can all hop on and Google, you know, there have

19  been a number of instances where he was opposed

20  to the program because he thought it converted

21  from being about public safety to being about a

22  revenue source, is that your understanding?

23      A.    I would have to go back and look at

24  some of these articles.  I just don't remember

25  the justification for his position.  In my

Page 85

1    mind, my memory was, I don't think he ever
2    equated safety with the program, it was other
3    issues.  And I'm not sure why those issues were
4    there.  I sense and, again I would have to say
5    you would have to qualify this, but his
6    residents in his ward were opposed to it,
7    therefore, he was.
8            Q.    Fair point.
9            A.    Yes.
10           Q.    But regardless of his reasons, you
11   never heard from him or his constituents that
12   this was not an effective public safety tool?
13           A.    No, sir.
14           Q.    Something else was driving his
15   motivation?
16           A.    That's correct.
17           Q.    I will represent to you and the
18   record will reflect it, but Council members
19   Brady and Cimperman also voted against the 2013
20   contract.  Does that refresh your memory at
21   all?
22           A.    No, sir.
23           Q.    You don't recall them being opposed
24   to the traffic cameras?
25           A.    I don't recall.

Page 86

```
 1        Q.    All right.  You don't recall any
 2   conversations with them about whether they were
 3   in favor or against the traffic cameras?
 4        A.    The only ones that I personally had
 5   any one on one dialog with was Councilman
 6   Pruitt, Terrell Pruitt.
 7        Q.    Okay.  Let's step back in time a
 8   little bit.  Going back to the first traffic
 9   camera contract, 2015, before the City of
10   Cleveland takes on the new endeavor it didn't
11   have traffic cameras beforehand.  I take it the
12   City of Cleveland does some due diligence to
13   determine, hey, whether or not we should be
14   involved in the business of traffic camera?
15             MS. DINEHART:  And, object, just
16   for the record, because you said 2015, I think
17   you mean 2005.
18        Q.    2005.  I'm sorry if I misspoke.
19   2005.
20        A.    In 2005 I was the security manager
21   of airport security for Cleveland Hopkins
22   Airport.  I didn't assume this role until the
23   contract had already been awarded.  So in terms
24   of due diligence and studies or analysis or
25   justifications, I will say that I, as director
```

Page 87

1    of public safety, I inherited the program that

2    was already in place prior to me coming.

3         Q.    When was the first point in time

4    where you decided, hey, I need to take a look

5    at this and determine whether or not the City

6    of Cleveland should continue a Traffic Camera

7    Program?

8         A.    Sometime after January 1st of 2006,

9    but prior to the first renewal.  I just don't

10   recall the time frame.

11        Q.    Okay.  Between 2006 and 2011?

12        A.    Well, I think there was a renewal

13   that had been made prior to that.  I just don't

14   remember the terms of the original contract,

15   whether or not it was for two years or year by

16   year extension or whether it was four years or

17   five years, but sometime before the first

18   renewal, but I believe it was prior to 2011.

19   Certainly I had an understanding of the program

20   and its value prior to 2011, when we asked for

21   the extension.

22        Q.    And the, sort of, year or date is

23   largely irrelevant, but regardless of when your

24   date took place, before you are going to give

25   consideration to and make a recommendation, do

Page 88

1    we continue this program or not, you gather

2    empirical evidence to see whether the program

3    was effective or not; correct?

4         A.    We did review the data, in terms of

5    accidents, locations, looked at some

6    statistical information that was provided to

7    us, I believe by accounting, accident location

8    throughout the region.  Looked at revenue

9    stream, of course, looked to see the measures

10   to see whether or not there was an increase or

11   decrease, what was happening in the community.

12             We took a number of information

13   into consideration, including accidents,

14   traffic enforcement, citations being issued or

15   notices being issued and the revenue stream, of

16   course.

17        Q.    In the course of doing that review,

18   did you review any data from other

19   jurisdictions outside of the City of Cleveland?

20        A.    Yes, we did.

21        Q.    Do you recall what cities or

22   municipalities you became aware of?

23        A.    We looked at comparable -- I

24   remember looking at comparable -- or similar

25   programs, not comparable, similar programs in

Page 89

1  other cities across other regions throughout,

2  look at the effect of this, how they were

3  utilized and the technologies they were

4  utilizing for the programs, but prior to 2011.

5       Q.    During the course of that review it

6  came to your attention that there were certain

7  cities who had enacted or began a Traffic

8  Camera Program, but later disbanded it as a

9  result of voter initiative city or state wide?

10      A.    I don't recall reviewing any data

11 for any communities that had a program

12 disbanded.  I just don't recall.

13      Q.    And I don't want to limit it to

14 data.

15      A.    Yes.

16      Q.    But you were generally aware at

17 that point in time that there had been

18 instances in the United States where

19 municipalities had begun a Traffic Camera

20 Program only to see the Traffic Camera Program

21 cease following a voter initiative city or

22 state wide?

23      A.    I'm aware that programs had been

24 eliminated, but not why.  I can't answer that

25 question directly and articulate any specific

Page 90

1    knowledge or incident that I had regarding a

2    program being abolished because of legislative

3    initiative.  I'm not aware.

4         Q.    But you were certainly aware, prior

5    to 2013, that the City of Cleveland's neighbor,

6    East Cleveland, had a legislative measure to

7    ban or limit the use of traffic cameras?

8              MS. DINEHART:  Objection to that

9    question.

10        A.    I don't remember.  I just don't

11   remember.

12        Q.    Are you aware, sitting here today,

13   that other municipalities, other than the City

14   of Cleveland, in this community, whether it's

15   South Euclid, East Cleveland or going a little

16   further east, Ashtabula, had limited or banned

17   the use of traffic cameras?

18        A.    I don't know.  I know that some

19   communities continue to use them, but I don't

20   know under which authority or policy in which

21   they continue to use them.  Like Newburgh

22   Heights, I have not followed it closely since

23   the voter amendment in 2014.

24        Q.    But moving back to the beginning of

25   2014, when you first heard about the City of

Page 91

1   Cleveland ballot initiative, I take it you
2   weren't shocked to find out, oh, my goodness,
3   voters might not like this and might try to
4   limit it or eliminate it?
5        A.   Well, I was both surprised and, as
6   I stated earlier, disappointed.
7        Q.   Why were you surprised?  It never
8   occurred to you that voters may not like the
9   traffic cameras?
10       A.   I know that some citizens, some
11  people who were cited were displeased with
12  getting a violation notice, but I thought the
13  overwhelming -- my opinion is that the program
14  had such value that people would support it.
15       Q.   So going into November of 2014 you
16  thought the ballot initiative would fail?
17       A.   I was surprised that it had got
18  that far.
19                  -  -  -  -  -
20                  (Thereupon, Plaintiff's Exhibit 4,
21                  NPR Article, was marked for purposes
22                  of identification.)
23                  -  -  -  -  -
24       Q.   I will show you what we will mark
25  for purposes of identification Plaintiff's

Page 92

1    Exhibit 4, which for purposes of identification

2    is an NPR Article dated February 22nd, 2014.

3                And if you turn to the second page

4    of this exhibit, if you look in the lower

5    left-hand block, it says, here are cities that

6    rejected traffic cameras in 2011, Albuquerque.

7    Ashtabula.  Bellingham, Washington.  Dayton,

8    Texas.  East Cleveland, Ohio.  If you turn the

9    page, Garfield Heights, Ohio.  Longview,

10   Washington.  Monroe, Washington.  South Euclid,

11   Ohio.  Do you see that?

12        A.    Yes, sir.

13        Q.    Is it fair to say that you would

14   have known on or about the time of this article

15   that voters in other states --

16        A.    I was familiar with Garfield

17   Heights, as I see the name here I remember

18   following that matter in the City of Garfield

19   Heights.

20        Q.    So you knew about it at the time,

21   contemporaneously; correct?

22        A.    Yes, sir, that's true.

23        Q.    So in about 2011 you knew that

24   another community in Cuyahoga County had banned

25   or limited the use of traffic cameras?

Page 93

1       A.      I am familiar with Garfield
2   Heights, that's correct.
3       Q.      You were familiar with that, in
4   other words, the voters banning the use of
5   traffic cameras?
6       A.      That's correct.
7       Q.      That risk that possibility that
8   voters in Cleveland might try to limit or ban
9   the use of traffic cameras, is it fair to say
10  that given the overall benefits of the traffic
11  camera you thought it better to have the
12  program and take what you hoped was a de
13  minimus risk, that it might be banned or
14  limited?
15      A.      You will have to restate the
16  question, because --
17      Q.      Yes.
18          So, obviously, from Garfield
19  Heights you knew that it was within the realm
20  of possibility that like Garfield Heights, City
21  of Cleveland could ban traffic cameras, that's
22  voters?
23      A.      That's correct.
24      Q.      When entering into a contract with
25  Xerox in 2013, you're going to look at all

1   different factors, is the contract going to

2   benefit public safety, is there a possibility

3   it could be eliminated after a year, and on

4   balance, it would have been your mindset that

5   given the tremendous benefit of public safety

6   of the Traffic Camera Program, we are willing

7   to take the relatively low risk that the voters

8   might not approve of this measure going

9   forward?

10       A.      Again, you are asking me my opinion

11  as former director; correct?

12       Q.      Correct, yes.

13       A.      I believe that the program's value

14  was, to the extent that if there was a risk,

15  again, if there was a risk, and I'm not sure

16  that there was at this time, at least in my

17  mind, doing the action that they took, the

18  program had significant value and should

19  proceed.

20       Q.      The value of the program exceeded

21  any potential risk that the voters might try to

22  end the program?

23       A.      In my opinion it did.

24       Q.      Other than -- I think I refreshed

25  your memory with Garfield Heights, can you

Page 95

1  think of other municipalities that you knew of

2  in 2011 or 2012 that banned traffic camera?

3          A.    I can't tell you why I focused on

4  Garfield Heights.  It's close to my home and

5  those kind of issues, but I just remember

6  following it and reading a certain amount of

7  media coverage on it at that time.  But other

8  than Garfield Heights, I don't remember any

9  other communities identified in this article.

10          Q.    Moving into post November, before

11  2014, sitting here today, are you aware of why

12  the City of Cleveland terminated the Traffic

13  Camera Program?

14          A.    Well, I have an understanding of

15  what I believe to be the reason.

16          Q.    And let me stop you there.

17          A.    Yeah.

18          Q.    Because I don't want any

19  understanding that came from your attorneys.

20          Do you have an understanding, other

21  than from lawyers, as to why the Traffic Camera

22  Program stopped?

23          A.    Voters made a decision.

24          Q.    And what's your understanding of

25  what that decision meant?

Page 96

1      A.      That prohibited the use of traffic
2  cameras for enforcement purposes in the City of
3  Cleveland.
4      Q.      And do you have an understanding of
5  whether or not the City of Cleveland, following
6  the ballot initiative, could continue to pay
7  Xerox monies under the contract?
8      A.      Restate that question for me,
9  please.
10     Q.      I will try to say it again and if
11 it doesn't make sense --
12     A.      Okay.
13     Q.      -- I will ask another question.
14             But do you have an understanding as
15 to whether or not, following that ballot
16 initiative, the City was prohibited from paying
17 Xerox monies under the contract?
18     A.      No.
19     Q.      You don't have an understanding one
20 way or the other?
21     A.      I do not have an understanding.
22     Q.      Okay.  Do you have any
23 understanding as to why Xerox hasn't been paid
24 by the city of Cleveland following that ballot
25 initiative?

Page 97

1       A.      I'm trying to respond to this

2   without saying it's my understanding.  The City

3   canceled the contract and that ended the

4   program.

5       Q.      Okay.  And are you aware that

6   there's a provision in the contract, a

7   termination provision, that says if the City

8   cancels the contract, as you testified, the

9   City has to pay Xerox a termination fee?

10      A.      I'm not aware.

11              MS. DINEHART:  Objection.  Asked

12  and answered.

13      Q.      You are not aware of that?

14      A.      No.  No, sir.

15      Q.      You weren't in any discussions,

16  involved in any discussions about whether or

17  not the City of Cleveland should pay that

18  termination fee?

19      A.      Other than the meeting, which I

20  articulated with the representatives from Xerox

21  following the vote, was in a meeting or

22  discussion that I was a participant.

23      Q.      Did that termination fee come up in

24  that meeting?

25      A.      I don't recall.

Page 98

```
 1        Q.      When do you recall it first coming
 2   to your attention that there may be a
 3   termination fee in the contract?
 4        A.      Sometime after Xerox initiated the
 5   litigation.
 6        Q.      And how did that come to your
 7   attention?
 8        A.      I believe a consultant for -- a
 9   consultant for Xerox called me and asked me to
10   help facilitate a meeting so he could put the
11   matter to rest.  I shared that information with
12   the director of public safety -- not the
13   director of public safety, the Director of Law,
14   Barbara Langhenry, that I had received a call
15   and was asked to help facilitate a meeting.
16        Q.      Who was the consultant?
17        A.      Eddie, E-D-D-I-E.  Eckart,
18   E-C-K-A-R-T.
19        Q.      And I just want to make sure we
20   have a timeline of when this would have
21   occurred.
22        A.      Well, I can --
23        Q.      And, unfortunately, I only have the
24   benefit of an amended complaint, but Xerox
25   filed an amended complaint in August and
```

Page 99

1  probably the original complaint in June of

2  2015, would it have been closer to the time of

3  the --

4        A.     I remember --

5        Q.     -- ballot initiative?

6        A.     -- a conversation that I had with

7  Eddie Eckart, because I was informed of the

8  same, and I believe it was in April of 2015.

9        Q.     And what did Eddie say to you?

10        A.     That it was a goal, I think in his

11  mind, again, the exact conversation was that

12  they were hopeful that the City and Xerox could

13  come to some kind of resolution.  And I thanked

14  him for his call.  I told him where I was at.

15  Told him I would get back with him or someone

16  would get back and I shared the information

17  with the Director of Law, Barbara Langhenry.

18        Q.     I don't want to know what you spoke

19  about with Barbara.

20        A.     Okay.

21        Q.     But was it Eddie that brought up

22  there was a termination fee in the contract?

