Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4          ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

5    XEROX STATE &

6    LOCAL SOLUTIONS, INC.,

7

8              Plaintiff,

9

10        vs.           Case No.  1:15CV1707

11

12    CITY OF CLEVELAND, OHIO,

13

14              Defendant.

15          ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

16               Deposition of

17              LARRY JONES, II

18        PAGE 9 WAS DEEMED CONFIDENTIAL

                 April 21, 2016

19                9:30 a.m.

20               Taken at:

             Baker Hostetler LLP

21     127 Public Square, Suite 2000

                Cleveland, Ohio

22

23    Christine M. Emery, Notary Public

24

25

Page 2

1    APPEARANCES:

2         On behalf of the Plaintiff:

3               Baker Hostetler LLP, by

4               TERRY M. BRENNAN, ESQ.

5               SAM CAMARDO, ESQ.

6               127 Public Square, Suite 2000

7               Cleveland, OH  44114

8               216-861-7485

9               tbrennan@bakerlaw.com

10              scamardo@bakerlaw.com

11

12        On behalf of the Defendant:

13              City of Cleveland Department of

14              Law, by

15              CONNOR NATHANSON, ESQ.

16              JILLIAN L. DINEHART, ESQ.

17              601 Lakeside Avenue, Room 106

18              Cleveland, OH  44114

19              216-664-3559

20              cnathanson@city.cleveland.oh.us

21              jdinehart@city.cleveland.oh.us

22                    ~ ~ ~ ~ ~

23   ALSO PRESENT:

24              Wes Wadle (telephonically)

25                    ~ ~ ~ ~ ~

Page 3

1                    TRANSCRIPT INDEX

2

3    APPEARANCES...............................    2

4

5    INDEX OF EXHIBITS .......................    4

6

7    EXAMINATION OF LARRY JONES, II

8    BY MR. BRENNAN...........................    5

9

10   REPORTER'S CERTIFICATE..................   150

11

12   EXHIBIT CUSTODY

13   EXHIBITS RETAINED BY THE COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1                    INDEX OF EXHIBITS
 2     NUMBER              DESCRIPTION              MARKED
 3     Exhibit 2    Notice of Deposition..........   12
 4     Exhibit 5    E-Mail With Revised Copy of .. 104
                    License and Service
 5                  Agreement
 6     Exhibit 6    March 25, 2015 .............. 141
                    Correspondence
 7

       Exhibit 7    January 12, 2015 ............ 142
 8                  Correspondence
 9

10      * Exhibit 2 marked in a previous deposition
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1          LARRY JONES, II, of lawful age, called

2     for examination, as provided by the Federal

3     Rules of Civil Procedure, being by me first

4     duly sworn, as hereinafter certified, deposed

5     and said as follows:

6               EXAMINATION OF LARRY JONES, II

7     BY MR. BRENNAN:

8          Q.    Good morning.

9          A.    Good morning.

10         Q.    My name is Terry Brennan and I,

11    along with Sam Camardo, represent Xerox in the

12    current lawsuit filed by Xerox against the City

13    of Cleveland relating to a traffic camera

14    program.

15               You're aware today that you are

16    here to have your deposition taken?

17         A.    Yes.

18         Q.    And you have given deposition

19    testimony before?

20         A.    Yes.

21         Q.    On how many occasions?

22         A.    This is the second of this week, so

23    I think four overall.

24         Q.    Four related to traffic cameras?

25         A.    No.  Four including this one, yes,

Page 6

1   all related to trafficking cameras.

2          Q.    Okay.  And I'm just going to run

3   through some of the rules of a deposition, even

4   though you had one yesterday and you have had

5   several others, just to make sure we are on the

6   same page.

7                As you are probably aware, I am

8   going to be asking you a series of questions.

9   If at any point in time you don't understand

10  one of my questions and you want a

11  clarification, will you please let me know?

12         A.    Yes.

13         Q.    I'm going to assume that if you

14  answer a question, you understood the question,

15  and you are prepared to give an answer on that

16  topic, so again, clarify anything that is

17  unclear, let me know if you are unable to

18  answer a question.  Okay?

19         A.    Okay.

20         Q.    The stenographer is here.  She is

21  going to be taking down questions and answers.

22  Nods of the head, shrugs of the shoulders,

23  don't get recorded on the transcript, even

24  though we might be able to see it here

25  visually, so please responds orally.  Okay?

Page 7

1      A.     Yes.

2      Q.     There may be times where I may ask

3  a long question, so I would encourage you to

4  just pause before you give an answer, make sure

5  I've concluded my question before you give an

6  answer, and I will try not to interrupt you.

7  Although, I apologize in advance if I do while

8  are you giving an answer, because I want you to

9  give full and complete answers.  Okay?

10      A.     Okay.

11      Q.     This is not a marathon, it's not an

12  endurance contest, I don't expect this is going

13  to take much time today.  But if at any point

14  in time you want to take a break, just let us

15  know, we are happy to take a break.  Okay?

16      A.     Okay.

17      Q.     The one caveat to that is, if there

18  is a question pending, I'm going to need you to

19  respond to the question before we go ahead and

20  take a break.  Okay?

21      A.     Okay.

22      Q.     Okay.  And, again, please state

23  your name and spell your last name for the

24  record.

25      A.     Larry Jones, II.  J-O-N-E-S.

Page 8

```
 1          Q.     And, sir, where do you reside?
 2     THE FOLLOWING, PAGE 9, WAS DEEMED CONFIDENTIAL
 3     AND FOR ATTORNEYS' EYES ONLY
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

1    A.    I reside at ████ ████ ████ ██████,

2    Cleveland, Ohio.

3         MR. BRENNAN:  And we will designate

4    that confidential for purposes of the

5    transcript.

6         MR. NATHANSON:  Thank you.

7    END OF CONFIDENTIAL PORTION OF TRANSCRIPT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1        Q.      You are currently employed?

2        A.      Currently employed by the City of

3    Cleveland.

4        Q.      And in what capacity?

5        A.      I'm the project manager for the

6    department of public safety.

7        Q.      And what are your duties or

8    responsibilities as the project manager?

9        A.      I oversee all technology,

10   implementations for the division of police, a

11   little bit with fire, EMS, so anything related

12   to IT with public safety, I'm involved with.

13       Q.      How long have you had that title?

14       A.      I've had that title since July of

15   2010.

16       Q.      Prior to that, were you employed?

17       A.      Yes.

18       Q.      And where were you employed prior

19   to that?

20       A.      Prior to that I was employed by the

21   Cuyahoga County Justice Services.

22       Q.      And what was your title with

23   Cuyahoga County?

24       A.      I was a program officer.

25       Q.      For how long did you hold that

Page 11

1    position?

2            A.      Program officer for four years,

3    seven months at the county.

4            Q.      And what's the highest level of

5    education you have achieved?

6            A.      Master's of business

7    administration.

8            Q.      You have achieved that from

9    Cleveland State?

10           A.      That is correct.

11           Q.      Sir, you are aware today that

12   you're testifying in two capacities, one, as

13   what's called a fact witness, where you are

14   just testifying as to facts or information

15   within your personal realm of understanding.

16   The second is what is called a 30(b)(6) witness

17   which, in lay terms means, you are charged with

18   having the knowledge and the responsibility of

19   the City of Cleveland and the information

20   readily available to the City of Cleveland on

21   certain topics.  Do you understand that?

22           A.      Yes.

23           Q.      And we are going to bifurcate the

24   deposition today.  The first half of the

25   deposition I'm going to be asking questions in

Page 12

1   your capacity as a 30(b)(6) witness, we will

2   then conclude that portion of the deposition

3   and I will ask you fact questions.  Is that

4   understood?

5        A.    Yes.

6        Q.    I'm going to show you the notice of

7   deposition, just so we have an understanding of

8   what topics you're the City of Cleveland's

9   designated witness for.  And it's previously

10  been marked as an exhibit.  But showing you,

11  just for purposes of this deposition, what's

12  previously been marked as Exhibit 2.

13                -  -  -  -  -

14              (Thereupon, Plaintiff's Exhibit 2,

15              Notice of Deposition, was previously

16              marked for purposes of

17              identification.)

18                -  -  -  -  -

19        Q.    Do you have that in front of you,

20  sir?

21        A.    I do have Exhibit 2 in front of me.

22        Q.    Okay.  And is this a document that

23  you've seen before?

24        A.    Yes, I have seen this document

25  before.

Page 13

1      Q.    Okay.  If you turn to the page

2  numbered two, which has a heading, a third of

3  the of the way down, called matters for

4  examination?

5      A.    Yes.  I'm on page two.

6      Q.    And is it accurate that you are the

7  designated witness for the City of Cleveland on

8  topic one, which is the parties' negotiation of

9  the agreement and its amendment?

10      A.    That is correct.

11      Q.    Okay.  The same would be true for

12  topic four?  And take a minute and go ahead and

13  read it.

14      A.    That is correct.

15      Q.    Is the same true for topic six?

16      A.    That is correct.

17      Q.    And just to fill in the record,

18  topic two, it speaks for itself, but it deals

19  with the City's purpose for starting and

20  continuing the traffic camera program?  I'm

21  sorry, topic four deals with Xerox's

22  performance as the City's vendor?

23      A.    Topic four is correct, yes.

24      Q.    Okay.  Topic six deals with the

25  City's performance under the agreement?

Page 14

1      A.    That is correct.

2      Q.    Okay.  Are you the City's

3   designated witness for topic seven?

4      A.    Yes, I am.

5      Q.    Which includes the City's decision

6   to turn off the traffic cameras?

7      A.    That is correct.

8      Q.    And you are the City's witness for

9   topic eight, the City's decision to stop paying

10  Xerox's monthly fee under the agreement?

11     A.    I can comment on topic eight, but

12  I'm not the -- that's a decision that goes

13  above, I would say, my position.  So I have

14  dealings with topic eight, but I'm not the

15  final decision maker on topic eight.

16     Q.    And we will delve into that a

17  little bit more during the course of this

18  morning, but fair to say the ultimate decision

19  maker for topic eight was the law department?

20     A.    That is correct.

21     Q.    And we will get to how that was

22  reached.  But from a non-law department

23  perspective, you are the person who can most

24  directly speak to that topic on behalf of the

25  City of Cleveland?

Page 15

1        A.     Correct.

2        Q.     You are the City's witness for

3    topic 13?

4        A.     Again, yes, I can speak to topic

5    13.

6        Q.     Okay.  Again, I take it from your

7    hesitation that decision was ultimately made by

8    the law department?

9        A.     Yes.  Yes.  So it's -- internally

10   we would have discussions, but ultimately we

11   would present everything to the law department

12   and look for guidance from the law department

13   on those type of matters.

14       Q.     Again, we will talk about this in

15   more detail, but did the law department make

16   the decision to not pay Xerox or did the law

17   department make the recommendation and,

18   ultimately, you or someone else within the

19   City, not wearing the hat of the law

20   department --

21              MR. NATHANSON:  Objection --

22       Q.     -- made the actual decision?

23              MR. NATHANSON:  -- as to what the

24   law department told him.

25       Q.     I'm asking, who made the decision

Page 16

1    to not pay Xerox and to discontinue the
2    program?  Was there a recommendation by the law
3    department or a decision by the law department?
4         A.    Again, those conversations happened
5    with the law department so, essentially, it
6    would be myself, the safety director, finance
7    and the law department in the room, presenting
8    our facts and then the law department reviews
9    everything we give them and then makes a
10   recommendation to us on what action we should
11   take.
12        Q.    Okay.  And who made the actual
13   decision to not pay Xerox and continue the
14   traffic program?
15        A.    Based off that I would say,
16   again --
17             MR. NATHANSON:  Object to the form
18   of the question, since the discussions between
19   safety and law or finance and law or whatever
20   respective department would be privileged, but
21   -- you can't talk about those specific
22   statements made.  Whether there was a
23   recommendation or a mandate --
24        Q.    The question was, who made the
25   decision to stop paying Xerox and discontinue

Page 17

1   the traffic program?

2        A.    Ultimately we take direction from

3   the law department.

4        Q.    Okay.  Who is we?

5        A.    The City as a whole.  As I

6   mentioned before, a meeting with the finance

7   director, safety director and law, law is going

8   to make the final recommendation of our course

9   of action.

10       Q.    And who makes the final decision,

11  as far as the course of action?

12       A.    We are not going to go against what

13  the law department says to us.  So if the law

14  recommends a certain action, that's what's in

15  the best interest of the City.

16       Q.    Okay.  I want the record to be

17  clear.  The law department made the decision or

18  the law department made a recommendation or the

19  folks within the City, not within the law

20  department, made the decision?

21       A.    The law department makes a

22  recommendation and then we act on that

23  recommendation.

24       Q.    If I had to stand in front of a

25  jury and ask you, who made the decision to stop

Page 18

1   paying Xerox, who made that decision?

2        A.    Right now that's something I don't

3   know.  Again, I sit in a room, lay out all the

4   facts, there's discussions above my level that

5   happen and then, ultimately, a decision comes

6   down.

7              That's something I wasn't

8   privileged to.  I don't recall somebody saying

9   on a certain day or time, this is the decision,

10  we're not paying Xerox.  I don't recall that

11  discussion myself.

12       Q.    You don't know who made the

13  decision?

14       A.    That is correct.

15       Q.    All right.  Did the mayor make the

16  decision to stop paying Xerox?

17       A.    I just responded, I don't know who

18  made that ultimate decision.

19       Q.    Okay.  So you were part of

20  decisions, the decision was made, but you can't

21  identify a person responsible for making the

22  decision?

23       A.    Yes.  So there's cabinet meetings

24  that happen, there's other meetings that happen

25  that I'm not invited to.  So I lay out the

Page 19

1  facts of meetings I am invited to of, this is

2  where we are at, and then those discussions

3  happen above, essentially, my pay grade.

4       Q.    How did you find out that the

5  decision was made to not pay Xerox?

6       A.    Essentially, Xerox kept submitting

7  invoices to us.  And until we resolved the

8  legislation, the amendment that was passed,

9  nothing was going to be paid until then.

10      Q.    Okay.  Who told you that?

11      A.    Yes, I received a recommendation

12  saying, we're not paying anything to Xerox

13  until legislation and everything is figured

14  out.  So that's directly coming from law,

15  coming from the finance director, coming from

16  the safety director, that hold on until

17  everything -- until this is resolved.

18      Q.    Each one of those folks told you

19  that, hold off on paying invoices until this is

20  resolved?

21      A.    At the last meeting I had that I

22  was invited to, I was told to collect all

23  invoices and hold onto them until this is

24  resolved.

25      Q.    Okay.  Who said that?

1      A.    Again, that was the same meeting

2  with the law, safety director, finance

3  director.

4      Q.    Okay.  And just to fill in the

5  blanks here, you are giving me titles, but what

6  are the names of that folks who were involved

7  in that meeting?

8      A.    At the time we had two

9  representatives from finance representing

10  Director Dumas, Natasha Brandt, I believe was

11  one of the individuals.  Safety Director

12  McGrath was there.  And, also, Rick Horvath,

13  from the law department was there.  And, I

14  believe, representatives from Clerk of Courts

15  were there also, Maria Vargas.

16      Q.    Anyone else that you can think of?

17      A.    I believe Monica, I can't recall

18  her last name, but she is in internal audit, I

19  believe also.

20      Q.    Within the City of Cleveland?

21      A.    Within the City of Cleveland.

22      Q.    When did that meeting take place?

23      A.    Approximately -- probably sometime

24  between November and December.

25      Q.    Of what?

Page 21

1        A.      After the passage of the amendment.

2        Q.      Sometime in November, December

3    of --

4        A.      Of 2014, yes.  I don't have that

5    exact date.

6        Q.      You can't pin it down within days

7    or weeks of the November 4th ballot initiative

8    being passed?

9        A.      No.  Again, I would have to try to

10   look back at my calendar.

11       Q.      Okay.  But it is fair to say,

12   again, if we are standing in front of a jury

13   trying this case, you can't say I made the

14   decision to turn off the traffic camera or I

15   made the decision to stop paying Xerox, someone

16   else made that decision?

17       A.      That is correct.

18       Q.      Do you know why that decision was

19   made?

20       A.      Part of the ballot amendment that

21   was passed it prohibited photo enforcement

22   cameras being operated without the police

23   officer being there at the camera.  And,

24   consequently, once a violation occurred, not

25   only did a police officer have to track that

1  violator down, they had to give them a ticket.

2  So at that present time, there was no way, via

3  the photo enforcement system to print ticket

4  right at that camera location.

5         So if a violation occurred at 71st

6  and Chester, there was no physical way for the

7  system to print out a ticket for that officer

8  to physically give to the motor vehicle.

9         So at that time we could not

10 operate the program.

11     Q.    Did the ballot initiative prohibit

12 the City of Cleveland from paying Xerox any

13 monies?

14     A.    Based off of the fixed fee for

15 operating the camera program, the cameras were

16 not operating at that time.

17     Q.    That's not my question.

18         Did the ballot initiative direct

19 the City of Cleveland to not pay Xerox money?

20     A.    No.

21     Q.    That was a decision made by the

22 City of Cleveland, not the members of the

23 public who voted in favor of the ballot

24 initiative; correct?

25     A.    In --

Page 23

1          MR. NATHANSON:  If you know.

2     A.    Again, with speaking to paying

3 Xerox, it was a fixed fee contract, the cameras

4 were not operating, so, therefore, there was no

5 payment.

6     Q.    Okay.  But the ballot initiative

7 doesn't have language that says, you, the City

8 of Cleveland, are hereby prohibited from paying

9 Xerox any money; correct?

10    A.    That is correct.

11    Q.    So the decision to not pay Xerox

12 wasn't made because of ballot initiative, it

13 was made based on the City of Cleveland's

14 reasoning; correct?

15    A.    Correct.

16    Q.    Okay.  The purpose, and I've talked

17 a little bit about the traffic camera program,

18 but you're aware that there is a particular

19 contract that's in dispute, as part of the

20 litigation.  There was a contract and then

21 there was an amendment to the contract, are you

22 aware of that?

23    A.    That is correct.

24    Q.    Okay.  And the contract, which has

25 previously been marked, and I'm happy to show

Page 24

1   it to you, it's Plaintiff Exhibit 1.

2                      -   -   -   -   -

3                      (Thereupon, Plaintiff's Exhibit 1,

4                      License and Service Agreement, was

5                      previously marked for purposes of

6                      identification.)

7                      -   -   -   -   -

8        Q.    The contract was effective June

9   1st, 2013.  And if you need to take a look to

10  refresh your recollection, if you turn to page

11  three, the agreement in the first line says,

12  it's made and entered into as of June 1, 2013?

13       A.    That is correct.

14       Q.    Okay.  And if you see here,

15  attached to it is an amendment to the

16  agreement?

17       A.    (Pause.)

18       Q.    And, I'm sorry, probably the

19  easiest thing to do is, if you look at the

20  label on the top of the page, it's 32 of 37.

21       A.    Okay.  Yes.

22       Q.    Okay.  The amendment was effective

23  July 15, 2013?

24       A.    That is correct.

25       Q.    Okay.  So for purposes of the

Page 25

1 record, as I'm describing the contract and the

2 amendment, these are the documents I'm

3 referring to. Is that your understanding as

4 well?

5      A. That is my understanding.

6      Q. The purpose of this contract was to

7 promote public safety; correct?

8      A. That is correct.

9      Q. Okay. The purpose was not to

10 generate revenue; correct?

11      A. That is correct.

12      Q. And before this contract was

13 entered into, the City of Cleveland and Xerox

14 had a previous ongoing relationship for traffic

15 cameras that dealt with both speeding as well

16 as red light violations; correct?

17      A. That is correct.

18      Q. That program as it existed before

19 this contract was also designed to promote

20 public safety; correct?

21      A. Correct.

22      Q. And fair to say the City of

23 Cleveland viewed that program prior to entering

24 into the contract as being effective in

25 promoting that purpose. In other words, the

Page 26

1    traffic camera program successfully enhanced

2    public safety within the City of Cleveland?

3         A.     That is correct.

4         Q.     And the reason why the City of

5    Cleveland entered into this contract was to

6    continue that goal, to continue to promote and

7    enhance public safety in the City of Cleveland?

8         A.     That is correct.

9         Q.     And, in fact, during the course of

10   the contract, it also succeeded in that goal?

11   In other words, the traffic camera program

12   enhanced public safety in the City of

13   Cleveland?

14        A.     That is correct.

15        Q.     And there was, though, a secondary

16   benefit to the City of Cleveland, which was

17   that it did, in fact, generate revenue;

18   correct?

19        A.     Yes, that was the output of the

20   contract.

21        Q.     Okay.  Again, wasn't the goal of

22   the contract?

23        A.     Correct, that wasn't the goal of

24   the contract.

25        Q.     It was, for lack of a better

Page 27

1    phrase, it was icing on the cake?

2         A.    Yeah.  It is what it is, yes.

3         Q.    In other words, the City of

4    Cleveland would have been satisfied with the

5    contract if, as the contract contemplated, it

6    was net neutral, in other words, the City

7    didn't make a dollar?

8         A.    That is correct.

9         Q.    Okay.  But the City was fortunate

10   enough to make more than a dollar.  In fact,

11   are you aware that the City of Cleveland made

12   millions of dollars off of this contract?

13        A.    Yes.

14        Q.    And implementing the traffic camera

15   program, as part of the goal to not generate

16   revenue, to just promote safety and save lives,

17   that was one of the goals; right?

18        A.    Yes, that was one of the goals.

19        Q.    Okay.  And in doing that, the City

20   of Cleveland would sometimes deploy cameras in

21   areas where a particular camera might not

22   generate a lot of revenue, but it was viewed by

23   the City of Cleveland that, this was the

24   location where we want to have a camera to

25   promote safety; correct?

Page 28

 1      A.    That is correct.
 2      Q.    Okay.  Can you think of particular
 3 locations where that would particularly be true
 4 where, if you just looked at an individual
 5 traffic camera location, it wasn't a big money
 6 maker, but we really need to have a camera
 7 there?
 8      A.    Yes, we had East 159th and Lake
 9 Shore, there was a senior high rise building
10 across the street from a Dave's Supermarket,
11 and the council member was very adamant to
12 having a camera there to slow down traffic and
13 folks running red lights in that area.  And it
14 was quite effective in slowing traffic down
15 there.
16           And, as you mentioned, it was a
17 camera that if you were just looking at a pure
18 numbers perspective, it didn't generate a lot
19 of violations, but its impact served what it
20 needed to do.
21      Q.    The traffic camera program did save
22 lives?
23      A.    There has been national studies
24 that says that, so we concurred with that same
25 rhetoric that we've actually put forth to City

Page 29

1    Council on numerous times about the program.

2         Q.    Okay.  So the City's actual

3    experience comported with national studies.  In

4    other words, the traffic camera program was

5    effective, it saved lives and reduced

6    accidents?

7         A.    That is correct.

8         Q.    Before the City entered into this

9    contract, did you speak with members of City

10   Council about whether or not the City should

11   continue the traffic camera program?

12        A.    Yes.

13        Q.    And with whom did you speak?

14        A.    We have two committees that a

15   contract has to go through or request

16   proposals.

17        Q.    Okay.

18        A.    Which is the safety committee and

19   then the finance committee.

20        Q.    And who was on the safety committee

21   at the time, at the beginning of and going into

22   the middle of 2013?

23        A.    At the time, to the best of my

24   recollection, would be Council Member Mike

25   Polensek.

Page 30

1      Q.     Uh-huh.

2      A.     Dona Brady.  Kevin Conwell.  Matt

3  Zone.  I believe Zack Reed.  And probably TJ

4  Dow.

5      Q.     Was there one person in charge of

6  chairing that committee?

7      A.     At that time I believe Kevin

8  Conwell was the chair of the safety committee.

9      Q.     And, I'm sorry, what was the full

10  name of the other committee?

11      A.     The finance committee.

12      Q.     Okay.  And who was on the finance

13  committee?

14      A.     That one's a bit tougher to recall.

15  I can tell you at the time, I believe, Council

16  Member Sweeney was the chair of that committee.

17  And that committee would have had close to

18  probably 12 members of council on it.  That's a

19  pretty big committee.

20      Q.     And do you know, were any of the

21  members of the safety committee also members of

22  the finance committee?

23      A.     Most likely a couple of them.  So

24  most likely Kevin Conwell, Matt Zone, I believe

25  Terrell Pruitt would have been on finance at

Page 31

1    the time.

2         Q.    Is it fair to say that the decision

3    to go forward with the contract was ultimately

4    driven by the safety committee rather than the

5    finance committee?

6         A.    Correct.  The safety committee

7    approves something, generally -- generally

8    speaking, finance will support what safety

9    recommends.

10        Q.    And did you regularly participate

11   in safety committee meetings?  Again, the time

12   period being the first half of 2013?

13        A.    Yes, I did.

14        Q.    How regularly did the committee

15   meet?

16        A.    The committee, I believe, meets on

17   the second and fourth Wednesday of each month,

18   except for during the summer recess period.

19        Q.    When is the summer recess period?

20        A.    Typically June through August.

21   They typically may meet -- have one committee

22   of -- the whole meeting once a month.

23        Q.    And did you actually have a

24   position on the committee or you were sort of

25   reporting to the committee?

Page 32

1       A.     Essentially, subject matter expert

2   for public safety when presenting different

3   projects.  So this project, I would have been

4   the subject matter expert to present the

5   proposal to council.

6       Q.     You took the lead from the public

7   safety perspective to report and make

8   recommendations for the safety committee about

9   whether or not to go forward with the contract?

10      A.     Yes, the director would make his

11  opening remarks and then any questions or any

12  other presentations I would handle.

13      Q.     And who was the director at the

14  time?

15      A.     At the time Marty Flask was the

16  director.

17      Q.     And you reported to him at that

18  point in time?

19      A.     That is correct.

20      Q.     There came a point in time where

21  that changed; correct?

22      A.     Yes.

23      Q.     And when did that change?

24      A.     February of 2014, I believe,

25  Michael McGrath was named safety director.

Page 33

1     Q.    To whom do you report today?

2     A.    I report to Chief Information

3   Officer Donald Phillips.  Still report to

4   Michael McGrath.

5     Q.    Do you consider one of the two of

6   those to be, kind of, your boss or they both

7   kind of are?

8     A.    Anything safety related is

9   definitely Director McGrath.  And anything IT,

10  IT overall for the City is under Chief

11  Phillips, so I guess it's kind of a dual split.

12    Q.    Okay.  Does anyone currently report

13  to you?

14    A.    No, not at this time.

15    Q.    Back in 2013, did anyone report to

16  you?

17    A.    No.

18    Q.    And during how many of the safety

19  committee meetings was the subject of the

20  traffic camera program discussed?  Again

21  limiting it to 2013.

22    A.    2013, it may have -- to the best of

23  my recollection, it may have just been meetings

24  around the request for proposal process.  And

25  then the subsequent awarding -- recommending

Page 34

1    the contract be awarded to Xerox.  So there may

2    have been, I'll say, maybe, four meetings at

3    most.

4         Q.    Are notes typically kept at these

5    meetings?

6         A.    City records, if the legislation --

7    if legislation is passed there will be a record

8    of -- a record -- a City record.  However, you

9    can go to a meeting and the committee might

10   decide to table the legislation until the next

11   time they meet.

12              So if any council members have

13   questions about a legislation or they don't

14   feel their answers were thoroughly -- their

15   questions were thoroughly answered, they can

16   always hold legislation, table it until the

17   next meeting.

18        Q.    But, in other words, having been

19   involved in a number of committees and

20   organizations, it wasn't the practice that on

21   month two someone presents notes of the

22   meetings of month one and they'd be reviewed

23   and approved?

24        A.    No, that was not the practice.

25        Q.    And I take it it was your

Page 35

1    recommendation, in 2013, to continue the

2    program?

3         A.    We actually put together a request

4    for proposal committee.  So that included

5    members from our traffic unit, myself, the

6    Clerk of Courts, who all reviewed all

7    proposals.  So as a group we made that

8    recommendation based on the evaluation of

9    criteria of the different camera proposals that

10   came into us.

11        Q.    Okay.

12        A.    So it wasn't just my

13   recommendation.

14        Q.    Sure.

15              But did you concur in that

16   recommendation?  In other words, the

17   recommendation to continue to move forward with

18   the traffic camera program, whether it was

19   going to be with Xerox or another supplier?

20        A.    Correct.

21        Q.    Okay.  And, again, you made that

22   recommendation for public safety reasons?

23        A.    Correct.

24        Q.    Okay.  Fair to say that the City of

25   Cleveland public safety budget at that time was

Page 36

1    roughly half a billion dollars?

2        A.    To the best of my recollection, I

3    believe the City budget is half a billion and

4    public safety is probably about 3 -- about 360

5    million of that.

6        Q.    Okay.  In terms of City of

7    Cleveland's budgeting, the amount of money that

8    the City of Cleveland would pay Xerox is

9    relatively minimal considering the size of that

10   budget; correct?

11       A.    Correct.

12       Q.    Were -- before the contract was

13   entered into, were you aware of any council

14   members who were against continuing the traffic

15   camera program?

16       A.    Yes, I was.

17       Q.    And who were those council members?

18       A.    Certain council members, such as

19   Councilman Zack Reed, did not want cameras in

20   his ward.  He didn't believe that the program

21   was effective.  He felt that the program

22   targeted City -- residents of the City of

23   Cleveland unfairly.  So he was one of the

24   council members that were against it.

25       Q.    Who else do you recall being

Page 37

1    against it?

2         A.    I know Councilman Pruitt did not

3    want any cameras in his ward also.  Councilman

4    Brady, Dona Brady did not want cameras in her

5    ward also.

6         Q.    And when you refer to Brady and

7    Pruitt, were they against the program as a

8    whole or just happy to have the program, just

9    don't want the folks in my ward to be subject

10   to it?

11        A.    I believe they were neutral when it

12   came down to being for or against it.  It was

13   more so, I don't want cameras in my ward and

14   I'm not supporting it.  If it passes, it

15   passes, so.

16        Q.    And did you explain to Councilman

17   Reed that his conclusion was inaccurate?  In

18   other words, citations were largely issued to

19   suburbanites, outer lying communities, rather

20   than residents of the City of Cleveland?

21        A.    We made several arguments to

22   Councilman Reed to that effect.  However,

23   council members believe what they are going to

24   believe, so.

25        Q.    Okay.  Understood.

Page 38

1       A.      Yeah.

2       Q.      But the empirical data you had

3   supported that?  In other words, that it wasn't

4   disproportionally affecting folks in the City

5   to the contrary, more citations were issued to

6   folks who lived in neighboring communities?

7       A.      Right.  We had the facts, the

8   numbers, of how many times we have been in

9   their ward, the ticket breakdown.  So we had

10  all of that quantitative information to give to

11  them.

12      Q.      And, again, it supported what I

13  suggested, which is, residents outside of the

14  City of Cleveland were being ticketed more than

15  residents of the City of Cleveland; correct?

16      A.      Yes, that's what the data showed.

17      Q.      Notwithstanding that, council

18  members are ultimately responsible to the folks

19  in their ward.  And if the folks in their ward

20  don't like getting a ticket, they are going to

21  listen to that; right?

22      A.      That is correct.

23      Q.      Okay.  Fair to say, if the City

24  wanted -- if the goal of the program was to

25  generate revenue, the City could have done

Page 39

1    other things to generate more revenue?  In

2    other words, for example increasing the amount

3    of the fine; correct?

4         A.    That is correct.

5         Q.    The City could have entered into a

6    contract with Xerox or someone else where the

7    City would get paid a percentage of the tickets

8    issued; correct?

9         A.    That is correct.

10        Q.    Those, among potential other

11   measures, could have been implemented if the

12   goal, again, was not safety, but to promote

13   revenue; correct?

14        A.    Correct.

15        Q.    But, ultimately, the City of

16   Cleveland decided this is a safety measure and,

17   you know, we are not going to try to get the

18   biggest, you know, dollar amount, in terms of

19   revenue, we want to do the right thing to help

20   promote safety in the City of Cleveland?

21        A.    That is correct.

22        Q.    Did the City do financial analyses

23   before entering into the contract?  In other

24   words, try to determine how much money the City

25   might make by entering into the contract?

Page 40

1      A.    No.  What we looked at, as you had
2  just laid out, as part of the request for
3  proposal, we had all vendors who submitted
4  provide basically the different -- not the
5  funding option, but the different price
6  proposal options.  So whether it was a fixed
7  fee price or a percentage of the ticket.  Just
8  so, financially, we could take a look at the
9  different options.  And in the end we went with
10  the fixed fee prices for the reasons you laid
11  out about the public safety driven program.
12      Q.    And City of Cleveland, prior to the
13  contract, had been satisfied with the services
14  Xerox had performed, I take it?
15      A.    That's correct.
16      Q.    And the City of Cleveland was very
17  satisfied with the services Xerox did perform
18  under the contract?
19      A.    That is correct.
20      Q.    If you would please identify what
21  it is that Xerox did under the contract in your
22  own terms?  In other words, did they supply
23  cameras?  Did they refurbish cameras?  If you
24  could just detail for us everything the City
25  understands that Xerox did under the contract?

Page 41

1      A.     To the best of my understanding,
2  Xerox was responsible for the deployment of the
3  portable camera units.  They were responsible
4  for the fixed cameras, whether those are red
5  light, the red light speed on green cameras,
6  the fixed speed cameras.  They were also
7  responsible for doing the first blind review.
8            So, essentially, if a violation
9  occurs, they do a review of that violation,
10  determine, yes, this is a good violation.  They
11  gather the BMV/DMV information.
12            It's also sent to the division of
13  police, who make that ultimate decision.  Once
14  they say, yes, this is a violation, it goes
15  back to Xerox.  Xerox is then responsible for
16  mailing out the first notice.  If that notice
17  doesn't -- if no payment is received, they mail
18  out the second notice.
19      Q.     They being Xerox?
20      A.     Yes, they being Xerox.
21      Q.     Did Xerox refurbish cameras?
22      A.     As part of an amendment that's not
23  listed here from a previous contract, they
24  refurbished six cameras, six of the single
25  green/red light cameras and six of the mobile

Page 42

1    vehicle cameras.

2         Q.    Okay.  Did Xerox install new

3    cameras as part of the contract?

4         A.    As part of our fee requirement, we

5    mandated that all equipment be brand new.

6         Q.    You're aware that going ahead and

7    implementing the contract, Xerox had

8    substantial upfront costs that Xerox

9    anticipated would be covered during the life of

10   the contract?

11        A.    I believe that's correct.

12        Q.    So, in other words, Xerox has big

13   upfront cost, the contract goes to full terms,

14   Xerox recovers those and hopefully makes a

15   profit; right?

16        A.    Yes.

17        Q.    And if the contract doesn't go to

18   term Xerox loses money?

19        A.    That's a risk with any business

20   dealings.

21        Q.    Okay.  But that was your

22   understanding?  In other words, Xerox paid a

23   lot of money up front, it's not as though Xerox

24   has fixed costs over the life of the program,

25   they have large costs up front that they hope

Page 43

1    to recover during the life of the contract?

2         A.    Correct.

3         Q.    And, in fact, that's why there was

4    a termination provision in the contract so if

5    contract terminated early, Xerox could recover

6    those costs?

7         A.    Correct.

8         Q.    The termination provision within

9    the contract -- and feel free to take a look.

10   The termination provision is only the City of

11   Cleveland's right, the City of Cleveland could

12   have terminated the contract early, Xerox

13   couldn't; correct?

14        A.    That is correct.

15        Q.    That provision was included within

16   the contract to benefit the City of Cleveland

17   as well as Xerox?  In other words, if the City

18   of Cleveland wanted to get out early, they

19   could get out early, but if the City of

20   Cleveland wanted to get out early, Xerox would

21   get paid its upfront costs?

22        A.    Yes, that was correct.

23        Q.    Okay.  You're aware that there is a

24   force majeure provision in the contract?

25        A.    Correct.

Page 44

1      Q.    All right.  You are not an

2  attorney; correct?

3      A.    That is correct.

4      Q.    Okay.  You're generally familiar

5  with what a force majeure provision is,

6  however, in the course of your employment with

7  the City of Cleveland?

8      A.    I've dealt with a little bit, but I

9  understand enough to the best of layperson's

10  understanding.

11      Q.    Okay.  You defer to the law

12  department for issues like that?

13      A.    That is correct.

14      Q.    Okay.  But you understood, and we

15  can look at the language, that the force

16  majeure provision in the contract dealt with

17  things like earthquakes, floods, fires --

18      A.    Acts of God.

19      Q.    -- war, acts of God, thing of that

20  nature?

21      A.    Correct.  That is correct.

22      Q.    Okay.  At the time the City of

23  Cleveland entered into the contract, did it

24  consider a ballot initiative to be a force

25  majeure event?

Page 45

1      A.    At the time the law department

2  drafted the language around the force majeure,

3  we knew since the beginning, well, since I have

4  been involved with the City, there's always

5  been rumblings of the state's going to do

6  something.  However, within my years of

7  experience with the City, nothing has come to

8  full circle.

9      Q.    Okay.  But, in other words, at the

10  time the City entered into the contract, did it

11  view a change in law, whether state, federal or

12  local, to be a force majeure event, like a

13  fire, a flood, an act of God or an act of war?

14      A.    I would have to look at the clause

15  in the contract to --

16      Q.    Okay.  Take a look.

17      A.    -- to get a better understanding.

18      Q.    It's 1.11.  Let's look at the

19  contract first, then we're happy to look at the

20  amendment.

21            (Discussion had off the record.)

22      Q.    Let me ask a more specific

23  question.  Looking at 1.11, that doesn't

24  address a change in local law; correct?

25      A.    That is correct.

Page 46

1       Q.     It doesn't address a change in
2    state law?
3       A.     Correct.
4       Q.     But at the time the City entered
5    into the contract, it was aware that other
6    municipalities and states had enacted
7    legislation that would either limit or prohibit
8    the use of traffic cameras; correct?
9       A.     That is correct.
10      Q.     And so it was certainly a
11   possibility with the City of Cleveland's mind
12   at the time they entered into the contract,
13   that those things could happen?  In other
14   words, that there could be a change in local or
15   state law that could prohibit or limit the use
16   of traffic cameras; correct?
17      A.     That is correct.
18      Q.     Okay.  And the City was aware of
19   that risk when it signed the contract and
20   negotiated the contract?
21      A.     Yes, the City and Xerox was aware
22   of it.
23      Q.     And how did you know that Xerox was
24   aware of that?
25      A.     There was actually movement at the

Page 47

1    state level.  So Xerox -- I believe Jim La -- I

2    am trying to remember the last name.

3         Q.    We won't hold you to it.  We won't

4    send him a copy of the transcript.

5         A.    But, essentially, Jim Lazarski and

6    myself had conversations and they told us they

7    had folks lobbying in -- the state

8    representatives.

9              And further down my road, myself

10   and Commissioner Muhic of traffic actually went

11   down and testified before their state senate on

12   one of the house bills for photo enforcement.

13        Q.    Okay.

14        A.    So both parties were aware.

15        Q.    Right.

16              And you recall Xerox saying to the

17   City of Cleveland, we understand if there's a

18   change in federal law, we understand if there's

19   a change in state law, you can't control that,

20   but you are still on the hook if there's a

21   change in local law.  You recall them conveying

22   that to you; correct?

23        A.    No, I don't recall that.

24        Q.    Did you have discussions about who

25   would be responsible if there was a change in

Page 48

1    local law?

2         A.    No.   All discussions centered

3    around what was happening at the state level.

4         Q.    Okay.   But sitting here, it makes

5    sense that Xerox wouldn't have a lot of upfront

6    costs, enter into a contract, only to have City

7    Council decide to change its mind two weeks

8    later, correct, and not being paid for its

9    upfront costs?

10        A.    Correct.

11        Q.    Okay.   We've talked a little bit

12   about the amendment to the contract, but how

13   did it come to be, and we'll walk through this

14   in more detail, that six weeks later the City

15   of Cleveland decides it wants to change the

16   contract?

17        A.    To the best of my knowledge -- I'm

18   not really sure.   I know the initial draft was

19   completed, essentially, previously I had worked

20   with another lawyer on everything I did related

21   to safety, Nancy Kelly.

22             Nancy Kelly was assigned to some

23   other duties, so this was my first time working

24   with Jeff Marks.   After the first draft was

25   done, it was signed.   I know Jeff still had

Page 49

1   some hesitation about some other additional

2   language he wanted in the contract. Myself and

3   the safety director have to lean towards Jeff's

4   experience and expert -- expertise in that

5   area. So there was a second draft completed

6   with language that draft -- Jeff Marks felt

7   more comfortable about.

8        Q.   Okay. And I just want to make sure

9   I have an understanding.

10       At the time the City enters into

11  the contract, the City was already

12  contemplating, hey, we might need an amendment

13  to clean up some things or change some things?

14       A.   Yes. I believe that the first

15  draft was completed, done, however, I believe

16  Jeff looked at it and said, you know, we still

17  need to clean X, Y and Z up. So we are going

18  to go ahead and do an amendment to the

19  contract.

20       Q.   Okay. But putting that in the

21  timeline of contract's amended day one, the

22  amendment six weeks later, at the time the City

23  signs the contract are they already thinking,

24  hey, there's stuff we might need to clean up?

25       A.   That part, I'm -- that's more of a

Page 50

1   Jeff Marks, law department, questions for the
2   exact outline.  For me the process of -- we
3   have a contract in place, operationally I can
4   run the program versus a legal question of,
5   okay, X, Y, Z language needs to be changed or
6   we need to tighten this up.  That's something
7   that's more of a law department question.
8          Q.    Yeah.  Understood that, you know,
9   it is ultimately their responsibility.  I just
10  want to get a sense of the timing.  In other
11  words, it could be the case, oftentimes, there
12  are amendments to a contract.  Sometimes folks
13  enter into a contract and then somebody raises
14  their hand and says, oh, my gosh, we've got to
15  clean this up.
16          There are other times, that I hear
17  you describing, but correct me if I am wrong,
18  that, you know, you are working, you want to
19  get the contract signed, but even at the time
20  you are signing the contract you are still
21  thinking, well, we need to do some edits here.
22  Is that how this particular contract and
23  amendment came about?
24          A.    Again, so this contract was
25  probably drafted, say, in May, so probably two

Page 51

