**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **XEROX STATE & LOCAL SOLUTIONS, INC.,** | Case No:  1:15-cv-1707 |
| **Plaintiff,** | Judge Dan Aaron Polster |
| **v.** | Magistrate Judge Kenneth S. McHargh |
| **CITY OF CLEVELAND, OHIO,** | |
| **Defendant.** | |

**PLAINTIFF XEROX STATE & LOCAL SOLUTIONS INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................... ii

Index of Exhibits ........................................................................................... v

Statement of the Issues ................................................................................ 1

Summary of Argument Presented ................................................................ 1

Statement of Facts ........................................................................................ 2

    A.    The 2013 contract. ............................................................. 3

    B.    Cleveland amends the contract's force-majeure provision. ............ 5

    C.    The traffic-camera program is effective in promoting its only goal—increasing public safety. ......................................................... 6

    D.    Cleveland amends its Charter to regulate traffic cameras. ............. 7

    E.    Cleveland stops paying Xerox. ....................................................... 8

Standard of Review ....................................................................................... 9

Law & Argument ........................................................................................... 9

    A.    Cleveland cannot rely on the ballot initiative to excuse its performance under the contract's force-majeure provision. ........... 9

        1.    Cleveland specifically excluded local laws from the force-majeure provision's scope. ........................................ 10

        2.    Cleveland representatives proposed and passed the law. .................................................................................. 11

        3.    Cleveland has admitted the initiative was foreseeable. ........ 14

        4.    Cleveland was not prevented from performing. ................. 15

        5.    Cleveland is estopped from asserting force majeure. ........... 16

    B.    Cleveland may not rely on the ballot initiative to excuse its performance under the Contracts Clause. .................................... 17

    C.    Cleveland thus breached its contract with Xerox. ....................... 19

Conclusion .................................................................................................... 20

i

### TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Bass Energy Inc. v. Highland Hts.*,
  193 Ohio App. 3d 725 (2010)................................................................... 17

*Broad St. Energy Co. v. Endeavor Ohio, LLC*,
  975 F. Supp. 2d 878 (S.D. Ohio 2013) ..................................................... 11

*In re Cablevision Con. Litig.*,
  864 F. Supp. 2d 258 (E.D.N.Y. 2012)....................................................... 10

*Cherry v. Mayor & City Council of Baltimore City*,
  762 F.3d 366 (4th Cir. 2014) .................................................................... 18

*City of Cuyahoga Falls v. Buckeye Comm. Hope Found.*,
  538 U.S. 188 (2003) .................................................................................. 13

*City of Middletown v. Ferguson*,
  25 Ohio St. 3d 71 (1986) ..............................................................12, 17, 18

*Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.*,
  731 F. Supp. 850 (N.D. Ill. 1990) ............................................................. 10

*Council 31 of the Am. Fed'n of State, Cty. & Mun. Employees, AFL-
  CIO v. Quinn*,
  680 F.3d 875 (7th Cir. 2012) .................................................................... 18

*DiMarco v. Shay*,
  154 Ohio App. 3d 141 (2003)................................................................... 11

*Donald Harris Law Firm v. Dwight-Killian*,
  166 Ohio App. 3d 786 (2006).................................................................... 15

*Dunaj v. Glassmeyer*,
  580 N.E.2d 98 (Ohio Com. Pl. Ct. 1990)................................................... 15

*Fifth Third Bank W. Ohio v. Carroll Bldg. Co.*,
  180 Ohio App. 3d 490 (2009)................................................................... 14

*Fuhr v. Hazel Park Sch. Dist.*,
  710 F.3d 668 (6th Cir. 2013) ...................................................................... 9

*Graham v. Drydock Coal Co.*,
  76 Ohio St. 3d 311 (1996) ........................................................................ 11

*Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC,*
  871 F. Supp. 2d 843 (D. Minn. 2012) ...................................................... 10

*Hampshire Cty. Trust Co. of N. Hampton, Mass. v. Stevenson,*
  114 Ohio St. 1 (1926) ............................................................................... 16

*Horwitz-Matthews, Inc. v. City of Chicago,*
  78 F.3d 1248 (7th Cir. 1996) .................................................................... 18

*Inhabitants of Elsemore v. Town of Hancock,*
  18 A.2d 692 (Me. 1941) ........................................................................... 13

*Lockheed Martin Corp. v. Goodyear Tire & Rubber Co.,*
  2012 WL 3499510 (N.D. Ohio Aug. 15, 2012) ......................................... 11

*Mead Corp. v. ABB Power Gen., Inc.,*
  319 F.3d 790 (6th Cir. 2003) .................................................................... 11

*In re Millers Cove Energy Co., Inc.,*
  62 F.3d 155 (6th Cir. 1995) ................................................................ 10, 16

*Offill v. Penn. Life Ins. Co.,*
  243 F.R.D. 276 (S.D. Ohio 2007) ............................................................. 19