23        A.     No, I am sure he did not.

24        Q.     Your knowledge of the termination

25  fee came from the law department, I don't want

Page 100

1    to know the substance of those conversations,

2    but that's where it came from?

3         A.    I believe so, but I can't state

4    specifically whether it was the law department

5    or from another public safety source.  I did

6    learn of it, but I don't remember the source of

7    that information.

8         Q.    And after you learned of it, did

9    you go back to review the contract to see what

10   the contract said about a termination fee?

11        A.    No, sir, I did not.

12        Q.    Sitting here today, do you have an

13   understanding of the termination provision?

14        A.    No, sir, I do not.

15        Q.    I take it you didn't make any

16   recommendations to anyone within the City of

17   Cleveland to pay or not pay a termination fee?

18        A.    No, sir.

19        Q.    I'm sorry, it was a double

20   negative.  My statement is correct?

21        A.    I did not make a recommendation to

22   anyone regarding the settlement of this

23   litigation.

24        Q.    Is it your understanding that after

25   the ballot initiative the cameras couldn't be

1    used for surveillance?

2         A.    I don't recall that ever being

3    discussed.

4         Q.    Okay.  But you knew that the

5    cameras had that capacity to be used for

6    surveillance?

7         A.    That's correct.

8         Q.    And that the ballot initiative was

9    being driven by citations rather than

10   surveillance?

11        A.    It was being driven by enforcement,

12   that's correct.

13        Q.    And is it fair to say that the

14   cameras could have continued to operate and

15   used for surveillance?

16        A.    I believe the technology would

17   support that.

18        Q.    But you didn't have any discussions

19   with anyone within the City of Cleveland to

20   say, hey, the surveillance aspect of these

21   cameras are valuable, let's keep them on even

22   if they are not issuing citations?

23        A.    I did not.

24        Q.    They could have been used that way?

25        A.    I believe it's possible they could

1    have.

2        Q.    And, as you have previously

3    testified, there some benefits to the cameras,

4    even if they are not operable?  In other words,

5    folks see the signs, they see the cameras, they

6    slow down, they stop running red lights;

7    correct?

8        A.    I believe that there is -- if

9    there's consequences for failing to adhere to

10   the signage and speed limit.

11       Q.    Well, not only are there

12   consequences, but there's -- it impacts driver

13   activity, whether or not you receive a

14   citation?  In other words, I'm going to slow

15   down if I see a sign, I'm not going to run a

16   red light if I see a sign or a camera?

17       A.    I believe that it has an impact if

18   there's a linkage between the signage and the

19   potential consequences by failing to adhere to

20   the speed limit or red light.

21       Q.    But not everyone who eventually

22   slows down in a traffic zone receives a

23   citation?

24       A.    That's right.

25       Q.    There an impact of seeing the sign

Page 103

1   and deciding, I'm going to hit the brakes, I'm

2   not going to go 35 in a school zone, I'm going

3   to go 20?

4          A.    The signage is there without any

5   potential risk to the motorist for failure to

6   adhere to it.  There is no follow through, no

7   consequences.  I don't think -- the sign loses

8   its effect.

9          Q.    Well, do you know what percentage

10  of the drivers in the City of Cleveland

11  actually know whether or not there's been a

12  ballot initiative and impact to the traffic

13  cameras?

14         A.    I do not.

15         Q.    Fair to say there is a substantial

16  portion of folks who, if you left up the signs

17  and cameras and didn't have the cameras

18  operative, would still say, oh, my goodness, I

19  need to slow down, I need to not run a red

20  light?

21         A.    Might.

22         Q.    Would that be your best

23  understanding of what would likely happen if

24  there was a significant percentage of drivers

25  who would see the cameras, see the signs and

Page 104

1    not violate City laws?

2              MS. DINEHART:  Objection.

3         A.    It would be a guess on my part.  I

4    couldn't respond with any kind of certainty to

5    that possibility.

6         Q.    Okay.  But you do know that not

7    every driver receives a violation, that there

8    are drivers who don't receive a violation were

9    encouraged by the signs and the cameras to

10   adhere to the traffic laws?

11             MS. DINEHART:  Objection.

12        A.    I believe that it is the placement

13   of the traffic cameras, the warning signs, and

14   the program itself had an impact on individuals

15   reducing their speed -- speed within the City

16   of Cleveland.

17        Q.    Following the ballot initiative,

18   did you give any consideration to whether or

19   not the cameras and signs should remain in

20   place as a deterrent to speeding and running

21   red lights?

22        A.    No.  I did not.  I was not in a

23   role at that time to -- I was not in a role at

24   that time to make that kind of recommendation

25   if I had agreed.

Page 105

1          Q.     Do you recall any conversations on
2    that topic?
3          A.     I recall none.
4          Q.     And I should expand it.  Any
5    communication on that topic, whether they were
6    oral or in writing?
7          A.     None.
8          Q.     Other than the communication you
9    had with Mr. Eckart, which was passed along to
10   the City of Cleveland following the ballot
11   initiative, do you recall any conversations
12   about resolving the conflict with Xerox, other
13   than with counsel?
14         A.     None.
15         Q.     Okay.  And I don't need to show
16   you, but I will represent to you there were a
17   number of pieces of correspondence exchanged
18   between Mr. Jones and others within the City of
19   Cleveland on the one hand and Xerox on the
20   other, following the initiative.  I don't see
21   you copied on those communications, but I just
22   want to confirm that you weren't receiving
23   those communications or weighing in on those
24   communications?
25         A.     I had no memory of receiving any

Page 106

1    correspondence post 2000 -- the vote, the

2    electoral vote.  I don't receive -- other than

3    my limited contact with Eddie Eckart, none.

4         Q.    Okay.  Similarly, following the

5    initiative, you weren't involved in any

6    discussions or decisions about, we should not

7    pay Xerox, we should pay Xerox a termination

8    fee or we should pay Xerox on a monthly basis

9    through the life of the contract?

10        A.    No, sir.

11        Q.    Okay.  When did you first learn

12   about this litigation?

13        A.    Although I may have anticipated

14   some litigation, I don't believe I learned

15   about it until sometime after it was initiated

16   by Xerox.  I just don't remember the time

17   frame.

18        Q.    Okay.  And what effort, if any,

19   have you taken to preserve documents that may

20   be relevant to the litigation?

21        A.    Archiving in my calendar those

22   notes and information that I may have had some

23   relationship to this litigation.

24        Q.    When you say archiving, what did

25   you do?

Page 107

1        A.     Again, referring back to my
2   calendar and Outlook, just maintaining a record
3   of any conversations or contact that I may have
4   had regarding litigation.
5        Q.     Just various organizations have
6   different retention policies --
7        A.     Okay.
8        Q.     -- does your e-mail have an auto
9   delete function?
10        A.     I do not believe so.  I don't --
11   anything deleted, I think the individual would
12   have to delete themselves.
13        Q.     Does there come a point in time
14   where your e-mails rollover to an archive
15   rather than --
16        A.     I believe that they're archived
17   after the end of the calendar year is my
18   understanding.
19        Q.     Okay.  So all of your e-mails in
20   2015 get archived beginning of 2016?
21        A.     I --
22             MS. DINEHART:  If you don't know,
23   don't guess.
24        A.     Yeah.  I moved from one safety
25   system to a city wide e-mail system server.  I

Page 108

1  don't know what happens, what's available prior

2  to 2014.  I just don't know.

3      Q.    Did you keep a hard copy file, as

4  it relates to the Xerox contract for the

5  Traffic Camera Program?

6      A.    I did not personally maintain any

7  files.

8      Q.    Is it your practice to take notes

9  during meetings?

10      A.    Generally I will.

11      Q.    Do you have any notes on your

12  meetings with Xerox or the City of Cleveland

13  relative to the Traffic Camera Program?

14      A.    Nothing that would not have been

15  retained in my Outlook system.

16      Q.    Just so I understand your practice,

17  is it your practice to take handwritten notes,

18  convert those notes to a written format?

19      A.    Or recollections that I have had

20  from the meeting, just a synopsis of the

21  meeting that I would retain within my Outlook

22  calendar.

23      Q.    Once you are done transferring your

24  handwritten notes to the electronic format you

25  dispose of those handwritten notes?

Page 109

1        A.    If I took any, usually, it was
2  mostly recollection.  This was the topic, this
3  was the conversation, this was the program,
4  this was the agenda, and put it in my Outlook.
5        Q.    Are you aware that following the
6  ballot initiative that Xerox continued to
7  provide services for the City of Cleveland?
8  Are you aware of whether tickets continue to
9  get processed and paid following the ballot
10  initiative?
11        A.    I do remember that for some period
12  of time following the ballot initiative that
13  tickets were still being provided to the
14  Division of Police and the clerks of courts for
15  some period of time.
16        Q.    Do you know whether that continues
17  to today?
18        A.    No, sir, I do not.
19        Q.    Were you involved in any
20  discussions or decisions relative to, should
21  the City of Cleveland continue to process
22  tickets following the ballot initiative?
23        A.    I believe that discussion was held,
24  but I was not a participant in it.
25        Q.    How did it come to your attention

Page 110

1   that such a discussion was held?

2        A.    It may have been third-hand

3   information from the Department of Public

4   Safety, Director of Public Safety or someone

5   within Public Safety, that I just don't recall

6   whom in the timeline format.

7        Q.    Regardless of the whom or the time,

8   was the substance of the communications, hey,

9   we are going to continue to process tickets and

10  collect revenue?

11       A.    I don't recall that conversation.

12       Q.    What do you recall about the

13  substance of the conversations?

14       A.    That some tickets or some notices

15  that had been issued prior to are violations

16  that had been identified prior to the ballot

17  initiative were waiting to be processed, they

18  were in the queue for possessing by either the

19  Division of Police or Clerk of Courts.  So

20  there was a period of time where there was a

21  backlog of citations or notices prior to the

22  ballot that were in the queue that violations

23  had been identified that were waiting to either

24  be processed by police or the Clerk of Courts.

25       Q.    Are you aware of Xerox having any

Page 111

1   role in the processing of those violations

2   following the ballot initiative?

3          A.    I know what their -- my

4   understanding was their role, of course, was to

5   provide information to the Division of Police

6   for validation purposes and to the Clerk of

7   Courts. So they had a specific role in that

8   and they did provide information that were

9   violations to the Division of Police, the Clerk

10  of Courts, ultimately the Clerk of Courts.

11         Q.    Following the ballot initiative?

12         A.    Prior to, I'm not sure about

13  afterwards.

14         Q.    So sitting here today, you don't

15  know whether Xerox continued to provide

16  services following the ballot initiative and as

17  a result the City of Cleveland received

18  millions of dollars in revenue at a time when

19  the City of Cleveland wasn't paying Xerox?

20              MS. DINEHART: Objection. Compound

21  question.

22         A.    I'm not aware of that.

23         Q.    Are you surprised to learn that

24  fact, that the City of Cleveland wasn't paying

25  Xerox, Xerox continued to provide services and

1    as a result that Cleveland made millions of

2    dollars in revenue?

3          A.    No.

4                MS. DINEHART:  Objection.  Compound

5    question.

6          A.    I don't know that.  I don't know

7    that.

8          Q.    Whether or not you know it, does

9    that surprise you?

10         A.    First of all, I don't believe it,

11   but I don't want to challenges anybody's

12   veracity here.  I don't believe it.

13         Q.    Because that wouldn't make sense?

14         A.    That's correct.

15         Q.    I'm sorry?

16         A.    That's correct.

17               MR. BRENNAN:  Why don't we take a

18   quick five-minute break?

19               (Short recess had.)

20         Q.    Sir, just so you are aware,

21   document production has not yet been completed

22   in the litigation, so there is a possibility I

23   would ask to continue your testimony at some

24   later date, but, you know, as of right now this

25   concludes your testimony for today.  I

Page 113

1    appreciate your time and your cooperation.

2          A.     Thank you.

3          Q.     Thank you.

4               MS. DINEHART:  At this point you

5    have the opportunity to either read the

6    transcript of the deposition or trust that

7    Christine has done a wonderful job.  Hooray.

8    When you do have the opportunity to read you

9    can correct basic typographical errors, but you

10   can't change your testimony.  We would

11   recommend at this point that you waive, but it

12   is up to you.  What would you like to do?

13               THE WITNESS:  I would like to

14   waive.

15          (Deposition concluded at 11:54 a.m.)

16

17

18

19

20

21

22

23

24

25

Page 114

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Federal Rules.

4

5                    SIGNATURE:

6    It was agreed by and between counsel and the

7    parties that the reading and signing of the

8    transcript of said deposition, be and the same

9    is hereby waived.

10

11                  TRANSCRIPT DELIVERY:

12   Counsel was requested to give instruction

13   regarding delivery date of transcript.

14

15

16

17

18

19

20

21

22

23

24

25

Page 115

1              REPORTER'S CERTIFICATE

2    The State of Ohio,     )

3                                    SS:

4    County of Cuyahoga.   )

5

6              I, Christine M. Emery, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, MARTIN L. FLASK,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19              I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 116

1          I do further certify that I am not

2   a relative, counsel or attorney for either

3   party, or otherwise interested in the event of

4   this action.