```
 1  months later Jeff might have saw something.
 2  Again, he would be more of an expert to speak
 3  about the drafting and the changes of the
 4  contract than -- than I would be.
 5        Q.    Okay.   What did you understand the
 6  purpose of the amendment to be?
 7        A.    Again, I believe at the time Jeff
 8  would make his changes, they were sent to me,
 9  and then I would send them to Xerox.  So it
10  wasn't that I was intimately involved with
11  discussions of, we need to make amendments, you
12  know, this paragraph, you know, should state
13  this or that.  It was more so of, hey, I
14  reviewed this, I'm not comfortable with the
15  language here, let's change this.
16        Q.    Okay.   And, again, that's coming
17  from him to you rather than you to him?
18        A.    That is correct.
19        Q.    You weren't the driver of the
20  amendment?
21        A.    That is correct.
22        Q.    Okay.   You didn't make -- you
23  weren't the one who said, we need to make an
24  amendment, we need to make these changes to the
25  contract, that was driven by the law
```

Page 52

1    department?

2         A.    That is correct.

3         Q.    You are aware that one of the

4    changes incorporated in the amendment was to

5    the force majeure provision; correct?

6         A.    That is correct.

7         Q.    And if you want to go ahead and

8    turn to the amendment itself, again, if you

9    look at the top of the page there's a lot of

10   verbiage there, but it is 35 of 37.  Do you

11   have 6.1.2 in front of you?

12        A.    Correct.

13        Q.    Okay.  And, again, if you look at

14   the language there, it doesn't refer to a local

15   enactment, correct, it refers to a federal or

16   State of the Ohio enactment or regulation?

17        A.    That is correct.

18        Q.    And if the City of Cleveland -- the

19   City of Cleveland, I take it, drafted this

20   amendment?

21        A.    That is correct.

22        Q.    It wasn't drafted by Xerox;

23   correct?

24        A.    Correct.

25        Q.    And if the City of Cleveland wanted

Page 53

1    to include the word local, they could have

2    included the word local; correct?

3         A.    That is correct.

4         Q.    In fact, there are instances, if

5    you want to turn to the contract itself, where

6    -- if you go to page 19 of 37, if you see

7    section 13.5, the last line says, applicable

8    state and local laws.  Do you see that?

9         A.    That's correct.

10        Q.    Okay.  If you also go down to the

11   next section, 14.1, it refers applicable

12   federal, state and local laws; correct?

13        A.    Correct.

14        Q.    So just as the word local was used

15   in the original contract, it could have been

16   used in the amendment, but wasn't; correct?

17        A.    Correct.

18        Q.    And if you look at section 13.5, if

19   you'll just read that to yourself?

20        A.    (Witness complies.)

21              Okay.

22        Q.    Okay.  And in this provision, the

23   City indicated that it was warranting, that it

24   would comply with applicable state and local

25   laws; correct?

Page 54

1       A.      That is correct.

2       Q.      After the ballot initiative, did

3  the traffic camera program comply with local

4  laws?

5       A.      Could you clarify that question?

6               MR. NATHANSON:  Objection.

7           I don't think he is qualified to

8  answer that -- that question.  Which number are

9  we -- are we on right now in the 30(b)(6)

10  deposition?

11              MR. BRENNAN:  The first topic.  The

12  negotiation of the contract and entering into

13  the contract.

14              MR. NATHANSON:  You are asking him

15  about the effective and filed amendment and

16  whether that's in compliance with local law,

17  that's not part of number one.

18              MR. BRENNAN:  Okay.  Look at six as

19  well.

20      Q.      Following the ballot initiative --

21              MR. NATHANSON:  I -- I'm sorry.  I

22  don't think this qualifies under number six

23  either.  It was --

24              MR. BRENNAN:  Okay.

25              MR. NATHANSON:  -- within section

Page 55

1    four of the contract.

2              MR. BRENNAN:    Your objection is

3    noted.

4         Q.    Following the passage of the ballot

5    initiative did the traffic camera program

6    comply with local laws?

7         A.    The ballot initiative allowed for

8    the use of photo enforcement cameras under a

9    strict set of parameters.

10        Q.    Okay.  So following the ballot

11   initiative the contract -- the City of

12   Cleveland would still in compliance with local

13   laws for the traffic camera program?

14        A.    Yes.

15        Q.    And, in fact, after the ballot

16   initiative, the City could have continued to

17   use traffic cameras; correct?

18        A.    No.

19        Q.    The City wasn't allowed to use

20   traffic cameras?

21        A.    At the time, after the ballot

22   initiative, the ballot initiative clearly

23   stated that officers had to physically hand

24   motorists the ticket after the violation

25   occurred.

Page 56

1          At that time, Xerox had no way of

2    printing tickets from a fixed camera in order

3    for this to even work.  So even if November 5th

4    the City decided, we are going to place an

5    officer at every camera, cameras could not

6    print tickets so, therefore, we would be in

7    violation of that charter amendment.

8          Q.    Did the City of Cleveland ask Xerox

9    whether it could implement a system to have

10   tickets be printed onsite?

11         A.    No, that was not the -- no.

12         Q.    Okay.  You're not aware, sitting

13   here today, whether Xerox could have done that?

14   In other words, print the ticket right from the

15   location?

16         A.    Again, if we had an officer to put

17   at each camera -- that was never the intent of

18   the program.  We would never -- it's cost

19   prohibitive to put an officer at the camera 24

20   hours a day to run a camera.

21         Q.    But the goal isn't to generate

22   revenue here, the goal is to save lives?

23         A.    Correct.

24         Q.    Okay.  But you didn't ask Xerox

25   whether they could in fact go ahead and print

Page 57

```
 1   tickets onsite; did you?

 2        A.    No, we did not.

 3        Q.    Okay.  Did you give consideration

 4   to whether the City could continue to use the

 5   traffic cameras and instead of issuing

 6   citations to violators that said you have to

 7   pay a fine, the City could issue a notice to

 8   violators saying you violated the law, next

 9   time you could be subject to a ticket and other

10   penalties?

11        A.    That process happened when a new

12   camera is put up.  We had, essentially, a

13   warning period of two weeks where violators

14   received that notice.

15             Again, the legislation clearly --

16   the City's legislation clearly states that

17   there is a fine for running the red light.  So

18   to me would be doing a disservice to the

19   legislation and the intent of the program by

20   just sending out warning notices.

21        Q.    Okay.  Have you studied whether --

22   has the City of Cleveland studied whether

23   warning notices are effective in reducing

24   accidents and death?

25        A.    No.  Again, when we sent the
```

Page 58

1  warning notices out, that was only for a

2  two-week period at fixed locations.

3        Q.    Okay.  So at the time the City of

4  Cleveland decided to turn off the cameras, it

5  didn't give consideration to whether continuing

6  to issue non-fine citations would help reduce

7  accidents and save lives?

8        A.    This was a revenue neutral

9  contract.  So submitting out non-fine

10  revenues -- I mean, submitting out non --

11  non-fine citations, essentially, would be

12  detrimental to the business model for Xerox.

13        Q.    Well, the business model of Xerox

14  is to get paid for the traffic cameras?

15        A.    Correct.  However, if we are

16  sending out non-fine warning notices to

17  everybody for the rest of the life of the

18  contract, we would run into, essentially, a

19  period where no revenue is being generated so

20  the City is not able to pay Xerox.

21        Q.    Okay.

22        A.    And at the end of the term of the

23  contract, I believe, if there is a shortfall

24  both parties agreed to walk away.

25        Q.    Understood.

Page 59

1            Do you know when that would occur?
2   In other words, when the City would break even?
3        A.    If we're sending out non -- the
4   City would never break even.
5        Q.    Let's step back.
6            The City made 15 million dollars
7   over the course of this contract?
8        A.    I don't have the financial
9   information in front of me.
10       Q.    Ballpark, does that make sense to
11  you?
12            MR. NATHANSON:  If you know.
13       A.    I don't know.  So the Clerk of
14  Courts deals with the collection of -- of money
15  from this program.
16       Q.    Okay.  You don't know, sitting here
17  today, as a representative of the City of
18  Cleveland, you don't know if the City of
19  Cleveland made one million, 2 million, 10
20  million or 15 million dollars off this
21  contract?
22       A.    Again, my responsibilities were for
23  operations.  I wasn't tasked with knowing, you
24  know, this month we made 2 million dollars,
25  next month we made this.  That was more of a

1   Clerks of Courts function for collections.

2       Q.    Okay.  Well, you knew the City of

3   Cleveland wasn't in the red?

4       A.    That's a fair statement.

5       Q.    It was making money off the

6   program?

7       A.    That's a fair statement.

8       Q.    Okay.  And the way the contract

9   works, as you described it, if in month one the

10  City has a one million dollar surplus, month 2

11  the program doesn't generate any revenue, the

12  City of Cleveland still has to pay Xerox until

13  such time as the City gets net neutral?

14      A.    That is correct.

15      Q.    Okay.  And sitting here today, do

16  you know whether or not the City of Cleveland

17  is net neutral on the contract?

18      A.    Again, that's something out of my

19  bailiwick of responsibilities.

20      Q.    Okay.  But was that a consideration

21  when the City of Cleveland decided to stop

22  paying Xerox?  In other words, are we net

23  neutral or can we consider to paying Xerox

24  until we get to net neutral?

25      A.    Again, that's something out of my

Page 61

1     -- out of my responsibilities.

2          Q.     You're the person who communicated

3     to Xerox to turn off the cameras; right?

4          A.     That is correct.

5          Q.     To stop the program?

6          A.     That is correct.

7          Q.     And at the time you made that

8     directive to Xerox you didn't know whether

9     Cleveland still had monies in its coffers to

10    pay Xerox; fair?

11         A.     That is fair.

12         Q.     And sitting here today, you don't

13    know whether the City of Cleveland had millions

14    of dollars to pay Xerox before it would get to

15    net neutral; correct?

16         A.     That is correct.

17         Q.     Okay.  And after the ballot

18    initiative of November 4th, the City of

19    Cleveland asked Xerox to continue to process

20    tickets as we've discussed; right?

21         A.     As part of the monthly fixed fee,

22    that was part of the services.  So any tickets

23    that happened before the ballot initiative,

24    anything that happened in October, should have

25    still been processed.

Page 62

1      Q.    Okay.   Where does it say it in the

2   contract that once Xerox terminates -- once the

3   City of Cleveland terminates the contract,

4   Xerox still has to process tickets?

5      A.    I don't believe the City ever

6   terminated the contract.

7      Q.    The City of Cleveland stopped

8   paying under the contract?

9      A.    The City never terminated the

10  contract.

11     Q.    Well, isn't the one obligation of

12  the City under the contract to pay Xerox?

13     A.    When the cameras are operational,

14  yes.

15     Q.    Okay.   Well, and that's the only

16  thing the City has to do under the contract is

17  pay Xerox; correct?   The City doesn't have to

18  refurbish cameras, the City doesn't have to

19  replace cameras, the City doesn't have to do

20  other things, it's one obligation is to pay

21  Xerox; correct?

22     A.    Correct.

23     Q.    Okay.   And the City hasn't been

24  doing that since November of 2014; correct?

25     A.    That is correct.

Page 63

1      Q.    And, again, the City made that
2  decision without knowing whether or not it was
3  net neutral on the contract?
4      A.    Again, I would not be in the best
5  position to comment on that.
6      Q.    Okay.  And you said Xerox would
7  have to keep continuing to process tickets
8  under its monthly fee, but the City of
9  Cleveland wasn't paying that monthly fee;
10  correct?
11      A.    The monthly fee I was speaking
12  about would be, say, for the month of October,
13  you could receive a photo enforcement ticket
14  October 31st and it may take six weeks for it
15  to go through the complete process.
16      Q.    Right.
17      A.    And any late notices that go out.
18  However, that ticket was part of that October
19  monthly fee for operating those cameras.
20      Q.    Okay.  Can you point me to a
21  provision in the contract that says, once the
22  City of Cleveland stops paying Xerox, Xerox
23  still has to process tickets?
24      A.    If the City paid Xerox for October,
25  that's part of October's services delivery.

Page 64

```
 1        Q.    And if I could just show the
 2   members of the jury the provision in the
 3   contract that says, after the City of Cleveland
 4   stops paying, Xerox still has to process
 5   tickets.
 6        A.    And, again, I would say, if the
 7   City paid Xerox for services for the month of
 8   the October, Xerox should perform those
 9   services for October.
10        Q.    And you believe -- do you know how
11   many millions the City of Cleveland made after
12   November 4th?
13        A.    No, I do not.
14        Q.    Okay.  Why did the City of
15   Cleveland continue to process tickets after
16   November 4th?
17        A.    Again, anything that was issued, I
18   believe, November -- probably November 3rd at
19   11:59 p.m. was still considered a good ticket.
20   Anything after -- from 12 a.m., November 4th,
21   election day on, was told to be voided out.
22        Q.    Okay.  But the City of Cleveland
23   continued to process tickets to generate
24   revenue; correct?
25        A.    No.  These were good violations
```

Page 65

1   that occurred while the program was allowable.

2         Q.     Which would have the effect of

3   generating millions of dollars for the City of

4   Cleveland?

5         A.     Again, these were violations that

6   occurred before the charter amendment was

7   approved.

8         Q.     Understood.

9               But sitting here today, are you

10  aware that the City made almost 4 million

11  dollars after November 4th off of tickets for

12  to violations prior to November 4th?

13        A.     If they were part of the November

14  -- October queue, then that's still why

15  the program was valid.  So that's --

16        Q.     I'm asking you a dollars amount,

17  not whether it's right, wrong or indifferent,

18  but are you aware that the City of Cleveland

19  received millions of dollars in revenue after

20  November 4th, 2014, as a result of the traffic

21  cameras?

22        A.     Again, I don't deal with the

23  financial aspects of the program overall,

24  that's not mine, that's not what I'm tasked

25  with, that's not my job.

Page 66

1        Q.      Okay.

2        A.      So, yes, they could have.

3        Q.      And did the City of Cleveland pay

4    Xerox for services Xerox performed in November?

5        A.      To the best of my knowledge, no.

6        Q.      Okay.  And you're aware that the

7    City of Cleveland's obligated to pay invoices

8    within 30 days; correct?

9        A.      Correct.

10        Q.      The City of Cleveland has not paid

11    invoices within 30 days following the ballot

12    initiative; correct?

13        A.      Correct.

14        Q.      In fact, there's millions of

15    dollars that Xerox claims it's owed but the

16    City of Cleveland hasn't paid it for invoices

17    issued to the City of Cleveland; correct?

18        A.      Correct.

19        Q.      Do you think it's -- on behalf of

20    City of Cleveland, do you think it's fair that

21    the City of Cleveland has made millions of

22    dollars off the program and Xerox has lost

23    millions of dollars off the program?

24        A.      To the best of my knowledge, the

25    City and Xerox had this relationship since

Page 67

1   2005, so they both made millions of dollars off

2   of this program.

3          Q.    I'm asking about the contract.

4              Do you think it's fair that under

5   the contract the City of Cleveland has made

6   more than tens of millions of dollars and Xerox

7   has lost millions of dollars?

8              MR. NATHANSON:  Objection.

9              Is this his personal opinion or as

10  a City representative?

11             MR. BRENNAN:  City representative.

12         A.    Again, I will say the same thing.

13  The City -- since the charter amendment, the

14  City has lost millions of dollars also by not

15  being able to operate the program.  And Xerox

16  has since removed those cameras and reused

17  them, so.

18         Q.    Well, the City of Cleveland hasn't

19  lost millions dollars, the City of Cleveland

20  just hasn't made millions of dollars; correct?

21         A.    If you want to make that assertion.

22  It's the same.  We could say Xerox removed the

23  equipment, so they, in a sense, made millions

24  of dollars somewhere else by reusing that

25  equipment.

Page 68

1      Q.    Well, they could have -- your

2    understanding is that Xerox used cameras for

3    other cities and it wouldn't have been able to

4    enter into a contract in other cities?

5      A.    No.  No.  What I was asserting is

6    that the upfront costs that they had had with

7    the City, when they removed that equipment,

8    they were able to refurbish it and place it

9    somewhere else in another city.  So that all of

10   the sudden decreased their upfront costs on

11   starting a new program.

12     Q.    Okay.  You are not aware that Xerox

13   could have a traffic camera program in

14   Cleveland and 100 other cities and it doesn't

15   matter whether or not the City of Cleveland

16   terminates the program or not, it can still

17   operate that program elsewhere; correct?

18     A.    Again, the City didn't terminate

19   the program, but that's not what I was --

20     Q.    Okay.

21     A.    -- making an assertion about.

22     Q.    City of Cleveland made millions of

23   dollars off this contract?

24     A.    Correct.

25     Q.    Okay.  Xerox has lost millions of

Page 69

1    dollars; correct?

2          A.     Under --

3          Q.     That would be your expectation?

4                 MR. NATHANSON:   Object.

5                 If you know.

6          A.     Yeah.  That's something -- I don't

7    know Xerox's financials.

8          Q.     Would it -- as a representative of

9    the City of Cleveland, do you think it's fair

10   that the City of Cleveland has made millions of

11   dollars off this contract and Xerox has lost

12   millions of dollars?

13         A.     Again, with any photo enforcement

14   program there's associated risks that both

15   parties agree to.

16         Q.     Is your answer yes or no?  Is it

17   fair that Xerox has lost millions and City of

18   Cleveland has made millions of dollars?  I just

19   want to tell a jury what your view is.

20         A.     Again, I don't see it under that

21   interpretation.  I think there were risks

22   associated with both parties with operating

23   this type of program.

24         Q.     Who bore the risk?  Who made

25   millions and who lost millions?

Page 70