*Sims v. Anderson,*
  38 N.E.3d 1123 (Ohio Ct. App. 2015)...................................................... 16

*Stand Energy Corp. v. Cinergy Servs., Inc.,*
  144 Ohio App. 3d 410 (2001)................................................10, 12, 15, 16

*Stricker v. Twp. of Cambridge,*
  710 F.3d 350 (6th Cir. 2013) ...................................................................... 9

*Stuckey v. Online Res. Corp.,*
  909 F. Supp. 2d 912 (S.D. Ohio 2012) ..................................................... 15

*Thomas v. Publishers Clearing House, Inc.,*
  29 F. App'x 319 (6th Cir. 2002)................................................................ 19

*Toledo Area AFL-CIO Council v. Pizza,*
  154 F.3d 307 (6th Cir. 1998) .............................................................. 17, 19

*Univ. of Hawai'i Prof'l Assembly v. Cayetano,*
  183 F.3d 1096 (9th Cir. 1999) .................................................................. 17

*W. Haven Sound Dev. Corp. v. W. Haven,*
  514 A.2d 734 (Conn. 1986)...................................................................... 12

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 9

**Other Authorities**

Ohio Constitution ...................................................................................... 17

U.S. Constitution ....................................................................................... 17

**INDEX OF EXHIBITS**

Exhibit A          Former Cleveland Safety Director Martin Flask's Deposition
                   (including exhibits)

Exhibit B          Project Manager for the Department of Public Safety Larry
                   Jones's Deposition (including exhibits)

Exhibit C          Declaration of Operations Vice President of Xerox State &
                   Local Solutions, Inc. Lewis Miller

Exhibit D          City of Cleveland's First Set of Admissions

Exhibit E          License and Services Agreement (LSA) between Xerox and
                   City of Cleveland (including schedules and exhibits)

Exhibit F          City of Cleveland Budget Administrator Gregory Cordek's
                   Deposition (including exhibits)

Exhibit G          Current Cleveland Safety Director Michael McGrath's
                   Deposition (including exhibits)

Exhibit H          City Record, Vol. 101, No. 5257 (Sept. 10, 2014)

Exhibit I          Initiative Petition to Enact § 203 to Cleveland Charter

Exhibit J          City of Cleveland's First Interrogatory Responses

Exhibit K          City of Cleveland's Second Set of Admissions

Exhibit L          Charter of the City of Cleveland § 200

**STATEMENT OF THE ISSUES**

A.   Does a local ballot initiative regulating traffic cameras excuse the
     City of Cleveland's ("Cleveland" or "City") performance under a
     force-majeure clause that only excuses performance if a federal or
     state law prohibits traffic cameras?

B.   Does the Contracts Clause of the United States and Ohio
     Constitutions, which precludes a municipality from changing the
     law to excuse its performance of contractual duties, permit the City
     to cite an amendment to the City's own Charter as an excuse not
     to pay Xerox under the parties' contract?

C.   Is the City liable to Xerox for breach of contract?

**SUMMARY OF ARGUMENT PRESENTED**

In June 2013, the City of Cleveland signed a contract with Xerox State &
Local Solutions, Inc. ("Xerox") for Xerox to provide the City traffic cameras and
related services during a four-year term.  In November 2014—almost three
years before the contract's term expired—the City stopped paying the contract's
monthly fee, depriving Xerox of over nine million dollars owed to Xerox.

The City's sole factual basis for ceasing payment is a November 2014
local ballot initiative that amended the City's Charter to regulate, not prohibit,
traffic-camera use.  The relevant contractual provision is clear:  Only state and
federal laws prohibiting the program—which an amendment to the City's own
Charter regulating the program is not—would have allowed the City to
terminate the contract without further payment to Xerox.

1

The contract is crystal clear that the ballot initiative was not a force-majeure event; however, even if it was less clear, a force-majeure event cannot be *caused* by the entity claiming force majeure.  The City of Cleveland signed the contract, and the City of Cleveland passed the ballot initiative.  The City has also admitted that it foresaw the possibility of a ballot initiative limiting or even prohibiting traffic cameras.  That admission, too, as a matter of law prevents the City from relying on the ballot initiative to excuse its performance.

Moreover, the Contracts Clauses of the United States and Ohio Constitutions prohibit the City from relying on its own charter amendment as an excuse to stop paying Xerox.  Because the parties' contract does not allow the City to walk away (other than by paying a calculable termination fee), the City's use of a law it passed as a defense to a breach of contract is the very essence of what the Contracts Clause prevents.

For these and the other reasons explained below, the Court should grant Xerox's motion for summary judgment as to liability.

### STATEMENT OF FACTS

From 2005 through November 2014, the City used traffic cameras to enforce its red-light and speeding laws, as part of its Operation Safe Streets program.  (Ex. A, Flask Dep. 27, 44, 47-48.)  Throughout that time, Xerox (or a predecessor) was the City's vendor that provided the traffic cameras and related services.  (Ex. A, Flask Dep. 27-33; Ex. B, Jones Dep. 25.)  The contract at issue in this litigation was signed in the summer of 2013.