5          IN WITNESS WHEREOF, I have hereunto

6   set my hand and affixed my seal of office at

7   Cleveland, Ohio, on this 15th day of

8   April, 2016.

9

10

11

12

13

14          Christine M. Emery, Notary Public

15              within and for the State of Ohio

16

17   My commission expires January 19, 2019.

18

19

20

21

22

23

24

25

[& - allows]                                                      Page 1

| & | | | |
| --- | --- | --- | --- |

**&** 1:5

**1**

**1** 4:3 12:15,17 13:1
**103** 13:4 15:15
**106** 2:17
**10th** 16:5 72:17,20
**115** 3:10
**11:54** 113:15
**12** 4:3
**127** 1:22 2:6
**15th** 116:7
**19** 4:4 116:17
**1996** 77:4
**1997** 77:4
**1:15cv1707** 1:10
**1st** 13:20 16:5 87:8

**2**

**2** 3:3 4:4 19:17 20:7
  42:14 43:8
**20** 103:3
**2000** 1:22 2:6 30:21
  106:1
**2005** 27:19 28:20
  29:1,3,7,21 32:11
  51:13 86:17,18,19
  86:20
**2006** 16:5 87:8,11
**2007** 43:2
**2008** 43:2
**2010** 34:1
**2011** 28:15,18,21
  29:7,25 30:13,17
  31:6 33:8 87:11,18
  87:20 89:4 92:6,23
  95:2
**2012** 30:19,22 95:2
**2013** 12:7,9 13:13
  13:20 14:5 15:19
  16:12,15 23:1 29:2
  30:23 34:13 35:3
  36:20 37:9,16 42:14
  43:5,8 51:13 60:18

80:22,23 83:15,15
85:19 90:5 93:25
**2014** 16:6 34:2,6,13
  41:4 46:4 66:25
  69:17,22 72:3,7,17
  72:20 76:13 78:1
  79:6 90:23,25 91:15
  92:2 95:11 108:2
**2015** 28:21 41:3
  46:3 52:7 73:12
  74:25 76:7 77:9
  78:5 86:9,16 99:2,8
  107:20
**2016** 1:19 40:14
  52:7 107:20 116:8
**2019** 116:17
**216-664-3559** 2:19
**216-861-7485** 2:8
**22nd** 92:2
**23rd** 15:18
**25** 75:1
**27th** 14:5

**3**

**3** 4:5 62:2,8
**30** 18:12 19:6 20:8
  40:12 54:20 55:12
  55:14,20 63:15,23
**35** 103:2

**4**

**4** 3:5 4:7 91:20 92:1
**404** 8:1
**44056** 8:2
**44114** 2:7,18

**5**

**5** 3:8 42:10,14 43:6
  43:8
**50** 51:21,22
**500** 42:7
**525** 42:8
**550** 42:8

| 6 | | | |
| --- | --- | --- | --- |

**6** 18:12 19:6 20:8
  40:12 54:20 55:12
  55:14,20 63:15,23
**601** 2:17
**62** 4:5
**67** 13:3

**7**

**70** 13:18

**8**

**8** 1:19
**89** 13:24

**9**

**9** 43:4,10
**91** 4:7
**93** 14:19
**96** 14:23
**97** 15:1
**98** 15:5
**9:30** 1:20 35:13,21

| a | | | |
| --- | --- | --- | --- |

**a.m.** 1:20 35:13
  113:15
**ability** 54:13 57:2
**able** 21:7 34:1,2,10
  57:3
**abolished** 90:2
**absence** 73:11 75:6
**acceded** 82:4
**access** 34:5,8
**accident** 32:19 37:1
  46:22 81:7 88:7
**accidentally** 55:1
**accidents** 42:23
  43:18 46:16 47:25
  84:14 88:5,13
**accomplish** 49:16
**accounting** 88:7
**accurate** 63:4,7
**acs** 27:22 28:2,7,17
  29:20 31:11,13,20
  32:2,25 33:9 56:9
  61:5 63:8

**action** 69:8 74:12
  83:11,17 94:17
  116:4
**actions** 76:22
**activities** 74:23
**activity** 102:13
**actual** 27:5
**adamantly** 84:7
**added** 50:17
**addition** 48:10
  49:10 53:19
**additional** 23:6
  25:10 30:15 48:13
  50:17
**address** 6:3 7:7 9:3
  72:14
**adhere** 102:9,19
  103:6 104:10
**adjournment**
  115:22
**administration** 29:4
**administrative**
  17:23
**advance** 48:22
**advisories** 39:10
**affirmatively** 36:14
  47:9
**affixed** 116:6
**aforesaid** 115:12
**age** 5:1
**agenda** 109:4
**agree** 41:12 50:16
  64:16 81:24
**agreed** 79:7 104:25
  114:6
**agreement** 4:3 12:18
  13:11 15:7 19:2
  29:7
**ahead** 11:20 32:11
**airport** 86:21,22
**albuquerque** 92:6
**alert** 38:12 48:23
**allow** 30:5
**allows** 18:16

[alternatively - best]                                                              Page 2

**alternatively** 50:7
**amended** 98:24,25
**amendment** 15:6,11
  15:13,16 16:13,23
  65:22 66:1 90:23
**amount** 41:25 59:22
  95:6
**analysis** 46:1 86:24
**annual** 41:24 42:6
  42:11
**answer** 45:12 58:21
  65:21 79:10 89:24
**answered** 97:12
**answers** 10:13,14,15
  18:19
**anticipated** 106:13
**anybody's** 112:11
**apart** 24:18
**apologize** 56:3
**appearances** 2:1 3:3
**appearing** 28:14
**appointment** 35:19
**appreciate** 113:1
**appropriate** 53:2
**approval** 82:12
**approve** 28:17
  82:16 94:8
**approved** 54:13
  82:8
**approximately**
  28:20 37:19 42:7,10
  43:4
**april** 1:19 99:8
  116:8
**archive** 107:14
**archived** 107:16,20
**archiving** 106:21,24
**area** 51:2 81:8
**areas** 54:7,12 75:19
**argument** 32:21
  84:9
**article** 4:7 91:21
  92:2,14 95:9
**articles** 84:24

**articulate** 35:20
  46:19 89:25
**articulated** 54:7
  70:21 97:20
**ashtabula** 90:16
  92:7
**asked** 19:7 22:6
  23:23 30:12 76:15
  83:8 87:20 97:11
  98:9,15
**asking** 7:6 9:19
  10:11 11:3,7 22:13
  28:15 47:13 54:20
  94:10
**aspect** 101:20
**aspects** 19:1 65:9
**assistant** 65:20 67:9
  67:18
**assume** 86:22
**atc** 31:2
**attendance** 66:20
  67:10,11
**attending** 67:5
**attention** 69:21 70:3
  80:21 89:6 98:2,7
  109:25
**attorney** 65:8 116:2
**attorneys** 5:13 6:13
  7:11 10:5 21:12,14
  65:18 95:19
**august** 15:18 16:15
  76:6 98:25
**authority** 90:20
**auto** 107:8
**available** 18:18
  30:11 32:6 34:3
  38:4 58:6 108:1
**avenue** 2:17 83:8,13
**award** 81:1
**awarded** 86:23
**aware** 12:1,5,6
  15:10 18:10 20:3
  29:8 37:9 41:2,3
  43:1 44:22 45:14,23
  47:3 48:16,23 52:24

64:3 66:2,3,7,9,12
69:12,15 73:16 76:1
88:22 89:16,23 90:3
90:4,12 95:11 97:5
97:10,13 109:5,8
110:25 111:22
112:20

| **b** |

**b** 14:24 18:12 19:6
  20:8 40:12 54:20
  55:12,14,20 63:15
  63:23
**back** 27:18 39:25
  55:12 76:15,25 77:4
  77:18 81:10 84:23
  86:7,8 90:24 99:15
  99:16 100:9 107:1
**backlog** 110:21
**bailiwick** 26:12
**baker** 1:21 2:3
**bakerlaw.com** 2:9
  2:10
**balance** 94:4
**ball** 12:13
**ballot** 37:7,10 44:23
  45:11 52:1 67:1,2,3
  68:15,19 69:13,13
  69:21 70:1,25 71:17
  71:18 72:10,15,22
  73:5,9 91:1,16 96:6
  96:15,24 99:5
  100:25 101:8
  103:12 104:17
  105:10 109:6,9,12
  109:22 110:16,22
  111:2,11,16
**ballpark** 43:12
**ban** 90:7 93:8,21
**banned** 90:16 92:24
  93:13 95:2
**banning** 93:4
**barbara** 98:14
  99:17,19

**based** 81:6
**basic** 77:3 113:9
**basis** 42:11 76:18,24
  78:11,20 106:8
**bear** 14:2 19:24
**bears** 12:24 20:14
**began** 89:7
**beginning** 13:11
  90:24 107:20
**begun** 89:19
**behalf** 2:2,12 14:7
  15:16 16:23 18:18
  21:8,15 24:2,12,20
  25:22 33:10,19
  36:17 40:1 47:17
  65:14 67:15,17
**belief** 51:24 75:12
**believe** 13:12,15
  18:25 21:22 27:22
  28:4 30:18 32:2,20
  33:6,13 41:18 42:20
  45:18,20 46:9,14
  48:19 60:17,21
  65:19 69:16 71:12
  76:16 77:8,24 80:17
  81:19 83:7,15,22
  87:18 88:7 94:13
  95:15 98:8 99:8
  100:3 101:16,25
  102:8,17 104:12
  106:14 107:10,16
  109:23 112:10,12
**believed** 57:24
**bellingham** 92:7
**beneficial** 42:24
**benefit** 36:22 44:1,4
  49:11 50:4 94:2,5
  98:24
**benefits** 39:6,17
  48:13,16,25 49:8,22
  93:10 102:3
**best** 21:1 58:18,25
  59:1,4,12,16 64:14
  103:22

**better** 48:5 59:7
  93:11
**bid** 60:3
**bit** 19:4 22:2 51:6
  61:21 79:3 86:8
**block** 92:5
**blocks** 83:12
**blog** 39:12,13
**boundary** 83:4,6
**brady** 85:19
**brakes** 103:1
**brancatelli** 83:10
**brancatelli's** 83:13
**break** 11:15,15,17
  11:20 19:3 55:14,17
  55:23 61:9 63:14
  73:2 112:18
**breakers** 48:5
**brennan** 2:4 3:8 5:7
  5:11 6:19 12:11
  53:18 54:22 55:6,10
  55:23 61:7,11 63:17
  112:17
**brief** 21:18 23:19
**briefed** 57:24,25
  58:1
**briefing** 58:3,4
  74:12
**briefly** 10:8
**bring** 80:21
**broader** 27:1 74:20
**broadway** 83:8,13
**brought** 99:21
**budget** 41:24 42:6
**building** 50:25
**business** 86:14
**businesses** 22:9
**button** 79:13,17
**buying** 26:21

**c**

**c** 15:1 98:18
**calendar** 4:5 21:10
  33:20,22,23 34:11
  34:12,23,23 35:1,8

35:9,12,15,20 36:6
  36:8,10 61:22 62:3
  62:13 77:11 106:21
  107:2,17 108:22
**call** 98:14 99:14
**called** 5:1 18:12
  39:13 78:15 98:9
**calling** 22:25
**calls** 50:13 71:15
**camardo** 2:5 5:12
**camera** 26:25 28:12
  32:8 36:21 38:9
  39:6,18 41:17 42:9
  43:3 44:8,10,20,25
  46:7 47:6,18 48:4
  49:4,20 50:25 52:1
  52:3,6,21 53:12
  54:14 56:12 57:4
  58:18 61:17 79:6,8
  80:6 81:8 83:6 84:4
  86:9,14 87:6 89:8
  89:19,20 93:11 94:6
  95:2,13,21 102:16
  108:5,13
**cameras** 27:2 37:22
  37:25 38:1,14,18
  45:17 48:10,14
  49:12 50:2,20 51:8
  54:15,17 57:2,4
  61:2 73:12,24 74:16
  74:18,21 75:6,7
  79:23 80:2,18 82:11
  83:1 85:24 86:3,11
  90:7,17 91:9 92:6
  92:25 93:5,9,21
  96:2 100:25 101:5
  101:14,21 102:3,5
  103:13,17,17,25
  104:9,13,19
**campbell** 29:5
**canceled** 97:3
**cancels** 97:8
**capacities** 9:14,15
  18:11

**capacity** 9:12 14:9
  15:20 18:12,22
  55:16 63:16,24
  101:5
**caption** 115:21
**case** 1:10 6:11
**cats** 23:5
**cause** 115:12
**caveat** 11:17
**cease** 89:21
**certain** 81:8 89:6
  95:6
**certainly** 17:17 27:9
  41:19 42:19 47:3
  52:24 58:1 59:4
  72:7 73:12 79:21
  87:19 90:4
**certainty** 104:4
**certificate** 3:10
  115:1
**certified** 5:4
**certify** 115:8,19
  116:1
**challenges** 112:11
**change** 9:3 28:4,5
  45:6 113:10
**changed** 72:16
**check** 76:8
**chief** 9:13,16 31:16
  74:4,9 77:22
**choose** 49:12 59:20
**choosing** 60:15
**chose** 58:16 59:11
**christine** 1:24 113:7
  115:6 116:14
**cimperman** 85:19
**citation** 102:14,23
**citations** 42:21
  43:19 51:9,14 74:25
  76:19 88:14 101:9
  101:22 110:21
**cited** 91:11
**cities** 75:19 88:21
  89:1,7 92:5

**citizens** 37:13,14
  91:10
**city** 1:12 2:13 5:14
  5:18 6:17,23,24 7:2
  13:10,16 14:7 15:7
  15:17,23 16:19,24
  17:14 18:14,20,24
  19:12 20:1,9,22
  21:3,8,13,15 24:2,3
  24:8,12,20 25:5,11
  27:16,20 28:3,11,13
  28:15,17 29:12
  30:13 31:13,18 32:3
  32:6,20 33:10,20
  35:4 36:18,22 37:2
  37:11,23 38:23
  39:21 40:1,24 41:16
  42:24 43:22 44:4,6
  44:24 45:7 46:3,7
  48:20 49:2,5,11,20
  50:4,7,22 51:4
  52:17,20 53:6,9,12
  54:4,11 56:5,12,25
  58:16 59:11,19
  60:15,19,21 61:16
  61:18 62:23 63:10
  64:1,10,25 65:8,14
  65:19 66:6,21 67:12
  67:15,22 68:16 70:4
  70:6,18 73:18 75:10
  75:16,20 76:23 79:7
  79:22,25 80:25
  84:13 86:9,12 87:5
  88:19 89:9,21 90:5
  90:13,25 92:18
  93:20 95:12 96:2,5
  96:16,24 97:2,7,9
  97:17 99:12 100:16
  101:19 103:10
  104:1,15 105:10,18
  107:25 108:12
  109:7,21 111:17,19
  111:24
**city's** 38:19 39:11
  41:23 62:19