```
 1          A.    Again, I ascertain that both --
 2    both sides.
 3          Q.    Okay.  The City of Cleveland made
 4    millions of dollars, Xerox lost millions of
 5    dollars; is that fair?  Simple question for the
 6    jury.
 7          A.    And, again, I state that both
 8    parties lost things with this charter amendment
 9    moving forward and being approved.
10          Q.    You lost the possibility of making
11    millions of dollars, Xerox lost the possibility
12    of breaking even; correct?
13          A.    That's under your interpretation.
14          Q.    What's your interpretation?
15          MR. NATHANSON:  Objection.
16          Asked and answered.
17          A.    Yes, that both -- both sides lost
18    the opportunity to gain revenue.
19          Q.    Who's in the red and who's in the
20    black under this contract?
21          MR. NATHANSON:  Objection.
22          Asked and answered.
23          A.    Again, I don't know Xerox's
24    financials, so I can comment on Xerox.
25          Q.    Okay.  You didn't give
```

Page 71

1    consideration to whether Xerox lost money,

2    whether the City of Cleveland should pay its

3    termination fee?

4         A.    Again, the City did not terminate

5    the contract.

6         Q.    The City is not paying under the

7    contract?

8         A.    The City's never sent out a letter

9    of termination to Xerox.

10        Q.    But you understand that nonpayment

11   is an incident of default under the contract?

12        A.    Again, I'm a lay person, I try and

13   understand the contract, but, again, a charter

14   amendment was approved, the City did not send

15   any correspondence to Xerox saying, we are

16   terminating the contract.

17        Q.    Because they didn't want to pay the

18   termination fee?

19        A.    Again, a charter amendment --

20        Q.    Simple question.  The City decided,

21   we're not going to formally say we terminated,

22   we don't want to use the cameras, but we don't

23   want to say we terminated because we don't want

24   to make a termination fee; correct?

25             MR. NATHANSON:   Objection.

Page 72

1              The reasoning for -- for that issue

2      was made upon the advice of counsel, so he

3      can't speak to the discussion.

4              MR. BRENNAN:  That's great if he

5      wants to assert the advice of counsel.

6         A.    I want to assert the advice of

7      counsel.

8         Q.    You don't know why the City decided

9      not to pay the termination fees?

10        A.    In the City's opinion, we were not

11     terminating the contract for conveyance.

12        Q.    Were you terminating the contract?

13        A.    No, the City was not terminating

14     the contract.

15        Q.    The contract's still ongoing?

16        A.    That is correct.

17        Q.    Okay.  So if the contract's still

18     ongoing and Xerox is entitled to a monthly fee,

19     I take it the City is paying the monthly fee?

20        A.    The monthly fee was for cameras

21     that are operational.  Right now the cameras

22     are not operational.

23        Q.    And the cameras can be operational,

24     they can issue citations that aren't fines;

25     correct?

Page 73

1      A.     (Pause.)

2      Q.     You decided to turn off the

3  cameras, not Xerox; correct?

4      A.     The City made that decision.

5      Q.     Okay.  So the City decided to make

6  the cameras non-operational; correct?

7      A.     Based off the charter amendment;

8  correct.

9      Q.     Okay.

10            MR. NATHANSON:  Can we take a break

11  soon?

12            MR. BRENNAN:  Yeah, we've been

13  going an hour, why don't we take a quick break?

14            (Short recess had.)

15     Q.     Thank you.  Sir, are you ready?

16     A.     Yes.

17     Q.     Okay.  Who made the decision on

18  behalf of the City of Cleveland to turn off the

19  cameras?

20     A.     The law department made the

21  decision.

22     Q.     Why did they make that decision?

23     A.     Based on the language of the

24  charter amendment the cameras were turned off

25  per the law department.

Page 74

1          Q.    Okay.  Who conveyed that to you
2    from the law department?
3                MR. NATHANSON:   Objection.
4          A.    Safety Director Mike McGrath
5    conveyed the decision from the law department
6    to turn off the cameras to me.
7          Q.    You did not have direct
8    communications with the law department about
9    that?
10         A.    No, I did not.
11         Q.    What did Mr. McGrath say to you?
12         A.    Mr. McGrath told me to turn the
13   cameras off.
14         Q.    Did he tell you why?
15         A.    No.  He said he spoke with the law
16   department and to turn the cameras off.
17         Q.    Okay.  And when did that
18   conversation take place?
19         A.    To the best of my recollection,
20   that conversation probably took place about --
21   it was 7:50-ish on -- that would have been
22   November 5th of 2014.
23         Q.    A.m.?
24         A.    Yes, a.m.
25         Q.    Okay.  So the ballot initiative

Page 75

1    passes on the 4th, morning of the 5th you two

2    have a conversation and he says turn off the

3    cameras?

4          A.    I reached out to the director and

5    said the ballot initiative passed, what is the

6    next step?  What are we doing?

7          Q.    And the response was?

8          A.    He was going to talk to the law

9    department and, subsequently, after he talked

10   to the law department, I received an e-mail

11   saying to turn off the cameras.

12         Q.    And the e-mail came from Mr.

13   McGrath?

14         A.    That is correct.

15         Q.    And the communication about why to

16   do it, it was solely based on the ballot

17   initiative?

18         A.    Again, that's a conversation the

19   director had with the law director on why to do

20   it.

21         Q.    I know, but if you look at topic

22   eight, you are the designated witness on the

23   City's decision to stop paying.  So the

24   question to you, as the witness on the topic

25   is, why did the City decide to stop paying

Page 76

1  Xerox its monthly fee?

2       A.    Again, that was a decision from the

3  law department.

4       Q.    It's not a who question.  It's a

5  why.

6             Why did the City stop paying Xerox

7  its monthly fee?

8       A.    Again --

9             MR. NATHANSON:  Objection.  That's

10 privileged.

11      Q.    If that's your answer, I'm entitled

12 to that answer.

13      A.    Yes.  That's privileged

14 conversation --

15      Q.    Okay.

16      A.    -- with counsel.

17      Q.    Do you have any non-privileged

18 reason of why the City of Cleveland decided to

19 stop paying Xerox its monthly fee?

20      A.    No, I do not.

21      Q.    Okay.  The City -- and when you say

22 I, again, you are speaking on behalf of the

23 City of Cleveland?

24      A.    Correct.

25      Q.    There is no non-privileged reason

Page 77

1   why the City decided to stop paying Xerox its

2   monthly fee; correct?

3          A.    Correct.

4          Q.    If you turn to the contract and if

5   you'll put in front of you -- again, if you go

6   to 13 of 37.

7          A.    (Witness complies.)

8                Okay.

9          Q.    Okay.  It reads, the City, in

10  accordance with the terms and conditions set

11  forth in Exhibit 1, shall pay all compensation

12  to contractor under this LSA.  All invoices

13  from the contractor shall be promptly processed

14  and payment will be issued as soon as

15  practicable after receipt of invoice with a

16  goal of not more than 30 days.  Did I read that

17  accurately?

18         A.    Correct.

19         Q.    Has the City made all payments

20  within 30 days owed to Xerox?

21         A.    Prior to the charter amendment,

22  yes.

23         Q.    Following the charter amendment?

24         A.    Again, the law department made the

25  decision and no payments have been made since

Page 78

1   the charter amendment.

2        Q.    Okay.   That's my question then.

3   Have payments been made since the charter

4   amendment?

5        A.    No payments have been made since

6   the charter amendment.

7        Q.    The City hasn't been paying

8   pursuant to 4.0 since the charter amendment?

9        A.    That is correct.

10       Q.    The City has one obligation under

11  the contract, which is to make payments, and

12  the City hasn't been doing that; correct?

13       A.    Correct.

14       Q.    Is the City planning on renewing

15  the contract?

16       A.    Not at this time.

17       Q.    Okay.   Is that something that's

18  being considered?

19       A.    If there's another movement to

20  change the charter amendment, that will

21  probably be something that the City would

22  greatly entertain.

23       Q.    But it's your testimony, on behalf

24  of the City of Cleveland, that the City of

25  Cleveland hasn't terminated the contract?

Page 79

1      A.    Correct, the City has not
2  terminated the contract.
3      Q.    And one of the rights the City has
4  under the contract is to extend the contract;
5  correct?
6      A.    That is correct.
7      Q.    Okay.  And the City is leaving that
8  issue open for the time being?
9      A.    The City sees this as a living,
10 breathing document, so the contract is still in
11 place right now.
12     Q.    And you would agree with me that
13 the obligation to pay is a material obligation
14 under the contract?
15     A.    Could you rephrase?
16     Q.    The obligation to the City of
17 Cleveland to pay Xerox is a material
18 obligation?  It's an important obligation under
19 the contract?
20     A.    It's one of the clauses in the
21 contract.
22     Q.    And it's a material clause?  I
23 mean, there is no bigger clause from Xerox's
24 perspective, other than the City's obligation
25 to pay; correct?

Page 80

```
 1          A.      That's Xerox's interpretation.
 2          Q.      Well, do you consider the
 3    obligation to pay to be a material provision or
 4    an immaterial provision?
 5          A.      Again, this clause, just like
 6    making sure the cameras are operational --
 7          Q.      That's material to the City of
 8    Cleveland?
 9          A.      Correct.
10          Q.      Okay.  And being paid is material
11    to Xerox?
12          A.      If Xerox wants to make that claim.
13          Q.      I'm asking you as the person who is
14    the designated witness on the negotiation and
15    hearing into the contract, is the obligation of
16    the City of Cleveland to pay Xerox a material
17    part of the contract or not?
18          A.      It's a clause in the contract.
19          Q.      Is it material, sir?
20          A.      To say it's material to Xerox,
21    that's something I can't answer.
22          Q.      I'm asking, is it material to the
23    City of Cleveland?
24          A.      I believe it's a weighted clause in
25    the contract.
```

Page 81

1    Q.    It's a what clause?

2    A.    It's a weighted clause in the

3 contract, just like all these other clauses in

4 the contract, it is a task or a duty to be

5 performed.

6    Q.    It's a yes or no question.  Is the

7 City's obligation to pay Xerox a material term

8 of the contract, yes or no?

9    A.    I guess, what is your definition of

10 material?  I'm not --

11    Q.    Important.  Having significance.

12 Critical.  Foundation of the contract.  Any and

13 all of the above, is it a material provision of

14 the contract that the City of Cleveland pay

15 Xerox?

16    A.    I think the City would make the

17 argument that all the clauses are -- in this

18 contract are material --

19    Q.    Including that one?

20    A.    -- not just that one.

21    Q.    But it would include that one?

22    A.    Including all clauses, yes.

23    Q.    Yes.

24          So the obligation of the City of

25 Cleveland to pay Xerox, among others, is a

Page 82

1    material portion of the contract?
2           A.     The whole is material, yes.
3           Q.     Including that portion?
4           A.     Including that portion.
5           Q.     Okay.  Let's just put a bow on it.
6    Okay?
7                  So the obligation of the City of
8    Cleveland to pay Xerox --
9                  MR. NATHANSON:  Objection.
10                 Asked and answered.
11          Q.     -- is a material provision in the
12   contract?
13          A.     I've already answered that.
14          Q.     And your answer is?
15          A.     That the entire contract is
16   material to the City's definition.
17          Q.     Sir, you know, I don't want to be
18   here all day, I'm happy to, I have no other
19   plans today.  Okay?  I hope you don't because
20   at this pace we are going to be here a lot
21   longer than I expected.
22                 Simple question, simple answer.  Is
23   the obligation of the City of Cleveland to pay
24   Xerox a material provision of the contract?
25          A.     And, again, I've answered that.

Page 83

1          Q.    What's your answer?  I don't know

2    your answer.  Is your answer yes?

3          A.    The City considers the personnel

4    clause to be material.  The City -- it's a

5    contract.  It's a living, breathing document to

6    us.  So there's no one clause that we will say

7    this is --

8          Q.    I'm not asking --

9          A.    -- more critical, more significant.

10         Q.    I'm not asking if it is more

11   material.

12              Is the obligation of the City of

13   Cleveland to pay Xerox under the contract a

14   material provision of the contract?

15         A.    Yes.

16         Q.    Okay.  Thank you.

17              MS. DINEHART:  Can we have one

18   minute with him in the hall, Terry, just off

19   the record, just to help all of us?  Is that

20   okay?

21              MR. BRENNAN:  Yes, that's fine.

22              MS. DINEHART:  Thank you.

23              (Discussion had off the record.)

24         Q.    Sir, does the City of Cleveland

25   consider Xerox to be in default under the

Page 84

1    agreement?

2         A.    The City does not consider Xerox to

3    be in default under the agreement.

4         Q.    You would agree with me that

5    there's no provision written in the agreement

6    that says the City of Cleveland can direct

7    Xerox to turn off cameras; correct?

8         A.    I believe as the City operating the

9    program they have that right.

10        Q.    That wasn't my question.

11              MR. BRENNAN:  Can you read the

12   question back to the witness, please?

13              (Record read.)

14        A.    To the best of my knowledge, that

15   is correct.

16        Q.    And, as I think we have discussed,

17   and I'm not trying to re-plow the same field,

18   the City of Cleveland has not been making

19   payment to Xerox since the ballot initiative,

20   since 2014; correct?

21        A.    That is correct.

22        Q.    Why has the City of Cleveland not

23   paid Xerox for services Xerox performed in

24   November of 2014?

25              MR. NATHANSON:  Same objection as

Page 85

1    before.   The actual decision from the law

2    department was privileged.

3              MR. BRENNAN:   Which is fine.

4        Q.    Can you think of any non-privileged

5    reason why the City of Cleveland has not paid

6    Xerox for services performed on or after

7    November 2014?

8        A.    No, I cannot.

9        Q.    Okay.   The -- I want to direct your

10   attention to another provision of the

11   agreement.   If you turn to page 26 of 37.

12       A.    (Witness complies.)

13       Q.    If you see there is a section E

14   2.1?

15       A.    Yes.

16       Q.    And that gives the City of

17   Cleveland the right to charge contractor, being

18   Xerox, $500 per day, per unit that is not

19   operational; correct?

20       A.    Correct.

21       Q.    Okay.   Has the City of Cleveland

22   sought to charge Xerox those amounts?

23       A.    Under this contract, no.

24       Q.    And that's because it was the City

25   of Cleveland's decision, not Xerox's, to make

Page 86

1   cameras non-operational; correct?

2        A.    No.

3        Q.    No, my statement is not correct?

4        A.    Correct.  This clause indicated if

5   a camera was broken and Xerox had not fully

6   repaired that camera, that then there would be

7   penalty charges relating to Xerox until that

8   camera was returned to operation.  This dealt

9   with malfunctioning cameras.

10       Q.    Well, it just says operational.

11  Operational means working for whatever reason;

12  right?

13       A.    Correct.

14       Q.    And cameras are not working in the

15  City of Cleveland; correct?

16       A.    Cameras were shut off in the City

17  of Cleveland, correct.

18       Q.    And the reason the City of

19  Cleveland is not trying to charge Xerox for

20  that is because it was the City of Cleveland's

21  decision and not Xerox's to make the cameras

22  non-operational; correct?

23       A.    No.

24       Q.    Who made the decision to make the

25  cameras non-operational?

Page 87

1      A.    Your statement regarding this
2  clause relates to cameras that are
3  malfunctioning.  In previous contracts we had
4  issues where cameras were malfunctioning.
5  There were no way for the City to, essentially,
6  hold a penalty to Xerox for cameras --
7  equipment that was malfunctioning.
8            So this clause, in the City's
9  opinion, does not relate to the City telling
10 Xerox to turn off the cameras.
11     Q.    Operational doesn't mean
12 operational?
13     A.    Again, when we speak of
14 operational, we are speaking of a
15 malfunctioning camera.
16     Q.    Why didn't you use the word
17 malfunctioning when drafting the contract?
18     A.    Again, this is speaking to the
19 drafting language of -- which I'm not a lawyer.
20 I know the intent, but I'm not the lawyer who
21 drafted the contract.
22     Q.    Okay.  But regardless, it was the
23 City of Cleveland's decision to make the
24 cameras non-operational, not Xerox's; correct?
25     A.    Correct.

Page 88

1      Q.    And the reasons behind that

2  decision are all privileged?

3      A.    That is correct.

4      Q.    The City of Cleveland believes it's

5  excused from paying Xerox any further monies

6  under the contract; fair?

7      A.    To the best of my knowledge, those

8  conversations of what should be paid and not

9  paid are with the law department, so that would

10  be privileged.

11      Q.    Okay.  But sitting here today, you

12  do know and you do understand, that's the

13  position, that's the understanding of the City

14  of Cleveland, that we are not going to pay

15  Xerox --

16          MR. NATHANSON:  Objection.

17      Q.    -- any further monies under the

18  contract?

19          MR. NATHANSON:  Objection.

20          If you know.  You can answer if you

21  know.

22      A.    Yeah, I don't know.

23      Q.    Okay.  Well, you're here testifying

24  on that subject on behalf of the City of

25  Cleveland.  So I just, again, want to make sure

Page 89

1    if it's something that's privileged, it's

2    privileged and I'm not going to go into it.

3    But in response to number 13, if you have it in

4    front of you, please identify all of the

5    factual bases for the City's assertion that

6    it's excused from paying Xerox the outstanding

7    fees under the traffic camera program?

8         A.    And, again, that would be a

9    privileged conversation with the law

10   department.

11        Q.    So any and all bases, per the

12   City's decision, are privileged?

13        A.    Those discussions were had with

14   direct counsel with the law department.

15             MR. NATHANSON:  Is that yes or no?

16        A.    So yes, it is a privileged

17   conversation.

18        Q.    Okay.  And, again, I just -- any

19   and all of the bases for the City's position

20   that it is excused from paying Xerox are

21   privileged?

22        A.    Yes.

23        Q.    Did you have any input into those

24   decisions, the decisions, one, to turn off the

25   cameras or, two, to not pay Xerox going

Page 90

1    forward?

2         A.    The decision to turn off the

3    cameras, as I mentioned before, I reached out

4    to the director and apprised him that the

5    charter amendment had been passed and what are

6    our next steps.

7         Q.    Okay.  But did you make any

8    recommendation?  Did you go to anyone and say,

9    we should turn off the cameras, we shouldn't

10   turn off the cameras?  Did you weigh in on that

11   issue?

12        A.    No, I did not.

13        Q.    Okay.  Did anyone from the City of

14   Cleveland, not in the law department, weigh in

15   on that issue?

16        A.    No.  As I stated, that was a direct

17   -- to Director McGrath who then talked to the

18   law director.

19        Q.    Okay.

20        A.    In my best recollection.  I don't

21   know, he might have talked to somebody else.

22   But, again, from my standpoint, I talked to the

23   director, the director said, I'm going to talk

24   to the law department.

25        Q.    Yeah.  And, again, I want you to

Page 91

1    put back on the 30(b)(6) hat, if you have taken

2    it off and, hopefully, you haven't, that's been

3    the entirety of this deposition.  But were

4    there any non-privileged recommendations or

5    communications about turning off the cameras?

6          A.    No, there was not.

7          Q.    Were there any non-privileged

8    recommendations or communications about not

9    paying Xerox its fees going forward?

10         A.    No, there was not.

11         Q.    You understand that the termination

12   for convenience fee is not a fixed fee, it

13   changes over the life of the contract; correct?

14         A.    That is correct.

15         Q.    And the reason it changes over the

16   life of the contract is because as the contract

17   goes forward, Xerox starts to recoup some of

18   its upfront costs; correct?

19         A.    That's correct.

20         Q.    So if the contract is terminated

21   day one, the termination for convenience fee is

22   going to be substantially greater than if it's

23   terminated the day before the contract was

24   naturally to expire; correct?

25         A.    Correct.

Page 92

1          Q.      Did you have an understanding in

2     November of 2014 the ballpark amount of the

3     termination fee under the contract?

4          A.      No, I did not.

5          Q.      Did you understand it to be

6     millions of dollars?

7          A.      No, I did not.

8          Q.      Were there any non-privileged

9     communications about whether or not to pay the

10    termination fee set forth in the contract?

11         A.      No, there weren't.

12         Q.      After the ballot initiative passed,

13    were there any non-privileged communications

14    about challenging the legalities of the ballot

15    initiative within the City of Cleveland?

16         A.      I believe there -- going before the

17    ballot initiative was passed, there were some

18    questions about the collections of the

19    signatures and the time period that they were

20    submitted.  So I know those discussions were

21    had, but I'm not aware of any questioning the

22    legality after the fact.

23         Q.      Okay.  So there were some question

24    -- there was some non-privileged communications

25    before the ballot initiative was passed, as far

Page 93

1  as whether we should even put it on the ballot,

2  whether, you know, it is a valid item to be put

3  forth to the voters?

4      A.    I believe City Council was mandated

5  that if the voters fill out the paperwork for

6  referendum that its the duty that the City

7  Council must put that on the ballot.

8      Q.    Okay.  Were you personally involved

9  in any discussions on the subject?

10      A.    No, council had a council meeting.

11  So at that point, when it became a City

12  referendum that dealt specifically with City

13  Council.  So at that point I, myself, being a

14  representative of the City, were removed from

15  those conversations.  So that's a direct City

16  Council function, to put ballot initiatives

17  before the voters.

18      Q.    And, again, after the ballot

19  initiative was passed, did the City of

20  Cleveland have any non-privileged

21  communications about whether or not to

22  challenge the legality of the ballot

23  initiative?

24      A.    To the best of my knowledge, I

25  don't recall any of those conversations.

Page 94

1       Q.    It is fair to say you are giving

2   testimony on behalf of the City of Cleveland,

3   not just in your personal capacity?

4       A.    Correct.

5       Q.    After the ballot initiative was

6   passed, we've talked a little bit about this,

7   but I just want to make sure, did the City of

8   Cleveland give any consideration to using the

9   traffic cameras for surveillance?

10      A.    No.  At that point we believed that

11  -- our belief that if they cut the cameras off

12  the surveillance component would be cut off

13  also.

14      Q.    Well, when you say, if they cut the

15  cameras off?

16      A.    If we instructed Xerox to cut the

17  cameras off, that meant the cameras were

18  completely off, so there would be no capability

19  of using the surveillance capability.

20      Q.    Correct.  But before that decision

21  was made or even after that decision was made,

22  was there any thought within the City of

23  Cleveland, hey, perhaps we can use this cameras

24  for another purpose?  Maybe we can use them for

25  surveillance?

1      A.      The City currently have a video

2  surveillance program that's up and running and

3  the monthly fees that the City would have to

4  pay to run that type of surveillance the --

5  would greatly outweigh what we would try to

6  accomplish.  So it wouldn't be beneficial to

7  the City to try to use that technology for

8  video surveillance.

9      Q.      And I'm not asking about any

10 reasoning for doing that or not doing that.

11 The simple question is, either before or after

12 the cameras were turned off, did the City of

13 Cleveland contemplate perhaps using the cameras

14 for surveillance purposes, yes or no?

15     A.      No.

16     Q.      And you said something to the

17 effect, and I don't want to put words in your

18 mouth, that it wouldn't be consistent with the

19 City's purpose.  But surveillance serves a

20 safety function; does it not?

21     A.      That is correct.

22     Q.      But notwithstanding that, the City

23 of Cleveland didn't give thought to whether or

24 not the traffic cameras can be used for

25 surveillance, not issuing tickets, and whether

Page 96

1  that might serve public safety; correct?

2       A.    Can you rephrase that?

3       Q.    Yeah.

4             Either before or after the City of

5  Cleveland made the decision to turn off the

6  cameras, the City -- I believe, it's your

7  testimony, didn't give thought or contemplation

8  whether or not it should use the traffic

9  cameras for surveillance rather than issuing

10 tickets, and whether that use of surveillance

11 would further public safety; correct?

12      A.    Yes, that is correct.

13      Q.    Have you ever served in any of the

14 armed forces?

15      A.    No, I have not.

16      Q.    Okay.  I will represent to you that

17 the armed forces place values on human life.

18 Okay?  So, for example, pilots in the Navy or

19 the Air Force might be instructed, if you are

20 going in a spin pattern, we want you to eject,

21 even if that means losing a plane or tens of

22 millions of dollars, rather than try to stay --

23 manning the pilot (sic) and, perhaps, save the

24 aircraft.

25            Has the City of Cleveland done any

1   sort of similar calculation, you know, what the

2   value is of having a traffic camera program

3   versus what the value is of saving lives of its

4   residents?

5       A.   To best of my knowledge, I don't

6   recall any of those conversations.

7       Q.   You've never heard discussions to

8   the effect of, you know, why don't we pay a

9   couple hundred grand a month if it saves one,

10  two, three, ten lives a year, it's worth it or

11  not worth it?  You have never heard any of

12  those discussions within the City of Cleveland

13  or public safety department?

14      A.   That is correct.

15      Q.   Do you have an opinion about that?

16           MR. NATHANSON:  Objection.

17           I feel like that's beyond the scope

18  of his 30(b)(6) capacity.

19      Q.   It's a fair objection, but if you

20  can give your response?

21      A.   Again, I oversee our video

22  surveillance program, and when you mentioned

23  the hundreds of thousand of dollars a month,

24  that's a one-time cost for us to put up video

25  surveillance cameras versus a recurring fee.

Page 98

1    So from that perspective, that would be my

2    personal opinion, that our video surveillance

3    program achieves the same goal with fewer

4    costs.

5         Q.    Does the video surveillance program

6    reduce incidents of red light violations?

7         A.    It's video surveillance, so it is

8    not a photo enforcement program, it serves a

9    different capacity.

10        Q.    It is not designed to stop people

11   from speeding or running red lights?

12        A.    And --

13        Q.    That's true?

14        A.    That's true.

15        Q.    Okay.  And stopping folks from

16   speeding and running red lights is a worthwhile

17   endeavor to promote safety; correct?

18        A.    That's correct.

19        Q.    Okay.  And the City doesn't have

20   any program in place that currently does that;

21   correct?

22        A.    The traffic unit does manual

23   enforcement now.

24        Q.    Of red lights and traffic cameras?

25        A.    No.  They do manual enforcement of

Page 99

1    speeding and other hot spot areas now.

2         Q.    Okay.

3         A.    So the photo enforcement technology

4    isn't available to do it.

5         Q.    And they did that before, during

6    and after the contract; right?

7         A.    Correct.

8         Q.    That hasn't changed regardless of

9    the fact that the City of Cleveland isn't

10   paying Xerox under the contract; correct?

11        A.    Correct.

12        Q.    At the time the City of Cleveland

13   entered into the contract, was there anything

14   the City of Cleveland was thinking about that

15   might cause it to terminate the contract?

16        A.    No.

17        Q.    In other words, if the City of

18   Cleveland during the life of the contract felt

19   that Xerox wasn't performing it could tell

20   Xerox, you are in default; correct?

21        A.    If the City felt Xerox wasn't

22   performing we would have those conversations

23   with Xerox about the performance.

24        Q.    Okay.  And you are aware and I'm

25   happy to show it to you, but there is a default

Page 100

1    provision where the City of Cleveland can

2    notify Xerox it's in default and it's got a

3    period of time to cure its default; correct?

4         A.    Correct.

5         Q.    So the only reason the City of

6    Cleveland at the time it entered into the

7    contract would be able to terminate the

8    contract would be if there was a change in law;

9    correct?

10        A.    Again, the City didn't terminate

11   the contract.

12        Q.    I'm not asking whether the City did

13   or didn't, at the time the City of Cleveland

14   entered into the contract, the only thought it

15   might have had, as far as, well, we may want to

16   terminate the contract or may not, would be if

17   there was a change in law; correct?

18        A.    And I don't believe the City ever

19   thought about terminating the contact entering

20   into it.  I don't believe that was a discussion

21   to say, we need a termination clause.

22        Q.    The City of Cleveland didn't want

23   the termination clause in the contact?

24        A.    The contact from 2005 had a

25   termination clause, so I believe we used the

Page 101

1    same template and maybe added a couple things

2    here or there.   However, the termination clause

3    was in the contact in 2005 and we started off

4    with that template to build the new contract.

5         Q.    Okay.   The termination clause was

6    made to benefit both parties.   If the City of

7    Cleveland decided they didn't want cameras they

8    could get rid of it.   If the City terminated

9    earlier than the contact's expiration, Xerox

10   would get paid; correct?

11        A.    That is correct.

12        Q.    The City decided where to deploy

13   cameras; correct?

14        A.    That is correct.

15        Q.    Okay.   It would instruct Xerox,

16   place a camera here, remove a camera from

17   there?

18        A.    Correct.

19        Q.    And Xerox followed those

20   instructions?

21        A.    Correct.

22        Q.    Are you aware of any time where

23   Xerox didn't follow those instructions, where

24   it didn't do what the City said?

25        A.    No.

Page 102