2

### A.    The 2013 contract.

Stemming from technological improvements in traffic cameras since 2005, the City decided in 2012 to issue a request for proposal to update and expand the City's traffic-camera program.  (Ex. A, Flask Dep. 30-32.)  The City "wanted to increase the number of fixed camera locations [ ], increase the mobility of the mobile cameras, and to have the ability for the Division of Police to be able to utilize the fixed camera locations as surveillance cameras for operational and forensic purposes." (*Id.* at 56-57.)  The City also wanted to ensure it had the best technology in place and so required all new equipment. (Ex. B, Jones Dep. 42; Ex. A, Flask Dep. 32.)[1]

During the bidding process, the City made clear that it was concerned about legal changes at the state level that could prohibit the City from using traffic cameras. (Ex. C, Miller Dec. ¶ 3.) All parties involved knew that traffic cameras were a "hot-button" political issue, and the City wanted to ensure that it would not be liable if Ohio prohibited their use. (Ex. B, Jones Dep. 48, 117-118.)

The City was also aware that a local ballot initiative was a possibility and even that at least one local voter was already gathering signatures in an effort to propose a City ballot initiative limiting traffic-camera use.  (Ex. D, Adm. Nos. 1-2; *see also* Ex. B, Jones Dep. 46; Ex. A, Flask Dep. 93-94.)  Several members of City Council also expressed their constituents' displeasure with the cameras

_____

[1] Mr. Jones and Mr. Flask testified as 30(b)(6) representatives and personally.

and openly opposed their use.  (Ex. B, Jones Dep. 36-38, 117-118; Ex. A, Flask Dep. 79-86.)

But in contrast to state laws, during the bidding process and while negotiating the contract with Xerox, the City did not raise the possibility that a local ballot initiative could limit or prevent traffic-cameras.  (Ex. B, Jones. Dep. 47-48.)  Indeed, based on the enormous up-front cost to Xerox to implement the contract under negotiation, Xerox would never have agreed to a provision allowing the City to terminate the contract or even simply to stop paying Xerox due to a change in local law.  (Ex. C, Miller Dec. ¶ 7.)  The City even acknowledges this fact.[2]

After Cleveland selected Xerox over four other potential vendors, the parties negotiated and entered into the contract currently at issue.  (Ex. C, Miller Dec. ¶ 4.)  The contract obligated Xerox to provide and install, according to an agreed upon schedule, a specified number of cameras.  (Ex. E, LSA § 2.2, Sched. A & B.)  Xerox also was required to perform a variety of services, including, among other duties, camera maintenance and processing and mailing citations approved by Cleveland police.  (*Id.* §§ 2.4-2.15.)

In exchange, the City was required to pay Xerox a fixed monthly fee during the contract's four-year term.  (*Id.* § 4.)  The fee was based on the number and type of cameras that were installed, according to the time frames set forth in Schedules A and B.  (*See Id.* § 4, Ex. 1 § E1.2.)  As of October 2014,

---

[2] The City admitted that "Xerox wouldn't have a lot of upfront costs, enter into a contract, only to have City Council decide to change its mind two weeks later."  (Ex. B, Jones Dep. 48.)

the monthly fee was $303,670.  (Ex. F, Cordek Dep. 29-32 & Ex. 10.)  Xerox

also agreed that the contract would be "revenue neutral" for the City.  (Ex. E,

LSA § 4, Ex. 1 § E1.1.)  In other words, the City would only be excused from

making payments if its total revenue fell short of the amount the City owed to

Xerox.  (Ex. B, Jones Dep. 58.)  As of May 31, 2016, the City had a surplus of

$12,235,985, well in excess of the remaining $9,413,770 in payments through

the end of the contract's term.  (Ex. C, Miller Dec. ¶¶ 12-13.)[3]

### B.  Cleveland amends the contract's force-majeure provision.

Shortly after the contract was signed, Jeff Marks, an attorney in the

City's Law Department, proposed adding to the force-majeure clause that if

traffic cameras were "prohibited by federal government or State of Ohio

enactment or regulation, on and after the effective date of the enactment or

regulation, CONTRACTOR shall terminate operation and use of all units and

the City obligation to pay CONTRACTOR for operation and use from and after

that date shall cease."  (Ex. B, Jones Dep. 48-54, 104-106 & Ex. 5 p. 13.)

Xerox accepted this language without revision.  (Ex. C, Miller Dec. ¶ 6; Ex. E,

LSA § 6.1.2.)