[city.cleveland.oh.us - conversation]                                    Page 4

city.cleveland.oh.us
2:20,21
civil  9:9,21 18:15
cl019  4:6 62:3
clarify  11:8 55:19
cle  39:13
clear  11:3 26:8 31:5
56:21 84:6
clearer  10:24
clearly  46:18
clerk  24:3,9 26:17
26:24 27:3 29:13
40:24 54:4 110:19
110:24 111:6,9,10
clerks  25:22 26:20
109:14
cleveland  1:12,22
2:7,13,18 5:15,18
6:17,23,24 7:3 9:17
13:10 14:7 15:8,17
15:23 16:20,24
17:14 18:14,20,24
19:12 20:1,9,22
21:8,13,15 24:2,3,9
24:12,20 25:5 27:16
27:21 28:3,11,15
29:12 31:13,18 32:3
32:7,20 33:11,20
36:18,23 37:3,11,13
37:23 38:23 40:2,25
41:16 42:24 43:22
44:4,6,24 45:7,22
46:3,7 48:21 49:2,5
49:11,21 50:4,8,22
51:4 52:17,20,25
53:6,9,12 54:12
56:6,12 57:1 58:16
59:11,20 60:15,19
61:16,19 62:23
63:11 64:2,10,25
65:9,14,19 66:22
67:12,15,22 68:17
70:5,10,18 71:8
73:18 74:23 75:10
75:17,21 76:20,24

79:7 86:10,12,21
87:6 88:19 90:6,14
90:15 91:1 92:8
93:8,21 95:12 96:3
96:5,24 97:17
100:17 101:19
103:10 104:16
105:10,19 108:12
109:7,21 111:17,19
111:24 112:1 116:7
cleveland's  21:3
90:5
close  84:16 95:4
closely  90:22
closer  99:2
cnathanson  2:21
coincided  76:2
collect  110:10
com  70:10
combination  44:18
combined  18:2
come  27:6 28:1
69:20 70:3 97:23
98:6 99:13 107:13
109:25
coming  87:2 98:1
comments  83:24
commission  116:17
commissioned  115:8
commissioner  74:5
78:15
commitment  30:13
committee  26:6,11
83:25
common  10:7
communicating
74:17
communication
22:17 62:25 105:5,8
communications
39:9 84:3 105:21,23
105:24 110:8
communities  89:11
90:19 95:9

community  48:21
88:11 90:14 92:24
commute  17:15
companies  31:3
comparable  88:23
88:24,25
compare  52:23 53:4
compensation  14:17
complaint  98:24,25
99:1
completed  10:23
112:21 115:22
compliance  38:21
complying  49:7
component  59:17
components  44:13
44:15 45:4,14
compose  26:6
composition  26:10
26:15 28:24
compound  111:20
112:4
compromise  26:5
computer  76:16
conclude  82:2
concluded  113:15
concludes  112:25
confidential  1:18
7:10 8:3
confirm  105:22
conflict  105:12
confusion  10:4
connection  62:17
66:17,18
connor  2:16
conscious  60:1
consequences  102:9
102:12,19 103:7
consider  31:23
56:10
considerable  59:22
consideration  49:22
87:25 88:13 104:18
considered  32:9
56:9 70:20

considering  58:7
constituents  85:11
consultant  98:8,9,16
contact  106:3 107:3
contemporaneously
92:21
content  72:25
context  68:4 69:1
continue  30:9 31:19
31:25 45:22 47:14
51:2 52:12 56:11
58:16 87:6 88:1
90:19,21 96:6 109:8
109:21 110:9
112:23
continued  52:7,9
101:14 109:6
111:15,25
continues  13:3
109:16
contract  5:17 12:4,6
13:9,15,21 14:6
15:11 16:10,19,23
16:25 17:4,7 19:1
23:1,1 24:24 27:14
27:16,18,21 28:11
28:16,18,20,21 29:1
29:3,20 30:23 31:12
38:5 42:5 43:5
52:10,13 53:25 54:8
64:13,18,18,19,22
65:1,15,22 66:1,6
66:10,13,17,18
80:24 81:2 85:20
86:9,23 87:14 93:24
94:1 96:7,17 97:3,6
97:8 98:3 99:22
100:9,10 106:9
108:4
contracts  28:10
controversial  11:12
convenience  65:10
66:9
conversation  21:18
21:20 22:2 23:16,17

[conversation - development]                                                    Page 5

23:20,22 33:5 35:16
35:23 36:11 37:4
62:13 68:6 70:5
73:14,19,21 74:3,11
74:15,20 77:6,20,22
78:16 83:23 99:6,11
109:3 110:11
**conversations**  21:11
31:14 34:4 73:1
75:24 78:5 86:2
100:1 105:1,11
107:3 110:13
**convert**  108:18
**converted**  84:20
**convey**  83:3
**cooperation**  113:1
**coordination**  54:1
**coordinator**  31:17
56:21 58:23
**copied**  105:21
**copy**  108:3
**corner**  13:2,19
**corollary**  46:12
**correct**  6:10 17:1,2
17:9 18:5,9 21:5,25
22:24 23:3,12,14
24:17 27:17 28:22
29:22 35:6 36:4,6
41:8 47:5,20 49:14
50:5 51:10,11 53:18
54:9 60:10 63:2,12
68:24 69:11 70:22
77:25 78:2,3 79:24
82:18 85:16 88:3
92:21 93:2,6,23
94:11,12 100:20
101:7,12 102:7
112:14,16 113:9
115:17
**corrections**  17:24
**correctly**  23:19
27:19 31:22
**correlation**  42:21
**correspondence**
105:17 106:1

**cost**  49:20 59:18,25
60:2,6
**council**  28:15,15,17
31:18 37:11 38:23
39:15,21 79:7,22
80:1,4,11 81:1 82:8
82:11,12,15,16,19
83:4,7,25 84:1,13
85:18
**councilman**  80:16
80:17,20 81:3 82:4
82:13,24 83:9 86:5
**counsel**  40:6,10
105:13 114:1,6,12
116:2
**counterintuitive**
42:18
**country**  75:20
**county**  92:24 115:4
**course**  38:12 40:13
43:18 54:8 67:10
74:14 88:9,16,17
89:5 111:4
**court**  1:1 3:13 5:15
12:2
**courtesy**  11:6
**courts**  24:4 25:22
26:18,20,24 27:3
29:13 54:4 109:14
110:19,24 111:7,10
111:10
**cover**  63:15,19
**coverage**  71:11 95:7
**create**  36:25
**created**  37:13
**crimes**  76:23
**crossed**  56:2
**current**  6:2 28:16
31:15 34:14
**currently**  15:24
34:3 46:22
**cursory**  76:8 78:10
78:12,25
**custody**  3:12

**cut**  43:14 44:14
68:10
**cuyahoga**  92:24
115:4

**d**

**d**  98:17,17
**data**  34:2 75:12 76:8
76:16 88:4,18 89:10
89:14
**date**  87:22,24
112:24 114:13
**dated**  14:5 16:11
32:12 92:2
**dates**  12:8 34:4
69:17 77:4
**day**  11:13 116:7
**days**  21:24
**dayton**  92:7
**de**  93:12
**dealer**  70:11
**dealers**  50:11
**dealing**  27:11 32:24
**dealt**  84:11
**december**  37:16
**decided**  87:4
**deciding**  24:24
25:18 103:1
**decision**  26:9 28:25
52:2 60:1 69:8
95:23,25
**decisions**  68:9,11
106:6 109:20
**decline**  51:14
**decrease**  42:16,22
42:22,23 74:22
76:12 78:15,18
88:11
**decreased**  42:13
43:6 75:1,5
**decreasing**  43:24
51:7
**deemed**  7:10
**defendant**  1:14 2:12

**delete**  107:9,12
**deleted**  107:11
**delivery**  114:11,13
**department**  2:13
17:5 21:12 30:6
62:23 65:18 66:5
71:2,2 81:5 99:25
100:4 110:3
**depending**  42:8
56:10
**depends**  35:18
**deploy**  49:12
**deployed**  14:22 50:3
**deposed**  5:4 10:5
**deposition**  1:16 4:4
5:20 9:9,21 10:1,1
11:24 16:8 19:15,18
19:22 20:8 22:14
35:13,19 55:14,16
63:15 113:6,15
114:8 115:20
**describing**  65:5
**description**  4:2
**designate**  18:16
**designated**  11:11
19:5,11 20:21 54:25
64:9
**designed**  16:25 17:4
17:7 26:16
**detail**  78:13
**details**  35:22
**determination**  26:3
59:19
**determine**  31:24
86:13 87:5
**determined**  68:17
**deterrent**  50:20
104:20
**detractors**  79:10
**develop**  30:14
**developed**  30:20
31:9
**developing**  36:20
**development**  42:18
43:16 56:15,18

[dialog - escape]                                                                                      Page 6

dialog  86:5
diary  36:10 61:23
different  10:6 18:11
  28:10 34:6,7 64:23
  94:1 107:6
diligence  86:12,24
dinehart  2:15 6:14
  14:14 29:15 34:15
  45:2 53:15 54:18
  55:5,18,25 58:20
  59:2,8,13,21 60:11
  61:10 63:20 79:15
  86:15 90:8 97:11
  104:2,11 107:22
  111:20 112:4 113:4
direct  42:20 72:17
directly  7:1 32:24
  56:17 78:22 79:11
  89:25
director  9:12,16,22
  14:9 15:21,22 16:4
  17:11 31:15 39:9,20
  41:20 42:15 53:17
  53:19 65:2,20 67:8
  67:9,18 86:25 94:11
  98:12,13,13 99:17
  110:4
disappointed  70:19
  91:6
disbanded  89:8,12
discuss  24:14
discussed  23:21
  35:17 40:10 53:25
  101:3
discussing  40:3
  62:25
discussion  59:23
  97:22 109:23 110:1
discussions  33:4,7
  77:17 80:25 97:15
  97:16 101:18 106:6
  109:20
displeased  91:11
dispose  108:25

dispute  42:6
distributed  30:18,20
district  1:1,2 5:15
  5:16 12:2
division  1:3 9:17
  17:24 26:23 38:2
  45:22 53:1 54:2,14
  57:3 71:23 74:8,24
  76:9,20 78:9 109:14
  110:19 111:5,9
divisions  17:22
docket  27:11
document  4:5 12:23
  13:2,5,9,19,19
  14:13 16:11 20:7,10
  20:14 62:3,9 70:6
  112:21
documentation
  77:19
documents  58:4
  60:24 106:19
doing  37:17 39:5
  48:15 82:22 88:17
  94:17
dollar  41:25
dollars  42:7,10,14
  43:4,6,10 49:21
  111:18 112:2
dot  70:10
double  41:11 100:19
doubled  46:3
downtown  50:24
dozen  9:10,11
draft  64:18
drafting  64:17,19
drive  48:23
driven  101:9,11
driver  46:25 47:7
  60:9 102:12 104:7
drivers  48:8 103:10
  103:24 104:8
driving  48:21 49:1
  50:23 51:3,21 60:14
  85:14

drug  50:11
due  86:12,24
duly  5:3 115:7,10
dumas  31:15
duties  17:18 18:3,4
  27:9
duty  17:19

e

e  8:1,1,1 36:16,19
  39:10 71:16 98:17
  98:17,18 107:8,14
  107:19,25
earlier  40:4 54:23
  72:5 91:6
early  77:8
east  90:6,15,16 92:8
eastern  1:3
eckart  98:17 99:7
  105:9 106:3
economic  32:15
eddie  98:17 99:7,9
  99:21 106:3
edging  75:18
effect  50:20 89:2
  103:8
effective  12:7 13:20
  52:18 53:10,21
  83:20 85:12 88:3
effort  72:11 106:18
efforts  32:19
eight  37:19
either  6:22 72:22
  110:18,23 113:5
  116:2
electoral  106:2
electorate  38:7 39:5
electronic  33:23
  34:23,24 108:24
electronically  62:20
eliminate  91:4
eliminated  89:24
  94:3
elude  69:17

eludes  23:7
emergency  17:23
  18:1
emery  1:24 115:6
  116:14
empirical  88:2
employ  50:8
employee  70:6
employees  67:24
employment  49:16
enacted  37:11 38:22
  53:10 89:7
encouraged  104:9
endeavor  86:10
ended  52:1 97:3
endurance  11:10
enforcement  26:25
  27:17 28:3,12 32:19
  36:21 37:1,25 44:8
  44:17,19,20 45:21
  54:16 73:12 74:22
  75:5 76:22 88:14
  96:2 101:11
enhance  41:17
enhanced  32:13
  48:19
enhancement  32:8
  37:21
ensure  17:13,20
  18:6 48:7
enter  27:21 29:1
entered  28:11,13
  29:3
entering  93:24
entire  53:6
entirety  45:4
entries  61:23 77:15
entry  4:5 35:8,9,12
  35:15 62:3 77:11
equal  43:21
equated  85:2
equipment  14:22
errors  113:9
escape  31:3

esq  2:4,5,15,16
essence  18:19 36:9
  64:23
estimate  9:19
estimated  60:6
euclid  90:15 92:10
evaluating  25:2
event  116:3
eventually  102:21
evidence  75:11 88:2
exact  9:20 43:11
  70:12 99:11
examination  3:7 5:2
  5:6 20:15,21
example  35:12
  62:11
exceeded  94:20
exchanged  105:17
executed  13:9
execution  64:13
executive  17:21
exhibit  3:12 4:3,4,5
  4:7 12:12,15,17,24
  13:1 14:17 19:17
  20:7 61:24 62:2,8
  64:12 91:20 92:1,4
exhibits  3:5,13 4:1
existence  42:5 52:25
  72:6
exists  76:25
expand  105:4
expect  11:13 77:13
experience  45:19
  46:20
experiences  9:25
  63:1,8
expires  116:17
explore  30:7
exposure  38:8
extend  53:5
extended  31:13 61:3
extension  28:16,18
  28:21 29:7 30:5,12
  31:6 32:23,25 33:2
  87:16,21