```
 1          Q.     So the ultimate decision making
 2    authority about turning cameras on, off, where
 3    to place them, that rested solely with the City
 4    of Cleveland, not Xerox; correct?
 5          A.     That is correct.
 6          Q.     Sir, why is it the City of
 7    Cleveland's position that the City hasn't
 8    terminated the contact, even though it isn't
 9    paying Xerox under the contract?
10          A.     Again, as far as payment fees,
11    those were privileged conversations with the
12    law department on what should be paid.
13          Q.     Okay.  Who made the decision that
14    the contract is not terminated, that rests
15    solely with the law department?
16          A.     That rests solely with the law
17    department.
18          Q.     It's the City's position -- I think
19    I'm using your phrase from earlier, the
20    contract remains a living, breathing document?
21          A.     That is correct.
22          Q.     But a living, breathing document
23    that Xerox hasn't been paid under since
24    November of '14; correct?
25          A.     That is correct.
```

Page 103

```
 1              MR. BRENNAN:  Why don't we take
 2     five minutes?  We may be wrapping up before the
 3     personal.
 4              (Short recess had.)
 5         Q.    Sir, is it true and accurate to say
 6     that the sole basis for the City's -- sole
 7     factual basis for the City's decision to turn
 8     off the cameras was the passage of the ballot
 9     initiative?
10         A.    That is correct.
11         Q.    Is it true and accurate to say that
12     the sole basis for the City's decision to cease
13     paying Xerox was the passage of the ballot
14     initiative?
15         A.    That is correct.
16         Q.    Is it fair to say that the
17     negotiation of the contract and execution of
18     the contract, that was something that was
19     scrutinized both outside the law department and
20     within the law department?
21         A.    Correct.
22         Q.    Okay.  This wasn't something that
23     was done haphazardly, it was the subject of a
24     lot of scrutiny and a lot of evaluating before
25     the City entered into the contract?
```

Page 104

1          A.     That is correct.

2          Q.     Okay.  And I want to show you --

3                 MR. BRENNAN:  What is our next one,

4     5?

5                 THE NOTARY:  Yes.

6                 MR. CAMARDO:  5.

7                      -   -   -   -   -

8                 (Thereupon, Plaintiff's Exhibit 5,

9                 E-Mail With Revised Copy of License

10                and Service Agreement, was marked

11                for purposes of identification.)

12                     -   -   -   -   -

13         Q.     Sir, showing you what's been marked

14    for purposes of identification as Exhibit 5.

15    Which at the bottom of the page bears an

16    alphanumeric labeling that ends in 318.

17                Do you have that document in front

18    of you?

19         A.     Yes, I do.

20         Q.     This is, in fact, an e-mail that

21    you drafted?

22         A.     This is correct.

23         Q.     Okay.  And you forwarded it onto

24    Jim?

25         A.     Correct.

Page 105

1        Q.    And in the cover e-mail, you're

2    identifying certain revisions to the attached

3    agreement; correct?

4        A.    This is correct.

5        Q.    Okay.  So not only with the law

6    department looking at the language and the

7    potential contract, but so were you and other

8    folks within the City of Cleveland?

9        A.    That is correct.

10        Q.    Okay.  And if you turn to the page

11    at the bottom that ends in 332.  Do you have

12    that in front of you?

13        A.    I do.

14        Q.    Okay.  And do you see section

15    6.1.2, force majeure, do you have that?

16        A.    Yes, I do.

17        Q.    And you see the provisions of the

18    agreement are underlined; correct?

19        A.    Correct.

20        Q.    Okay.  And to the left-hand side of

21    the page, there is a vertical line that matches

22    up with the underlining; correct?

23        A.    Correct.

24        Q.    And that indicates that these are

25    revisions being made and what's commonly used

Page 106

1    as redlined form to the agreement; correct?

2         A.    That is correct.

3         Q.    Were these changes that you were

4    proposing in the agreement or someone else was

5    proposing in the agreement?

6         A.    So these changes would have came

7    from the law department.

8         Q.    Okay.  So this is a redline that

9    would have been forwarded to both, the law

10   department -- from the law department to you?

11        A.    Correct.

12        Q.    But not only is the law department

13   reviewing proposed revisions to the agreement,

14   you are and other folks and the City of

15   Cleveland are as well?

16        A.    Correct.

17        Q.    Okay.  Sir, at this point in time

18   we are going to conclude your 30(b)(6) witness.

19   Reserving the right if necessary to resume it.

20   We are now concluding that portion of the

21   deposition and are moving forward only asking

22   you to testify in your personal capacity.

23   Okay?

24        A.    Okay.

25        Q.    It's come to our understanding that

Page 107

1    at some point in time you had electronic data

2    that was lost or destroyed on your computer;

3    correct?

4         A.    That's correct.

5         Q.    Okay.  And when did that happen?

6         A.    So I lost e-mails from -- I started

7    with the City in July of 2010, so anything from

8    July of 2010 to 2014, probably, of -- I would

9    say early 2014.  So probably anything from,

10   maybe, May of 2014.  So that time period from

11   July 2010 to about May of 2014, the previous

12   computer I had, essentially, stopped working.

13              Documents were saved to the hard

14   drive.  Well, my e-mail archive files, when

15   they set it up, they saved it to the hard

16   drive.  So when that hard drive was gone, I

17   lost those -- those files.  So my files now

18   start with 2014 on my current computer.

19        Q.    Okay.  And when in 2014?

20        A.    It's probably anything around, I

21   would say, May, May to June of 2014, I have

22   most of my e-mails.

23        Q.    I just want to make sure, when did

24   the crash actually occur, so I understand the

25   period of time where data was destroyed, but

Page 108

1    when did the destruction take place, for lack

2    of a better phrase?

3         A.    That, I'm not sure of.  I just know

4    the gaps in my e-mails, in the documents.  So

5    anything that I didn't have on there,

6    essentially, a shared drive, on a server or USB

7    drive e-mail-wise I don't have.

8         Q.    Okay.  But you don't know whether

9    that crash, for lack of a better phrase,

10   occurred in '14, '15 or '16?

11        A.    Oh, no, the crash would have

12   occurred between '13 and '14.

13        Q.    Okay.  And as part of responding to

14   this lawsuit, have you sought to gather

15   documents responsive to any requests that Xerox

16   might have made?

17        A.    Yes.

18        Q.    And what did you do to respond to

19   Xerox's document request?

20        A.    There was a request for e-mails, so

21   the e-mails that I had I produced.  I believe

22   the IT folks actually went into the computer

23   also trying to see what they could potentially

24   pull from archives, any documents as far as

25   contacts, letters, all that stuff, was turned

Page 109

1    over, as part of, I believe, discovery.

2         Q.    Okay.  Did you physically go

3    through the process of trying to pull e-mails

4    from your computer?

5         A.    I have done it and also someone

6    from IT actually worked on my computer, also.

7         Q.    And how did you go about searching

8    for and gathering documents responsive to

9    Xerox's document request?

10        A.    I went through and searched

11   anything with Xerox in the title, anything

12   dealing with Jeff Townsend.  I actually had a

13   Xerox folder.  So a lot of the e-mails that

14   Jeff and I exchanged or received went through

15   the folder only for Xerox documents.

16        Q.    Okay.  You did a word search in

17   your e-mail?

18        A.    That is correct.

19        Q.    And the terms that you plugged in

20   was Xerox as well as Jeff's name?

21        A.    Jeff's name and anything dealing

22   with Jim also, Jim Lazarski.

23        Q.    Okay.  All right.

24              MR. NATHANSON:  We've got that

25   name.

Page 110

1          MR. BRENNAN:  We've taken care of

2    it already.

3          Q.    Did you do any other search terms?

4          A.    No, those would be the search

5    terms.

6          Q.    Okay.  Did you search both your

7    inbox and your sent items?

8          A.    I did.

9          Q.    Okay.  Do you have a deleted items

10   folder?

11         A.    I do.

12         Q.    Did you search that folder as well?

13         A.    No.  Once they are deleted, they

14   are deleted.

15         Q.    Okay.  There's no temporary housing

16   for those e-mails and communications until they

17   finally and formally go to the trash?

18         A.    The stuff that was saved on the

19   hard drive was, essentially, deleted off of

20   there, but the archive stuff.

21              So, essentially, any of my

22   documents that communicate with Xerox went to a

23   special folder.  So it's -- and I have a

24   special sent folder.  So, essentially, I

25   archived all of my sent e-mails from '14, '15

Page 111

1   and '16 are all in an archive folder now.

2        Q.    Okay.  Do documents automatic --

3   e-mails automatically go to an archive?

4        A.    No, I physically move them.

5        Q.    Okay.  And how regularly do you do

6   that?

7        A.    Whenever I get the notice that my

8   inbox is running out of space, I will start

9   moving e-mails.

10        Q.    And once you identify documents

11   that may be responsive to Xerox document

12   request, how did you collect those documents?

13   In other words, did you burn them on a disk?

14   Did you print them off?  What did you do?

15        A.    I sent them over in an e-mail to

16   the law department.

17        Q.    You indicated you also had -- let

18   me stay within the electronic documents.

19              Did you search any Word documents?

20        A.    Yes.

21        Q.    And how did you search for Word

22   documents?

23        A.    I have a Xerox folder, a photo

24   enforcement folder, where I keep all documents

25   related to either this contract or anything

Page 112

1   dealing with Xerox.

2        Q.    Do you have any subfolders within

3   that folder or just one main folder?

4        A.    Yeah, there's subfolders.   So

5   there's contract stuff.   There's press release

6   stuff for photo enforcement site.   So literally

7   anything dealing with Xerox and the photo

8   enforcement program.

9        Q.    And you went through all of the

10  Word documents that you had and did you do the

11  same process for those for the law department?

12       A.    Correct.

13       Q.    You also -- did you search any

14  other types of documents, PDFs, Excel

15  spreadsheets, PowerPoints, anything else?

16       A.    No, I did not.

17       Q.    Do you believe you have any such

18  documents related to the Xerox contracts and

19  the traffic program?

20       A.    No.   The only other documents would

21  have been, like, the annual report, which is

22  prepared by Xerox.

23       Q.    What is included with the annual

24  report?

25       A.    That report was the different

Page 113

1  cites, the number of citations, the events, how

2  the mobile cameras are doing, and then it

3  includes a tally of the overall program.

4      Q.    And the tally, what's included

5  within the tally?

6      A.    Red light cameras generated this.

7  Fixed cameras generated that.

8      Q.    And this is and that is revenue

9  dollars?

10      A.    That is correct.

11      Q.    So you would get on an annual basis

12  the amount of revenue was being generated by

13  the cameras?

14      A.    Every January.

15      Q.    Okay.  And did you get any annual

16  or other regular reports that indicated how

17  much the City of Cleveland was paying Xerox?

18      A.    No.

19      Q.    Okay.  Do you know whether or not

20  the City of Cleveland prepared its own reports,

21  indicating how much revenue had been generated?

22      A.    From time to time finance would

23  have to put things together for counsel,

24  especially budget hearings.  Budget hearings,

25  that would always be a topic that would come

Page 114

1   up.

2          Q.     And who was responsible for doing

3   that within financing?

4          A.     It would be part of the Clerk of

5   Courts budget hearing to council, because they

6   would have to report out the photo enforcement

7   program forgiveness, parking forgiveness.

8          Q.     Do you know the name of any person

9   or persons who prepared those types of reports

10  for Council?

11         A.     Maria Vargas is the administrator

12  over the Parking Violations Bureau.  So that

13  would, essentially, be my point of contact for

14  anything financial related to what photo

15  enforcement is doing.

16         Q.     And do you know why the City of

17  Cleveland prepared its own reports if Xerox

18  separately created reports showing revenue

19  generated?

20         A.     Again, council members want

21  documentation in all types, forms, formats, so

22  it's based off of council requests.

23         Q.     Okay.

24         A.     We'd format document requests to

25  however they want to see it.

Page 115

1      Q.    Did you ever receive any indication

2  that the information about the revenues

3  collected by the City of Cleveland, you know,

4  was inaccurate or needed to be double-checked

5  or needed re --

6      A.    That never came up in our

7  conversations.

8      Q.    Okay.  So as far as you know, the

9  information that the City of Cleveland received

10  from Xerox about the amount collected you have

11  no reason to challenge whether its accurate or

12  inaccurate; correct?

13      A.    From the operations and safety

14  department, no.

15      Q.    Okay.  Do you know where the folks

16  within the Clerks of Courts who were preparing

17  the reports for City Council gathered the data

18  to show the amounts of monies collected?

19      A.    They actually have their own

20  parking enforcement program, which feeds

21  directly into the photo enforcement program.

22  So they have their own system set up on how

23  they do collections and how money comes in.

24      Q.    And is there a name for that

25  program that they use, how would you refer

Page 116

1    to --

2         A.    I believe it is called ETIMS, but

3    they could better clarify the exact name of

4    that system.

5         Q.    Okay.  ETIMS, is that an acronym?

6    How would you spell that just --

7         A.    E-T-I-M-S.

8         Q.    Okay.  Is that an acronym?

9         A.    It's an acronym that I don't know

10   what it stands for.  This is more of a parking

11   violations bureau support function.

12        Q.    And do you know whether that

13   tracks, you know, late fines or late penalties

14   fines, sort of how it categorizes information?

15        A.    No.

16        Q.    Okay.  Would you get those reports

17   from the Clerk of Courts regularly?

18        A.    No.

19        Q.    And who at City Council that you

20   are aware of wanted to know how much revenue

21   was being generated?

22        A.    It could be any council member.  So

23   Zack Reed would be a perfect example of wanting

24   to know how much is the City making.

25             So any council member who wanted to

Page 117

1    make the argument that the program was about

2    revenue, would make those statements and want

3    information.

4         Q.    Okay Councilwoman Brady was another

5    one.

6         A.    Yeah, Councilwoman Brady.  Could be

7    council member TJ Dow.

8         Q.    Okay.  So did you have

9    conversations with those folks on that subject?

10   In other words, they would want to know how

11   much revenue is being generated because our

12   impression is it's not about safety, it's about

13   revenue?

14        A.    Typically, Director McGrath would

15   handle those one-on-one conversations with

16   council members when it got to -- to that level

17   of wanting to know money and dollars and make

18   those arguments.

19        Q.    You tried to stay out of the fray?

20        A.    Yes.

21        Q.    Discretion is the better part of

22   valor, so that's a good move on your part.

23              You are aware, before the contract,

24   that there -- this was kind of a political hot

25   spot, you know, traffic camera, some council

Page 118

1    people wanted, it some people didn't; correct?

2         A.    That's correct.

3         Q.    Some members of the voting populus

4    wanted traffic cameras, a lot of folks probably

5    didn't; correct?

6         A.    That's correct.

7         Q.    When the ballot initiative was

8    proposed, what efforts did you personally make,

9    if any, to try to stop the ballot initiative

10   from passing?

11        A.    So as part of my job from time to

12   time I have to actually go out to different

13   council ward club meetings, where they meet

14   with their residents.

15             So at times I've been out speaking

16   about our video surveillance program.  And when

17   they have conversations or questions about the

18   traffic camera program, the council members

19   like to put me on the spot and say, well, this

20   is the gentleman who oversees the program.

21             So I gave them details about, you

22   know, this is the numbers, you know, this is

23   what happens for you to actually get a

24   violation.  So we encountered -- a lot of folks

25   didn't know that you got to be doing 11 miles

1  over the posted limit to get a violation.

2        And you know, hey, if you stop, and

3  just because you go across the line and you see

4  the camera flash, that doesn't necessarily mean

5  you are getting a ticket.  So we did a lot of

6  educational things, letting folks know out in

7  the community about the program.

8        Q.    And the purpose of that is

9  two-fold.  It's, one, to give truthful, factual

10  information to folks but, two, that truthful,

11  factual information would, hopefully, get

12  people to buy in to going forward with the

13  program and continue to support it; correct?

14        A.    That is correct.

15        Q.    You explained to folks, hey, we

16  believe there is a real safety benefit to this.

17  We believe the City should do it.  It's

18  preventing accidents, saving lives?

19        A.    Correct.

20        Q.    Do you know how many different

21  wards you spoke with to try to support the

22  traffic camera program?

23        A.    My best recollection would probably

24  be over half of the wards in the City I've been

25  to just because that's part of my duties and

Page 120

```
 1    responsibilities in the position.  It might not
 2    be necessarily that I went there for traffic
 3    cameras, but when the question comes up they
 4    love to throw you under the bus to answer it,
 5    so.
 6         Q.    Well, the whole point is to not
 7    have people be thrown under the bus here, so.
 8         A.    Yeah.
 9         Q.    Did you ever have conversations
10    with the mayor about the traffic camera
11    program?
12         A.    No, I did not.
13         Q.    And are you aware of any print,
14    television, radio or other media, tools
15    employed by the City of Cleveland to try to
16    prevent the ballot initiative from being
17    passed?
18         A.    Yes.
19         Q.    And what media are you aware of?
20         A.    I know Councilman Johnson, Jeff
21    Johnson, and, also, Councilman Brian Cummins
22    did a couple things on NPR.  So I prepared,
23    essentially, talking points documentation for
24    them so they could be prepared to go on NPR in
25    support of the program.  I also know the mayor
```

Page 121

1   did do a commercial in support of the program.

2   And I believe there was actually a mailing that

3   went out in support of the program also.

4        Q.    And were you involved in any

5   television aspect?  You talked about the

6   talking points for the radio.  Were you

7   involved in drafting anything for television?

8        A.    No.  I've done media interviews

9   related to the topic, but nothing drafted for

10  television for the mayor or anybody else.

11       Q.    Okay.  You've personally done

12  interviews related to the traffic camera

13  program?

14       A.    Correct.

15       Q.    And who with whom have you done

16  interviews?

17       A.    I believe the last one was probably

18  with Tom Meyer from Channel 3.

19       Q.    Okay.  When was that?

20       A.    This was probably back in June of

21  2013, somewhere around there I believe that was

22  probably either -- no, I take that back.  When

23  we issued out the PCUs, Director Flask and I

24  did an interview with Channel 5 promoting the

25  PCUs, letting people know what they were, the

Page 122

1    purpose for them.

2              And I am trying to I think, there

3    -- there might have been a couple other ones

4    that -- we get media requests to talk about the

5    program or they have questions about the

6    program.

7         Q.    Okay.  And you're aware that some

8    folks within City Council wanted the ballot

9    initiative to pass?

10        A.    That's something I wasn't aware of.

11   From my perspective, we didn't see anybody from

12   council.  If they felt that way, they weren't

13   out there campaigning against the program, I

14   will say, to the best of my knowledge.

15        Q.    Okay.  But you knew certain council

16   members didn't want it in their ward?

17        A.    That is correct.

18        Q.    Okay.  And some people thought it's

19   not for safety, it's all the money grab, it's

20   all about cash?

21        A.    That's correct.

22        Q.    Okay.  Were you ever asked to sign

23   the ballot initiative?

24        A.    Actually, I believe I was asked to

25   sign it at a community meeting I was at.

Page 123

1      Q.    Okay.

2      A.    I -- I did not sign the ballot

3   initiative.

4      Q.    Do you know folks who, you know,

5   within the City of Cleveland did sign it?

6      A.    To the best of my knowledge, no, I

7   don't know any of those folks.

8      Q.    Do you know who presented it to you

9   for your signature?

10      A.    Some gentleman was there at the

11   meeting trying to collect signatures.

12      Q.    Okay.  Have you described, in

13   general terms, everything you did to, sort of,

14   hopefully, prevent the ballot initiative from

15   being passed?

16      A.    Yes.  As an employee of the City,

17   it was told to us very clearly, that as a

18   function of giving people the facts of the

19   programs, we were allowed to do that, but to

20   outright campaign against it as a City

21   employee, there's rules that we are not allowed

22   to do certain things, so we were told to be,

23   essentially, as helpful, as factual as we

24   could, but there is a line we can't cross as a

25   City employee to outright campaign -- campaign

Page 124

1   for something.

2        Q.    Or against something?

3        A.    Or against something, correct.

4        Q.    And you stayed within those

5   directed boundaries?

6        A.    Correct.

7        Q.    Fair to say you were disappointed

8   when the ballot initiative passed?

9        A.    That is correct.

10       Q.    Okay.  And Mr. Flask has testified,

11  you know, that that's because if the traffic

12  program has the effect of saving lives and

13  reducing accidents, removing the cameras has

14  the opposite effect?  In other words, accidents

15  and fatalities increased; correct?

16       A.    Correct.

17       Q.    But, again, you in your personal

18  capacity were not involved in any discussions

19  about, we should challenge the ballot

20  initiative, it may violate the contract clause

21  or some other clauses or laws?

22       A.    No.  No, I wasn't.

23       Q.    Okay.  Fair to say you wished the

24  traffic camera program were in place today?

25       A.    That is correct.

Page 125

1          Q.    Do you know how the revenues from

2    the traffic camera program were used?

3          A.    That, I don't know.

4          Q.    Okay.  Do you know whether they

5    stayed within the budget for public safety?

6          A.    That, I don't know.

7          Q.    Okay.  So -- well, let me ask you

8    this a different way.

9               Once the traffic camera program

10   ended, City stopped receiving millions of

11   dollars a year from traffic cameras, well, at

12   least for new citations issued, we can agree on

13   that; correct?

14         A.    Correct.

15         Q.    All right.  As a result of that,

16   did the City have to reduce its force or take

17   any other measures to cut back on its public

18   safety budget?

19         A.    That is something that's out of my

20   kind of bailiwick of what I do.  Budget-wise

21   I'm not familiar with how the public safety

22   budget is put together, what's added in, what's

23   taken out.

24         Q.    Okay.  You don't have any

25   involvement in that, whether it's making

Page 126

1  recommendations or looking at how we allocate

2  costs within public safety?

3        A.    No.

4        Q.    We have a double negative in there.

5  My statement is correct?

6        A.    No, I'm not in the position to look

7  at the budget, allocate or make anything --

8  make any recommendations on what's being

9  funded, what's not being funded.

10       Q.    One option the City of Cleveland

11 could have explored after the passage of the

12 ballot initiative was to have a police officer

13 onsite where the traffic cameras were; correct?

14       A.    That is correct.

15       Q.    And one of the options the City of

16 Cleveland had was to have officers onsite only

17 during a limited period of time?  For example,

18 morning rush hour or afternoon rush hour;

19 correct?

20       A.    Correct.

21       Q.    In other words, it wouldn't be the

22 requirement by the City of Cleveland that you

23 would need to have three officers there a total

24 of 24 hours a day; correct?

25       A.    Correct.

Page 127

1       Q.    The City could have deployed one an
2    hour here, two hours there to further prevent
3    violations of speed and red light laws;
4    correct?
5       A.    Correct.
6       Q.    And, in fact, you have empirical
7    data that shows there are certain points of
8    time that are greater -- that, you know, result
9    in greater violations than other points in
10   time; correct?
11      A.    Correct.
12      Q.    3 a.m. doesn't get as many tickets
13   as 8 in the morning, when someone is rushing to
14   work; correct?
15      A.    That's correct.
16      Q.    But, again, were you involved in
17   any discussions about whether the City should
18   do that?  Should we go ahead and have an
19   officer at these high risk areas at X or Y time
20   of the day?
21      A.    During those discussions, the main
22   focal point was, we don't have enough officers
23   to employ at, say, ten locations.  And the
24   whole point of the fixed camera location is,
25   you didn't need an officer there.  And that's

Page 128

1    why we changed from the mobile speed vehicles

2    to the portable camera units because all of the

3    sudden we could drop a trailer in a location

4    and didn't have to manually have an officer in

5    a police car so you are not there for three

6    hours.  All of the sudden we could reallocate

7    that resource.

8         Q.    The City of Cleveland has done that

9    before?  In other words, used an officer in

10   connection with a camera?

11        A.    We have six mobile vehicles where

12   we had to place an officer in that vehicle.

13        Q.    And those mobile units were

14   effective in levying from speed and red light

15   violations?

16        A.    In the beginning, yes.  In the end

17   of the program and why we switched, they became

18   less and less effective due to mandates from

19   City Council.

20        Q.    Which happens with all traffic

21   cameras if they are successful; right?  A

22   successful program means over time you are

23   going have fewer violations; right?

24        A.    I would differ from that reasoning.

25        Q.    I'm happy to show you e-mails, but

Page 129

1    you know, you have e-mail communications where

2    you are hoping numbers are being reduced and

3    the incidents of violations are going down;

4    correct?

5         A.    That's a correct statement.

6         Q.    That's a goal of the traffic camera

7    program; right?

8         A.    Correct.

9         Q.    And, in fact, that is what happens.

10   Over the life of Xerox's cameras, number of

11   violations go down, with you, wearing your

12   public safety hat, say, that's a good thing;

13   right?

14        A.    Right.  And I was speaking of the

15   mobile cameras.  Council made demands that all

16   the mobile cameras spend a certain amount of

17   time in each counsel ward.  Which took the

18   resources away from hitting some of those areas

19   that were notorious for speeding.

20              So the PCUs allowed us to be in a

21   council ward, but also focus on those notorious

22   areas.

23        Q.    And didn't the City in fact, sort

24   of, rank this is the worst intersection, this

25   has the highest rates of accidents and

1  fatalities, did you keep that sort of empirical

2  data?

3      A.    The agency is NOWAKA, which is

4  probably like the Northeast Ohio -- any

5  something, they essentially study accident data

6  across the five county region and rank the

7  intersections that have the most crashes.  So,

8  yes, we would look at that data, compare it to

9  the cites we currently have up operational and

10  should we expand.

11      Q.    And after the passage of the ballot

12  initiative, did the City of Cleveland give

13  consideration to leaving traffic cameras in the

14  top five or ten intersections along with an

15  officer there?

16      A.    To the best of my knowledge, no.

17      Q.    You weren't a party to any

18  discussions about any topics like that, let's

19  keep the cameras as sort of belt and

20  suspenders, we will use an officer at these

21  half dozen high risk locations?

22      A.    No, at that time, that would have

23  been chief of police, traffic unit conversation

24  of how they plan to deploy their resources,

25  their officers.

Page 131

1      Q.     Do you know, were any officers
2  terminated following -- as a direct result of
3  the passage of the ballot initiative?
4      A.     I do not believe they were.
5      Q.     Okay.  Are you aware of any safety
6  measure the City had to get rid of as a result
7  of the passage of the ballot initiative?
8      A.     That, I'm unaware of.
9      Q.     I think I asked you this in your
10 30(b)(6) capacity, but I just want to, you
11 know, ask you in your personal capacity.
12         You weren't involved in any
13 discussions about -- setting aside the law
14 department, about we should or should not pay
15 Xerox; correct?
16     A.     Correct.
17     Q.     The letters that you -- you did
18 author some letters to Xerox following the
19 passage of the ballot initiative; correct?
20     A.     That is correct.
21     Q.     Did you draft those on your own or
22 were those drafted by the law department for
23 your signature?
24     A.     Drafted with assistance from the
25 law department.

Page 132

1      Q.    Okay.  Who carried the labor on
2  that, who was the first draftor of those
3  communications?
4      A.    It most likely was a collaborative
5  process between Jeff Marks, Ronda Curtis and,
6  probably, Rick Horvath.
7      Q.    Okay.  Is it fair to say that the
8  statement in those communications that postdate
9  the ballot initiative that you sent to Xerox,
10  that those were primarily authored by folks
11  other than yourself?
12      A.    That is correct.
13      Q.    Okay.  And so if there are factual
14  positions or legal arguments made in those
15  documents, while they bear your signature,
16  those aren't -- weren't made by you in your
17  personal capacity?
18      A.    Right.  I'm the program
19  administrator, so the letter should come from
20  me or next up would be Director McGrath, but
21  correct.
22      Q.    So if you authored a letter saying,
23  you know, we haven't terminated, that's someone
24  else, law department or otherwise,
25  communicating to you that the City of Cleveland

Page 133

1    took the position it wasn't terminated; right?

2         A.    That is correct.

3         Q.    It wasn't your own determination,

4    after reviewing the contract and otherwise

5    making the decision; right?

6         A.    That is correct.

7         Q.    In fact, after the ballot

8    initiative was passed, you didn't go back and

9    review the contract and the amendment; did you?

10        A.    No.

11        Q.    You weren't there -- you were

12   intimately involved in, sort of, the passage of

13   the contract, getting it drafted, getting it to

14   its final form; is that fair to say?

15        A.    Yes.

16        Q.    But you didn't pick up the contract

17   after the ballot initiative or on the day of

18   ballot initiative and say what does this mean

19   legally or otherwise?

20        A.    Correct, I did not.

21        Q.    And have you looked at the contract

22   since the date of the ballot initiative to

23   today?

24        A.    Yes.  I have looked at the

25   contract.

Page 134