As noted above, the City was aware at this time that a change in local, as

well as state or federal, law could prohibit or limit the use of the traffic

cameras. (Ex. B, Jones Dep. 46).  But the City specifically did not include the

---

[3] The City's figures show revenue of approximately $2.5 million less than
Xerox's.  (Ex. F, Cordek Dep. Ex. 9.)  The parties use the same system, so there
should be no discrepancy.  But even the City's revenue figures show enough
surplus to cover the remaining payments.  Thus, the dispute is not material to
this motion, and Xerox will address this issue in the damages phase.

word "local" in the amendment, as the City admitted it could have attempted to do, and as was in fact done elsewhere in the contract.  (*Id.* at 52-53.)

Apart from the force-majeure clause, the City could only terminate the contract under section 6.1.3.  (*See* Ex. E, LSA § 6.1.3.)  But this clause ensured Xerox would be paid its unamortized expenses if the City exercised its termination right.  (Ex. B, Jones Dep. 42-43; Ex. C, Miller Dec. ¶ 5.)

### C.     The traffic-camera program is effective in promoting its only goal—increasing public safety.

The purpose of the City's traffic-camera program was to enhance public safety.  (Ex. A, Flask Dep. 41-42; Ex. B, Jones Dep. 25.)  Both City representatives to testify at deposition on the subject confirmed this fact unequivocally.  (*Id.*)  While the cameras also generated substantial revenue, this was only a bi-product.  (*Id.*)

The program achieved its goal while in operation.  It was effective in both reducing incidents of speeding and red light violations as well as in increasing safety on the City's streets.  (Ex. A, Flask Dep. 42-43; Ex. G, McGrath Dep. 18-20 & Ex. 16.)  The City's former Safety Director described the program as having "a very positive impact," and the former program manager agreed that "the traffic camera program was effective, it saved lives and reduced accidents." (Ex. A, Flask Dep. 46; Ex. B, Jones Dep. 29.)  Indeed, the yearly revenue the City received from citations decreased over the program's life.  (Ex. A, Flask Dep. 42-44.)  While this meant less revenue, the City "viewed it as a benefit to the program" because it showed the traffic-camera program was working.  (*Id.*)

Mr. Flask agreed that the cameras' removal, which is discussed below, "had a negative impact on public safety." (*Id.* at 46.)  Mr. Flask even noticed that pedestrian fatalities in the City "almost doubled" in 2015, only a year after it turned off the cameras.  (*Id.*)

**D.     Cleveland amends its Charter to regulate traffic cameras.**

It is no secret that, despite their positive safety impact, most residents do not like traffic cameras.  (Ex. D, Adm. No. 2; Ex. B, Jones Dep. 38.)  And even before the contract was signed, the City knew at least one voter was gathering signatures in an effort to limit the city's use of traffic cameras.  (Ex. D, Adm. No. 1.)

These citizens petitioned City Council in September 2014 to put their proposal on the November 4, 2014 ballot.  (Ex. H, City Record at 1297.)  The proposal would require a police officer to issue citations at the time and place of the violation but did not prohibit traffic cameras generally.  (*See* Ex. I, Petition.)  City Council placed the proposal on the ballot, and on November 4, 2014, Cleveland voters approved the measure, thus enacting Cleveland Charter § 203.  (Am. Compl., D.E. 4, ¶¶ 22-24; Am. Ans., D.E. 17, ¶¶ 14-15.)

The next day, program manager Larry Jones, on direction from the City's new Safety Director, instructed Xerox to "turn off" the cameras.  (Ex. B, Jones Dep. 61, 74-75; Ex. G, McGrath Dep. 13-14 & Ex. 14.)  While documents the City produced suggest this decision would "have to be made by the Mayor's office," (Ex. G, McGrath Dep. 7-9 & Ex. 13), Mr. McGrath and Mr. Jones testified that the Law Department made the "recommendation," which they

acted on without the Mayor's input and without any non-privileged consideration of any facts on their own.  (Ex. G, McGrath Dep. 7-10; Ex. B, Jones Dep. 17.)

### E. Cleveland stops paying Xerox.

The parties met in late 2014 to determine the next steps for the traffic-camera program.  (Ex. A, Flask Dep. 66-68.)  The City's attorney informed Xerox that it neither intended to continue paying Xerox's monthly fee nor intended to pay the termination fee.  (Ex. C, Miller Dec. ¶ 9.)  The City instead claimed that the passage of the ballot initiative excused its performance entirely.  (Ex. C, Miller Dec. ¶ 10.)  Later, Mr. Jones confirmed that the "sole factual basis for the City's decision to turn off the cameras was the passage of the ballot initiative," as well as that the "sole basis for the City's decision to cease paying Xerox was the passage of the ballot initiative."  (Ex. B, Jones Dep. 103; *see also* Ex. J, Interrogatory Response Nos. 8-9.)