extent  6:15 29:16
  94:14
extremely  56:16
  60:25 63:2
eyes  7:11

f

f  6:1
facilitate  39:2 98:10
  98:15
fact  19:23 25:25
  35:20 36:4,5 40:20
  43:24 57:9 72:9
  84:17 111:24
factor  59:19 60:14
factors  31:23 56:13
  75:13,15,22,25 94:1
facts  40:13 41:2
  71:19
factual  56:3
fail  91:16
failing  102:9,19
failure  103:5
fair  16:7 17:12 33:8
  36:15 41:14 42:15
  46:6 47:16 48:12
  50:19 51:25 52:5
  55:10,17 56:4 58:15
  60:18 61:16 64:13
  70:14 79:4 85:8
  92:13 93:9 101:13
  103:15
fall  77:9
familiar  9:25 32:18
  45:8 46:21 92:16
  93:1,3
fantastic  7:5
far  91:18
fast  34:19
fatalities  46:2,15,21
  46:24 47:1,4 48:1
  73:17 74:1,7,16,19
  75:9,18
favor  82:21,21 86:3

feasibility  30:8
february  16:5 34:1
  72:17,20 78:1 92:2
federal  5:2,15 12:2
  18:15 114:3
fee  97:9,18,23 98:3
  99:22,25 100:10,17
  106:8
feet  50:12
fewer  50:9 51:21,22
  76:4
figure  78:17
file  12:2 108:3
filed  5:14 98:25
files  108:7
filings  27:11
final  64:24
finance  31:15
financial  17:4
find  81:17 91:2
fine  48:15
finish  34:16
fire  17:22
first  5:3 13:21 25:19
  26:3 27:15,18 28:10
  38:12 69:12,15 70:8
  70:14 86:8 87:3,9
  87:17 90:25 98:1
  106:11 112:10
  115:10
five  9:23 20:20
  22:20 23:13,18
  25:17 31:1,3 40:15
  55:1,4,5,7 57:15,19
  59:16 61:9 83:12
  87:17 112:18
fixed  54:11,13 56:25
  57:4 59:24 60:2
flask  1:17 3:7 5:1,6
  5:8 6:1 63:11 115:9
flexibility  37:24
floor  84:1
fluctuated  42:12
focused  79:1 95:3

fold  75:4
folks  24:16,23 25:6
  25:17 26:11 27:4
  29:10 36:8 47:19,22
  48:11 51:21,23,23
  58:12 64:25 71:15
  72:13 74:17 78:6,16
  79:21,25 102:5
  103:16
follow  103:6
followed  90:22
following  7:10 13:24
  15:5 44:23 45:3,16
  46:5,23 51:18,23
  52:1 67:1,3 68:15
  89:21 92:18 95:6
  96:5,15,24 97:21
  104:17 105:10,20
  106:4 109:5,9,12,22
  111:2,11,16
follows  5:5
force  27:2 65:9
  66:12,16 68:2,23
  69:5
foregoing  115:16,21
forensic  57:5
format  77:3 108:18
  108:24 110:6
former  6:15 94:11
forth  34:4 64:11
  71:22
forward  14:12
  15:14 60:1 80:1,12
  94:9
four  55:1 87:16
frame  16:9 42:4
  43:2 76:5 83:16
  87:10 106:17
freeing  49:25
front  12:3,24 13:6
  13:25 39:21 55:8
  84:12
full  5:23
function  107:9

[funding - information]                                                                    Page 8

| | | | |
|---|---|---|---|
| **funding** 59:23 | **goodness** 91:2 | **hey** 25:18 49:4 | 102:17,25 103:12 |
| **further** 16:25 90:16 | 103:18 | 71:16 83:19 86:13 | 104:14 |
| 115:19 116:1 | **google** 84:18 | 87:4 101:20 110:8 | **impacts** 102:12 |
| **g** | **government** 45:7 | **hide** 12:13 | **implementation** |
| | **great** 70:17 | **high** 42:1 | 14:24 |
| **garfield** 92:9,16,18 | **greater** 73:25 | **higher** 43:8 | **implemented** 41:16 |
| 93:1,18,20 94:25 | **guess** 104:3 107:23 | **hire** 50:8 | 51:8,13 |
| 95:4,8 | **guns** 50:11 | **historical** 52:23 | **implementing** 48:14 |
| **gather** 88:1 | **h** | 76:10 | **important** 10:20 |
| **gathering** 69:25 | | **historically** 53:1 | 35:25 56:13,17 |
| **generally** 9:25 11:2 | **h** 39:10 | **history** 52:17 53:6 | **improved** 33:2 |
| 36:5 43:1 44:23 | **half** 43:14 | **hit** 103:1 | **improvement** 33:12 |
| 66:17 89:16 108:10 | **hand** 13:2,18 61:23 | **holding** 29:11 | **inaccurately** 68:14 |
| **generated** 43:3 | 92:5 105:19 110:2 | **home** 95:4 | **inartfully** 61:22 |
| **generating** 42:10 | 116:6 | **hooray** 113:7 | **incident** 90:1 |
| **getting** 34:18 78:2 | **handles** 26:21 | **hop** 84:18 | **incidents** 47:7,19,22 |
| 91:12 | **handwritten** 108:17 | **hope** 70:16 | 52:19 53:11 |
| **give** 18:19 57:22 | 108:24,25 | **hoped** 93:12 | **include** 82:14 |
| 65:1 78:10 87:24 | **happen** 103:23 | **hopeful** 99:12 | **included** 31:2 56:20 |
| 104:18 114:1,12 | **happened** 36:10 | **hopkins** 86:21 | 57:7,11 74:10 |
| **given** 93:10 94:5 | 65:4 | **hostetler** 1:21 2:3 | **including** 31:16 |
| 115:13,18 | **happening** 88:11 | **hot** 79:13,17 | 44:16 48:1 64:12 |
| **giving** 19:22 22:14 | **happens** 108:1 | **hour** 11:15,16 61:8 | 75:23 88:13 |
| 39:16,23 | **happy** 60:23 | **huh** 10:16 | **incorporated** 57:9 |
| **go** 11:13,20 13:18 | **hard** 108:3 | **hundreds** 9:6 49:21 | **increase** 54:10 |
| 30:16 50:24 55:24 | **harper** 39:9 | **i** | 56:24 57:1 73:17 |
| 60:1 68:18 69:9 | **hat** 9:22 25:5 64:2 | | 75:9,17 88:10 |
| 76:15 84:23 100:9 | **hate** 17:10 | **ideal** 52:5 | **increased** 37:22,24 |
| 103:2,3 | **head** 10:17 47:11 | **identification** 12:14 | 38:17 46:16,16,17 |
| **goal** 17:13 18:5 47:6 | **heading** 20:14 | 12:20 19:19 20:6 | 46:21,25 47:1,4 |
| 47:21,25 48:7 49:17 | **heard** 64:6 66:14,16 | 62:5,8 91:22,25 | 49:15 54:15 74:19 |
| 82:15 99:10 | 70:8,14 85:11 90:25 | 92:1 | **index** 3:1,5 4:1 |
| **goals** 47:16,17 | **hearing** 70:24 | **identified** 24:15 | **indicated** 33:18 |
| **goes** 27:18 | **hearings** 84:1 | 33:16 41:6 95:9 | 46:11 |
| **going** 10:8,11,13 | **heights** 50:24 90:22 | 110:16,23 | **indicating** 82:25 |
| 11:19 16:10,13 | 92:9,17,19 93:2,19 | **identifies** 76:21 | **individual** 29:10 |
| 19:24 22:13 24:24 | 93:20 94:25 95:4,8 | **identify** 30:10 46:1 | 107:11 |
| 61:8 76:25 78:17 | **held** 67:7 109:23 | 48:15 59:9 82:9 | **individuals** 25:1 |
| 86:8 87:24 90:15 | 110:1 | **identity** 24:16 | 29:6 40:21,23 67:13 |
| 91:15 93:25 94:1,8 | **help** 19:14 39:2 | **ii** 21:19 25:7 40:25 | 104:14 |
| 102:14,15 103:1,2,2 | 98:10,15 | 67:11 | **information** 6:12 |
| 110:9 | **helping** 70:18 | **imbedded** 82:6,9 | 34:5,11,12 52:23 |
| **good** 5:8,9 32:2 | **hereinafter** 5:4 | **immediately** 83:9 | 53:3 54:2 57:22 |
| 33:14,17 37:12 | **hereunto** 116:5 | **impact** 37:8 42:1 | 58:6 71:3,7,22 |
| 59:14 61:6 | | 46:8,10,13 61:18 | 73:15 75:3 81:7 |

[information - legislative]                                                    Page 9

| | | | |
|---|---|---|---|
| 88:6,12 98:11 99:16 100:7 106:22 110:3 111:5,8<br>**informed** 99:7<br>**inherited** 87:1<br>**initial** 5:25 70:15<br>**initially** 56:8<br>**initiate** 73:19,20<br>**initiated** 73:22 98:4 106:15<br>**initiative** 37:7,10 44:23 52:2,16 67:1 67:2,3 68:15,19 69:13,14,21 71:17 71:19 72:15,22 73:5 73:9 89:9,21 90:3 91:1,16 96:6,16,25 99:5 100:25 101:8 103:12 104:17 105:11,20 106:5 109:6,10,12,22 110:17 111:2,11,16<br>**injuries** 48:1<br>**inoperative** 61:3<br>**inquiries** 71:4,10 72:2<br>**inquiry** 39:22<br>**insight** 18:25 46:20<br>**installation** 54:1<br>**installed** 32:11 80:18<br>**instances** 84:19 89:18<br>**instruction** 114:2,12<br>**integrated** 26:24<br>**interacted** 39:2<br>**interacting** 71:1<br>**interaction** 54:3<br>**interested** 116:3<br>**internal** 70:4 71:15 72:13<br>**intersection** 49:19<br>**intersections** 50:1 50:10 | **introduced** 5:10<br>**involved** 26:4 27:2 29:6,14,19,24 32:24 33:5,6 36:20 56:18 56:22 64:19 65:7,19 66:5 78:22 86:14 97:16 106:5 109:19<br>**involvement** 72:17<br>**involving** 74:11<br>**irrelevant** 87:23<br>**issuance** 29:20<br>**issue** 19:8 23:1 45:11 49:8 65:15 75:5 76:4<br>**issued** 27:6 43:19 51:9 57:13 71:21 75:1 76:19 88:14,15 110:15<br>**issues** 33:15 44:19 57:10 61:2 63:18 78:7 85:3,3 95:5<br>**issuing** 101:22<br>**item** 20:19 45:25 69:10<br>**items** 16:18 50:17 56:19 57:6 77:16<br><br>**j**<br><br>**jackson** 72:22 73:5 73:9,24<br>**jane** 29:4<br>**january** 16:5 87:8 116:17<br>**jdinehart** 2:20<br>**jeff** 66:20 67:9,18<br>**jeffrey** 65:20<br>**jillian** 2:15<br>**job** 113:7<br>**jones** 21:19,21 22:5 23:10 25:7 29:13 31:17 39:1 40:4,25 58:1 67:11,18 105:18<br>**jones's** 22:19 | **judge** 12:3<br>**june** 12:7 13:20 14:5 16:11 99:1<br>**jurisdictions** 88:19<br>**justification** 84:25<br>**justifications** 86:25<br><br>**k**<br><br>**k** 6:1 98:18<br>**keep** 61:24 77:14,16 101:21 108:3<br>**kennels** 17:24<br>**key** 18:4 57:6<br>**kind** 36:10 49:5 71:22 95:5 99:13 104:4,24<br>**knew** 41:21 43:7 92:20,23 93:19 95:1 101:4<br>**know** 11:5,6,7,16 12:8 20:2 24:13 25:24 26:2,17 27:23 28:9,23 29:18 34:25 37:12 39:1,10 40:9 40:14 41:24 45:8,9 45:13 46:5,25 48:22 48:22 49:4 51:22 55:21 59:3,15 60:5 60:24 62:18 64:6 65:13 66:4 68:3,7 71:20 75:11 76:5,14 77:2,10 78:1 80:23 84:17,18 90:18,18 90:20 91:10 99:18 100:1 103:9,11 104:6 107:22 108:1 108:2 109:16 111:3 111:15 112:6,6,8,24<br>**knowledge** 18:17,17 19:1,25 21:2,4 45:20 54:21 55:20 55:22,24 56:3 64:5 90:1 99:24<br>**known** 92:14 | **kts** 23:5<br><br>**l**<br><br>**l** 1:17 2:15 3:7 5:1,6 5:25 6:1 115:9<br>**label** 12:24<br>**lack** 48:5<br>**ladder** 65:5<br>**lakeside** 2:17<br>**lane** 8:2<br>**langhenry** 98:14 99:17<br>**language** 64:22 81:13<br>**largely** 29:9 87:23<br>**larry** 21:19 25:7 31:17 39:1 40:4,25 58:1 67:11,18<br>**lasted** 23:18<br>**late** 30:22 46:1 66:25 73:10 77:8<br>**law** 2:14 21:12 48:5 62:22 65:18,20 66:5 67:9,18 98:13 99:17 99:25 100:4<br>**lawful** 5:1<br>**laws** 48:23 49:7 51:18,23 104:1,10<br>**lawsuit** 5:13 12:2<br>**lawyers** 95:21<br>**lay** 18:13 65:7<br>**layperson** 65:24<br>**lead** 65:13<br>**learn** 40:12,20,20 41:7 100:6 106:11 111:23<br>**learned** 40:15,19 100:8 106:14<br>**leave** 35:14<br>**led** 75:7,8<br>**left** 69:9 92:5 103:16<br>**legislation** 37:10 38:22 82:6,9<br>**legislative** 90:2,6 |

**letting**  11:6
**level**  33:5
**license**  4:3 12:18
 15:6
**life**  37:2 43:15 52:10
 52:13 106:9
**light**  49:13 51:15
 102:16,20 103:20
**lights**  47:22 48:12
 48:18 51:1 52:19
 53:11 102:6 104:21
**limit**  89:13 90:7
 91:4 93:8 102:10,20
**limited**  19:7 44:10
 71:6 75:23 90:16
 92:25 93:14 106:3
**line**  56:2
**lines**  13:21
**linkage**  102:18
**linked**  44:19
**list**  14:19,21
**litigation**  19:9 23:2
 42:6 62:17 65:16
 98:5 100:23 106:12
 106:14,20,23 107:4
 112:22
**little**  19:4 22:1 51:6
 61:21 79:3 86:8
 90:15
**llp**  1:21 2:3
**local**  1:6
**located**  27:24 37:22
 38:14,18 50:21
 56:25
**location**  54:14 83:6
 88:7
**locations**  54:11
 56:25 57:4 82:6,7
 82:10 88:5
**long**  77:2
**longer**  10:21
**longview**  92:9
**look**  13:1 34:2 54:24
 84:23 87:4 89:2
 92:4 93:25