```
 1        Q.    Okay.  As part of your deposition
 2   preparation?
 3        A.    Yes.
 4        Q.    And what did you do to prepare for
 5   your deposition?
 6        A.    Reviewed the contract and all the
 7   documents, essentially, I sent over to the law
 8   department.
 9        Q.    And did you do that with your
10   counsel?
11        A.    On my own and with counsel.
12        Q.    Okay.  And did you meet with
13   counsel, I don't want to know the substance,
14   did you meet with counsel to prepare for your
15   deposition?
16        A.    Correct.
17        Q.    On how many occasions?
18        A.    I believe I met with them twice.
19        Q.    When were those meetings?
20        A.    I think the initial drafting of
21   interrogatories and then a day before coming to
22   the deposition.
23        Q.    Okay.  So --
24        A.    Just a review.
25        Q.    Yesterday?  Weren't you being
```

Page 135

1    deposed yesterday?

2         A.    Yes, I was.

3         Q.    So you were being deposed and you

4    were being prepped?  It's a full day.

5         A.    Yes.

6         Q.    Fair enough.

7               Did you do anything else to prepare

8    for your testimony today?

9         A.    No.

10        Q.    Did you talk to anyone about your

11   testimony?

12        A.    No.

13        Q.    But I take it you advised one of

14   your two bosses that, hey, I'm not going to be

15   in today, I'm stuck with the lawyers again?

16        A.    Yeah.  I share my calendar.  So

17   they can look on my calendar.

18        Q.    Okay.

19        A.    If they want to know where I'm at

20   they have that ability to see where I am at so,

21   yes, they are aware of it.

22        Q.    Have you talked with Mr. Flask

23   since he testified?

24        A.    No, I have not.

25        Q.    Okay.  Have you talked with anyone

Page 136

1   else, other than your counsel, about the

2   substance of your testimony?  What you are

3   planning to talk about?  What you are planning

4   to say?

5        A.    Yes.

6        Q.    Okay.  Who -- who else have you

7   discussed it with?

8        A.    Oh, my girlfriend.

9        Q.    Okay.  What did you say to her?

10       A.    Oh, just that I have a deposition

11  here and it is about the photo enforcement

12  program and Xerox.

13       Q.    Okay.  Again, I asked you this as

14  City representative, but in your personal

15  capacity, if I represent to you that the City

16  made over 10 million dollars and Xerox lost

17  millions of dollars, how does that strike you?

18       A.    Personally it's -- to me it's part

19  of -- there was a risk associated with this

20  contract, this program, and nationwide we've

21  seen this happen in other cities.  And I know

22  Ashtabula County was one where the voters voted

23  it out and Xerox had that contract at that

24  time.

25       Q.    And do you know if Xerox was paid a

Page 137

1    termination fee in that situation?

2         A.    I didn't know the legal standing of

3    that.  I just know they were in Ashtabula and

4    the voters voted it out.

5         Q.    And you knew that the City of

6    Cleveland and other local municipalities had

7    addressed traffic camera programs?

8         A.    Correct.

9         Q.    And you knew that before the City

10   entered into the contract?

11        A.    Correct.

12        Q.    Okay.  But it's your testimony

13   you're comfortable today if under the contract

14   the City made over 10 million dollars a year

15   and Xerox lost millions of dollars, that's fine

16   with you?

17        A.    That's the risk associated with

18   this program and the contract.

19        Q.    The risk all falls on Xerox, not

20   the City of Cleveland?

21        A.    I think that's an opinion.

22        Q.    Is that your opinion?

23        A.    I think both sides had risks.

24        Q.    Okay.  But at the end of the day

25   one's got a big pile of money, the other is in

Page 138

1   the red?

2          A.     Again, I think both sides had

3   risks.

4          Q.     Who got the reward here?

5          A.     At the end of the day, I don't

6   think anybody got the reward.  I think we are

7   both dissatisfied that it can't continue.

8          Q.     But while it was in place, the City

9   of Cleveland saved lives, reduced accidents,

10  reduced violations and made over 10 million

11  dollars.  Pretty good result for the City of

12  Cleveland; right?

13         A.     And our program was on Xerox's

14  website as the banner program.  And we were

15  customer references for other RFP projects, so

16  I think they reaped from -- the success of our

17  program allowed them to get other contracts

18  also.

19         Q.     Okay.  And what's your basis for

20  saying that?

21         A.     I know Jim has reached out to me to

22  say, hey, we have put you down as a reference

23  for this RFP, a customer might call you.

24         Q.     Did any customers ever call you?

25         A.     I don't recall that.

Page 139

1      Q.    Okay.  You don't have any memory

2  sitting here today of any representative from

3  any other state or local municipality

4  contacting you saying should we go with Xerox

5  or not?

6      A.    Honestly, I deal with Xerox,

7  Motorola, several other big companies and

8  people always call, how is this technology?

9  How were you treated?

10      Q.    No.  But I'm asking specific, do

11  you have any recollection of anyone from any

12  other state or municipality calling you about

13  the Xerox traffic camera program?

14      A.    Honestly, that I don't recall.

15      Q.    Okay.  You never gave, to the best

16  of your recollection, a letter of

17  recommendation, an oral recommendation of Xerox

18  to another municipality; correct?

19      A.    To the best of my recollection, I

20  believe I did.

21      Q.    You believe you did?

22      A.    I believe I did.

23      Q.    To whom?

24      A.    Again, I don't recall the exact

25  City, municipality, but I remember being

Page 140

1    contacted by Jim to say, hey, we put you down

2    for a reference as part of --

3         Q.    But did you actually get contacted,

4    that was my question, not were you put down as

5    a reference.  Did you actually get contacted

6    orally or in writing by any municipality about

7    the Xerox Traffic Camera Program?

8         A.    That, I can't give you an answer

9    on.

10        Q.    Meaning, your answer is, not that I

11   recall?

12        A.    Not that I recall.

13        Q.    So sitting here today, you can't

14   identify a specific contract that Xerox got

15   because of the City of Cleveland contract;

16   correct?

17        A.    That is correct.

18        Q.    And there's no provision in the

19   party's agreement for a referral fee or

20   financial benefit that Xerox would get from

21   doing business with the City of Cleveland,

22   other than getting paid under the contract;

23   correct?

24        A.    That is correct.

25             MR. BRENNAN:  Why don't we take

Page 141

1   five minutes.  We will probably be wrapping up

2   soon.

3                   (Short recess had.)

4           Q.    Mr. Jones, we were talking a little

5   bit about document collection.  You also had

6   paper files related to the Xerox traffic camera

7   program?

8           A.    Pretty much everything was

9   electronic, I tried to.  Pretty much anything

10  would have been a Word document, PDF, would

11  have scanned it into, made it electronic.  I

12  don't believe I had a paper-paper folder.

13          Q.    Did you look to see if you had a

14  paper folder?

15          A.    No.

16          Q.    Okay.  I'm going to ask that you do

17  that just to confirm that you don't have

18  anything that hasn't been produced?

19          A.    Okay.

20                   -   -   -   -   -

21                   (Thereupon, Plaintiff's Exhibit 6,

22                   March 25, 2015 Correspondence, was

23                   marked for purposes of

24                   identification.)

25                   -   -   -   -   -

Page 142

1      Q.    We talked a little bit about your

2 correspondence with Xerox.  And I'm going to

3 show you what's been marked for purposes of

4 identification as Exhibit 6, which is a March

5 25, 2015 correspondence with Xerox?

6      A.    Yes.

7      Q.    Okay.  And, again, this is

8 something that, while it went out under your

9 signature to Xerox, it is drafted by others?

10     A.    That is correct.

11              -  -  -  -  -

12              (Thereupon, Plaintiff's Exhibit 7,

13              January 12, 2015 Correspondence, was

14              marked for purposes of

15              identification.)

16              -  -  -  -  -

17     Q.    Showing you what's been marked for

18 purposes of identification as Exhibit 7.  This

19 is a January 12, 2015 correspondence going back

20 over here from you to Xerox?

21     A.    Correct.

22     Q.    And, again, this is something that

23 was drafted by others rather than you?

24     A.    Correct.

25     Q.    Okay.  Did you have any other

Page 143

1   written communication with Xerox following the
2   ballot initiative?
3        A.    Written, no.  This would have been
4   the official communication from the City to
5   Xerox.
6        Q.    Okay.  I take it by the pause in
7   your answer you had oral communications with
8   representatives from Xerox following the
9   passage of the ballot initiative?
10       A.    Yes.  I know I had conversations
11  with Jeff Townsend, meeting right after, about
12  turning the cameras off.  And then it was,
13  okay, we've got to figure out what we are going
14  to do next and having those verbal
15  conversations.  There might have been a couple
16  e-mails back and forth between Jeff and I about
17  that.
18       Q.    Okay.  And setting aside the
19  e-mails, what do you recall being said by you
20  and him in those oral communications?
21       A.    At the time it was just that, I've
22  been instructed by the director of the law
23  department to turn the cameras off and what
24  this means for the rest of the program when I
25  get back in town, I'm going have those

Page 144

1    discussions and will get back to you.

2        Q.    Okay.  Do you recall during any of

3    those discussions you telling him this was a

4    force majeure event?

5        A.    No.

6        Q.    Do you recall during any of those

7    discussions telling him, we're not going to pay

8    the termination for convenience fee?

9        A.    No.

10       Q.    During any of those conversations

11   did you say, we are not going to pay the

12   monthly fee?

13       A.    No.

14       Q.    During any of those conversations

15   did any representative from Xerox say, it's our

16   fault, don't worry, don't pay us?

17       A.    No.

18       Q.    Anything like that?

19       A.    No.

20       Q.    Did you attend any meetings with

21   representatives from Xerox following the

22   passage of the ballot initiative?

23       A.    Jeff might have came in town one

24   last time as his responsibilities for being

25   Xerox's project manager, but I believe at some

Page 145

1    point there was a meeting that was called

2    between Xerox, Xerox attorneys and the City,

3    City Law Department and safety director.

4         Q.    Okay.  Were you present for that

5    meeting?

6         A.    Yes.

7         Q.    And what do you recall occurring in

8    that meeting?

9         A.    I think the goal of the meeting

10   was, let's figure out a way to work this out

11   between the two parties and there, essentially,

12   walked away where I believe Xerox was going to

13   take a first draft at proposing something and

14   then the City would review it and respond.

15        Q.    Okay.  Do you recall Xerox

16   proposing a settlement or a resolution to the

17   contract following the passing of the ballot

18   initiative?

19        A.    Yes, that is correct.

20        Q.    And they proposed that millions of

21   dollars be paid to Xerox; correct?

22        A.    That is correct.

23        Q.    Okay.  Were you responsible for

24   evaluating that proposal and recommending a

25   response or a counterproposal?

Page 146

1        A.    Those would have been privileged
2   conversation with the law department that
3   myself, Director McGrath, members from finance
4   would have been involved, and the Clerk of
5   Courts --
6        Q.    Okay.
7        A.    -- would have all been involved
8   with those conversations.
9        Q.    Did you have any communications,
10  other than with counsel, about how, if at all,
11  to respond to Xerox's proposal to settle this
12  matter?
13       A.    No, I was told that at this point
14  everything needed to go through the law
15  department with our recommendations, proposals,
16  responses.
17       Q.    Okay.  So everything following the
18  passage of the ballot initiative that you would
19  have had communications about after November
20  4th was all done in a privileged setting?
21       A.    That is correct.
22       Q.    You didn't meet separately with Mr.
23  McGrath or Mr. Flask and say, Xerox wants 5
24  million, we should pay them a million or
25  anything like that?

Page 147

1      A.      That is correct.

2      Q.      Is there anything, as it relates to

3  non-payment of Xerox and turning off the

4  cameras, that we haven't yet discussed today?

5      A.      I don't believe so.

6      Q.      Okay.  There is nothing that you

7  can recall sitting here right now?

8      A.      Correct.

9      Q.      I have no further questions at this

10  time.  Thank you.

11      A.      Okay.

12          MR. BRENNAN:  Thank you.

13          MR. NATHANSON:  When they order the

14  transcript you have the right to read it if you

15  want.  The court reporter will get in touch

16  with us to have you review it if you want to

17  verify its accuracy or if you trust in her

18  accuracy you can say, we are going to waive

19  signature, on the record, then you don't have

20  to go down to her office to review it to read.

21  It's up to you.

22          We usually recommend waiving.

23          THE WITNESS:  All right.

24          MR. NATHANSON:  We have used this

25  court reporter in the past and she has done a

Page 148

1    very good job.

2                    THE WITNESS:   Okay.

3             I recommend waiving.

4         (Deposition concluded at 12:26 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 149

1    Whereupon, counsel was requested to give
2    instruction regarding the witness's review of
3    the transcript pursuant to the Civil Rules.

4

5                        SIGNATURE:
6    It was agreed by and between counsel and the
7    parties that the reading and signing of the
8    transcript of said deposition, be and the same
9    is hereby waived.

10

11                    TRANSCRIPT DELIVERY:
12   Counsel was requested to give instruction
13   regarding delivery date of transcript.
14        Terry M. Brennan, Esq.-Original
15        Connor Nathanson, Esq.-Copy

16

17

18

19

20

21

22

23

24

25

Page 150

1              REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                                    SS:

4     County of Cuyahoga.   )

5

6              I, Christine M. Emery, a Notary

7     Public within and for the State of Ohio, duly

8     commissioned and qualified, do hereby certify

9     that the within named witness, LARRY JONES, II,

10    was by me first duly sworn to testify the

11    truth, the whole truth and nothing but the

12    truth in the cause aforesaid; that the

13    testimony then given by the above-referenced

14    witness was by me reduced to stenotypy in the

15    presence of said witness; afterwards

16    transcribed, and that the foregoing is a true

17    and correct transcription of the testimony so

18    given by the above-referenced witness.

19              I do further certify that this

20    deposition was taken at the time and place in

21    the foregoing caption specified and was

22    completed without adjournment.

23

24

25

Page 151

1          I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5          IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 28th day of

8    April, 2016.

9

10

11

12

13

14          Christine M. Emery, Notary Public

15               within and for the State of Ohio

16

17   My commission expires January 19, 2019.

18

19

20

21

22

23

24

25

[& - allowed]                                                                                       Page 1

| & | | | |
|---|---|---|---|
| **&**  1:5 | **2013**  24:9,12,23 29:22 31:12 33:15 33:21,22 35:1 121:21 | 65:20 75:1 146:20 | **acronym**  116:5,8,9 |
| **1** | | **5** | **act**  17:22 45:13,13 |
| **1**  24:1,3,12 77:11 | **2014**  21:4 32:24 62:24 65:20 74:22 84:20,24 85:7 92:2 107:8,9,10,11,18,19 107:21 | **5**  3:8 4:4 104:4,6,8 104:14 121:24 146:23 | **action**  16:10 17:9,11 17:14 151:4 |
| **1.11**  45:23 | | | **acts**  44:18,19 |
| **1.11.**  45:18 | | | **actual**  15:22 16:12 29:2 85:1 |
| **10**  59:19 136:16 137:14 138:10 | | **500**  85:18 | **adamant**  28:11 |
| **100**  68:14 | **2015**  4:6,7 141:22 142:5,13,19 | **5th**  56:3 74:22 75:1 | **added**  101:1 125:22 |
| **104**  4:4 | **2016**  1:18 151:8 | **6** | **additional**  49:1 |
| **106**  2:17 | **2019**  151:17 | **6**  4:6 11:16 12:1 54:9 91:1 97:18 106:18 131:10 141:21 142:4 | **address**  45:24 46:1 |
| **11**  118:25 | **21**  1:18 | | **addressed**  137:7 |
| **11:59**  64:19 | **216-664-3559**  2:19 | | **adjournment** 150:22 |
| **12**  4:3,7 30:18 64:20 142:13,19 | **216-861-7485**  2:8 | **6.1.2**  52:11 105:15 | **administration**  11:7 |
| **127**  1:21 2:6 | **2228**  9:1 | **601**  2:17 | **administrator** 114:11 132:19 |
| **12:26**  148:4 | **24**  56:19 126:24 | **7** | |
| **13**  15:3,5 77:6 89:3 108:12 | **25**  4:6 141:22 142:5 | **7**  4:7 142:12,18 | **advance**  7:7 |
| | **26**  85:11 | **71st**  22:5 | **advice**  72:2,5,6 |
| **13.5**  53:7,18 | **28th**  151:7 | **7:50**  74:21 | **advised**  135:13 |
| **14**  102:24 108:10,12 110:25 | **3** | **8** | **affixed**  151:6 |
| | **3**  36:4 121:18 127:12 | **8**  127:13 | **aforesaid**  150:12 |
| **14.1**  53:11 | | **9** | **afternoon**  126:18 |
| **141**  4:6 | **30**  11:16 12:1 54:9 66:8,11 77:16,20 91:1 97:18 106:18 131:10 | **9**  1:18 8:2 | **age**  5:1 |
| **142**  4:7 | | **9:30**  1:19 | **agency**  130:3 |
| **15**  24:23 59:6,20 108:10 110:25 | | **a** | **agree**  69:15 79:12 84:4 125:12 |
| | **318**  104:16 | **a.m.**  1:19 64:20 74:23,24 127:12 | **agreed**  58:24 149:6 |
| **150**  3:10 | **31st**  63:14 | | **agreement**  4:5 13:9 13:25 14:10 24:4,11 24:16 84:1,3,5 85:11 104:10 105:3 105:18 106:1,4,5,13 140:19 |
| **159th**  28:8 | **32**  24:20 | **ability**  135:20 | |
| **16**  108:10 111:1 | **332**  105:11 | **able**  6:24 58:20 67:15 68:3,8 100:7 | |
| **19**  53:6 151:17 | **35**  52:10 | **accident**  130:5 | |
| **1:15cv1707**  1:10 | **360**  36:4 | **accidents**  29:6 57:24 58:7 119:18 124:13 124:14 129:25 138:9 | |
| **1st**  24:9 | **37**  24:20 52:10 53:6 77:6 85:11 | | **ahead**  7:19 13:12 42:6 49:18 52:7 56:25 127:18 |
| **2** | **39th**  9:1 | **accomplish**  95:6 | **air**  96:19 |
| **2**  3:3 4:3,10 12:12 12:14,21 59:19,24 60:10 | **3rd**  64:18 | **accuracy**  147:17,18 | **aircraft**  96:24 |
| | **4** | **accurate**  13:6 103:5 103:11 115:11 | **allocate**  126:1,7 |
| **2.1**  85:14 | **4**  3:5 65:10 | **accurately**  77:17 | **allowable**  65:1 |
| **2000**  1:21 2:6 | **4.0**  78:8 | **achieved**  11:5,8 | **allowed**  55:7,19 123:19,21 129:20 138:17 |
| **2005**  67:1 100:24 101:3 | **44114**  2:7,18 | **achieves**  98:3 | |
| **2010**  10:15 107:7,8 107:11 | **4th**  21:7 61:18 64:12 64:16,20 65:11,12 | | |

**alphanumeric** 104:16
**amended** 49:21
**amendment** 13:9
19:8 21:1,20 23:21
24:15,22 25:2 41:22
45:20 48:12 49:12
49:18,22 50:23 51:6
51:20,24 52:4,8,20
53:16 54:15 56:7
65:6 67:13 70:8
71:14,19 73:7,24
77:21,23 78:1,4,6,8
78:20 90:5 133:9
**amendments** 50:12
51:11
**amount** 36:7 39:2
39:18 65:16 92:2
113:12 115:10
129:16
**amounts** 85:22
115:18
**analyses** 39:22
**annual** 112:21,23
113:11,15
**answer** 6:14,15,18
7:4,6,8 54:8 69:16
76:11,12 80:21
82:14,22 83:1,2,2
88:20 120:4 140:8
140:10 143:7
**answered** 34:15
70:16,22 82:10,13
82:25
**answers** 6:21 7:9
34:14
**anticipated** 42:9
**anybody** 121:10
122:11 138:6
**apologize** 7:7
**appearances** 2:1 3:3
**applicable** 53:7,11
53:24
**apprised** 90:4

**approved** 34:23
65:7 70:9 71:14
**approves** 31:7
**approximately** 20:23
**april** 1:18 151:8
**archive** 107:14
110:20 111:1,3
**archived** 110:25
**archives** 108:24
**area** 28:13 49:5
**areas** 27:21 99:1
127:19 129:18,22
**argument** 81:17
117:1
**arguments** 37:21
117:18 132:14
**armed** 96:14,17
**ascertain** 70:1
**ashtabula** 136:22
137:3
**aside** 131:13 143:18
**asked** 61:19 70:16
70:22 82:10 122:22
122:24 131:9
136:13
**asking** 6:8 11:25
15:25 54:14 65:16
67:3 80:13,22 83:8
83:10 95:9 100:12
106:21 139:10