At the same time the City asked Xerox to turn off the cameras, it also requested that Xerox continue processing citations.  (Ex. B, Jones Dep. 61.)  As a show of good faith while attempting to negotiate a resolution to the contract, Xerox did as instructed and continued to perform services despite not being paid.  (Ex. C, Miller Dec. ¶ 11.)  In fact, Xerox has expended several hundred thousand dollars in operating expenses over the last year and a half in return for which it has been paid absolutely nothing; the City, on the other hand, has made an additional $3.9 million during that time.  (*Id.*)

Xerox, on multiple occasions, attempted to resolve this case for several months before initiating litigation.  After it became clear that the parties could not reach a resolution, Xerox filed suit in August 2015.

STANDARD OF REVIEW

Summary judgment "is proper if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  To avoid summary judgment, the City must point to "evidence 'upon which a reasonable jury could return a verdict'" in its favor. *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013).

LAW & ARGUMENT

The Court instructed the parties to "file simultaneous cross-motions for summary judgment on two subjects: (a) the impairment of contract claim and (b) the force majeure clause in the parties' contract."  (Jan. 6, 2016 Minute Order.)  Because the City cannot rely on the ballot initiative either under the force-majeure provision or under the Contracts Clause, Xerox moves the Court to enter judgment that the City is liable to Xerox for breach of contract.

**A.     Cleveland cannot rely on the ballot initiative to excuse its performance under the contract's force-majeure provision.**

The sole basis for the City's non-payment is its argument that the November 2014 ballot initiative excuses the City's performance under the contract's force-majeure provision.  (Ex. B, Jones Dep. 103; Ex. J, Interrogatory Response Nos. 8-9.)  For five independent reasons, the City is mistaken.

9

### 1. Cleveland specifically excluded local laws from the force-majeure provision's scope.

The portion of the contract's force-majeure provision addressing changes to law provides that "if the use of traffic law photo, video, or electronic-monitoring devices . . . is prohibited by *federal government or State of Ohio enactment or regulation*, on and after the effective date of the enactment or regulation, CONTRACTOR shall terminate operation and use of all units and the City obligation to pay CONTRACTOR for operation and use from and after that date shall cease."  (Ex. E, LSA § 6.1.2 (emphasis added).)

This provision, which is to be narrowly construed, "defines the scope of unforeseeable events that might excuse nonperformance by a party." *Stand Energy Corp. v. Cinergy Servs., Inc.*, 144 Ohio App. 3d 410, 416 (2001);[4] *see also Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, 871 F. Supp. 2d 843, 854 (D. Minn. 2012) (force-majeure clauses narrowly construed); *In re Cablevision Con. Litig.*, 864 F. Supp. 2d 258, 264 (E.D.N.Y. 2012) (same).

Because the City, which drafted the clause, included "federal government and State of Ohio" but specifically excluded "local" or "City of Cleveland," the City may only cite Ohio or federal laws as force-majeure events.  *See In re Millers Cove Energy Co., Inc.*, 62 F.3d 155, 159 (6th Cir. 1995) ("if the Moores had wanted to escape the duty to mine because it was not profitable, the

---

[4] Thus, under *Stand Energy*, the City's pleaded affirmative defenses of impossibility, impracticability, and frustration of purpose do not apply—as the Court's briefing instruction recognized—because the parties specifically addressed when the City's performance is excused in the contract.  *See also Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.*, 731 F. Supp. 850, 855 (N.D. Ill. 1990) (if "the parties include a force majeure clause in the contract, the clause supersedes" common law impossibility or impracticability doctrines).

Moores should have included such a clause"); *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 975 F. Supp. 2d 878, 890 (S.D. Ohio 2013) ("if certain things are specified in a law, contract, or will, other things are impliedly excluded") (quotation omitted).  Section 6.1.2 thus unambiguously prevents the City from relying on a local law to excuse performance.  *DiMarco v. Shay*, 154 Ohio App. 3d 141, 148 (2003) (courts "give effect to the words used, *not [ ] delete words used or [ ] insert words not used*") (emphasis in original, quotation omitted).

Moreover, the City drafted the relevant language.  And the City admits it included the term "local" to describe laws elsewhere in the contract, and could have proposed doing so in § 6.1.2.  (Ex. B, Jones Dep. 52-53, 104-106 & Ex. 5 p. 13.)  *See Mead Corp. v. ABB Power Gen., Inc.*, 319 F.3d 790, 798 (6th Cir. 2003) (contracts construed against drafter).  Nor do courts interpret contracts "as reasonable men would not be likely to enter into."  *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 316 (1996).  Mr. Jones admitted it would not have made sense for Xerox to allow Cleveland to escape performance based on a local law.  (Ex. B, Jones Dep. 48.)  And courts do not "interpret [the] contract so as to render clauses superfluous."  *Lockheed Martin Corp. v. Goodyear Tire & Rubber Co.*, 2012 WL 3499510, at *4 (N.D. Ohio Aug. 15, 2012).  Allowing a local law to excuse the City's obligations nullifies the termination provision, which requires the City (which enacts local laws) to pay a fee to terminate.