**looked**  33:24 78:12
 88:5,8,9,23
**looking**  33:11 37:12
 88:24
**loses**  103:7
**lot**  36:8
**loud**  47:10
**low**  94:7
**lower**  92:4
**lowest**  60:3

**m**

**m**  1:24 2:4 115:6
 116:14
**macedonia**  8:2
**mail**  71:16 107:8,25
**mails**  36:16,19
 107:14,19
**maintain**  35:25
 108:6
**maintained**  71:24
**maintaining**  107:2
**majeure**  65:9 66:12
 66:16 68:2,23 69:5
**majority**  82:16
**making**  28:24 49:6
 58:7 84:12
**management**  18:1
**manager**  21:19
 57:25 58:10 86:20
**mark**  91:24
**marked**  4:2 12:19
 12:25 19:18 20:6
 62:4,7 91:21
**marking**  12:14
 19:21
**marks**  65:20 66:21
 67:9,19
**martin**  1:17 3:7 5:1
 5:6,25 115:9
**matter**  20:20 92:18
 98:11
**matters**  20:14 78:13
**maureen**  39:9

**mayor**  29:4 34:1
 72:21 73:4,8,10,20
 73:23,24 74:3,12
 75:4 77:7,20 78:6
**mayor's**  71:3
**mean**  86:17
**means**  82:19
**meant**  95:25
**measurable**  45:25
**measure**  34:20 36:9
 71:10 90:6 94:8
**measures**  88:9
**media**  39:10,22
 69:23 70:9,10 71:2
 71:4,11,15 72:2,13
 95:7
**medical**  17:23
**medium**  70:13
**meeting**  66:19,23
 67:6,7 68:2,16,22
 69:7 74:18 77:11
 97:19,21,24 98:10
 98:15 108:20,21
**meetings**  21:10
 77:17 108:9,12
**members**  39:14
 58:10 79:25 80:5,11
 82:20 85:18
**memo**  70:6
**memorialize**  62:13
**memory**  21:2,4
 22:10 40:16 41:7
 43:9 68:21 73:3
 85:1,20 94:25
 105:25
**message**  36:25
 37:14 38:7,16 39:5
**messaging**  36:21
 38:12,21
**microsoft**  35:5
**middle**  5:25
**million**  42:7,10,14
 43:4,6,10
**millions**  111:18
 112:1

**mind**  52:6 85:1
 94:17 99:11
**mindset**  94:4
**mine**  83:10
**minimalized**  72:20
**minimized**  78:2
**minimus**  93:13
**minor**  33:15
**minute**  61:9 112:18
**minutes**  23:18
**misspoke**  86:18
**mobile**  37:25 54:16
 54:17 57:1
**mobility**  37:24
 54:15 57:1
**modest**  11:1
**moment**  23:9
**money**  83:20
**monies**  5:17 12:3
 96:7,17
**monitor**  49:13,19
**monitored**  50:2
**monitoring**  27:10
 49:6 50:1,10
**monroe**  92:10
**monthly**  76:18
 106:8
**morning**  5:8,9
**motivation**  85:15
**motive**  41:18,19
**motorist**  103:5
**move**  15:14 63:23
 83:10
**moved**  32:5 33:25
 83:11 107:24
**moving**  9:2 14:12
 78:4 82:24 90:24
 95:10
**multitude**  18:3
 50:14 57:10 75:25
**municipalities**  88:22
 89:19 90:13 95:1

| n | note  54:19 | offer  54:10 | 107:7,19 |
|---|---|---|---|
| **name**  5:11,23,24,25 | **notes**  61:15 67:5 | **offering**  59:7 | **once**  108:23 |
| 23:7,11 28:4 44:6 | 106:22 108:8,11,17 | **office**  17:25 18:1 | **ones**  86:4 |
| 56:10 67:23 92:17 | 108:18,24,25 | 24:4,9 33:25 67:7 | **open**  69:10 |
| **named**  44:6 115:9 | **notice**  4:4 19:15,18 | 71:3,25 116:6 | **operable**  102:4 |
| **names**  22:8 23:13 | 20:8 38:13 54:24 | **officer**  6:16 49:19 | **operate**  101:14 |
| 25:12,24 31:3 58:14 | 91:12 | 49:23 | **operating**  41:24 |
| **narrative**  35:9 36:1 | **notices**  43:19 88:15 | **officers**  44:17 49:13 | **operation**  44:5,9,18 |
| 36:2 | 110:14,21 | 49:16,23,25 50:3,8 | 45:15 |
| **nathanson**  2:16 55:3 | **notified**  61:4 | 50:9,9 74:23 75:1,6 | **operational**  57:5 |
| 63:21 | **november**  30:19,21 | 76:4 | **operative**  103:18 |
| **necessary**  53:2 | 44:24 69:14 70:25 | **offices**  71:8 | **opinion**  32:11,21 |
| **need**  6:6 9:20 11:15 | 76:12 79:5 91:15 | **oh**  2:7,18 23:23 91:2 | 33:14,17 42:1 56:16 |
| 11:19 26:9 38:6 | 95:10 | 103:18 | 58:22 91:13 94:10 |
| 48:15 77:18 87:4 | **npr**  4:7 91:21 92:2 | **ohio**  1:2,12,22 5:16 | 94:23 |
| 103:19,19 105:15 | **nuisance**  81:18 | 92:8,9,11 115:2,7 | **opportunities**  32:6 |
| **needed**  32:8 | **number**  4:2 9:20 | 116:7,15 | 38:4 |
| **negative**  41:11 | 13:3,4,17,24 14:15 | **okay**  9:5 11:1,2,13 | **opportunity**  38:1 |
| 46:13 100:20 | 14:18,18 15:5,6,15 | 11:23 12:1,10 13:8 | 113:5,8 |
| **negatively**  37:8 | 19:6 22:6 26:9 30:8 | 13:14,17,23 14:6,23 | **opposed**  36:7 49:19 |
| **negotiating**  32:25 | 30:9 37:22 38:17 | 15:4,10,14 17:10 | 60:15 84:7,19 85:6 |
| 65:9,15 66:5 | 40:21 42:12,20,21 | 18:10 19:14 20:5,24 | 85:23 |
| **negotiation**  64:12 | 46:16 48:11 51:9,13 | 21:14,24 22:1,16 | **options**  32:6 38:3 |
| 65:25 | 54:11 56:24 64:11 | 23:7,10 24:5,18 | 59:24 |
| **neighbor**  90:5 | 65:18 67:13 71:21 | 25:4,21 26:2,8,17 | **oral**  10:14 105:6 |
| **neighborhood**  44:16 | 73:25 74:25 76:18 | 27:10 28:7,9 29:19 | **order**  6:11 7:8 82:12 |
| 45:19,21 | 76:22 84:19 88:12 | 31:5,10 33:8 34:9 | **organization**  18:16 |
| **networking**  54:3 | 105:17 | 34:17 35:4,7 36:15 | 18:18 |
| **never**  85:11 91:7 | **numbers**  13:24 | 39:4,16,25 40:18 | **organizations**  107:5 |
| **new**  30:10 38:5 | 20:20 43:11 75:18 | 41:1,9,14 43:12 | **original**  29:6,20 |
| 40:13 54:7 83:6,7 | 76:10 78:14 | 44:3 45:9 46:5,15 | 87:14 99:1 |
| 86:10 | | 46:23 47:3,15,24 | **originally**  16:11 |
| **newburgh**  90:21 | **o** | 48:3,7 51:20,25 | 32:10 40:17 |
| **nexus**  74:15 | **object**  6:14 86:15 | 53:5 54:5 55:6,25 | **outlook**  35:5 62:13 |
| **nod**  10:16 | **objection**  29:15 45:2 | 56:8 57:18 58:5 | 107:2 108:15,21 |
| **nodding**  36:14 47:9 | 53:15 55:11 58:20 | 59:6,10 60:18,23 | 109:4 |
| 47:11 | 59:2,8,13,21 60:11 | 61:7,10 62:11 63:13 | **outside**  6:12 88:19 |
| **non**  11:12 | 90:8 97:11 104:2,11 | 63:25 64:9,21 66:8 | **overall**  60:25 93:10 |
| **normal**  77:20 79:1 | 111:20 112:4 | 68:7,22 69:24 70:13 | **oversight**  17:21,23 |
| **normally**  78:12,25 | **obvious**  17:10 | 71:9 72:1,8 74:14 | 78:23 |
| **northern**  1:2 5:16 | **obviously**  93:18 | 77:5,13,24 80:15 | **overwhelming** |
| **notary**  1:24 115:6 | **occasion**  34:19 | 81:22 84:17 86:7 | 91:13 |
| 116:14 | **occurred**  36:11 | 87:11 96:12,22 97:5 | |
| | 78:18 91:8 98:21 | 99:20 101:4 104:6 | |
| | | 105:15 106:4,11,18 | |

**[p - program]**                                                                 Page 12

**p**

**p**  8:1 39:10
**p.m.**  35:13
**page**  12:24 13:3,4
  13:17,24 14:2,15,16
  14:18 15:1,5,5,15
  20:13,16,17,18 92:3
  92:9
**pages**  15:15 16:14
**paid**  51:10 96:23
  109:9
**paper**  33:22 34:23
**pardon**  53:23
**parks**  17:5
**part**  17:17 33:2,18
  38:16 71:10,13
  104:3
**participant**  97:22
  109:24
**participate**  26:18
**participating**  40:22
**particular**  19:11
  62:24 64:22
**parties**  114:7
**party**  116:3
**passed**  69:14 70:16
  72:23 73:6,9 105:9
**patrol**  44:17
**pause**  24:21
**pay**  96:6 97:9,17
  100:17,17 106:7,7,8
**paying**  96:16 111:19
  111:24
**payments**  26:22
  27:6
**pedestrian**  46:2,20
  46:24 47:4 73:17,25
  74:6 75:9,17
**pedestrians**  48:8
**pending**  11:18
**people**  26:3,9 28:24
  29:12,13 35:11
  38:12 48:17,21 49:1
  51:18 91:11,14

**percent**  41:23,25
  42:4 51:21,22 75:2
**percentage**  59:25
  103:9,24
**perception**  48:20
**period**  31:21 34:13
  35:22 61:3 79:5
  109:11,15 110:20
**person**  18:16,19
  22:17 64:14
**personal**  54:21
  55:16,21,24 63:16
  63:23 64:5
**personally**  20:2 33:6
  63:11 64:6 81:9
  86:4 108:6
**petition**  72:11
**phone**  75:24
**phrase**  48:5
**pieces**  105:17
**place**  10:2 30:3,5
  31:6 37:18 48:4
  66:24 67:6 75:13
  76:12 87:2,24
  104:20 115:20
**placement**  104:12
**plain**  70:10
**plaintiff**  1:8 2:2
**plaintiff's**  12:15,17
  13:1 19:17 20:7
  62:2 91:20,25
**plan**  69:8
**planning**  6:11 7:8
**plans**  9:1,3
**please**  5:23 12:11
  34:15 60:13 80:12
  96:9
**pnc**  50:25
**point**  6:5,20 11:4
  28:1 31:7,24 32:5
  34:25 37:18 42:14
  43:8 55:15,17 63:14
  85:8 87:3 89:17
  107:13 113:4,11

**points**  77:17
**police**  6:15 9:13,16
  9:18 17:22 26:24
  27:2 31:16 38:2
  45:22 49:16,18 53:1
  54:3,14 57:3 71:23
  74:4,8,24 76:9,20
  78:10 109:14
  110:19,24 111:5,9
**policies**  107:6
**policy**  90:20
**politically**  79:14,18
**polster**  12:3
**portion**  8:3 27:8
  103:16
**position**  16:3 83:25
  84:3,25
**positive**  42:18 43:16
  43:17,25 46:8,9
  51:18 61:18 63:2,9
  70:15
**possessing**  110:18
**possibility**  72:14
  93:7,20 94:2 104:5
  112:22
**possible**  58:18
  101:25
**post**  95:10 106:1
**posted**  39:14 83:5
**potential**  6:9 30:20
  37:7 38:8 94:21
  102:19 103:5
**potentially**  45:15
  70:1
**pr**  38:10,11
**practice**  35:7,14
  77:14 108:8,16,17
**pre**  83:14,15
**predecessor**  29:14
**prefer**  10:21 43:22
**preliminary**  68:5
**preparation**  33:19
  36:17
**prepare**  21:7,16
  30:6 57:21

**prepared**  20:24 74:8
  76:21,24
**preparing**  34:9
  40:11
**presence**  115:15
**present**  2:23 28:12
  52:8
**presentation**  39:24
**preserve**  8:1 106:19
**press**  71:2,8,25
**previous**  72:5
**previously**  83:5
  102:2
**primarily**  17:7
  65:25
**primary**  17:12,19
  18:5 60:9
**printed**  14:4 62:17
  62:18
**prior**  34:5 40:14
  79:5 87:2,9,13,18
  87:20 89:4 90:4
  108:1 110:15,16,21
  111:12
**proactive**  71:9
**probably**  11:14
  63:13 77:21,23 99:1
**procedure**  18:15
**proceed**  94:19
**process**  9:2 26:19
  27:5 109:21 110:9
**processed**  109:9
  110:17,24
**processing**  15:1
  59:12,15 111:1
**production**  112:21
**professional**  17:25
**program**  27:1 30:9
  32:1,8 35:4 37:8,18
  37:21 38:9,20 39:6
  39:18,24 41:17 42:9
  43:3,15 44:2,3,7,8
  44:11,13,20,25 46:8
  46:13,24 47:7,18
  48:4 52:1,3,6,15,21

[program - reduced]                                                                    Page 13