**aspect** 121:5
**aspects** 65:23
**assert** 72:5,6
**asserting** 68:5
**assertion** 67:21
68:21 89:5
**assigned** 48:22
**assistance** 131:24
**associated** 69:14,22
136:19 137:17
**assume** 6:13
**attached** 24:15
105:2

**attend** 144:20
**attention** 85:10
**attorney** 44:2 151:2
**attorneys** 8:3 145:2
**audit** 20:18
**august** 31:20
**author** 131:18
**authored** 132:10,22
**authority** 102:2
**automatic** 111:2
**automatically** 111:3
**available** 11:20 99:4
**avenue** 2:17
**awarded** 34:1
**awarding** 33:25
**aware** 5:15 6:7
11:11 23:18,22
27:11 36:13 42:6
43:23 46:5,18,21,24
47:14 52:3 56:12
65:10,18 66:6 68:12
92:21 99:24 101:22
116:20 117:23
120:13,19 122:7,10
131:5 135:21

**b**

**b** 11:16 12:1 54:9
91:1 97:18 106:18
131:10
**back** 21:10 33:15
41:15 59:5 84:12
91:1 121:20,22
125:17 133:8
142:19 143:16,25
144:1
**bailiwick** 60:19
125:20
**baker** 1:20 2:3
**bakerlaw.com** 2:9
2:10
**ballot** 21:7,20 22:11
22:18,23 23:6,12
44:24 54:2,20 55:4
55:7,10,15,21,22

61:17,23 66:11
74:25 75:5,16 84:19
92:12,14,17,25 93:1
93:7,16,18,22 94:5
103:8,13 118:7,9
120:16 122:8,23
123:2,14 124:8,19
126:12 130:11
131:3,7,19 132:9
133:7,17,18,22
143:2,9 144:22
145:17 146:18
**ballpark** 59:10 92:2
**banner** 138:14
**based** 16:15 22:14
23:13 35:8 73:7,23
75:16 114:22
**bases** 89:5,11,19
**basically** 40:4
**basis** 103:6,7,12
113:11 138:19
**bear** 132:15
**bears** 104:15
**beginning** 29:21
45:3 128:16
**behalf** 2:2,12 14:24
66:19 73:18 76:22
78:23 88:24 94:2
**belief** 94:11
**believe** 20:10,14,17
20:19 30:3,7,15,24
31:16 32:24 36:3,20
37:11,23,24 42:11
47:1 49:14,15 51:7
58:23 62:5 64:10,18
80:24 84:8 92:16
93:4 96:6 100:18,20
100:25 108:21
109:1 112:17 116:2
119:16,17 121:2,17
121:21 122:24
131:4 134:18
139:20,21,22
141:12 144:25
145:12 147:5

[believed - changes]                                                                Page 3

believed  94:10
believes  88:4
belt  130:19
beneficial  95:6
benefit  26:16 43:16
  101:6 119:16
  140:20
best  17:15 29:23
  33:22 36:2 41:1
  44:9 48:17 63:4
  66:5,24 74:19 84:14
  88:7 90:20 93:24
  97:5 119:23 122:14
  123:6 130:16
  139:15,19
better  26:25 45:17
  108:2,9 116:3
  117:21
beyond  97:17
bifurcate  11:23
big  28:5 30:19 42:12
  137:25 139:7
bigger  79:23
biggest  39:18
billion  36:1,3
bills  47:12
bit  10:11 14:17
  23:17 30:14 44:8
  48:11 94:6 141:5
  142:1
black  70:20
blanks  20:5
blind  41:7
bmv  41:11
bore  69:24
boss  33:6
bosses  135:14
bottom  104:15
  105:11
boundaries  124:5
bow  82:5
brady  30:2 37:4,4,6
  117:4,6
brand  42:5

brandt  20:10
break  7:14,15,20
  59:2,4 73:10,13
breakdown  38:9
breaking  70:12
breathing  79:10
  83:5 102:20,22
brennan  2:4 3:8 5:7
  5:10 9:3 54:11,18
  54:24 55:2 67:11
  72:4 73:12 83:21
  84:11 85:3 103:1
  104:3 110:1 140:25
  147:12 149:14
brian  120:21
broken  86:5
budget  35:25 36:3
  36:10 113:24,24
  114:5 125:5,18,20
  125:22 126:7
budgeting  36:7
build  101:4
building  28:9
bureau  114:12
  116:11
burn  111:13
bus  120:4,7
business  11:6 42:19
  58:12,13 140:21
buy  119:12

c

cabinet  18:23
cake  27:1
calculation  97:1
calendar  21:10
  135:16,17
call  138:23,24 139:8
called  5:1 11:13,16
  13:3 116:2 145:1
calling  139:12
camardo  2:5 5:11
  104:6
camera  5:13 13:20
  21:14,23 22:4,15

23:17 26:1,11 27:14
  27:21,24 28:5,6,12
  28:17,21 29:4,11
  33:20 35:9,18 36:15
  41:3 54:3 55:5,13
  56:2,5,17,19,20
  57:12 68:13 86:5,6
  86:8 87:15 89:7
  97:2 101:16,16
  117:25 118:18
  119:4,22 120:10
  121:12 124:24
  125:2,9 127:24
  128:2,10 129:6
  137:7 139:13 140:7
  141:6
cameras  5:24 6:1
  14:6 21:22 22:15
  23:3 25:15 27:20
  36:19 37:3,4,13
  40:23,23 41:4,5,6
  41:21,24,25 42:1,3
  46:8,16 55:8,17,20
  56:5 57:5 58:4,14
  61:3 62:13,18,19
  63:19 65:21 67:16
  68:2 71:22 72:20,21
  72:23 73:3,6,19,24
  74:6,13,16 75:3,11
  80:6 84:7 86:1,9,14
  86:16,21,25 87:2,4
  87:6,10,24 89:25
  90:3,9,10 91:5 94:9
  94:11,15,17,17,23
  95:12,13,24 96:6,9
  97:25 98:24 101:7
  101:13 102:2 103:8
  113:2,6,7,13 118:4
  120:3 124:13
  125:11 126:13
  128:21 129:10,15
  129:16 130:13,19
  143:12,23 147:4
campaign  123:20,25
  123:25

campaigning  122:13
capability  94:18,19
capacities  11:12
capacity  10:4 12:1
  94:3 97:18 98:9
  106:22 124:18
  131:10,11 132:17
  136:15
caption  150:21
car  128:5
care  110:1
carried  132:1
case  1:10 21:13
  50:11
cash  122:20
categorizes  116:14
cause  99:15 150:12
caveat  7:17
cease  103:12
centered  48:2
certain  11:21 17:14
  18:9 36:18 105:2
  122:15 123:22
  127:7 129:16
certainly  46:10
certificate  3:10
  150:1
certified  5:4
certify  150:8,19
  151:1
chair  30:8,16
chairing  30:6
challenge  93:22
  115:11 124:19
challenging  92:14
change  32:23 45:11
  45:24 46:1,14 47:18
  47:19,21,25 48:7,15
  49:13 51:15 78:20
  100:8,17
changed  32:21 50:5
  99:8 128:1
changes  51:3,8,24
  52:4 91:13,15 106:3
  106:6

[channel - collections]

Page 4

**channel** 121:18,24
**charge** 30:5 85:17
85:22 86:19
**charged** 11:17
**charges** 86:7
**charter** 56:7 65:6
67:13 70:8 71:13,19
73:7,24 77:21,23
78:1,3,6,8,20 90:5
**checked** 115:4
**chester** 22:6
**chief** 33:2,10 130:23
**christine** 1:23 150:6
151:14
**circle** 45:8
**citations** 37:18 38:5
57:6 58:6,11 72:24
113:1 125:12
**cites** 113:1 130:9
**cities** 68:3,4,14
136:21
**city** 1:12 2:13 5:12
10:2 11:19,20 12:8
13:7 14:25 15:19
17:5,15,19 20:20,21
22:12,19,22 23:7,13
25:13,22 26:2,4,7
26:12,16 27:3,6,9
27:11,19,23 28:25
29:8,9,10 33:10
34:6,8 35:24 36:3,6
36:8,22,22 37:20
38:4,14,15,23,25
39:5,7,15,20,22,24
40:12,16,24 43:10
43:11,16,17,19 44:7
44:22 45:4,7,10
46:4,11,18,21 47:17
48:6,14 49:10,11,22
52:18,19,25 53:23
55:11,16,19 56:4,8
57:4,7,22 58:3,20
59:2,4,6,17,18 60:2
60:10,12,13,16,21
61:13,18 62:3,5,7,9

62:12,16,17,18,19
62:23 63:1,8,22,24
64:3,7,11,14,22
65:3,10,18 66:3,7
66:10,16,17,20,21
66:25 67:5,10,11,13
67:14,18,19 68:7,9
68:15,18,22 69:9,10
69:17 70:3 71:2,4,6
71:14,20 72:8,13,19
73:4,5,18 75:25
76:6,18,21,23 77:1
77:9,19 78:7,10,12
78:14,21,24,24 79:1
79:3,7,9,16 80:7,16
80:23 81:14,16,24
82:7,23 83:3,4,12
83:24 84:2,6,8,18
84:22 85:5,16,21,24
86:15,16,18,20 87:5
87:9,23 88:4,13,24
90:13 92:15 93:4,6
93:11,12,14,15,19
94:2,7,22 95:1,3,7
95:12,22 96:4,6,25
97:12 98:19 99:9,12
99:14,17,21 100:1,5
100:10,12,13,18,22
101:6,8,12,24 102:3
102:6,7 103:25
105:8 106:14 107:7
113:17,20 114:16
115:3,9,17 116:19
116:24 119:17,24
120:15 122:8 123:5
123:16,20,25
125:10,16 126:10
126:15,22 127:1,17
128:8,19 129:23
130:12 131:6
132:25 136:14,15
137:5,9,14,20 138:8
138:11 139:25
140:15,21 143:4
145:2,3,14

**city's** 13:19,22,25
14:2,5,8,9 15:2 29:2
57:16 71:8 72:10
75:23 79:24 81:7
82:16 87:8 89:5,12
89:19 95:19 102:18
103:6,7,12
**city.cleveland.oh.us**
2:20,21
**civil** 5:3 149:3
**claim** 80:12
**claims** 66:15
**clarification** 6:11
**clarify** 6:16 54:5
116:3
**clause** 45:14 79:22
79:23 80:5,18,24
81:1,2 83:4,6 86:4
87:2,8 100:21,23,25
101:2,5 124:20
**clauses** 79:20 81:3
81:17,22 124:21
**clean** 49:13,17,24
50:15
**clear** 17:17
**clearly** 55:22 57:15
57:16 123:17
**clerk** 20:14 35:6
59:13 114:4 116:17
146:4
**clerks** 60:1 115:16
**cleveland** 1:12,21
2:7,13,18 5:13 9:2
10:3 11:9,19,20
13:7 14:25 20:20,21
22:12,19,22 23:8
25:13,23 26:2,5,7
26:13,16 27:4,11,20
27:23 35:25 36:8,23
37:20 38:14,15
39:16,20 40:12,16
43:11,16,18,20 44:7
44:23 47:17 48:15
52:18,19,25 55:12
56:8 57:22 58:4

59:18,19 60:3,12,16
60:21 61:9,13,19
62:3,7 63:9,22 64:3
64:11,15,22 65:4,18
66:3,10,16,17,20,21
67:5,18,19 68:14,15
68:22 69:9,10,18
70:3 71:2 73:18
76:18,23 78:24,25
79:17 80:8,16,23
81:14,25 82:8,23
83:13,24 84:6,18,22
85:5,17,21 86:15,17
86:19 88:4,14,25
90:14 92:15 93:20
94:2,8,23 95:13,23
96:5,25 97:12 99:9
99:12,14,18 100:1,6
100:13,22 101:7
102:4 105:8 106:15
113:17,20 114:17
115:3,9 120:15
123:5 126:10,16,22
128:8 130:12
132:25 137:6,20
138:9,12 140:15,21
151:7
**cleveland's** 12:8
23:13 36:7 43:11
46:11 66:7 85:25
86:20 87:23 102:7
**close** 30:17
**club** 118:13
**cnathanson** 2:20
**coffers** 61:9
**collaborative** 132:4
**collect** 19:22 111:12
123:11
**collected** 115:3,10
115:18
**collection** 59:14
141:5
**collections** 60:1
92:18 115:23

[come - correct]

come  45:7 48:13
  106:25 113:25
  132:19
comes  18:5 115:23
  120:3
comfortable  49:7
  51:14 137:13
coming  19:14,15,15
  51:16 134:21
comment  14:11 63:5
  70:24
commercial  121:1
commission  151:17
commissioned  150:8
commissioner  47:10
committee  29:18,19
  29:20 30:6,8,10,11
  30:13,16,17,19,21
  30:22 31:4,5,6,11
  31:14,16,21,24,25
  32:8 33:19 34:9
  35:4
committees  29:14
  34:19
commonly  105:25
communicate
  110:22
communicated  61:2
communicating
  132:25
communication
  75:15 143:1,4
communications
  74:8 91:5,8 92:9,13
  92:24 93:21 110:16
  129:1 132:3,8 143:7
  143:20 146:9,19
communities  37:19
  38:6
community  119:7
  122:25
companies  139:7
compare  130:8
compensation  77:11

complete  7:9 63:15
completed  48:19
  49:5,15 150:22
completely  94:18
compliance  54:16
  55:12
complies  53:20 77:7
  85:12
comply  53:24 54:3
  55:6
component  94:12
comported  29:3
computer  107:2,12
  107:18 108:22
  109:4,6
conclude  12:2
  106:18
concluded  7:5 148:4
concluding  106:20
conclusion  37:17
concur  35:15
concurred  28:24
conditions  77:10
confidential  1:18
  8:2 9:4,7
confirm  141:17
connection  128:10
connor  2:15 149:15
consequently  21:24
consider  33:5 44:24
  60:23 80:2 83:25
  84:2
consideration  57:3
  58:5 60:20 71:1
  94:8 130:13
considered  64:19
  78:18
considering  36:9
considers  83:3
consistent  95:18
contact  100:19,23
  100:24 101:3 102:8
  114:13
contact's  101:9

contacted  140:1,3,5
contacting  139:4
contacts  108:25
contemplate  95:13
contemplated  27:5
contemplating
  49:12
contemplation  96:7
contest  7:12
continue  16:13 26:6
  26:6 29:11 35:1,17
  57:4 61:19 64:15
  119:13 138:7
continued  55:16
  64:23
continuing  13:20
  36:14 58:5 63:7
contract  23:3,19,20
  23:21,24 24:8 25:1
  25:6,12,19,24 26:5
  26:10,20,22,24 27:5
  27:5,12 29:9,15
  31:3 32:9 34:1
  36:12 39:6,23,25
  40:13,18,21,25
  41:23 42:3,7,10,13
  42:17 43:1,4,5,9,12
  43:16,24 44:16,23
  45:10,15,19 46:5,12
  46:19,20 48:6,12,16
  49:2,11,19,23 50:3
  50:12,13,19,20,22
  50:24 51:4,25 53:5
  53:15 54:12,13 55:1
  55:11 58:9,18,23
  59:7,21 60:8,17
  62:2,3,6,8,10,12,16
  63:3,21 64:3 67:3,5
  68:4,23 69:11 70:20
  71:5,7,11,13,16
  72:11,12,14 77:4
  78:11,15,25 79:2,4
  79:4,10,14,19,21
  80:15,17,18,25 81:3
  81:4,8,12,14,18

82:1,12,15,24 83:5
  83:13,14 85:23
  87:17,21 88:6,18
  91:13,16,16,20,23
  92:3,10 99:6,10,13
  99:15,18 100:7,8,11
  100:14,16 101:4
  102:9,14,20 103:17
  103:18,25 105:7
  111:25 112:5
  117:23 124:20
  133:4,9,13,16,21,25
  134:6 136:20,23
  137:10,13,18
  140:14,15,22
  145:17
contract's  49:21
  72:15,17
contractor  77:12,13
  85:17
contracts  87:3
  112:18 138:17
contrary  38:5
control  47:19
convenience  91:12
  91:21 144:8
conversation  74:18
  74:20 75:2,18 76:14
  89:9,17 130:23
  146:2
conversations  16:4
  47:6 88:8 93:15,25
  97:6 99:22 102:11
  115:7 117:9,15
  118:17 120:9
  143:10,15 144:10
  144:14 146:8
conveyance  72:11
conveyed  74:1,5
conveying  47:21
conwell  30:2,8,24
copy  4:4 47:4 104:9
  149:15
correct  11:10 13:10
  13:14,16,23 14:1,7

[correct - decision]                                                                                          Page 6

14:20 15:1 18:14
21:17 22:24 23:9,10
23:14,15,23 24:13
24:24 25:7,8,10,11
25:16,17,20,21 26:3
26:8,14,18,23 27:8
27:25 28:1 29:7
31:6 32:19,21 35:20
35:23 36:10,11
38:15,22 39:3,4,8,9
39:13,14,21 40:15
40:19 42:11 43:2,7
43:13,14,22,25 44:2
44:3,13,21,21 45:24
45:25 46:3,8,9,16
46:17 47:22 48:8,10
50:17 51:18,21 52:2
52:5,6,12,15,17,21
52:23,24 53:2,3,9
53:12,13,16,17,25
54:1 55:17 56:23
58:15 60:14 61:4,6
61:15,16 62:17,21
62:22,24,25 63:10
64:24 66:8,9,12,13
66:17,18 67:20
68:17,24 69:1 70:12
71:24 72:16,25 73:3
73:6,8 75:14 76:24
77:2,3,18 78:9,12
78:13 79:1,5,6,25
80:9 84:7,15,20,21
85:19,20 86:1,3,4
86:13,15,17,22
87:24,25 88:3 91:13
91:14,18,19,24,25
94:4,20 95:21 96:1
96:11,12 97:14
98:17,18,21 99:7,10
99:11,20 100:3,4,9
100:17 101:10,11
101:13,14,18,21
102:4,5,21,24,25
103:10,15,21 104:1
104:22,25 105:3,4,9

105:18,19,22,23
106:1,2,11,16 107:3
107:4 109:18
112:12 113:10
115:12 118:1,2,5,6
119:13,14,19
121:14 122:17,21
124:3,6,9,15,16,25
125:13,14 126:5,13
126:14,19,20,24,25
127:4,5,10,11,14,15
129:4,5,8 131:15,16
131:19,20 132:12
132:21 133:2,6,20
134:16 137:8,11
139:18 140:16,17
140:23,24 142:10
142:21,24 145:19
145:21,22 146:21
147:1,8 150:17
correspondence  4:6
4:8 71:15 141:22
142:2,5,13,19
cost  42:13 56:18
97:24
costs  42:8,24,25
43:6,21 48:6,9 68:6
68:10 91:18 98:4
126:2
council  28:11 29:1
29:10,24 30:15,18
32:5 34:12 36:13,17
36:18,24 37:23
38:17 48:7 93:4,7
93:10,10,13,16
114:5,10,20,22
115:17 116:19,22
116:25 117:7,16,25
118:13,18 122:8,12
122:15 128:19
129:15,21
councilman  36:19
37:2,3,16,22 120:20
120:21

councilwoman
117:4,6
counsel  72:2,5,7
76:16 89:14 113:23
129:17 134:10,11
134:13,14 136:1
146:10 149:1,6,12
151:2
counterproposal
145:25
county  10:21,23
11:3 130:6 136:22
150:4
couple  30:23 97:9
101:1 120:22 122:3
143:15
course  14:17 17:8
17:11 26:9 44:6
59:7
court  1:1 3:13
147:15,25
courts  20:14 35:6
59:14 60:1 114:5
115:16 116:17
146:5
cover  105:1
covered  42:9
crash  107:24 108:9
108:11
crashes  130:7
created  114:18
criteria  35:9
critical  81:12 83:9
cross  123:24
cummins  120:21
cure  100:3
current  5:12 107:18
currently  10:1,2
33:12 95:1 98:20
130:9
curtis  132:5
custody  3:12
customer  138:15,23
customers  138:24

cut  94:11,12,14,16
125:17
cuyahoga  10:21,23
150:4

d

data  38:2,16 107:1
107:25 115:17
127:7 130:2,5,8
date  21:5 133:22
149:13
dave's  28:10
day  18:9 49:21
56:20 64:21 82:18
85:18 91:21,23
126:24 127:20
133:17 134:21
135:4 137:24 138:5
151:7
days  21:6 66:8,11
77:16,20
deal  65:22 139:6
dealing  109:12,21
112:1,7
dealings  14:14
42:20
deals  13:18,21,24
59:14
dealt  25:15 44:8,16
86:8 93:12
death  57:24
december  20:24
21:2
decide  34:10 48:7
75:25
decided  39:16 56:4
58:4 60:21 71:20
72:8 73:2,5 76:18
77:1 101:7,12
decides  48:15
decision  14:5,9,12
14:15,18 15:7,16,22
15:25 16:3,13,25
17:10,17,20,25 18:1
18:5,9,13,16,18,20

[decision - drafted]                                                    Page 7

18:22 19:5 21:14,15
21:16,18 22:21
23:11 31:2 41:13
63:2 73:4,17,21,22
74:5 75:23 76:2
77:25 85:1,25 86:21
86:24 87:23 88:2
89:12 90:2 94:20,21
96:5 102:1,13 103:7
103:12 133:5
**decisions** 18:20
89:24,24
**decreased** 68:10
**deemed** 1:18 8:2
**default** 71:11 83:25
84:3 99:20,25 100:2
100:3
**defendant** 1:14 2:12
**defer** 44:11
**definitely** 33:9
**definition** 81:9
82:16
**deleted** 110:9,13,14
110:19
**delivery** 63:25
149:11,13
**delve** 14:16
**demands** 129:15
**department** 2:13
10:6 14:19,22 15:8
15:11,12,15,17,20
15:24 16:3,3,5,7,8
16:20 17:3,13,17,18
17:20,21 20:13
44:12 45:1 50:1,7
52:1 73:20,25 74:2
74:5,8,16 75:9,10
76:3 77:24 85:2
88:9 89:10,14 90:14
90:24 97:13 102:12
102:15,17 103:19
103:20 105:6 106:7
106:10,10,12
111:16 112:11
115:14 131:14,22

131:25 132:24
134:8 143:23 145:3
146:2,15
**deploy** 27:20 101:12
130:24
**deployed** 127:1
**deployment** 41:2
**deposed** 5:4 135:1,3
**deposition** 1:16 4:3
4:10 5:16,18 6:3
11:24,25 12:2,7,11
12:15 54:10 91:3
106:21 134:1,5,15
134:22 136:10
148:4 149:8 150:20
**described** 60:9
123:12
**describing** 25:1
50:17
**description** 4:2
**designate** 9:3
**designated** 12:9
13:7 14:3 75:22
80:14
**designed** 25:19
98:10
**destroyed** 107:2,25
**destruction** 108:1
**detail** 15:15 40:24
48:14
**details** 118:21
**determination**
133:3
**determine** 39:24
41:10
**detrimental** 58:12
**differ** 128:24
**different** 32:2 35:9
40:4,5,9 98:9
112:25 118:12
119:20 125:8
**dinehart** 2:16 83:17
83:22
**direct** 22:18 74:7
84:6 85:9 89:14

90:16 93:15 131:2
**directed** 124:5
**direction** 17:2
**directive** 61:8
**directly** 14:24 19:14
115:21
**director** 16:6 17:7,7
19:15,16 20:2,3,10
20:11 32:10,13,16
32:25 33:9 49:3
74:4 75:4,19,19
90:4,17,18,23,23
117:14 121:23
132:20 143:22
145:3 146:3
**disappointed** 124:7
**discontinue** 16:1,25
**discovery** 109:1
**discretion** 117:21
**discussed** 33:20
61:20 84:16 136:7
147:4
**discussion** 18:11
45:21 72:3 83:23
100:20
**discussions** 15:10
16:18 18:4 19:2
47:24 48:2 51:11
89:13 92:20 93:9
97:7,12 124:18
127:17,21 130:18
131:13 144:1,3,7
**disk** 111:13
**disproportionally**
38:4
**dispute** 23:19
**dissatisfied** 138:7
**disservice** 57:18
**district** 1:1,2
**division** 1:3 10:10
41:12
**dmv** 41:11
**document** 12:22,24
79:10 83:5 102:20
102:22 104:17

108:19 109:9
111:11 114:24
141:5,10
**documentation**
114:21 120:23
**documents** 25:2
107:13 108:4,15,24
109:8,15 110:22
111:2,10,12,18,19
111:22,24 112:10
112:14,18,20
132:15 134:7
**doing** 27:19 41:7
57:18 62:24 75:6
78:12 95:10,10
113:2 114:2,15
118:25 140:21
**dollar** 27:7,10 39:18
60:10
**dollars** 27:12 36:1
59:6,20,24 61:14
65:3,11,16,19 66:15
66:22,23 67:1,6,7
67:14,19,20,24
68:23 69:1,11,12,18
70:4,5,11 92:6
96:22 97:23 113:9
117:17 125:11
136:16,17 137:14
137:15 138:11
145:21
**dona** 30:2 37:4
**donald** 33:3
**double** 115:4 126:4
**dow** 30:4 117:7
**dozen** 130:21
**draft** 48:18,24 49:5
49:6,15 131:21
145:13
**drafted** 45:2 50:25
52:19,22 87:21
104:21 121:9
131:22,24 133:13
142:9,23

| | | | |
|---|---|---|---|
| **drafting** 51:3 87:17 87:19 121:7 134:20 | **eight** 14:9,11,14,15 14:19 75:22 | **entering** 25:23 39:23,25 54:12 100:19 | **exhibits** 3:5,13 4:1 |
| | | | **existed** 25:18 |
| **draftor** 132:2 | **either** 46:7 54:23 | **enters** 49:10 | **expand** 130:10 |
| **drive** 107:14,16,16 108:6,7 110:19 | 95:11 96:4 111:25 121:22 151:2 | **entertain** 78:22 | **expect** 7:12 |
| | | **entire** 82:15 | **expectation** 69:3 |
| **driven** 31:4 40:11 51:25 | **eject** 96:20 | **entirety** 91:3 | **expected** 82:21 |
| | **election** 64:21 | **entitled** 72:18 76:11 | **experience** 29:3 45:7 49:4 |
| **driver** 51:19 | **electronic** 107:1 111:18 141:9,11 | **equipment** 42:5 67:23,25 68:7 87:7 | |
| **drop** 128:3 | | | **expert** 32:1,4 49:4 51:2 |
| **dual** 33:11 | **emery** 1:23 150:6 151:14 | **especially** 113:24 | |
| **due** 128:18 | | **esq** 2:4,5,15,16 149:14,15 | **expertise** 49:4 |
| **duly** 5:4 150:7,10 | **empirical** 38:2 127:6 130:1 | | **expiration** 101:9 |
| **dumas** 20:10 | | **essentially** 16:5 19:3 19:6 32:1 41:8 47:5 48:19 57:12 58:11 58:18 87:5 107:12 108:6 110:19,21,24 114:13 120:23 123:23 130:5 134:7 145:11 | **expire** 91:24 |
| **duties** 10:7 48:23 119:25 | **employ** 127:23 | | **expires** 151:17 |
| | **employed** 10:1,2,16 10:18,20 120:15 | | **explain** 37:16 |
| **duty** 81:4 93:6 | | | **explained** 119:15 |
| **e** | **employee** 123:16,21 123:25 | | **explored** 126:11 |
| **e** 4:4 7:25 75:10,12 85:13 104:9,20 105:1 107:6,14,22 108:4,7,20,21 109:3 109:13,17 110:16 110:25 111:3,9,15 116:7 128:25 129:1 143:16,19 | **employment** 44:6 | | **extend** 79:4 |
| | **ems** 10:11 | **etims** 116:2,5 | **eyes** 8:3 |
| | **enacted** 46:6 | **evaluating** 103:24 145:24 | **f** |
| | **enactment** 52:15,16 | | **fact** 11:13 12:3 26:9 26:17 27:10 43:3 53:4 55:15 56:25 66:14 92:22 99:9 104:20 127:6 129:9 129:23 133:7 |
| | **encountered** 118:24 | **evaluation** 35:8 | |
| | **encourage** 7:3 | **event** 44:25 45:12 144:4 151:3 | |
| **earlier** 101:9 102:19 | **endeavor** 98:17 | | |
| **early** 43:5,12,18,19 43:20 107:9 | **ended** 125:10 | **events** 113:1 | **facts** 11:14 16:8 18:4 19:1 38:7 123:18 |
| | **ends** 104:16 105:11 | **everybody** 58:17 | |
| **earthquakes** 44:17 | **endurance** 7:12 | **exact** 21:5 50:2 116:3 139:24 | **factual** 89:5 103:7 119:9,11 123:23 132:13 |
| **easiest** 24:19 | **enforcement** 21:21 22:3 47:12 55:8 63:13 69:13 98:8,23 98:25 99:3 111:24 112:6,8 114:6,15 115:20,21 136:11 | | |
| **east** 9:1 28:8 | | **examination** 3:7 5:2 5:6 13:4 | |
| **eastern** 1:3 | | | **fair** 14:18 21:11 25:22 31:2 35:24 38:23 60:4,7 61:10 61:11 66:20 67:4 69:9,17 70:5 88:6 94:1 97:19 103:16 124:7,23 132:7 133:14 135:6 |
| **edits** 50:21 | | **example** 39:2 96:18 116:23 126:17 | |
| **education** 11:5 | **enhance** 26:7 | **excel** 112:14 | |
| **educational** 119:6 | **enhanced** 26:1,12 | **exchanged** 109:14 | |
| **effect** 37:22 65:2 95:17 97:8 124:12 124:14 | **enter** 48:6 50:13 68:4 | **excused** 88:5 89:6 89:20 | |
| | **entered** 24:12 25:13 26:5 29:8 36:13 39:5 44:23 45:10 46:4,12 99:13 100:6 100:14 103:25 137:10 | **execution** 103:17 | **falls** 137:19 |
| **effective** 24:8,22 25:24 28:14 29:5 36:21 54:15 57:23 128:14,18 | | **exhibit** 3:12 4:3,4,6 4:7,10 12:10,12,14 12:21 24:1,3 77:11 104:8,14 141:21 142:4,12,18 | **familiar** 44:4 125:21 |
| | | | **far** 17:11 92:25 100:15 102:10 |
| **efforts** 118:8 | | | |

108:24 115:8
**fatalities** 124:15
130:1
**fault** 144:16
**favor** 22:23
**february** 32:24
**federal** 5:2 45:11
47:18 52:15 53:12
**fee** 14:10 22:14 23:3
40:7,10 42:4 61:21
63:8,9,11,19 71:3
71:18,24 72:18,19
72:20 76:1,7,19
77:2 91:12,12,21
92:3,10 97:25 137:1
140:19 144:8,12
**feeds** 115:20
**feel** 34:14 43:9
97:17
**fees** 72:9 89:7 91:9
95:3 102:10
**felt** 36:21 49:6 99:18
99:21 122:12
**fewer** 98:3 128:23
**field** 84:17
**figure** 143:13
145:10
**figured** 19:13
**filed** 5:12 54:15
**files** 107:14,17,17
141:6
**fill** 13:17 20:4 93:5
**final** 14:15 17:8,10
133:14
**finally** 110:17
**finance** 16:6,19 17:6
19:15 20:2,9 29:19
30:11,12,22,25 31:5
31:8 113:22 146:3
**financial** 39:22 59:8
65:23 114:14
140:20
**financially** 40:8
**financials** 69:7
70:24

**financing** 114:3
**find** 19:4
**fine** 39:3 57:7,17
58:6,9,11,16 83:21
85:3 137:15