### 2. Cleveland representatives proposed and passed the law.

"To use a *force majeure* clause as an excuse for nonperformance, the nonperforming party bears the burden of proving that the event was beyond

the party's control and without its fault or negligence." *Stand Energy Corp.*, 144 Ohio App. 3d at 416. (*See also* Ex. E, LSA § 1.11 (limiting Force Majeure Events to "events or unforeseen circumstances beyond the reasonable control of the CONTRACTOR or the CITY").) The City cannot meet that burden.

The City argues that City Voters, not City Government, proposed and passed the ballot initiative. But Xerox's contract was entered into with "the City of Cleveland, Ohio (a Municipal Corporation, hereinafter referred to as 'CITY')." (Ex. E, LSA p. 4.) And under the City's Charter as well as Ohio law, City Voters are just as much authorized to act on the City's behalf as is the Mayor, City Council, or any other City Government officials. *See* Ex. L, *Charter of the City of Cleveland*, Ch. 39, § 200 (authorizing amendments to Charter through voter initiatives); *see also City of Middletown v. Ferguson*, 25 Ohio St. 3d 71, 76 (1986) (cities are bound by decisions of their voters).

Thus, the ballot initiative was not "beyond *the party's* control." To the contrary, the party—the City—is directly responsible for it. As the Ohio Supreme Court held in a related context, once "a municipal corporation . . . enters into binding contracts with third parties . . ., the legislature (*or here, the electorate* ) is not free to alter the corporation's ability to perform." *Middletown*, 25 Ohio St. 3d at 76 (emphasis in original). Other state Supreme Courts have applied this reasoning to reject impossibility defenses based on voter-initiated legislation. *See W. Haven Sound Dev. Corp. v. W. Haven*, 514 A.2d 734, 739-40 (Conn. 1986) (refusing to allow a city "to escape its contractual obligations by a vote of its citizens that rendered performance of the contract impossible");

12

*Inhabitants of Elsemore v. Town of Hancock*, 18 A.2d 692, 696 (Me. 1941)
(same).

The City has identified no case supporting a contrary view, and Xerox
has found none.  Instead, the City has offered as its only legal authority *City of
Cuyahoga Falls v. Buckeye Comm. Hope Found.*, 538 U.S. 188, 197 (2003).
This case is irrelevant.  There, Cuyahoga Falls enacted a plan to build low-
income housing.  A group of voters then initiated a petition seeking to overturn
that plan, and some of those voters expressed discriminatory sentiments in
supporting the petition.  Litigation ensued on two tracks.

The initiative itself was challenged.  The Ohio courts voided the initiative,
and thus the low-income housing was built.  The initiative's supporters also
sued Cuyahoga Falls for damages based on race discrimination, claiming the
voters' discriminatory statements were given effect through the city's placing of
the petition on the ballot.  But the group challenged only the "referendum
petitioning *process* and not [ ] the referendum itself—which never went into
effect[.]"  *Id.* at 195 (emphasis in original).  The Supreme Court thus rejected
the claim, holding that the group "point[ed] to no evidence suggesting that
these official acts"—i.e., the administrative acts involved in placing the
referendum on the ballot—"were themselves motivated by racial animus."  *Id.*
And "proof of racially discriminatory intent or purpose is required."  *Id.* at 194.

Here, Xerox is not seeking damages for the equivalent of an intentional
tort.  Intent is irrelevant to a breach of contract claim.  Nor is Xerox challenging
the process through which the petition was placed on the ballot.  Rather,

13

representatives authorized to act on the City's behalf acted in passing the initiative.  The City thus cannot meet its burden to show the initiative was beyond its control.

### 3. Cleveland has admitted the initiative was foreseeable.

Even if City Government could divorce itself from the electorate, it faces another—now undisputed—hurdle:  Cleveland knew a voter-driven initiative was a possibility when it signed the contract.  As Mr. Jones testified:

> Q.  But at the time the City entered into the contract, it was aware that other municipalities and states had enacted legislation that would either limit or prohibit the use of traffic cameras; correct?
>
> A.  That is correct.
>
> Q.  And so it was certainly a possibility with the City of Cleveland's mind at the time they entered into the contract, that those things could happen? In other words, that there could be a change in local or state law that could prohibit or limit the use of traffic cameras; correct?
>
> A.  That is correct.
>
> Q.  Okay. And the City was aware of that risk when it signed the contract and negotiated the contract?
>
> A.  Yes, the City and Xerox was aware of it.[5]

(Ex. B, Jones Dep. 46.)