53:9,13 54:6,16
56:13 61:17 70:17
71:5,20 78:6 79:6,8
80:6 82:17 83:24
84:4,8,20 85:2 87:1
87:7,19 88:1,2 89:8
89:11,20,20 90:2
91:13 93:12 94:6,18
94:20,22 95:13,22
97:4 104:14 108:5
108:13 109:3
**program's** 51:12
94:13
**programs** 52:24
88:25,25 89:4,23
**progress** 58:2
**prohibited** 96:1,16
**project** 14:24 21:19
31:16 56:21 57:25
58:10,10,22
**promote** 81:19
**promoted** 82:3
**proposal** 22:23
58:24
**proposals** 22:8,10
24:1 25:3 30:7,14
30:19 40:23 56:16
56:19,20 57:7
**propose** 64:21
**prospective** 36:8
**protective** 6:10 7:8
**provide** 10:23 11:6
23:10 24:5 36:1
53:24 109:7 111:5,8
111:15,25
**provided** 5:2 17:21
33:14,17 59:4,12,14
60:22 62:19,20,22
76:8 78:9 88:6
109:13
**provider** 28:2 58:18
**providing** 32:2 54:2
60:20 71:3,6
**provision** 65:11
66:10,13 97:6,7

100:13
**provisions** 65:10
**pruitt** 80:17,20 81:4
86:6,6
**public** 1:22,24 2:6
6:12 9:13,16,22
14:10 15:22 16:4,25
17:8,11 26:22 30:6
32:16,18 33:25
38:13 39:23 41:17
41:20 42:2,16 46:8
46:13 50:4 53:17,20
61:18 65:2 67:8
71:23 72:18,19 78:1
78:23 81:5,20 82:3
84:5,11,12,21 85:12
87:1 94:2,5 98:12
98:13 100:5 110:3,4
110:5 115:7 116:14
**pull** 76:16
**purpose** 6:8 77:22
**purposes** 5:22 6:9
12:14,19,23 16:8
17:5 19:19 20:6
35:1 57:5 62:4,8
63:25 77:20 91:21
91:25 92:1 96:2
111:6
**pursuant** 5:17 114:3
**put** 35:9,11,15 38:18
39:10,11 48:4 62:12
70:25 72:15 80:12
98:10 109:4
**putting** 70:1 72:10

**q**

**qualified** 115:8
**qualify** 75:7 85:5
**quality** 37:2
**quantity** 24:15
**question** 10:23 11:5
11:8,18,19 15:16
22:13 23:24 24:6
34:16 45:12 58:3
60:12 79:10,16

89:25 90:9 93:16
96:8,13 111:21
112:5
**questions** 10:12,21
11:3,23 17:11 63:19
**queue** 110:18,22
**quick** 23:16 112:18

**r**

**r** 8:1,1 39:10,10
98:18
**radio** 70:11
**rank** 25:18
**rates** 32:19 46:16,22
71:22
**reached** 22:2
**reaction** 70:15
**reactive** 71:12
**read** 113:5,8
**reading** 95:6 114:7
**ready** 63:14
**real** 42:1
**realignment** 83:5
**really** 27:1
**realm** 93:19
**reason** 16:22 52:11
52:14 58:15 79:1,2
95:15
**reasons** 59:10 70:21
85:10
**recall** 12:9 15:13
23:9 25:4,8,11,21
26:7,14 28:6 29:17
29:18 33:3 39:3,5
39:16,19,23 40:3
41:7 57:14,14 58:2
58:4,13,14 59:6
60:8 67:5,8,14,20
68:1,4,25 69:3 70:7
70:9,12 72:25 73:4
73:7,8 76:3,11 77:6
77:12 80:4,7,10,11
80:14 81:3,12 82:25
83:16,18 84:2,6,8
84:15 85:23,25 86:1

87:10 88:21 89:10
89:12 97:25 98:1
101:2 105:1,3,11
110:5,11,12
**recalled** 84:10
**receive** 102:13
104:8 106:2
**received** 98:14
111:17
**receives** 102:22
104:7
**receiving** 105:22,25
**recess** 61:13 112:19
**recipient** 78:8,21,24
**recognize** 13:8 62:9
**recognized** 32:4
**recognizing** 33:11
**recollection** 109:2
**recollections** 108:19
**recommend** 52:15
113:11
**recommendation**
26:14,15 28:25 30:2
30:4 31:12,18 58:8
81:1,6,25 87:25
100:21 104:24
**recommendations**
58:9 100:16
**recommended** 74:9
**recommending**
60:10
**record** 5:11,22,24
10:24 12:23 35:25
54:19 77:16 85:18
86:16 107:2
**records** 61:24
**red** 47:22 48:12,17
49:13 51:1,14 52:19
53:11 102:6,16,20
103:19 104:21
**redflex** 23:5 31:2
**redirect** 63:22
**reduce** 47:7,18,21
**reduced** 115:14

reducing  47:25
  48:11 52:18 53:10
  104:15
reduction  37:1,2
  43:18
reed  80:16,16 82:24
refer  16:9 32:14
  77:18
reference  14:14
referenced  115:13
  115:18
referred  54:23
  61:22
referring  16:10 44:7
  107:1
reflect  77:11 85:18
refresh  85:20
refreshed  94:24
regard  37:5
regarding  34:3
  44:16 73:11 83:24
  90:1 100:22 107:4
  114:2,13
regardless  29:10
  70:13 85:10 87:23
  110:7
region  88:8
regions  89:1
rejected  92:6
relates  108:4
relationship  6:21
  26:22 31:11,19,25
  58:17 61:5 106:23
relative  108:13
  109:20 116:2
relatively  11:12
  94:7
relevant  6:4 106:20
remain  45:15
  104:19
remained  45:5,10
remember  22:8
  23:19 24:19 27:19
  28:14 31:22 36:24
  37:3 42:13 43:7,10

43:11 57:25 71:1
  72:7 75:3 80:14
  81:9,15 83:14,17
  84:6,24 87:14 88:24
  90:10,11 92:17 95:5
  95:8 99:4 100:6
  106:16 109:11
reminded  22:20
  24:7
removed  83:9
renewal  29:25 30:3
  30:5 80:24 87:9,12
  87:18
repeat  79:16
rephrase  11:8
report  70:9,10 74:8
  74:10 76:17,21,25
  77:4 78:9 79:1
reported  76:23
reporter  3:13
reporter's  3:10
  115:1
reporting  77:19
  81:7
reports  69:23,25
represent  85:17
  105:16
representative
  18:14,24 20:22 37:4
  40:1 54:25 56:5
  62:19 64:10 66:21
  67:12
representatives  24:8
  25:9,11,14 26:1
  65:8 66:20 67:19,21
  68:16 97:20
represented  41:23
representing  5:13
request  22:7,9,23
  24:1 30:7,14,19
  40:22 56:15,18,20
  57:7 58:24
requested  114:1,12
requests  25:2 72:13

require  49:15
required  82:7
requirement  38:15
residence  6:8
residential  6:3 7:7
residents  17:13
  32:22 81:19 85:6
resigned  6:23
resolution  99:13
resolving  105:12
respond  11:19 22:9
  30:24 50:13 97:1
  104:4
responded  22:11
  57:10
respondents  22:7,21
  22:22 23:4 40:16
  57:9 59:16
responding  72:12
response  10:24
  22:19 24:6 46:19
  47:17 69:4 70:24
  71:4
responses  25:2,17
  25:18 26:4,10 57:15
  57:19,23 58:2,7
responsibilities
  17:18 18:3 27:9,12
  50:15
responsibility  17:20
  19:24 25:23
responsible  65:25
responsive  33:15
  39:22 58:24 71:10
rest  98:11
restate  93:15 96:8
restating  68:14
result  27:7 40:11
  66:19 68:8,11,19
  69:7 70:4 72:8 83:4
  89:9 111:17 112:1
resulted  75:15
retain  108:21
retained  3:13 77:3
  77:21 108:15

retention  107:6
retire  7:2,4
revenue  41:21 42:17
  42:22 43:2,14,23,23
  43:24 51:7 59:23
  71:20 84:4,22 88:8
  88:15 110:10
  111:18 112:2
review  10:8 23:25
  23:25 26:10,18
  34:10 35:2 36:16
  40:22 57:12,15,18
  58:11 64:22 76:6
  78:10,11,24,25 88:4
  88:17,18 89:5 100:9
  114:2
reviewed  15:12
  16:14 21:10 33:20
  34:22 78:19
reviewing  12:22
  25:17 26:4 61:15
  89:10
rfp  22:11,21,23,23
  25:18 30:16,24,25
  31:7 40:16 57:12,16
  57:23 58:7 60:3
right  13:2,18 23:8
  24:25 27:13 31:3
  40:8 42:25 43:20
  49:9,24 55:20 56:1
  61:9 68:12 70:2
  73:2 80:3,9 86:1
  102:24 112:24
rise  76:2
risk  93:7,13 94:7,14
  94:15,21 103:5
role  26:21 33:4 40:1
  45:7 71:6 72:16,19
  72:19 78:1,22 86:22
  104:23,23 111:1,4,7
roles  9:17
rollover  107:14
room  2:17
rpf  57:10

[rule - speak]                                                                 Page 15

| | | | |
|---|---|---|---|
| **rule** 18:15 20:8 | **scheduled** 35:21 | **set** 64:11 116:6 | **sir** 6:2,20 10:3 11:25 |
| **rules** 5:3 10:1,6 | **schedules** 14:13 | **settlement** 100:22 | 13:6,7,25 14:1,8,11 |
| 114:3 | **school** 103:2 | **seven** 24:23 25:1 | 14:25 15:3,9,18 |
| **run** 51:1 102:15 | **scientific** 75:12 | 40:23 | 16:21 18:9 20:11,12 |
| 103:19 | **scrapped** 45:11 | **shaker** 50:24 | 20:18,23 21:6 22:15 |
| **running** 47:22 48:12 | **script** 14:5 | **shared** 39:14 71:24 | 23:3 29:23 30:1 |
| 48:17 52:19 53:11 | **seal** 116:6 | 98:11 99:16 | 33:21 40:5 41:5 |
| 102:6 104:20 | **second** 13:21 23:24 | **sharing** 6:12 7:9 | 47:23 48:2,6,9 50:6 |
| | 92:3 | 75:4 | 50:15,18 51:5,16,19 |
| **s** | **secondly** 26:5 | **sharon** 31:15 | 52:4 53:14,22 55:9 |
| | **section** 36:1 54:20 | **shocked** 91:2 | 56:7 57:17,20 60:4 |
| **s** 6:1 8:1 | **security** 86:20,21 | **shoots** 71:15 | 61:14,20 62:10,15 |
| **safe** 44:5,9,18 | **see** 13:20 14:13,19 | **short** 34:13 61:13 | 63:3,6 64:8,20 65:3 |
| **safely** 48:24 | 14:25 15:8 49:3 | 112:19 | 65:6,23 66:11 67:25 |
| **safety** 9:13,16,22 | 50:25 56:19 57:6 | **shoulders** 10:17 | 69:2,6 81:21,23 |
| 14:10 15:21,22 16:5 | 75:16 76:1 78:24 | **show** 12:10 19:14 | 82:1 85:13,22 92:12 |
| 17:1,8,12,13,20 | 88:2,9,10 89:20 | 60:23 76:17 91:24 | 92:22 97:14 100:11 |
| 18:4,6 26:23 30:6 | 92:11,17 100:9 | 105:15 | 100:14,18 106:10 |
| 32:16,18 33:25 | 102:5,5,15,16 | **showed** 64:12 73:16 | 109:18 112:20 |
| 38:11 39:12,13,20 | 103:25,25 105:20 | **showing** 20:5 62:7 | **sites** 14:20,21 |
| 41:17,20 42:2,16 | **seeing** 102:25 | **shown** 64:24 | **sits** 43:9 |
| 46:8,13 48:8,20 | **seek** 30:14 | **shrug** 10:17 | **sitting** 45:23 66:8 |
| 50:5 53:17,20 61:18 | **seeking** 5:17 12:3 | **side** 60:1 | 67:23 90:12 95:11 |
| 65:2 67:8 71:23 | 59:5 | **sign** 49:3 65:1 | 100:12 111:14 |
| 72:18,19 78:2,23 | **seen** 13:13 | 102:15,16,25 103:7 | **six** 58:13 |
| 81:5,20 82:3 84:5 | **sense** 10:9 16:16 | **signage** 51:1 102:10 | **slash** 63:9 |
| 84:11,21 85:2,12 | 61:12 63:18 64:7 | 102:18 103:4 | **slow** 51:2 102:6,14 |
| 87:1 94:2,5 98:12 | 68:5 85:4 96:11 | **signature** 14:3,4 | 103:19 |
| 98:13 100:5 107:24 | 112:13 | 114:5 116:13 | **slows** 102:22 |
| 110:4,4,5 | **separate** 24:18 | **signatures** 69:25 | **solely** 44:10 |
| **salary** 49:22 | **september** 35:3 | **signed** 14:6 15:16 | **solutions** 1:6 |
| **sam** 2:5 5:12 | 37:15 76:7 | 16:11,15,22 17:6,6 | **somebody** 17:5 |
| **sat** 23:25 | **series** 10:11 | **significant** 37:20 | 57:21 |
| **satisfied** 33:9 60:19 | **serve** 6:25 | 41:22 73:16 74:22 | **sorry** 20:16 34:17 |
| 60:21,25 | **served** 16:4 | 75:8 78:14 94:18 | 44:14 54:22 67:4 |
| **saw** 42:19 46:2 64:5 | **server** 107:25 | 103:24 | 79:15 86:18 100:19 |
| 69:24 74:21,24 | **servers** 34:7 | **significantly** 72:16 | 112:15 |
| 75:18 78:13 | **service** 4:3 12:18 | **signing** 114:7 | **sort** 55:13 68:17 |
| **saying** 55:22 75:8 | 15:6 32:3 33:13,16 | **signs** 102:5 103:16 | 69:9 87:22 |
| 81:4,14,16 84:13 | 50:14 | 103:25 104:9,13,19 | **source** 70:12 84:22 |
| 97:2 | **services** 17:24 30:15 | **similar** 88:24,25 | 100:5,6 |
| **says** 35:12 71:16 | 30:15 50:14 53:24 | **similarly** 106:4 | **sources** 64:4 |
| 83:10 92:5 97:7 | 58:19 59:4 60:20,22 | **simply** 23:16 38:9 | **south** 90:15 92:10 |
| **scamardo** 2:10 | 109:7 111:16,25 | **simultaneously** | **speak** 21:15 34:19 |
| **schedule** 14:19,21 | | 75:13 | 38:24 47:10 64:14 |
| 14:23,24 15:1 | | | |

speaking 73:4,8
specific 12:8 25:24
33:3 54:6 58:3
59:17 69:17 77:5
82:7,10 84:8 89:25
111:7
specifically 16:12
23:23,25 26:23
32:17 39:4 56:23
67:20 81:16 100:4
specifics 83:18
specified 115:21
speeches 39:17
speed 37:1 49:13
51:15 102:10,20
104:15,15
speeders 46:17
speeding 47:8,19
48:12,17 52:19
53:11 104:20
spell 5:24
spoke 39:1 40:6
99:18
spoken 73:10
spring 69:16,21
72:3,7
square 1:22 2:6
ss 115:3
staff 31:16
standards 17:25
standing 44:21
started 35:1 76:4,12
starting 14:18
state 1:5 5:23 89:9
89:22 100:3 115:2,7
116:15
stated 83:25 91:6
statement 41:12
50:16 81:17 100:20
statements 84:12
states 1:1 89:18
92:15
stating 84:15
statistical 52:22,23
53:3 71:7 73:15