**fines** 72:24 116:13
116:14
**fire** 10:11 45:13
**fires** 44:17
**first** 5:3 11:24 24:11
31:12 41:7,16 45:19
48:23,24 49:14
54:11 132:2 145:13
150:10
**five** 103:2 130:6,14
141:1
**fixed** 22:14 23:3
40:6,10 41:4,6
42:24 56:2 58:2
61:21 91:12 113:7
127:24
**flash** 119:4
**flask** 32:15 121:23
124:10 135:22
146:23
**flood** 45:13
**floods** 44:17
**focal** 127:22
**focus** 129:21
**fold** 119:9
**folder** 109:13,15
110:10,12,23,24
111:1,23,24 112:3,3
141:12,14
**folks** 17:19 19:18
20:6 28:13 37:9
38:4,6,18,19 47:7
50:12 98:15 105:8
106:14 108:22
115:15 117:9 118:4
118:24 119:6,10,15
122:8 123:4,7
132:10
**follow** 101:23

**followed** 101:19
**following** 8:2 54:20
55:4,10 66:11 77:23
131:2,18 143:1,8
144:21 145:17
146:17
**follows** 5:5
**force** 43:24 44:5,15
44:24 45:2,12 52:5
96:19 105:15
125:16 144:4
**forces** 96:14,17
**foregoing** 150:16,21
**forgiveness** 114:7,7
**form** 16:17 106:1
133:14
**formally** 71:21
110:17
**format** 114:24
**formats** 114:21
**forms** 114:21
**forth** 28:25 77:11
92:10 93:3 143:16
**fortunate** 27:9
**forward** 31:3 32:9
35:17 70:9 90:1
91:9,17 106:21
119:12
**forwarded** 104:23
106:9
**foundation** 81:12
**four** 5:23,24,25 11:2
13:12,21,23 34:2
55:1
**fourth** 31:17
**fray** 117:19
**free** 43:9
**front** 12:19,21 17:24
21:12 42:23,25
52:11 59:9 77:5
89:4 104:17 105:12
**full** 7:9 30:9 42:13
45:8 135:4
**fully** 86:5

**function** 60:1 93:16
95:20 116:11
123:18
**funded** 126:9,9
**funding** 40:5
**further** 47:9 88:5,17
96:11 127:2 147:9
150:19 151:1

**g**

**gain** 70:18
**gaps** 108:4
**gather** 41:11 108:14
**gathered** 115:17
**gathering** 109:8
**general** 123:13
**generally** 31:7,7
44:4
**generate** 25:10
26:17 27:15,22
28:18 38:25 39:1
56:21 60:11 64:23
**generated** 58:19
113:6,7,12,21
114:19 116:21
117:11
**generating** 65:3
**gentleman** 118:20
123:10
**getting** 38:20 119:5
133:13,13 140:22
**girlfriend** 136:8
**give** 6:15 7:4,5,9
16:9 22:1,8 38:10
57:3 58:5 70:25
94:8 95:23 96:7
97:20 119:9 130:12
140:8 149:1,12
**given** 5:18 150:13
150:18
**gives** 85:16
**giving** 7:8 20:5 94:1
123:18
**go** 7:19 13:12 17:12
29:15 31:3 32:9

34:9 42:17 49:18
52:7 53:6,10 56:25
63:15,17 77:5 89:2
90:8 109:2,7 110:17
111:3 118:12 119:3
120:24 127:18
129:11 133:8 139:4
146:14 147:20
**goal** 26:6,10,21,23
27:15 38:24 39:12
56:21,22 77:16 98:3
129:6 145:9
**goals** 27:17,18
**god** 44:18,19 45:13
**goes** 14:12 41:14
42:13 91:17
**going** 6:2,8,13,21
7:12,18 11:23,25
12:6 17:7,12 19:9
29:21 35:19 37:23
38:20 39:17 42:6
45:5 49:17 56:4
71:21 73:13 75:8
82:20 88:14 89:2,25
90:23 91:9,22 92:16
96:20 106:18
119:12 128:23
129:3 135:14
141:16 142:2,19
143:13,25 144:7,11
145:12 147:18
**good** 5:8,9 41:10
64:19,25 117:22
129:12 138:11
148:1
**gosh** 50:14
**grab** 122:19
**grade** 19:3
**grand** 97:9
**great** 72:4
**greater** 91:22 127:8
127:9
**greatly** 78:22 95:5
**green** 41:5,25

**group** 35:7
**guess** 33:11 81:9
**guidance** 15:12

**h**

**half** 11:24 31:12
36:1,3 119:24
130:21
**hall** 83:18
**hand** 50:14 55:23
105:20 151:6
**handle** 32:12 117:15
**haphazardly** 103:23
**happen** 18:5,24,24
19:3 46:13 107:5
136:21
**happened** 16:4
57:11 61:23,24
**happening** 48:3
**happens** 118:23
128:20 129:9
**happy** 7:15 23:25
37:8 45:19 82:18
99:25 128:25
**hard** 107:13,15,16
110:19
**hat** 15:19 91:1
129:12
**head** 6:22
**heading** 13:2
**hear** 50:16
**heard** 97:7,11
**hearing** 80:15 114:5
**hearings** 113:24,24
**help** 39:19 58:6
83:19
**helpful** 123:23
**hereinafter** 5:4
**hereunto** 151:5
**hesitation** 15:7 49:1
**hey** 49:12,24 51:13
94:23 119:2,15
135:14 138:22
140:1

**high** 28:9 127:19
130:21
**highest** 11:4 129:25
**hitting** 129:18
**hold** 10:25 19:16,19
19:23 34:16 47:3
87:6
**honestly** 139:6,14
**hook** 47:20
**hope** 42:25 82:19
**hopefully** 42:14
91:2 119:11 123:14
**hoping** 129:2
**horvath** 20:12 132:6
**hostetler** 1:20 2:3
**hot** 99:1 117:24
**hour** 73:13 126:18
126:18 127:2
**hours** 56:20 126:24
127:2 128:6
**house** 47:12
**housing** 110:15
**huh** 30:1
**human** 96:17
**hundred** 97:9
**hundreds** 97:23

**i**

**icing** 27:1
**identification** 12:17
24:6 104:11,14
141:24 142:4,15,18
**identify** 18:21 40:20
89:4 111:10 140:14
**identifying** 105:2
**ii** 1:17 3:7 5:1,6 7:25
150:9
**immaterial** 80:4
**impact** 28:19
**implement** 56:9
**implementations**
10:10
**implemented** 39:11
**implementing** 27:14
42:7

**important** 79:18
81:11
**impression** 117:12
**inaccurate** 37:17
115:4,12
**inbox** 110:7 111:8
**incident** 71:11
**incidents** 98:6 129:3
**include** 53:1 81:21
**included** 35:4 43:15
53:2 112:23 113:4
**includes** 14:5 113:3
**including** 5:25
81:19,22 82:3,4
**incorporated** 52:4
**increased** 124:15
**increasing** 39:2
**index** 3:1,5 4:1
**indicated** 53:23 86:4
111:17 113:16
**indicates** 105:24
**indicating** 113:21
**indication** 115:1
**indifferent** 65:17
**individual** 28:4
**individuals** 20:11
**information** 11:14
11:19 33:2 38:10
41:11 59:9 115:2,9
116:14 117:3
119:10,11
**initial** 48:18 134:20
**initiative** 21:7 22:11
22:18,24 23:6,12
44:24 54:2,20 55:5
55:7,11,16,22,22
61:18,23 66:12
74:25 75:5,17 84:19
92:12,15,17,25
93:19,23 94:5 103:9
103:14 118:7,9
120:16 122:9,23
123:3,14 124:8,20
126:12 130:12
131:3,7,19 132:9

[initiative - lay]

133:8,17,18,22
143:2,9 144:22
145:18 146:18
**initiatives** 93:16
**input** 89:23
**install** 42:2
**instances** 53:4
**instruct** 101:15
**instructed** 94:16
96:19 143:22
**instruction** 149:2,12
**instructions** 101:20
101:23
**intent** 56:17 57:19
87:20
**interest** 17:15
**interested** 151:3
**internal** 20:18
**internally** 15:9
**interpretation** 69:21
70:13,14 80:1
**interrogatories**
134:21
**interrupt** 7:6
**intersection** 129:24
**intersections** 130:7
130:14
**interview** 121:24
**interviews** 121:8,12
121:16
**intimately** 51:10
133:12
**invited** 18:25 19:1
19:22
**invoice** 77:15
**invoices** 19:7,19,23
66:7,11,16 77:12
**involved** 10:12 20:6
34:19 45:4 51:10
93:8 121:4,7 124:18
127:16 131:12
133:12 146:4,7
**involvement** 125:25
**ish** 74:21

**issue** 57:7 58:6 72:1
72:24 79:8 90:11,15
**issued** 37:18 38:5
39:8 64:17 66:17
77:14 121:23
125:12
**issues** 44:12 87:4
**issuing** 57:5 95:25
96:9
**item** 93:2
**items** 110:7,9

**j**

**j** 7:25
**january** 4:7 113:14
142:13,19 151:17
**jdinehart** 2:21
**jeff** 48:24,25 49:6,16
50:1 51:1,7 109:12
109:14 120:20
132:5 143:11,16
144:23
**jeff's** 49:3 109:20,21
**jillian** 2:16
**jim** 47:1,5 104:24
109:22,22 138:21
140:1
**job** 65:25 118:11
148:1
**johnson** 120:20,21
**jones** 1:17 3:7 5:1,6
7:25 141:4 150:9
**july** 10:14 24:23
107:7,8,11
**june** 24:8,12 31:20
107:21 121:20
**jury** 17:25 21:12
64:2 69:19 70:6
**justice** 10:21

**k**

**keep** 63:7 111:24
130:1,19
**kelly** 48:21,22
**kept** 19:6 34:4

**kevin** 30:2,7,24
**kind** 33:6,7,11
117:24 125:20
**knew** 45:3 60:2
122:15 137:5,9
**know** 6:11,17 7:15
18:3,12,17 21:18
23:1 30:20 37:2
39:17,18 46:23
48:18,25 49:16 50:8
50:18 51:12,12 59:1
59:12,13,16,18,24
60:16 61:8,13 64:10
69:5,7 70:23 72:8
75:21 82:17 83:1
87:20 88:12,20,21
88:22 90:21 92:20
93:2 97:1,8 108:3,8
113:19 114:8,16
115:3,8,15 116:9,12
116:13,20,24
117:10,17,25
118:22,22,25 119:2
119:6,20 120:20,25
121:25 123:4,4,7,8
124:11 125:1,3,4,6
127:8 129:1 131:1
131:11 132:23
134:13 135:19
136:21,25 137:2,3
138:21 143:10
**knowing** 59:23 63:2
**knowledge** 11:18
48:17 66:5,24 84:14
88:7 93:24 97:5
122:14 123:6
130:16

**l**

**l** 2:16
**la** 47:1
**label** 24:20
**labeling** 104:16
**labor** 132:1

**lack** 26:25 108:1,9
**laid** 40:2,10
**lake** 28:8
**lakeside** 2:17
**language** 23:7 44:15
45:2 49:2,6 50:5
51:15 52:14 73:23
87:19 105:6
**large** 42:25
**largely** 37:18
**larry** 1:17 3:7 5:1,6
7:25 150:9
**late** 63:17 116:13,13
**law** 2:14 14:19,22
15:8,11,12,15,16,19
15:24 16:2,3,5,7,8
16:19,19 17:3,7,7
17:13,13,17,18,19
17:21 19:14 20:2,13
44:11 45:1,11,24
46:2,15 47:18,19,21
48:1 50:1,7 51:25
54:16 57:8 73:20,25
74:2,5,8,15 75:8,10
75:19 76:3 77:24
85:1 88:9 89:9,14
90:14,18,24 100:8
100:17 102:12,15
102:16 103:19,20
105:5 106:7,9,10,12
111:16 112:11
131:13,22,25
132:24 134:7
143:22 145:3 146:2
146:14
**lawful** 5:1
**laws** 53:8,12,25 54:4
55:6,13 124:21
127:3
**lawsuit** 5:12 108:14
**lawyer** 48:20 87:19
87:20
**lawyers** 135:15
**lay** 11:17 18:3,25
71:12

layperson's 44:9
lazarski 47:5 109:22
lead 32:6
lean 49:3
leaving 79:7 130:13
left 105:20
legal 50:4 132:14
  137:2
legalities 92:14
legality 92:22 93:22
legally 133:19
legislation 19:8,13
  34:6,7,10,13,16
  46:7 57:15,16,19
letter 71:8 132:19
  132:22 139:16
letters 108:25
  131:17,18
letting 119:6 121:25
level 11:4 18:4 47:1
  48:3 117:16
levying 128:14
license 4:4 24:4
  104:9
life 42:9,24 43:1
  58:17 91:13,16
  96:17 99:18 129:10
light 25:16 41:5,5,25
  57:17 98:6 113:6
  127:3 128:14
lights 28:13 98:11
  98:16,24
limit 46:7,15 119:1
limited 126:17
limiting 33:21
line 24:11 53:7
  105:21 119:3
  123:24
listed 41:23
listen 38:21
literally 112:6
litigation 23:20
little 10:11 14:17
  23:17 44:8 48:11
  94:6 141:4 142:1

lived 38:6
lives 27:16 28:22
  29:5 56:22 58:7
  97:3,10 119:18
  124:12 138:9
living 79:9 83:5
  102:20,22
llp 1:20 2:3
lobbying 47:7
local 1:6 45:12,24
  46:14 47:21 48:1
  52:14 53:1,2,8,12
  53:14,24 54:3,16
  55:6,12 137:6 139:3
location 22:4 27:24
  28:5 56:15 127:24
  128:3
locations 28:3 58:2
  127:23 130:21
long 7:3 10:13,25
longer 82:21
look 15:12 21:10
  24:9,19 40:8 43:9
  44:15 45:14,16,18
  45:19 52:9,13 53:18
  54:18 75:21 126:6
  130:8 135:17
  141:13
looked 28:4 40:1
  49:16 133:21,24
looking 28:17 45:23
  105:6 126:1
loses 42:18
losing 96:21
lost 66:22 67:7,14
  67:19 68:25 69:11
  69:17,25 70:4,8,10
  70:11,17 71:1 107:2
  107:6,17 136:16
  137:15
lot 27:22 28:18
  42:23 48:5 52:9
  82:20 103:24,24
  109:13 118:4,24
  119:5

love 120:4
lsa 77:12
lying 37:19

**m**

m 1:23 2:4 116:7
  149:14 150:6
  151:14
mail 4:4 41:17 75:10
  75:12 104:9,20
  105:1 107:14 108:7
  109:17 111:15
  129:1
mailing 41:16 121:2
mails 107:6,22
  108:4,20,21 109:3
  109:13 110:16,25
  111:3,9 128:25
  143:16,19
main 112:3 127:21
majeure 43:24 44:5
  44:16,25 45:2,12
  52:5 105:15 144:4
maker 14:15,19
  28:6
making 18:21 60:5
  68:21 70:10 80:6
  84:18 102:1 116:24
  125:25 133:5
malfunctioning
  86:9 87:3,4,7,15,17
manager 10:5,8
  144:25
mandate 16:23
mandated 42:5 93:4
mandates 128:18
manning 96:23
manual 98:22,25
manually 128:4
marathon 7:11
march 4:6 141:22
  142:4
maria 20:15 114:11
marked 4:2,10
  12:10,12,16 23:25

24:5 104:10,13
  141:23 142:3,14,17
marks 48:24 49:6
  50:1 132:5
marty 32:15
master's 11:6
matches 105:21
material 79:13,17
  79:22 80:3,7,10,16
  80:19,20,22 81:7,10
  81:13,18 82:1,2,11
  82:16,24 83:4,11,14
matt 30:2,24
matter 32:1,4 68:15
  146:12
matters 13:3 15:13
mayor 18:15 120:10
  120:25 121:10
mcgrath 20:12
  32:25 33:4,9 74:4
  74:11,12 75:13
  90:17 117:14
  132:20 146:3,23
mean 58:10 79:23
  87:11 119:4 133:18
meaning 140:10
means 11:17 86:11
  96:21 128:22
  143:24
meant 94:17
measure 39:16
  131:6
measures 39:11
  125:17
media 120:14,19
  121:8 122:4
meet 31:15,21 34:11
  118:13 134:12,14
  146:22
meeting 17:6 19:21
  20:1,7,22 31:22
  34:9,17 93:10
  122:25 123:11
  143:11 145:1,5,8,9

[meetings - objection]

meetings  18:23,24
  19:1 31:11 33:19,23
  34:2,5,22 118:13
  134:19 144:20
meets  31:16
member  28:11
  29:24 30:16 116:22
  116:25 117:7
members  22:22 29:9
  30:18,21,21 34:12
  35:5 36:14,17,18,24
  37:23 38:18 64:2
  114:20 117:16
  118:3,18 122:16
  146:3
memory  139:1
mentioned  17:6
  28:16 90:3 97:22
met  134:18
meyer  121:18
michael  32:25 33:4
middle  29:22
mike  29:24 74:4
miles  118:25
million  36:5 59:6,19
  59:19,20,20,24
  60:10 65:10 136:16
  137:14 138:10
  146:24,24
millions  27:12 61:13
  64:11 65:3,19 66:14
  66:21,23 67:1,6,7
  67:14,19,20,23
  68:22,25 69:10,12
  69:17,18,25,25 70:4
  70:4,11 92:6 96:22
  125:10 136:17
  137:15 145:20
mind  46:11 48:7
mine  65:24
minimal  36:9
minute  13:12 83:18
minutes  103:2 141:1
mobile  41:25 113:2
  128:1,11,13 129:15

129:16
model  58:12,13
money  22:19 23:9
  28:5 36:7 39:24
  42:18,23 59:14 60:5
  71:1 115:23 117:17
  122:19 125:16
monica  20:17
monies  22:13 61:9
  88:5,17 115:18
month  31:17,22
  34:21,22 59:24,25
  60:9,10 63:12 64:7
  97:9,23
monthly  14:10
  61:21 63:8,9,11,19
  72:18,19,20 76:1,7
  76:19 77:2 95:3
  144:12
months  11:3 51:1
morning  5:8,9 14:18
  75:1 126:18 127:13
motor  22:8
motorists  55:24
motorola  139:7
mouth  95:18
move  35:17 111:4
  117:22
movement  46:25
  78:19
moving  70:9 106:21
  111:9
muhic  47:10
municipalities  46:6
  137:6
municipality  139:3
  139:12,18,25 140:6

n

n  7:25
name  5:10 7:23,23
  20:18 30:10 47:2
  109:20,21,25 114:8
  115:24 116:3

named  32:25 150:9
names  20:6
nancy  48:21,22
natasha  20:10
nathanson  2:15 9:6
  15:21,23 16:17 23:1
  54:6,14,21,25 59:12
  67:8 69:4 70:15,21
  71:25 73:10 74:3
  76:9 82:9 84:25
  88:16,19 89:15
  97:16 109:24
  147:13,24 149:15
national  28:23 29:3
nationwide  136:20
naturally  91:24
nature  44:20
navy  96:18
necessarily  119:4
  120:2
necessary  106:19
need  7:18 24:9 28:6
  49:12,17,24 50:6,21
  51:11,23,24 100:21
  126:23 127:25
needed  28:20 115:4
  115:5 146:14
needs  50:5
negative  126:4
negotiated  46:20
negotiation  13:8
  54:12 80:14 103:17
neighboring  38:6
net  27:6 60:13,17,22
  60:24 61:15 63:3
neutral  27:6 37:11
  58:8 60:13,17,23,24
  61:15 63:3
never  56:17,18 59:4
  62:9 71:8 97:7,11
  115:6 139:15
new  42:2,5 57:11
  68:11 101:4 125:12
nods  6:22

non  14:22 58:6,9,10
  58:11,16 59:3 73:6
  76:17,25 85:4 86:1
  86:22,25 87:24 91:4
  91:7 92:8,13,24
  93:20 147:3
nonpayment  71:10
northeast  130:4
northern  1:2
notary  1:23 104:5
  150:6 151:14
noted  55:3
notes  34:4,21
notice  4:3 12:6,15
  41:16,16,18 57:7,14
  111:7
notices  57:20,23
  58:1,16 63:17
notify  100:2
notorious  129:19,21
notwithstanding
  38:17 95:22
november  20:24
  21:2,7 56:3 61:18
  62:24 64:12,16,18
  64:18,20 65:11,12
  65:13,20 66:4 74:22
  84:24 85:7 92:2
  102:24 146:19
nowaka  130:3
npr  120:22,24
number  4:2 34:19
  54:8,17,22 89:3
  113:1 129:10
numbered  13:2
numbers  28:18 38:8
  118:22 129:2
numerous  29:1

o

o  7:25
object  16:17 69:4
objection  15:21 54:6
  55:2 67:8 70:15,21
  71:25 74:3 76:9

[objection - particular]                                                                                          Page 14

82:9 84:25 88:16,19
97:16,19
obligated  66:7
obligation  62:11,20
78:10 79:13,13,16
79:18,18,24 80:3,15
81:7,24 82:7,23
83:12
occasions  5:21
134:17
occur  59:1 107:24
occurred  21:24 22:5
55:25 65:1,6 108:10
108:12
occurring  145:7
occurs  41:9
october  61:24 63:12
63:14,18,24 64:8,9
65:14
october's  63:25
office  147:20 151:6
officer  10:24 11:2
21:23,25 22:7 33:3
56:5,16,19 126:12
127:19,25 128:4,9
128:12 130:15,20
officers  55:23
126:16,23 127:22
130:25 131:1
official  143:4
oftentimes  50:11
oh  2:7,18 50:14
108:11 136:8,10
ohio  1:2,12,21 9:2
52:16 130:4 150:2,7
151:7,15
okay  6:2,18,19,25
7:9,10,15,16,20,21
7:22 12:22 13:1,11
13:24 14:2 15:6
16:12 17:4,16 18:19
19:10,25 20:4 21:11
23:6,16,24 24:14,21
24:22,25 25:9 26:21
27:9,19 28:2 29:2

29:17 30:12 33:12
35:11,21,24 36:6
37:25 38:23 42:2,21
43:23 44:4,11,14,22
45:9,16 46:18 47:13
48:4,11 49:8,20
50:5 51:5,16,22
52:13 53:10,21,22
54:18,24 55:10
56:12,24 57:3,21
58:3,21 59:16 60:22
60:8,15,20 61:17
62:1,15,23 63:6,20
64:14,22 66:1,6
68:12,20,25 70:3,25
72:17 73:5,9,17
74:1,17,25 76:15,21
77:8,9 78:2,17 79:7
80:10 82:5,6,19
83:16,20 85:9,21
87:22 88:11,23
89:18 90:7,13,19
92:23 93:8 96:16,18
98:15,19 99:2,24
101:5,15 102:13
103:22 104:2,23
105:5,10,14,20
106:8,17,23,24
107:5,19 108:8,13
109:2,16,23 110:6,9
110:15 111:2,5
113:15,19 114:23
115:8,15 116:5,8,16
117:4,8 121:11,19
122:7,15,18,22
123:1,12 124:10,23
125:4,7,24 131:5
132:1,7,13 134:1,12
134:23 135:18,25
136:6,9,13 137:12
137:24 138:19
139:1,15 141:16,19
142:7,25 143:6,13
143:18 144:2 145:4
145:15,23 146:6,17

147:6,11 148:2
once  21:24 31:22
41:13 62:2,2 63:21
110:13 111:10
125:9
one's  30:14 137:25
ones  122:3
ongoing  25:14 72:15
72:18
onsite  56:10 57:1
126:13,16
open  79:8
opening  32:11
operate  22:10 67:15
68:17
operated  21:22
operating  22:15,16
23:4 63:19 69:22
84:8
operation  86:8
operational  62:13
72:21,22,23 73:6
80:6 85:19 86:1,10
86:11,22,25 87:11
87:12,14,24 130:9
operationally  50:3
operations  59:23
115:13
opinion  67:9 72:10
87:9 97:15 98:2
137:21,22
opportunity  70:18
opposite  124:14
option  40:5 126:10
options  40:6,9
126:15
oral  139:17 143:7,20
orally  6:25 140:6
order  56:2 147:13
organizations  34:20
original  53:15
149:14
outer  37:19
outline  50:2

output  26:19
outright  123:20,25
outside  38:13
103:19
outstanding  89:6
outweigh  95:5
overall  5:23 33:10
65:23 113:3
oversee  10:9 97:21
oversees  118:20
owed  66:15 77:20

p

p.m.  64:19 148:4
pace  82:20
page  1:18 6:6 8:2
13:1,5 24:10,20
52:9 53:6 85:11
104:15 105:10,21
paid  19:9 39:7 42:22
43:21 48:8 58:14
63:24 64:7 66:10,16
80:10 84:23 85:5
88:8,9 101:10
102:12,23 136:25
140:22 145:21
paper  141:6,12,12
141:14
paperwork  93:5
paragraph  51:12
parameters  55:9
parking  114:7,12
115:20 116:10
part  18:19 21:20
23:19 27:15 40:2
41:22 42:3,4 49:25
54:17 61:21,22
63:18,25 65:13
80:17 108:13 109:1
114:4 117:21,22
118:11 119:25
134:1 136:18 140:2
participate  31:10
particular  23:18
27:21 28:2 50:22

[particularly - presents]                                                                 Page 15

| | | | |
|---|---|---|---|
| **particularly**  28:3 | **payment**  23:5 41:17 | **persons**  114:9 | 127:22,24 145:1 |
| **parties**  13:8 47:14 | 77:14 84:19 102:10 | **perspective**  14:23 | 146:13 |
| 58:24 69:15,22 70:8 | 147:3 | 28:18 32:7 79:24 | **points**  120:23 121:6 |
| 101:6 145:11 149:7 | **payments**  77:19,25 | 98:1 122:11 | 127:7,9 |
| **party**  130:17 151:3 | 78:3,5,11 | **phillips**  33:3,11 | **polensek**  29:25 |
| **party's**  140:19 | **pcus**  121:23,25 | **photo**  21:21 22:3 | **police**  10:10 21:22 |
| **pass**  122:9 | 129:20 | 47:12 55:8 63:13 | 21:25 41:13 126:12 |
| **passage**  21:1 55:4 | **pdf**  141:10 | 69:13 98:8 99:3 | 128:5 130:23 |
| 103:8,13 126:11 | **pdfs**  112:14 | 111:23 112:6,7 | **political**  117:24 |
| 130:11 131:3,7,19 | **penalties**  57:10 | 114:6,14 115:21 | **populus**  118:3 |
| 133:12 143:9 | 116:13 | 136:11 | **portable**  41:3 128:2 |
| 144:22 146:18 | **penalty**  86:7 87:6 | **phrase**  27:1 102:19 | **portion**  9:7 12:2 |
| **passed**  19:8 21:8,21 | **pending**  7:18 | 108:2,9 | 82:1,3,4 106:20 |
| 34:7 75:5 90:5 | **people**  98:10 118:1 | **physical**  22:6 | **position**  11:1 14:13 |
| 92:12,17,25 93:19 | 118:1 119:12 120:7 | **physically**  22:8 | 31:24 63:5 88:13 |
| 94:6 120:17 123:15 | 121:25 122:18 | 55:23 109:2 111:4 | 89:19 102:7,18 |
| 124:8 133:8 | 123:18 139:8 | **pick**  133:16 | 120:1 126:6 133:1 |
| **passes**  37:14,15 75:1 | **percentage**  39:7 | **pile**  137:25 | **positions**  132:14 |
| **passing**  118:10 | 40:7 | **pilot**  96:23 | **possibility**  46:11 |
| 145:17 | **perfect**  116:23 | **pilots**  96:18 | 70:10,11 |
| **pattern**  96:20 | **perform**  40:17 64:8 | **pin**  21:6 | **postdate**  132:8 |
| **pause**  7:4 24:17 | **performance**  13:22 | **place**  20:22 50:3 | **posted**  119:1 |
| 73:1 143:6 | 13:25 99:23 | 56:4 68:8 74:18,20 | **potential**  39:10 |
| **pay**  15:16 16:1,13 | **performed**  40:14 | 79:11 96:17 98:20 | 105:7 |
| 19:3,5 22:19 23:11 | 66:4 81:5 84:23 | 101:16 102:3 108:1 | **potentially**  108:23 |
| 36:8 57:7 58:20 | 85:6 | 124:24 128:12 | **powerpoints**  112:15 |
| 60:12 61:10,14 | **performing**  99:19 | 138:8 150:20 | **practicable**  77:15 |
| 62:12,17,20 66:3,7 | 99:22 | **plaintiff**  1:8 2:2 | **practice**  34:20,24 |
| 71:2,17 72:9 77:11 | **period**  31:12,18,19 | 24:1 | **preparation**  134:2 |
| 79:13,17,25 80:3,16 | 57:13 58:2,19 92:19 | **plaintiff's**  12:14 | **prepare**  134:4,14 |
| 81:7,14,25 82:8,23 | 100:3 107:10,25 | 24:3 104:8 141:21 | 135:7 |
| 83:13 88:14 89:25 | 126:17 | 142:12 | **prepared**  6:15 |
| 92:9 95:4 97:8 | **person**  14:23 18:21 | **plan**  130:24 | 112:22 113:20 |
| 131:14 144:7,11,16 | 30:5 61:2 71:12 | **plane**  96:21 | 114:9,17 120:22,24 |
| 146:24 | 80:13 114:8 | **planning**  78:14 | **preparing**  115:16 |
| **paying**  14:9 16:25 | **personal**  11:15 67:9 | 136:3,3 | **prepped**  135:4 |
| 18:1,10,16 19:12,19 | 94:3 98:2 103:3 | **plans**  82:19 | **presence**  150:15 |
| 21:15 22:12 23:2,8 | 106:22 124:17 | **please**  6:11,25 7:22 | **present**  2:23 15:11 |
| 60:22,23 62:8 63:9 | 131:11 132:17 | 40:20 84:12 89:4 | 22:2 32:4 145:4 |
| 63:22 64:4 71:6 | 136:14 | **plow**  84:17 | **presentations**  32:12 |
| 72:19 75:23,25 76:6 | **personally**  93:8 | **plugged**  109:19 | **presented**  123:8 |
| 76:19 77:1 78:7 | 118:8 121:11 | **point**  6:9 7:13 32:18 | **presenting**  16:7 |
| 88:5 89:6,20 91:9 | 136:18 | 32:20 63:20 93:11 | 32:2 |
| 99:10 102:9 103:13 | **personnel**  83:3 | 93:13 94:10 106:17 | **presents**  34:21 |
| 113:17 | | 107:1 114:13 120:6 | |

[press - reaped]                                                    Page 16

press 112:5
pretty 30:19 138:11
  141:8,9
prevent 120:16
  123:14 127:2
preventing 119:18
previous 4:10 25:14
  41:23 87:3 107:11
previously 12:9,12
  12:15 23:25 24:5
  48:19
price 40:5,7
prices 40:10
primarily 132:10
print 22:3,7 56:6,14
  56:25 111:14
  120:13
printed 56:10
printing 56:2
prior 10:16,18,20
  25:23 40:12 65:12
  77:21
privileged 16:20
  18:8 76:10,13,17,25
  85:2,4 88:2,10 89:1
  89:2,9,12,16,21
  91:4,7 92:8,13,24
  93:20 102:11 146:1
  146:20
probably 6:7 20:23
  24:18 30:3,18 36:4