The City admitted the same thing responding to requests for admission:

"Defendant was aware that voters in other Northeast Ohio municipalities had

---

[5] That Xerox was also aware local politics could change is irrelevant.  *See Fifth Third Bank W. Ohio v. Carroll Bldg. Co.*, 180 Ohio App. 3d 490, 494 (2009) ("the law will not insert by construction for the benefit of one of the parties an exception or condition which the parties either by design or neglect have omitted from their own contract") (quotation omitted).  From Xerox's perspective, the City had a termination right to address these issues.

used and were attempting to use ballot initiatives to completely prohibit traffic camera enforcement programs in those cities." (Ex. D, Adm. No. 2.) Mr. Flask also testified that he knew voters struck down a traffic-camera program in nearby Garfield Heights before he signed the 2013 contract. (Ex. A, Flask Dep. 92-93.) Indeed, the City was even "aware of at least one person [in the City of Cleveland] who was allegedly gathering signatures for a petition to prohibit the City's traffic camera program prior to June 2013." (Ex. D, Adm. No. 1.)

Ohio law is clear: "When a party assumes the risk of certain contingencies in entering a contract, as is the case here, such contingencies cannot later constitute a 'force majeure.'" *Dunaj v. Glassmeyer*, 580 N.E.2d 98, 101 (Ohio Com. Pl. Ct. 1990); *see also Stand Energy Corp.*, 144 Ohio App. 3d at 416 (force-majeure events are "unforeseeable events"). Likewise, the contract defines "Force Majeure Event" as those "unforeseen circumstances beyond the reasonable control of the CONTRACTOR or CITY." (Ex. E, LSA § 1.11.) The City's admission that a ballot initiative was foreseeable prevents the City from relying on it to excuse the City's performance.[6]

### 4. Cleveland was not prevented from performing.

Force majeure is only for events that "actually prevent performance." *Dunaj*, 580 N.E.2d at 100. That is, "[a] party cannot be excused from

---

[6] This admission also would preclude the City's impossibility, impracticability, and frustration-of-purpose (a defense "not widely accepted in Ohio") defenses. *See Donald Harris Law Firm v. Dwight-Killian*, 166 Ohio App. 3d 786, 790 (2006); *Stuckey v. Online Res. Corp.*, 909 F. Supp. 2d 912, 932 (S.D. Ohio 2012).

performance merely because performance may prove difficult, burdensome, or economically disadvantageous." *Stand Energy Corp.*, 144 Ohio App. 3d at 416.

The City admitted that the ballot initiative does not prohibit the City from using the cameras, much less from paying Xerox. (Ex. B, Jones Dep. 22-23, 55.)  Mr. Jones argued that "it's cost prohibitive to put an officer at the camera 24 hours a day to run a camera." (Ex. B, Jones Dep. 56.)  But courts "generally refuse to excuse lack of compliance with contractual provisions due to economic hardship[.]" *In re Millers Cove Energy*, 62 F.3d at 158; *see also Stand Energy Corp.*, 144 Ohio App. 3d at 416 (same).  Mr. Flask and Mr. Jones also testified that the cameras have several uses beyond writing tickets, such as surveillance, deterrence, and issuing warnings to drivers.  (Ex. A, Flask Dep. 48-51, 101-104; Ex. B, Jones Dep. 56-57.)  All of these uses would promote safety, and thus advance the program's sole purpose.

And finally, the City's underlying position that paying Xerox is economically infeasible is belied by the numbers.  All told, the City has a surplus—i.e., money in excess of what it has paid Xerox under the contract—of somewhere in the neighborhood of $9.6 to $12.2 million.  (Ex. F, Cordek Dep. Exs. 9-10; Ex. C, Miller Dec. ¶ 12.)  Either way, the City's surplus exceeds what it owes Xerox if it terminated the contract or continued to pay the monthly fee.

### 5.  Cleveland is estopped from asserting force majeure.

"Ohio courts have recognized that a party who accepts the benefits of a contract or transaction will be estopped to deny the obligations imposed on it by that same contract or transaction." *Sims v. Anderson*, 38 N.E.3d 1123,

16

1131 (Ohio Ct. App. 2015) (quotation omitted). *See also Hampshire Cty. Trust Co. of N. Hampton, Mass. v. Stevenson*, 114 Ohio St. 1, 19 (1926) (same).

The provision on which the City relies provides that if a federal or state law prohibits traffic cameras, "CONTRACTOR shall terminate operation and use of all units and the City obligation to pay CONTRACTOR for operation and use from and after that date shall cease." (Ex. E, LSA, p. 35, § 6.1.2.) This provision does not apply as discussed above. But even if it did, the City would be estopped from using it. The City instructed Xerox to continue working and processing the unissued and outstanding tickets. (Ex. B, Jones Dep. 61.) So Xerox's "operation" did not terminate. The City cannot deny the obligation to pay Xerox while continuing to economically benefit from the contract, making almost $4 million after instructing Xerox to turn off the cameras.

### B. Cleveland may not rely on the ballot initiative to excuse its performance under the Contracts Clause.

The U.S. Constitution and Ohio's Constitution each prohibits the City from passing any "law impairing the obligation of contracts." U.S. Const. Art. I § 10; Ohio Const., Art. II, § 28. This prohibition applies equally to voter-initiated laws. *See Middletown*, 25 Ohio St. 3d at 77. To determine whether a law violates the Contracts Clause, courts consider whether a contract was substantially impaired, and if so, whether the law is reasonable and appropriate to achieve a "significant and legitimate public purpose." *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998); *see also Bass Energy Inc. v. Highland Hts.*, 193 Ohio App. 3d 725, 730-31 (2010).