77:19 78:9,13 81:6
88:6
statistically 74:24
statistics 76:1 78:19
stenographer 10:12
stenographers
34:20
stenotypy 115:14
step 86:7
stepping 39:25
steps 68:18
sticker 12:12,25
stood 60:5 76:9
78:14
stop 47:12 48:5
50:11 84:14 95:16
102:6
stopped 28:2 95:22
strategy 40:10
stream 41:21 42:23
59:23 88:9,15
streams 71:21
street 51:22 83:12
streets 44:5,9,18
structure 26:16
structures 26:21
studies 86:24
subject 6:16
subpoena 6:6,9,17
6:25
subpoenaed 6:16
subsequent 76:13
substance 100:1
110:8,13
substantial 103:15
suggested 40:17
suite 1:22 2:6
summarizing 57:22
summary 74:7,10
summer 77:8
support 75:11,12
79:11 82:17 91:14
101:17
supporters 79:9

supportive 72:18
sure 10:7 29:16 49:6
66:15 72:24 85:3
94:15 98:19 99:23
111:12
surprise 112:9
surprised 91:5,7,17
111:23
surveillance 38:2
54:15 57:4 101:1,6
101:10,15,20
switch 55:21
switching 79:3
sworn 5:3 115:10
synopsis 108:20
system 32:10 36:22
107:25,25 108:15
systems 34:7

**t**

t 98:18
take 9:24 10:14,15
10:21,22 11:14,17
11:20 30:3,5 49:22
55:14,17,23 61:9
65:13 66:23 67:6
76:12 86:11 87:4
91:1 93:12 94:7
100:15 108:8,17
112:17
taken 1:21 5:20
76:22 83:11,17
106:19 115:20
takes 10:2 86:10
talk 16:12 22:1
72:21
talked 51:6 61:21
talking 16:9,13
27:15 31:1,1 32:15
32:16,17 33:1 42:3
42:4 55:19 79:4
taxing 81:18
tbrennan 2:9
team 23:25 58:11,23

technologies 89:3
technology 30:10
32:4 33:1 58:25
59:7 101:16
telephone 22:18
telephonic 22:16
telephonically 2:24
televised 70:11
tell 22:12 68:13 79:2
95:3
telling 81:9
ten 72:5
tenure 16:2 39:20
51:3 53:8,16
term 68:3,23 69:4
terminate 6:22
terminated 6:24
44:24 95:12
terminating 46:12
termination 45:3
46:23 65:10 66:9
97:7,9,18,23 98:3
99:22,24 100:10,13
100:17 106:7
terminology 66:14
terms 18:13 32:7
36:25 43:12 60:6
65:14 86:23 87:14
88:4
terrell 80:17 86:6
terry 2:4 5:11 14:15
54:18
test 11:10
testified 9:6,8,21
40:2 41:1,15 61:14
97:8 102:3
testify 6:6 19:8
20:25 21:1,7,16
33:19 55:16 115:10
testifying 18:11,13
18:21,23 19:25 20:2
64:2,4
testimony 19:23
22:14 24:23 34:10
36:17 39:21 40:12

46:6 56:4 63:15
64:1 68:14 77:24
112:23,25 113:10
115:13,17
**texas** 92:8
**texting** 75:23
**thank** 113:2,3
**thanked** 99:13
**thing** 40:19 46:18
**things** 20:2 38:20
40:9 43:21 47:24
56:24 64:3,5,5,6
71:7 81:18,20 83:20
**think** 11:2,12,14
23:17 30:21 31:2
41:15 52:11,14,16
53:9,20 60:24 61:4
61:14 63:13 74:11
75:14 83:10,19 85:1
86:16 87:12 94:24
95:1 99:10 103:7
107:11
**third** 110:2
**thought** 32:1 35:24
84:20 91:12,16
93:11
**thousand** 49:21
**three** 20:20 21:8,17
23:18 24:8,9,11
25:10,25 40:17,24
40:24 54:7 55:2,3,5
55:7 56:23 57:6,11
**ticket** 49:2,8 59:12
59:14
**tickets** 27:5,7 71:21
76:4 109:8,13,22
110:9,14
**time** 6:6,22 11:4
16:7 24:20 25:23
28:1,10 31:6,7,24
32:4 33:7 34:13,14
34:25 35:22 37:18
39:7,12,18 42:4
43:2,5 51:7 55:15
56:11,22 61:4 63:5

71:24 76:5 77:17
78:20 79:5 83:16
86:7 87:3,10 89:17
92:14,20 94:16 95:7
99:2 104:23,24
106:16 107:13
109:12,15 110:7,20
111:18 113:1
115:20
**timeline** 15:2 28:5
98:20 110:6
**timely** 37:14
**times** 9:6,8,20
**title** 15:24 16:3
29:11
**titled** 20:8
**titles** 29:9
**today** 5:20 11:10
18:10,22 20:24
34:10 35:19 36:17
40:12 41:2 45:24
56:4 63:7 66:8
67:23 90:12 95:11
100:12 109:17
111:14 112:25
**told** 24:19 99:14,15
**tool** 85:12
**topic** 39:17 55:2
79:13,17 105:2,5
109:2
**topics** 11:11 19:7,11
20:25 21:9,17 38:25
54:25 63:16 64:11
64:15 79:3
**tracked** 74:7
**traffic** 26:25 27:16
28:3,12 32:7 36:21
37:8,22,25 38:9,17
39:6,18 41:16 42:9
43:3,19 44:7,10,16
44:20,25 45:16,21
46:7 47:6,18 48:4
48:10,14 49:12,20
50:2,20,25 51:7
52:1,3,6,20 53:12

54:16 56:12 58:18
61:17 73:11 74:4,6
74:6,16,22,25 75:6
75:7,9 78:6,15 79:6
79:8,22 80:2,5 83:5
84:4 85:24 86:3,8
86:11,14 87:6 88:14
89:7,19,20 90:7,17
91:9 92:6,25 93:5,9
93:10,21 94:6 95:2
95:12,21 96:1
102:22 103:12
104:10,13 108:5,13
**transcribed** 10:16
10:18 115:16
**transcript** 3:1 8:3
113:6 114:3,8,11,13
**transcription**
115:17
**transferring** 108:23
**trap** 83:20
**tremendous** 61:17
94:5
**trend** 32:19
**trial** 6:7,22
**triggered** 73:13
**true** 46:12 51:9 63:4
63:7,10 65:11,12,21
92:22 115:16
**trust** 9:5 64:24
113:6
**truth** 115:11,11,12
**try** 11:7 34:20 73:2
91:3 93:8 94:21
96:10
**trying** 97:1
**turn** 13:11,23 14:16
14:18,23 15:4 20:13
92:3,8
**turner** 24:10
**two** 18:11 20:13,17
20:18,20 21:24 25:8
30:9 31:21 36:19,20
47:24 55:1,3,5,7
59:24 75:4,12 76:1

80:14 87:15
**type** 26:18
**types** 77:14
**typographical** 113:9

**u**

**uh** 10:16
**ultimate** 47:25
**ultimately** 81:24
111:10
**umbrella** 56:2 65:1
**unclear** 28:5
**understand** 5:19,21
10:10,18 11:5,21
16:18,21 18:21,23
19:10,22 20:4,19
24:22 27:14 54:24
61:24 66:15 108:16
**understanding** 10:8
19:13 28:8,19 57:8
68:20 82:5 84:22
87:19 95:14,19,20
95:24 96:4,14,19,21
96:23 97:2 100:13
100:24 103:23
107:18 111:4
**understood** 6:19
10:25 11:22 16:17
45:1 69:18 72:1
**undertaken** 52:17
**underway** 72:11
**unfortunately** 98:23
**uniformed** 75:5
**unique** 75:20
**united** 1:1 89:18
**update** 36:6
**upper** 13:2,18
**use** 36:9 38:1 90:7
90:17,19,21 92:25
93:4,9 96:1
**uses** 35:5 68:23
**usually** 109:1
**utilize** 54:13 57:3
**utilized** 89:3

| | | | |
|---|---|---|---|
| **utilizing** 89:4 | 94:7,21 95:23 | **wish** 56:19 | 68:17 81:2 93:25 |
| **v** | **vs** 1:10 | **wished** 81:11 | 96:7,17,23 97:9,20 |
| **v** 8:1 | **w** | **wishes** 82:4 | 98:4,9,24 99:12 |
| **validation** 111:6 | **wadle** 2:24 | **witness** 19:6,23 | 105:12,19 106:7,7,8 |
| **valuable** 81:8 | **wait** 10:22 | 34:17 36:14 47:9 | 106:16 108:4,12 |
| 101:21 | **waiting** 47:12 | 113:13 115:9,14,15 | 109:6 110:25 |
| **value** 32:1,14,15,16 | 110:17,23 | 115:18 116:5 | 111:15,19,25,25 |
| 32:18,22 36:25 | **waive** 113:11,14 | **witness's** 114:2 | **y** |
| 37:14 38:19 87:20 | **waived** 114:9 | **wonderful** 113:7 | **yeah** 34:18 41:10 |
| 91:14 94:13,18,20 | **want** 10:7 22:1 | **word** 18:4 | 55:10 59:3 61:1 |
| **various** 14:13 76:10 | 25:19 40:9 55:18 | **words** 10:15 17:3 | 69:19 95:17 107:24 |
| 107:5 | 61:23 63:18 73:2 | 19:23 24:22 25:16 | **year** 42:8 46:2 73:11 |
| **vendor** 23:6 30:24 | 80:1,13,18 81:14 | 29:11 35:11 36:7 | 76:7 87:15,16,22 |
| 33:7 56:11 59:20 | 82:13,20,25 89:13 | 38:6 44:22 46:15 | 94:3 107:17 |
| **vendors** 30:20,21 | 95:18 98:19 99:12 | 48:3 50:23 51:12,20 | **years** 31:21 37:19 |
| 31:1 60:7,10,16 | 99:25 105:22 | 58:5 68:13 69:24 | 42:13 72:6 77:1 |
| **veracity** 112:12 | 112:11 | 70:5,16 71:14 74:17 | 87:15,16,17 |
| **verbal** 10:15 | **wanted** 52:12 56:23 | 81:12 84:11 93:4 | **z** |
| **version** 64:24 | 56:24 57:6 | 102:4,14 | **zachary** 80:16 |
| **versions** 64:23 | **ward** 80:2,13,18,19 | **work** 17:16 33:9 | **zack** 80:16 |
| **versus** 60:7 | 81:9,11,15 82:13,20 | 50:24 84:13 | **zone** 102:22 103:2 |
| **vestiges** 45:10 | 83:1,7,9,12,13 85:6 | **worked** 39:8 | |
| **viable** 45:16 | **warned** 34:19 | **working** 36:24 | |
| **view** 51:17 | **warning** 104:13 | 59:18 60:6 | |
| **viewed** 38:7 42:16 | **washington** 92:7,10 | **world** 52:5 | |
| 43:16,17,24 44:1 | 92:10 | **worthy** 35:24 | |
| 53:2 58:17 | **way** 45:24 62:21 | **write** 63:1 | |
| **violate** 104:1 | 96:20 101:24 | **writing** 105:6 | |
| **violation** 91:12 | **we've** 53:25 | **written** 108:18 | |
| 104:7,8 | **wearing** 9:21 25:5 | **wrong** 77:25 | |
| **violations** 49:14 | **website** 38:19 39:11 | **wrote** 63:5 | |
| 59:25 110:15,22 | **wednesday** 21:22,23 | **x** | |
| 111:1,9 | **week** 21:22,23 40:4 | **x** 26:9 35:13 | |
| **visitors** 17:14,15,15 | **weekly** 74:7,10 | **xerox** 1:5 5:13,14,16 | |
| **vocally** 84:7 | 76:18,21,24 78:8,11 | 5:18 12:1 13:10,16 | |
| **voice** 18:20 19:12,25 | 78:20 | 15:7 16:20 23:5 | |
| **vote** 80:7 82:21 | **weeks** 40:13 | 28:7 32:24 33:10 | |
| 97:21 106:1,2 | **weighing** 105:23 | 36:24 37:4 38:25 | |
| **voted** 79:22 80:5,7 | **went** 73:23 | 39:3 46:7 52:20 | |
| 85:19 | **wes** 2:24 | 53:12,24 56:9 58:17 | |
| **voter** 89:9,21 90:23 | **whereof** 116:5 | 59:11,18,20 60:5,7 | |
| **voters** 69:25 70:24 | **wide** 89:9,22 107:25 | 60:10,15,20 61:5,16 | |
| 72:9,15 91:3,8 | **willing** 94:6 | 63:1,9 66:6,20 | |
| 92:15 93:4,8,22 | | 67:16,17,19,24 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.