  50:25,25 64:18
  74:20 78:21 107:8,9
  107:20 118:4
  119:23 121:17,20
  121:22 130:4 132:6
  141:1
procedure 5:3
process 33:24 50:2
  57:11 61:19 62:4
  63:7,15,23 64:4,15
  64:23 109:3 112:11
  132:5
processed 61:25
  77:13

produced 108:21
  141:18
profit 42:15
program 5:14 10:24
  11:2 13:20 16:2,14
  17:1 22:10,15 23:17
  25:18,23 26:1,11
  27:15 28:21 29:1,4
  29:11 33:20 35:2,18
  36:15,20,21 37:7,8
  38:24 40:11 42:24
  50:4 54:3 55:5,13
  56:18 57:19 59:15
  60:6,11 61:5 65:1
  65:15,23 66:22,23
  67:2,15 68:11,13,16
  68:17,19 69:14,23
  84:9 89:7 95:2 97:2
  97:22 98:3,5,8,20
  112:8,19 113:3
  114:7 115:20,21,25
  117:1 118:16,18,20
  119:7,13,22 120:11
  120:25 121:1,3,13
  122:5,6,13 124:12
  124:24 125:2,9
  128:17,22 129:7
  132:18 136:12,20
  137:18 138:13,14
  138:17 139:13
  140:7 141:7 143:24
programs 123:19
  137:7
prohibit 22:11 46:7
  46:15
prohibited 21:21
  23:8
prohibitive 56:19
project 10:5,8 32:3
  144:25
projects 32:3 138:15
promote 25:7,19
  26:6 27:16,25 39:12
  39:20 98:17

promoting 25:25
  121:24
promptly 77:13
proposal 32:5 33:24
  35:4 40:3,6 145:24
  146:11
proposals 29:16
  35:7,9 146:15
proposed 106:13
  118:8 145:20
proposing 106:4,5
  145:13,16
provide 40:4
provided 5:2
provision 43:4,8,10
  43:15,24 44:5,16
  52:5 53:22 63:21
  64:2 80:3,4 81:13
  82:11,24 83:14 84:5
  85:10 100:1 140:18
provisions 105:17
pruitt 30:25 37:2,7
public 1:21,23 2:6
  10:6,12 22:23 25:7
  25:20 26:2,7,12
  32:2,6 35:22,25
  36:4 40:11 96:1,11
  97:13 125:5,17,21
  126:2 129:12 150:7
  151:14
pull 108:24 109:3
pure 28:17
purpose 13:19 23:16
  25:6,9,25 51:6
  94:24 95:19 119:8
  122:1
purposes 9:4 12:11
  12:16 24:5,25 95:14
  104:11,14 141:23
  142:3,14,18
pursuant 78:8 149:3
put 28:25 35:3
  56:16,19 57:12 77:5
  82:5 91:1 93:1,2,7
  93:16 95:17 97:24

113:23 118:19
125:22 138:22
140:1,4
putting 49:20

q

qualified 54:7 150:8
qualifies 54:22
quantitative 38:10
question 6:14,14,18
  7:3,5,18,19 16:18
  16:24 22:17 45:23
  50:4,7 54:5,8 70:5
  71:20 75:24 76:4
  78:2 81:6 82:22
  84:10,12 92:23
  95:11 120:3 140:4
questioning 92:21
questions 6:8,10,21
  11:25 12:3 32:11
  34:13,15 50:1 92:18
  118:17 122:5 147:9
queue 65:14
quick 73:13
quite 28:14

r

radio 120:14 121:6
raises 50:13
rank 129:24 130:6
rates 129:25
reached 14:22 75:4
  90:3 138:21
read 13:13 53:19
  77:16 84:11,13
  147:14,20
readily 11:20
reading 149:7
reads 77:9
ready 73:15
real 119:16
reallocate 128:6
really 28:6 48:18
realm 11:15
reaped 138:16

[reason - rested]                                                                                                    Page 17

**reason**  26:4 76:18
  76:25 85:5 86:11,18
  91:15 100:5 115:11
**reasoning**  23:14
  72:1 95:10 128:24
**reasons**  35:22 40:10
  88:1
**recall**  18:8,10 20:17
  30:14 36:25 47:16
  47:21,23 93:25 97:6
  138:25 139:14,24
  140:11,12 143:19
  144:2,6 145:7,15
  147:7
**receipt**  77:15
**receive**  63:13 115:1
**received**  19:11
  41:17 57:14 65:19
  75:10 109:14 115:9
**receiving**  125:10
**recess**  31:18,19
  73:14 103:4 141:3
**recollection**  24:10
  29:24 33:23 36:2
  74:19 90:20 119:23
  139:11,16,19
**recommend**  147:22
  148:3
**recommendation**
  15:17 16:2,10,23
  17:8,18,22,23 19:11
  35:1,8,13,16,17,22
  90:8 139:17,17
**recommendations**
  32:8 91:4,8 126:1,8
  146:15
**recommending**
  33:25 145:24
**recommends**  17:14
  31:9
**record**  7:24 13:17
  17:16 25:1 34:7,8,8
  45:21 83:19,23
  84:13 147:19

**recorded**  6:23
**records**  34:6
**recoup**  91:17
**recover**  43:1,5
**recovers**  42:14
**recurring**  97:25
**red**  25:16 28:13 41:4
  41:5,25 57:17 60:3
  70:19 98:6,11,16,24
  113:6 127:3 128:14
  138:1
**redline**  106:8
**redlined**  106:1
**reduce**  58:6 98:6
  125:16
**reduced**  29:5 129:2
  138:9,10 150:14
**reducing**  57:23
  124:13
**reed**  30:3 36:19
  37:17,22 116:23
**refer**  37:6 52:14
  115:25
**reference**  138:22
  140:2,5
**referenced**  150:13
  150:18
**references**  138:15
**referendum**  93:6,12
**referral**  140:19
**referring**  25:3
**refers**  52:15 53:11
**refresh**  24:10
**refurbish**  40:23
  41:21 62:18 68:8
**refurbished**  41:24
**regarding**  87:1
  149:2,13
**regardless**  87:22
  99:8
**region**  130:6
**regular**  113:16
**regularly**  31:10,14
  111:5 116:17

**regulation**  52:16
**relate**  87:9
**related**  5:24 6:1
  10:11 33:8 48:20
  111:25 112:18
  114:14 121:9,12
  141:6
**relates**  87:2 147:2
**relating**  5:13 86:7
**relationship**  25:14
  66:25
**relative**  151:2
**relatively**  36:9
**release**  112:5
**remains**  102:20
**remarks**  32:11
**remember**  47:2
  139:25
**remove**  101:16
**removed**  67:16,22
  68:7 93:14
**removing**  124:13
**renewing**  78:14
**repaired**  86:6
**rephrase**  79:15 96:2
**replace**  62:19
**report**  32:7 33:1,2,3
  33:12,15 112:21,24
  112:25 114:6
**reported**  32:17
**reporter**  3:13
  147:15,25
**reporter's**  3:10
  150:1
**reporting**  31:25
**reports**  113:16,20
  114:9,17,18 115:17
  116:16
**represent**  5:11
  96:16 136:15
**representative**
  59:17 67:10,11 69:8
  93:14 136:14 139:2
  144:15

**representatives**  20:9
  20:14 47:8 143:8
  144:21
**representing**  20:9
**request**  29:15 33:24
  35:3 40:2 108:19,20
  109:9 111:12
**requested**  149:1,12
**requests**  108:15
  114:22,24 122:4
**requirement**  42:4
  126:22
**reserving**  106:19
**reside**  8:1 9:1
**residents**  36:22
  37:20 38:13,15 97:4
  118:14
**resolution**  145:16
**resolved**  19:7,17,20
  19:24
**resource**  128:7
**resources**  129:18
  130:24
**respective**  16:20
**respond**  7:19 108:18
  145:14 146:11
**responded**  18:17
**responding**  108:13
**responds**  6:25
**response**  75:7 89:3
  97:20 145:25
**responses**  146:16
**responsibilities**  10:8
  59:22 60:19 61:1
  120:1 144:24
**responsibility**  11:18
  50:9
**responsible**  18:21
  38:18 41:2,3,7,15
  47:25 114:2 145:23
**responsive**  108:15
  109:8 111:11
**rest**  58:17 143:24
**rested**  102:3

[rests - shows]                                                                                Page 18

rests  102:14,16
result  65:20 125:15
   127:8 131:2,6
   138:11
resume  106:19
retained  3:13
returned  86:8
reused  67:16
reusing  67:24
revenue  25:10 26:17
   27:16,22 38:25 39:1
   39:13,19 56:22 58:8
   58:19 60:11 64:24
   65:19 70:18 113:8
   113:12,21 114:18
   116:20 117:2,11,13
revenues  58:10
   115:2 125:1
review  41:7,9 133:9
   134:24 145:14
   147:16,20 149:2
reviewed  34:22 35:6
   51:14 134:6
reviewing  106:13
   133:4
reviews  16:8
revised  4:4 104:9
revisions  105:2,25
   106:13
reward  138:4,6
rfp  138:15,23
rhetoric  28:25
rick  20:12 132:6
rid  101:8 131:6
right  18:2,15 22:4
   27:17 38:7,21 39:19
   42:15 43:11 44:1
   47:15 54:9 56:14
   61:3,20 63:16 65:17
   72:21 79:11 84:9
   85:17 86:12 99:6
   106:19 109:23
   125:15 128:21,23
   129:7,13,14 132:18
   133:1,5 138:12

143:11 147:7,14,23
rights  79:3
rise  28:9
risk  42:19 46:19
   69:24 127:19
   130:21 136:19
   137:17,19
risks  69:14,21
   137:23 138:3
road  47:9
ronda  132:5
room  2:17 16:7 18:3
roughly  36:1
rules  5:3 6:3 123:21
   149:3
rumblings  45:5
run  6:2 50:4 56:20
   58:18 95:4
running  28:13 57:17
   95:2 98:11,16 111:8
rush  126:18,18
rushing  127:13

                s

s  7:25 116:7
safety  10:6,12 16:6
   16:19 17:7 19:16
   20:2,11 25:7,20
   26:2,7,12 27:16,25
   29:18,20 30:8,21
   31:4,6,8,11 32:2,7,8
   32:25 33:8,18 35:22
   35:25 36:4 39:12,16
   39:20 40:11 48:21
   49:3 74:4 95:20
   96:1,11 97:13 98:17
   115:13 117:12
   119:16 122:19
   125:5,18,21 126:2
   129:12 131:5 145:3
sam  2:5 5:11
satisfied  27:4 40:13
   40:17
save  27:16 28:21
   56:22 58:7 96:23

saved  29:5 107:13
   107:15 110:18
   138:9
saves  97:9
saving  97:3 119:18
   124:12
saw  51:1
saying  18:8 19:12
   47:16 57:8 71:15
   75:11 132:22
   138:20 139:4
says  17:13 23:7
   24:11 28:24 50:14
   53:7 63:21 64:3
   75:2 84:6 86:10
scamardo  2:10
scanned  141:11
scope  97:17
scrutinized  103:19
scrutiny  103:24
seal  151:6
search  109:16 110:3
   110:4,6,12 111:19
   111:21 112:13
searched  109:10
searching  109:7
second  5:22 11:16
   31:17 41:18 49:5
secondary  26:15
section  53:7,11,18
   54:25 85:13 105:14
see  6:24 24:14 53:6
   53:8 69:20 85:13
   105:14,17 108:23
   114:25 119:3
   122:11 135:20
   141:13
seen  12:23,24
   136:21
sees  79:9
senate  47:11
send  47:4 51:9
   71:14
sending  57:20 58:16
   59:3

senior  28:9
sense  48:5 50:10
   59:10 67:23
sent  41:12 51:8
   57:25 71:8 110:7,24
   110:25 111:15
   132:9 134:7
separately  114:18
   146:22
series  6:8
serve  96:1
served  28:19 96:13
server  108:6
serves  95:19 98:8
service  4:4 24:4
   104:10
services  10:21 40:13
   40:17 61:22 63:25
   64:7,9 66:4 84:23
   85:6
set  55:9 77:10 92:10
   107:15 115:22
   151:6
setting  131:13
   143:18 146:20
settle  146:11
settlement  145:16
seven  11:3 14:3
share  135:16
shared  108:6
shore  28:9
short  73:14 103:4
   141:3
shortfall  58:23
shoulders  6:22
show  12:6 23:25
   64:1 99:25 104:2
   115:18 128:25
   142:3
showed  38:16
showing  12:10
   104:13 114:18
   142:17
shows  127:7

| | | | |
|---|---|---|---|
| shrugs  6:22 | solutions  1:6 | standpoint  90:22 | subfolders  112:2,4 |
| shut  86:16 | somebody  18:8 | stands  116:10 | subject  32:1,4 33:19 |
| sic  96:23 | 50:13 90:21 | start  107:18 111:8 | 37:9 57:9 88:24 |
| side  105:20 | soon  73:11 77:14 | started  101:3 107:6 | 93:9 103:23 117:9 |
| sides  70:2,17 137:23 | 141:2 | starting  13:19 68:11 | submitted  40:3 |
| 138:2 | sorry  13:21 24:18 | starts  91:17 | 92:20 |
| sign  122:22,25 | 30:9 54:21 | state  1:5 7:22 11:9 | submitting  19:6 |
| 123:2,5 | sort  31:24 97:1 | 45:11 46:2,15 47:1 | 58:9,10 |
| signature  123:9 | 116:14 123:13 | 47:7,11,19 48:3 | subsequent  33:25 |
| 131:23 132:15 | 129:23 130:1,19 | 51:12 52:16 53:8,12 | subsequently  75:9 |
| 142:9 147:19 149:5 | 133:12 | 53:24 70:7 139:3,12 | substance  134:13 |
| 151:13 | sought  85:22 108:14 | 150:2,7 151:15 | 136:2 |
| signatures  92:19 | space  111:8 | state's  45:5 | substantial  42:8 |
| 123:11 | speak  14:24 15:4 | stated  55:23 90:16 | substantially  91:22 |
| signed  46:19 48:25 | 29:9,13 51:2 72:3 | statement  60:4,7 | suburbanites  37:19 |
| 50:19 | 87:13 | 86:3 87:1 126:5 | succeeded  26:10 |
| significance  81:11 | speaking  23:2 31:8 | 129:5 132:8 | success  138:16 |
| significant  83:9 | 63:11 76:22 87:14 | statements  16:22 | successful  128:21,22 |
| signing  50:20 149:7 | 87:18 118:15 | 117:2 | successfully  26:1 |
| signs  49:23 | 129:14 | states  1:1 46:6 57:16 | sudden  68:10 128:3 |
| similar  97:1 | speaks  13:18 | stay  96:22 111:18 | 128:6 |
| simple  70:5 71:20 | special  110:23,24 | 117:19 | suggested  38:13 |
| 82:22,22 95:11 | specific  16:21 45:22 | stayed  124:4 125:5 | suite  1:21 2:6 |
| single  41:24 | 139:10 140:14 | stenographer  6:20 | summer  31:18,19 |
| sir  8:1 11:11 12:20 | specifically  93:12 | stenotypy  150:14 | supermarket  28:10 |
| 73:15 80:19 82:17 | specified  150:21 | step  59:5 75:6 | supplier  35:19 |
| 83:24 102:6 103:5 | speed  41:5,6 127:3 | steps  90:6 | supply  40:22 |
| 104:13 106:17 | 128:1,14 | stop  14:9 16:25 | support  31:8 116:11 |
| sit  18:3 | speeding  25:15 | 17:25 18:16 21:15 | 119:13,21 120:25 |
| site  112:6 | 98:11,16 99:1 | 60:21 61:5 75:23,25 | 121:1,3 |
| sitting  48:4 56:12 | 129:19 | 76:6,19 77:1 98:10 | supported  38:3,12 |
| 59:16 60:15 61:12 | spell  7:23 116:6 | 118:9 119:2 | supporting  37:14 |
| 65:9 88:11 139:2 | spend  129:16 | stopped  62:7 107:12 | sure  6:5 7:4 35:14 |
| 140:13 147:7 | spin  96:20 | 125:10 | 48:18 49:8 80:6 |
| situation  137:1 | split  33:11 | stopping  98:15 | 88:25 94:7 107:23 |
| six  13:15,24 41:24 | spoke  74:15 119:21 | stops  63:22 64:4 | 108:3 |
| 41:24,25 48:14 | spot  99:1 117:25 | street  9:1 28:10 | surplus  60:10 |
| 49:22 54:18,22 | 118:19 | strict  55:9 | surveillance  94:9,12 |
| 63:14 128:11 | spreadsheets  112:15 | strike  136:17 | 94:19,25 95:2,4,8 |
| size  36:9 | square  1:21 2:6 | stuck  135:15 | 95:14,19,25 96:9,10 |
| slow  28:12 | ss  150:3 | studied  57:21,22 | 97:22,25 98:2,5,7 |
| slowing  28:14 | stand  17:24 | studies  28:23 29:3 | 118:16 |
| sole  103:6,6,12 | standing  21:12 | study  130:5 | suspenders  130:20 |
| solely  75:16 102:3 | 137:2 | stuff  49:24 108:25 | sweeney  30:16 |
| 102:15,16 | | 110:18,20 112:5,6 | |

**switched** 128:17
**sworn** 5:4 150:10
**system** 22:3,7 56:9 115:22 116:4

**t**

**t** 116:7
**table** 34:10,16
**take** 7:13,14,15,20 13:12 15:6 16:11 17:2 20:22 24:9 34:25 40:8,14 43:9 45:16 52:19 63:14 72:19 73:10,13 74:18 103:1 108:1 121:22 125:16 135:13 140:25 143:6 145:13
**taken** 1:20 5:16 91:1 110:1 125:23 150:20
**talk** 15:14 16:21 75:8 90:23 122:4 135:10 136:3
**talked** 23:16 48:11 75:9 90:17,21,22 94:6 121:5 135:22 135:25 142:1
**talking** 120:23 121:6 141:4
**tally** 113:3,4,5
**targeted** 36:22
**task** 81:4
**tasked** 59:23 65:24
**tbrennan** 2:9
**technology** 10:9 95:7 99:3 139:8
**telephonically** 2:24
**television** 120:14 121:5,7,10
**tell** 30:15 69:19 74:14 99:19
**telling** 87:9 144:3,7
**template** 101:1,4
**temporary** 110:15
**ten** 97:10 127:23 130:14
**tens** 67:6 96:21
**term** 42:18 58:22 81:7
**terminate** 68:18 71:4 99:15 100:7,10 100:16
**terminated** 43:5,12 62:6,9 71:21,23 78:25 79:2 91:20,23 101:8 102:8,14 131:2 132:23 133:1
**terminates** 62:2,3 68:16
**terminating** 71:16 72:11,12,13 100:19
**termination** 43:4,8 43:10 71:3,9,18,24 72:9 91:11,21 92:3 92:10 100:21,23,25 101:2,5 137:1 144:8
**terms** 11:17 36:6 39:18 40:22 42:13 77:10 109:19 110:3 110:5 123:13
**terrell** 30:25
**terry** 2:4 5:10 83:18 149:14
**testified** 47:11 124:10 135:23
**testify** 106:22 150:10
**testifying** 11:12,14 88:23
**testimony** 5:19 78:23 94:2 96:7 135:8,11 136:2 137:12 150:13,17
**thank** 9:6 73:15 83:16,22 147:10,12
**thing** 24:19 39:19 44:19 62:16 67:12 129:12
**things** 39:1 44:17 46:13 49:13,13 62:20 70:8 101:1 113:23 119:6 120:22 123:22
**think** 5:23 20:16 28:2 54:7,22 66:19 66:20 67:4 69:9,21 81:16 84:16 85:4 102:18 122:2 131:9 134:20 137:21,23 138:2,6,6,16 145:9
**thinking** 49:23 50:21 99:14
**third** 13:2
**thoroughly** 34:14,15
**thought** 94:22 95:23 96:7 100:14,19 122:18
**thousand** 97:23
**three** 24:11 97:10 126:23 128:5
**throw** 120:4
**thrown** 120:7
**ticket** 22:1,3,7 38:9 38:20 40:7 55:24 56:14 57:9 63:13,18 64:19 119:5
**ticketed** 38:14
**tickets** 39:7 56:2,6 56:10 57:1 61:20,22 62:4 63:7,23 64:5 64:15,23 65:11 95:25 96:10 127:12
**tighten** 50:6
**time** 6:9 7:13,14 18:9 20:8 22:2,9,16 29:21,23 30:7,15 31:1,11 32:14,15,18 32:20 33:14 34:11 35:25 44:22 45:1,10 46:4,12 48:23 49:10 49:22 50:19 51:7 55:21 56:1 57:9 58:3 60:13 61:7 78:16 79:8 92:19 97:24 99:12 100:3,6 100:13 101:22 106:17 107:1,10,25 113:22,22 118:11 118:12 126:17 127:8,10,19 128:22 129:17 130:22 136:24 143:21 144:24 147:10 150:20
**timeline** 49:21
**times** 7:2 29:1 38:8 50:16 118:15
**timing** 50:10
**title** 10:13,14,22 109:11
**titles** 20:5
**tj** 30:3 117:7
**today** 5:15 7:13 11:11,24 33:1 56:13 59:17 60:15 61:12 65:9 82:19 88:11 124:24 133:23 135:8,15 137:13 139:2 140:13 147:4
**told** 15:24 19:10,18 19:22 47:6 64:21 74:12 123:17,22 146:13
**tom** 121:18
**tools** 120:14
**top** 24:20 52:9 130:14
**topic** 6:16 13:8,12 13:15,18,21,23,24 14:3,9,11,14,15,19 14:24 15:3,4 54:11 75:21,24 113:25 121:9
**topics** 11:21 12:8 130:18
**total** 126:23
**touch** 147:15

[tougher - want]                                                                 Page 21

**tougher** 30:14
**town** 143:25 144:23
**townsend** 109:12
  143:11
**track** 21:25
**tracks** 116:13
**traffic** 5:13,24 13:20
  14:6 16:14 17:1
  21:14 23:17 25:14
  26:1,11 27:14 28:5
  28:12,14,21 29:4,11
  33:20 35:5,18 36:14
  46:8,16 47:10 54:3
  55:5,13,17,20 57:5
  58:14 65:20 68:13
  89:7 94:9 95:24
  96:8 97:2 98:22,24
  112:19 117:25
  118:4,18 119:22
  120:2,10 121:12
  124:11,24 125:2,9
  125:11 126:13
  128:20 129:6
  130:13,23 137:7
  139:13 140:7 141:6
**trafficking** 6:1
**trailer** 128:3
**transcribed** 150:16
**transcript** 3:1 6:23
  9:5,7 47:4 147:14
  149:3,8,11,13
**transcription**
  150:17
**trash** 110:17
**treated** 139:9
**tried** 117:19 141:9
**true** 13:11,15 28:3
  98:13,14 103:5,11
  150:16
**trust** 147:17
**truth** 150:11,11,12
**truthful** 119:9,10
**try** 7:6 21:9 39:17
  39:24 71:12 95:5,7
  96:22 118:9 119:21

  120:15
**trying** 21:13 47:2
  84:17 86:19 108:23
  109:3 122:2 123:11
**turn** 13:1 14:6 21:14
  24:10 52:8 53:5
  58:4 61:3 73:2,18
  74:6,12,16 75:2,11
  77:4 84:7 85:11
  87:10 89:24 90:2,9
  90:10 96:5 103:7
  105:10 143:23
**turned** 73:24 95:12
  108:25
**turning** 91:5 102:2
  143:12 147:3
**twice** 134:18
**two** 11:12 13:2,5,18
  20:8 29:14 33:5
  34:21 48:7 50:25
  57:13 58:2 75:1
  89:25 97:10 119:9
  119:10 127:2
  135:14 145:11
**type** 15:13 69:23
  95:4
**types** 112:14 114:9
  114:21
**typically** 31:20,21
  34:4 117:14

**u**

**uh** 30:1
**ultimate** 14:18
  18:18 41:13 102:1
**ultimately** 15:7,10
  15:18 17:2 18:5
  31:3 38:18 39:15
  50:9
**unable** 6:17
**unaware** 131:8
**unclear** 6:17
**underlined** 105:18
**underlining** 105:22

**understand** 6:9
  11:21 44:9 47:17,18
  51:5 71:10,13 88:12
  91:11 92:5 107:24
**understanding**
  11:15 12:7 25:3,5
  41:1 42:22 44:10
  45:17 49:9 68:2
  88:13 92:1 106:25
**understands** 40:25
**understood** 6:14
  12:4 37:25 44:14
  50:8 58:25 65:8
**unfairly** 36:23
**unit** 35:5 85:18
  98:22 130:23
**united** 1:1
**units** 41:3 128:2,13
**upfront** 42:8,13
  43:21 48:5,9 68:6
  68:10 91:18
**usb** 108:6
**use** 46:8,15 55:8,17
  55:19 57:4 71:22
  87:16 94:23,24 95:7
  96:8,10 115:25
  130:20
**usually** 147:22

**v**

**valid** 65:15 93:2
**valor** 117:22
**value** 97:2,3
**values** 96:17
**vargas** 20:15 114:11
**vehicle** 22:8 42:1
  128:12
**vehicles** 128:1,11
**vendor** 13:22
**vendors** 40:3
**verbal** 143:14
**verbiage** 52:10
**verify** 147:17
**versus** 50:4 97:3,25

**vertical** 105:21
**video** 95:1,8 97:21
  97:24 98:2,5,7
  118:16
**view** 45:11 69:19
**viewed** 25:23 27:22
**violate** 124:20
**violated** 57:8
**violation** 21:24 22:5
  41:8,9,10,14 55:24
  56:7 118:24 119:1
**violations** 25:16
  28:19 64:25 65:5,12
  98:6 114:12 116:11
  127:3,9 128:15,23
  129:3,11 138:10
**violator** 22:1
**violators** 57:6,8,13
**visually** 6:25
**voided** 64:21
**voted** 22:23 136:22
  137:4
**voters** 93:3,5,17
  136:22 137:4
**voting** 118:3
**vs** 1:10

**w**

**wadle** 2:24
**waive** 147:18
**waived** 149:9
**waiving** 147:22
  148:3
**walk** 48:13 58:24
**walked** 145:12
**want** 6:10 7:8,14
  17:16 27:24 36:19
  37:3,4,9,13 39:19
  49:8 50:10,18 52:7
  53:5 67:21 69:19
  71:17,22,23,23 72:6
  82:17 85:9 88:25
  90:25 94:7 95:17
  96:20 100:15,22
  101:7 104:2 107:23

[want - zone]                                                                 Page 22

114:20,25 117:2,10
122:16 131:10
134:13 135:19
147:15,16
**wanted** 38:24 43:18
43:20 49:2 52:25
116:20,25 118:1,4
122:8
**wanting** 116:23
117:17
**wants** 48:15 72:5
80:12 146:23
**war** 44:19 45:13
**ward** 36:20 37:3,5,9
37:13 38:9,19,19
118:13 122:16
129:17,21
**wards** 119:21,24
**warning** 57:13,20
57:23 58:1,16
**warranting** 53:23
**way** 13:3 22:2,6
56:1 60:8 87:5
122:12 125:8
145:10
**we've** 28:25 48:11
50:14 61:20 73:12
94:6 109:24 110:1
136:20 143:13
**wearing** 15:19
129:11
**website** 138:14
**wednesday** 31:17
**week** 5:22 58:2
**weeks** 21:7 48:7,14
49:22 57:13 63:14
**weigh** 90:10,14
**weighted** 80:24 81:2
**went** 40:9 47:10
108:22 109:10,14
110:22 112:9 120:2
121:3 142:8
**wes** 2:24
**whereof** 151:5

**wise** 108:7 125:20
**wished** 124:23
**witness** 11:13,16
12:1,9 13:7 14:3,8
15:2 53:20 75:22,24
77:7 80:14 84:12
85:12 106:18
147:23 148:2 150:9
150:14,15,18 151:5
**witness's** 149:2
**word** 53:1,2,14
87:16 109:16
111:19,21 112:10
141:10
**words** 25:25 26:11
27:3,6 29:4 34:18
35:16 37:18 38:3
39:2,24 40:22 42:12
42:22 43:17 45:9
46:14 50:11 56:14
59:2 60:22 95:17
99:17 111:13
117:10 124:14
126:21 128:9
**work** 56:3 127:14
145:10
**worked** 48:19 109:6
**working** 48:23
50:18 86:11,14
107:12
**works** 60:9
**worry** 144:16
**worst** 129:24
**worth** 97:10,11
**worthwhile** 98:16
**wrapping** 103:2
141:1
**writing** 140:6
**written** 84:5 143:1,3
**wrong** 50:17 65:17

**x**

**x** 49:17 50:5 127:19
**xerox** 1:5 5:11,12
15:16 16:1,13,25

18:1,10,16 19:5,6
19:12 21:15 22:12
22:19 23:3,9,11
25:13 34:1 35:19
36:8 39:6 40:14,17
40:21,25 41:2,15,15
41:19,20,21 42:2,7
42:8,12,14,18,22,23
43:5,12,17,20 46:21
46:23 47:1,16 48:5
51:9 52:22 56:1,8
56:13,24 58:12,13
58:20 60:12,22,23
61:3,8,10,14,19
62:2,4,12,17,21
63:6,22,22,24 64:4
64:7,8 66:4,4,15,22
66:25 67:6,15,22
68:2,12,25 69:11,17
70:4,11,24 71:1,9
71:15 72:18 73:3
76:1,6,19 77:1,20
79:17 80:11,12,16
80:20 81:7,15,25
82:8,24 83:13,25
84:2,7,19,23,23
85:6,18,22 86:5,7
86:19 87:6,10 88:5
88:15 89:6,20,25
91:9,17 94:16 99:10
99:19,20,21,23
100:2 101:9,15,19
101:23 102:4,9,23
103:13 108:15
109:11,13,15,20
110:22 111:11,23
112:1,7,18,22
113:17 114:17
115:10 131:15,18
132:9 136:12,16,23
136:25 137:15,19
139:4,6,13,17 140:7
140:14,20 141:6
142:2,5,9,20 143:1
143:5,8 144:15,21

145:2,2,12,15,21
146:23 147:3
**xerox's** 13:21 14:10
69:7 70:23 79:23
80:1 85:25 86:21
87:24 108:19 109:9
129:10 138:13
144:25 146:11

**y**

**y** 49:17 50:5 127:19
**yeah** 27:2 38:1 50:8
69:6 73:12 88:22
90:25 96:3 112:4
117:6 120:8 135:16
**year** 97:10 125:11
137:14
**years** 11:2 45:6
**yesterday** 6:4
134:25 135:1

**z**

**z** 49:17 50:5
**zack** 30:3 36:19
116:23
**zone** 30:3,24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.