17

Where, as here, the government is party to the contract, the key question is whether the law "create[s] a defense to the breach that prevents the recovery of damages." *Univ. of Hawai'i Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999).  Or put another way, whether the City "set up a defense that prevented [Xerox] from obtaining damages, or some equivalent remedy, for the breach." *Council 31 of the Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 885 (7th Cir. 2012); *see also Middletown*, 25 Ohio St. 3d at 77 (violation where "initiative ordinance went beyond a mere breach of contract because its passage precluded any remedy in damages").

As a corollary to this rule, "a city is permitted to raise any defense to breach of contract in a state law action, except a defense that even if there was a contract and it was broken the city cannot be liable because the repealing ordinance extinguished any remedy that the plaintiff would otherwise have had." *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 371 (4th Cir. 2014) (quotation omitted); *see also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1252 (7th Cir. 1996) (holding that Chicago was not permitted to raise a "defense that even if there was a contract and it was broken the City cannot be liable because the repealing ordinance extinguished any remedy that the developer would otherwise have had").

Here, the City seeks to violate the rule laid down in cases like *Cherry* and *Horwitz*.  As noted above, there is no contractual provision authorizing the City to quit paying because of a local law (unless it terminates the contract for convenience and pays the appropriate fee).  The force-majeure clause

18

specifically, and intentionally, omits local laws from its coverage. Thus, the City may not cite the ballot initiative to excuse its performance. The Contracts Clause prevents this argument.

Xerox brought a breach of contract, instead of Contracts Clause, action because the ballot initiative and subsequent Charter § 203 do not on their face say that Xerox is prevented from suing the City for breach of contract or from recovering damages. But if the Court accepts the City's interpretation that the ballot initiative extinguishes any breach of contract claim, then the ballot initiative would substantially impair the City's contractual obligations to Xerox.

Further, the ballot initiative fails the second part of the test—it is in direct contradiction of any significant and legitimate public purpose. *See Toledo Area AFL-CIO Council*, 154 F.3d at 323. The City has admitted as much, noting that it "had a negative impact on public safety," and that pedestrian fatalities in Cleveland "almost doubled" in 2015. (Ex. A, Flask Dep. 46.)

Thus, the Contracts Clause is yet another reason why the City cannot rely on the ballot initiative as an excuse to breach its contract with Xerox.

## C. Cleveland thus breached its contract with Xerox.

To establish its breach of contract claim, Xerox must show: "(a) the existence of a contract; (b) performance by the plaintiff; (c) breach by the defendant; and (d) damage or loss to the plaintiff." *Thomas v. Publishers Clearing House, Inc.*, 29 F. App'x 319, 322 (6th Cir. 2002). "'[B]reach,' as applied to the law of contracts, is defined as a failure without legal excuse to

perform any promise which forms a whole or part of a contract." *Offill v. Penn. Life Ins. Co.*, 243 F.R.D. 276, 281 (S.D. Ohio 2007) (quotation omitted).

Xerox has established a breach of contract claim.  The City does not dispute the contract is valid and enforceable.  (Am. Compl., D.E. 4, ¶ 34; Am. Ans., D.E. 17, ¶ 25.)  Xerox performed and is not in default under the contract. (Ex. B, Jones Dep. 84.)  The City failed to perform a material provision—it has not paid Xerox any contractual fees since the ballot initiative passed in November of 2014—without any valid excuse, as explained above.  (Ex. B, Jones Dep. 62, 77-78, 83; Ex. K, Second Adm. No. 1.)  And Xerox has been damaged:  the City withheld moneys Xerox is owed.  (Ex. C, Miller Dec. ¶ 11.)

## CONCLUSION

For the reasons explained above, the Court should grant Xerox's motion for summary judgment and enter judgment that the City is liable to Xerox for damages in an amount to be determined at trial.

Dated:   June 3, 2016

Respectfully submitted,

/s/ *Terry Brennan*
Terry Brennan (0065568)
Chris Bator (0038550)
Sam A. Camardo (0089427)
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio  44114-1214
Telephone: 216.621.0200
Facsimile: 216.696.0740
tbrennan@bakerlaw.com
cbator@bakerlaw.com
scamardo@bakerlaw.com

*Attorneys for Xerox State & Local Solutions, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this case was assigned to the standard track.  The

foregoing brief is 20 pages, which complies with the page limitations of Local

Rule 7.1.

/s/ *Terry Brennan*
*An Attorney for Xerox State & Local*
*Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2016, a copy of foregoing memorandum in support of motion for summary judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

/s/ *Terry Brennan*
*An Attorney for Xerox State & Local Solutions, Inc.*